Rene L. Valladares
Federal Public Defender
Nevada Bar No. 11479
T. Kenneth Lee
Assistant Federal Public Defender
Ohio Bar No. 0065158
Ken_Lee@fd.org
Heather Fraley
Assistant Federal Public Defender
Texas Bar No. 24050621
Heather_Fraley@fd.org
Lisa C. Brunner
Assistant Federal Public Defender
Pennsylvania Bar No. 318543
Lisa_Brunner@fd.org
Benjamin A. Gerson
Assistant Federal Public Defender
New York Bar No. 5505144
Benjamin_Gerson@fd.org
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
(702) 388-5819 (fax)

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| Thomas Richardson,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>William Reubart,[1] *et al.*,<br><br>　　　　　Respondents. | Case No. 3:22-cv-00017-RFB-CSD<br><br>**Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody**<br><br>DEATH PENALTY CASE |

---

[1] Under FRCP 25(d), William Reubart is substituted for William Gittere as the respondent warden.

## TABLE OF CONTENTS

Procedural History ............................................................................................. 1

    A.    State Direct Appeal ................................................................... 4

    B.    State Postconviction ................................................................. 6

    C.    28 U.S.C. § 2254 Proceedings .............................................. 10

Statement Regarding 28 U.S.C. § 2254(D) ..................................................... 10

Statement With Respect to Exhaustion and Procedural Default ......................... 11

Prior Counsel .................................................................................................. 12

Grounds for Relief ........................................................................................... 13

Claim One: Ineffective Assistance of Trial Counsel—Culpability Phase ............... 14

    A.    Counsel were ineffective for failing to adequately develop and present evidence that rebuts the State's allegation that the murders of Feldman and Folker occurred on September 7, 2005. .................................................. 15

    B.    Counsel were ineffective for failing to develop and present evidence that challenged the investigation and the evidence presented by the State. ...... 18

    C.    Counsel were ineffective for failing to adequately impeach, investigate, and/or object to the testimony about the baseball cap that law enforcement failed to preserve, the State used to corroborate co-defendant Dehnart's testimony, and the State used to support a finding of guilt. ...................... 27

        1.    The timing of when law enforcement discovered the importance and relevance of the Auto Club 500 baseball cap is unsupportable and demonstrates police misconduct. ............................................... 27

        2.    Law enforcement failed to obtain crime scene photographs from the crime scene cleaning crew and failure to enhance the Taco Bell surveillance video and the photograph of the crime scene showing a baseball cap hanging off the bed frame ...................................... 33

            a)    Nevada Crime Scene Cleaners. ................................... 33

            b)    Image enhancement. .................................................. 35

ii

D.  Counsel was ineffective for failing to object to LaFrance's identification of Mr. Richardson in the Taco Bell surveillance video. ................................. 37

E.  Counsel was ineffective for failing to object to the State's introduction of phone calls between Mr. Richardson and Wes McCoy ................................. 38

F.  Counsel was ineffective for failing to challenge Kimberly Ross's credibility. .................................................................................................................... 40

G.  Trial counsel were ineffective for failing to introduce evidence that Dehnart had a prior offense involving a hammer ......................................................... 41

H.  Counsel were ineffective for failing to adequately challenge evidence and testimony related to the alleged murder weapon. ....................................... 43

  1.  Mr. Richardson's trial counsel were ineffective for failing to cross-examine Dehnart on his identification of the Home Depot store as the hardware store where the murder weapon was purchased. ................... 44

  2.  Counsel were ineffective for failing to object to the September 7, 2005 Home Depot receipt that showed some unknown person purchased a hammer on that date. ................................................................................ 48

I.  Counsel were ineffective for failing to challenge the State's experts. ......... 50

  1.  Counsel failed to object to the introduction of blood spatter evidence by Detective Vaccaro. .................................................................................... 51

  2.  Counsel failed to object to the introduction of blood spatter and crime scene reconstruction testimony by CSA Holstein, who was unqualified. 53

    a)  Reasonably competent counsel would have objected because CSA Holstein was not qualified to testify as an expert on blood spatter analysis. ................................................................................... 53

    b)  Reasonably competent counsel would have objected because Holstein was not qualified or admitted as an expert to give crime scene reconstruction testimony. ................................................... 55

  3.  Trial counsel failed to object to the introduction of blood spatter pattern evidence on the basis it is junk science. .................................................. 57

Claim Two: Prosecutorial Misconduct—Culpability Phase ...................................... 59

A.  The prosecutor made improper appeals to the emotions and sympathies of the jury ....................................................................................................... 59

iii

1.    Inflaming the passions and prejudices of the jury during opening statements, throughout Mr. Richardson's trial, and during closing arguments. ..................................................... 59

    a)   Improper victim impact—Feldman and Folker. ...................... 59

    b)   Improper victim impact—Kimberly Ross..................................... 66

B.    The State improperly vouched for the credibility of Detective James Vaccaro............................................................................................... 68

    1.    Detective Vaccaro was not the excellent detective the State presented to the jury. ..................................................................................... 69

    a)   Detective Vaccaro knowingly violated a suspect's constitutional rights in order to obtain inculpatory evidence. ...................................... 69

    b)   Detective Vaccaro allowed the crime scene to be contaminated............. 71

C.    The State improperly shifted the burden of proof.......................... 76

D.    The prosecutor committed misconduct during guilt phase opening statements. ....................................................................................... 77

    1.    The State committed misconduct by telling the jury that Mr. Richardson was in custody and a prisoner in opening statements. ........................... 78

    a)   The State informed the jury that Mr. Richardson was at the same location as Dehnart. ..................................................................... 78

    b)   The State informed that jury that Mr. Richardson was in custody when the State told the jury that Mr. Richardson did not have freedom of movement................................................................................ 79

    2.    The State committed misconduct during opening statements when it impeded the jury's fact-finding obligations by giving improper argument. ....................................................................................... 81

E.    The State committed misconduct by continuously referencing Mr. Richardson's pretrial detention throughout its case in chief. ............... 83

    1.    The State made it clear that Mr. Richardson was a prisoner when the witnesses described how Mr. Richardson was not free to move about the facility on his own. ..................................................................... 84

iv

2.   The State made it clear that Mr. Richardson was a prisoner when witnesses described how Mr. Richardson needed the permission and assistance of police officers to perform simple activities..........................87

3.   The State made it clear to the jury that Mr. Richardson was a prisoner at the time detectives interviewed him when they showed the jury a photograph of Mr. Richardson in jail attire in front of a cinderblock wall. ....................................................................................................88

F.   The State committed misconduct when it offered evidence of a hammer and boots that it knew to be inauthentic during the trial phase.......................91

1.   The State committed misconduct when it admitted into evidence a hammer, not the actual murder weapon, that was used for more than mere demonstrative purposes. ..................................................92

   a)   The State introduced a photograph of a hammer that it could not authenticate...............................................................92

   b)   The State improperly introduced the physical hammer from the photograph that the State argued, without any basis, was identical to the murder weapon. ...................................................93

   c)   The State improperly went beyond the limited purpose of demonstrative evidence when it used the hammer presented in court as the basis for improper expert conclusions. ...................................................94

      (1)   The State first called Dr. Simms, who improperly concluded that a hammer identical the one presented in court was the murder weapon. ...........................................................94

      (2)   The State then called Detective Holstein as an improper expert in tool mark evidence, who testified about the damage in the trailer from the hammer. ................................................95

2.   The prosecution committed misconduct when it offered evidence of boots that Ross had presented to officers from her own unsupervised investigation...............................................................96

   a)   Ross testified that that she acquired the receipt for the second set of boots after the murders, making them irrelevant....................................97

   b)   Ross provided inconsistent statements to detectives concerning the type of shoes that Mr. Richardson usually wore and only determined to investigate the work boots to save her son................................98

    c)    The work boots provided by Ross were irrelevant because they were provided after the fact and no boot prints were introduced by the State during trial.............................................................................. 100

G.    The State committed misconduct when it commented upon and introduced evidence that commented upon Mr. Richardson's Fifth Amendment rights. ................................................................................................................... 101

Claim Three: Culpability Phase—*Brady* Violation ................................................. 108

A.    The State violated *Brady* when it withheld Kimberly Ross impeachment evidence.................................................................................................... 108

1.    The State violated *Brady* by failing to disclose Kim Ross's prior convictions for crimes involving dishonesty, prior bad acts, and her outstanding warrants. ............................................................... 109

a)    Ross's credibility is called into question because she had a prior conviction involving dishonesty. ............................................. 109

b)    Ross' credibility could have been undermined because of prior bad acts. ................................................................................................ 110

(1)    Ross was charged with additional crimes which call her truthfulness into question. ..................................................... 110

(2)    Ross constantly and consistently broke promises she made to the Riverside County Court, which ultimately issued warrants for her arrest. .................................................................... 111

2.    The State violated *Brady* by failing to provide the additional 4–5 photographs of the Auto Club 500 hat that Kim Ross testified were of good quality, which she saw and used to identify the hat, but were not provided to the defense or entered into evidence. ................................. 112

B.    The State violated *Brady* and *Napue* when it: (1) permitted Robert Dehnart, the State's key witness and Mr. Richardson's co-defendant, to present false and misleading testimony about the terms of his plea agreement; and (2) failed to provide the defense with the complete terms of Dehnart's agreement with the State. .......................................... 116

Claim Four: Ineffective Assistance of Trial Counsel—Penalty Phase ................... 124

A.    Mr. Richardson's 1992 Court-Martial Conviction...................................... 125

1.    Counsel unreasonably failed to obtain Mr. Richardson's court-martial records, which were easily obtainable.................................................... 125

2.    The penalty phase testimony of Sokol played a critical role in the jury's imposition of a death sentence; yet, the defense failed to conduct an adequate investigation to demonstrate that Sokol was not credible..... 128

    a)    Summation of Sokol's penalty phase story. ............................................. 129

    b)    Trial counsel were ineffective for failing to impeach Sokol's credibility using the court-martial records. ............................................. 132

        (1)    Sokol's credibility was a major problem during Mr. Richardson's court-martial proceedings. ............................................. 132

        (2)    Documented injuries do not support Sokol's penalty phase testimony. ....................................................... 133

        (3)    No evidence exists to support Sokol's self-proclaimed confirmations of her allegations against Mr. Richardson........................................ 135

        (4)    No evidence existed to support that Mr. Richardson had a gun when he went to Sokol's home after the alleged rape occurred.................. 136

3.    Counsel were ineffective for failing to obtain and use Mr. Richardson's court-martial records to prevent Sokol from providing victim-impact testimony related to her son.................................................... 137

    a)    Counsel were ineffective for failing to request a curative instruction... 140

4.    Counsel were ineffective for failing to rebut the Sokol aggravating evidence with evidence from Mr. Richardson's court-martial, which demonstrate Mr. Richardson's court-martial was not a forgone conclusion. ......................................................... 141

5.    Counsel were ineffective for failing to interview Sokol prior to her penalty phase testimony......................................................... 145

6.    Counsel were ineffective for failing to find and interview Captain Mitchell, Mr. Richardson's court-martial attorney. ............................... 146

B.    Counsel were ineffective for failing to conduct a constitutionally adequate mitigation investigation and for failing to present compelling mitigation evidence to the jury. ..................................................................... 147

1.    Counsel unreasonably failed to investigate Mr. Richardson's childhood and brain/frontal lobe damage. ............................................................ 148

   a)   A history of impulsive and risky behavior, and not understanding consequences. ................................................................. 150

   b)   Mr. Richardson has an inability to understand and comply with social norms and cues. ............................................................. 154

   c)   It's highly likely that Mr. Richardson sustained numerous head injuries while playing contact sports in Republic, Washington. ....................... 155

2.    Counsel failed to develop and present compelling mitigation evidence about Mr. Richardson's traumatic childhood. ....................................... 157

   a)   Mr. Richardson's life in Seattle, Washington, is reminiscent of the movie *The Great Santini*. ........................................................ 158

     (1)   Thomas Richardson, Sr., is like Lt. Col. Wilbur "Bull" Meechum in *The Great Santini*. ................................................... 159

     (2)   Like the scene in *The Great Santini*, Mr. Richardson was ordered to hurt/assault another kid .................................................... 161

     (3)   Mr. Richardson's life was far removed from the wholesome family life portrayed to the outside world. ............................................. 162

   b)   The Richardson family abruptly fled Seattle to avoid the black cloud hovering over one or both of Mr. Richardson's parents. ...................... 163

     (1)   Mr. Richardson's father physically assaulted a child, while in uniform and on-the-job. .................................................. 164

     (2)   Mr. Richardson's parents had a terrible reputation in the community .......................................................................... 165

     (3)   Shame drove Mr. Richardson's father to move the family. ............. 166

   c)   Life in Republic, Washington, was not better for Mr. Richardson. ....... 166

   d)   Mr. Richardson was traumatized when his parents abandoned him in Seattle. ..................................................................... 169

C.    Trial counsel were ineffective for failing to investigate and present expert testimony regarding Mr. Richardson's brain damage. .............................. 170

Claim Five: Prosecutorial Misconduct—Penalty Phase............................................ 192

   A.      The State's penalty phase closing argument was rife with misconduct. ...192

      1.    In closing argument, the prosecutor impermissibly argued facts not in evidence. ................................................................................ 192

         a)   The prosecutor made sweeping generalizations about Mr. Richardson's personality traits and about how "normal people" would react differently from Mr. Richardson, despite not presenting any evidence to support such arguments. ................................................ 193

         b)   There was no evidence presented during the penalty phase to demonstrate what Mr. Richardson's incarcerated life would be like. ... 194

      2.    The State urged the jury to send a message to the community by arguing that the imposition of a sentence less than the death penalty would be sending the wrong "moral statement." ................................... 196

      3.    The State improperly argued that the jury should consider a sentence for Mr. Richardson's offenses in proportion to sentences for other crimes in Nevada. ......................................................... 197

      4.    The State improperly urged the jury to impose a sentence based on emotion, rather than the evidence. ........................................ 199

      5.    The State urged the jury not to find or recognize the mitigation evidence presented by Mr. Richardson by misstating the role and function of mitigating circumstances. .................................................. 201

         a)   During the penalty phase closing arguments, the prosecution misstated the role and function of mitigating circumstances by telling the jury that it did not have to consider the mitigating evidence. ............................. 201

         b)   It's clear that the jurors listened to the State's improper argument because the jury failed to find any mitigating circumstances despite the clear evidence of these circumstances in the record. ............................. 204

Claim Six: Penalty Phase—*Brady/Napue* .............................................. 208

   A.      The State violated *Brady* when it withheld the transcript of Staci Sokol's court-martial testimony from the defense. ................................. 208

   B.      The State committed misconduct when it knowingly allowed Sokol to provide false and misleading testimony. .................................. 213

1.   Sokol's penalty phase testimony about how Mr. Richardson beat her during the alleged sexual assault, her self-proclaimed confirmations of her allegations against Mr. Richardson, the overall strength of the court-martial case against Mr. Richardson, and victim-impact testimony about her son was patently false or misleading and the State knew it. .......... 214

Claim Seven: Failure to Preserve Evidence ............................................. 216

A.   The Auto Club 500 Hat. ..................................................... 216

1.   Mr. Richardson's federal due process rights were violated when the trial court allowed the introduction of evidence related to the baseball cap. 220

2.   Mr. Richardson's federal equal protection rights were violated due to the introduction of evidence related to the baseball cap. ............................. 222

3.   Mr. Richardson's federal constitutional rights were violated due to the trial court's refusal to give a proper negative inference instruction concerning the loss of evidence. ................................................. 224

4.   Mr. Richardson suffered prejudice as a result of the trial court's erroneous rulings. .................................................... 227

Claim Eight: Ineffective Assistance of Counsel—Voir Dire ................................... 230

Claim Nine: Trial Court Error ............................................. 235

A.   The trial court violated Mr. Richardson's right to counsel and right to a fair trial by interfering with his ability to present a defense. .......................... 235

1.   Clearly established federal law establishes a defendant's right to present a defense. ..................................................... 235

2.   Mr. Richardson presented a valid theory of defense supported by the evidence. ........................................................ 236

3.   The trial court prevented Mr. Richardson from presenting evidence in support of his defense. ............................................. 238

4.   The trial court prevented Mr. Richardson from making certain closing arguments in support of his defense. ................................... 242

5.   This error had a substantial and injurious effect on the outcome of the proceeding. ........................................................ 247

B.   The trial court violated Mr. Richardson's Constitutional rights to due process and a fair trial due to erroneous evidentiary rulings. .................. 248

C.   The trial court violated Mr. Richardson's right to a fair trial by failing to grant a mistrial during the culpability phase and failing to caution the victims' family members during the penalty phase regarding inflammatory and prejudicial emotional outbursts............................................................ 252

D.   The trial court abused its discretion in failing to grant a mistrial after an experienced homicide detective referenced the fact that Mr. Richardson was in jail when he was interviewed by officers. ........................................ 254

E.   The trial court violated Mr. Richardson's constitutional rights by admitting gruesome photographs. ................................................................................ 256

F.   The district court improperly permitted the jury to receive victim-impact evidence during the culpability phase............................................................ 259

G.   The trial court erred in failing to preclude the victim impact evidence from Mr. Richardson's prior offenses during the penalty hearing.................... 264

H.   Singly and cumulatively, the trial court errors had a substantial and injurious effect on the outcome of the proceeding...................................... 268

Claim Ten: Jury Instructions ............................................................................ 269

A.   The trial court erred in failing to give an accomplice cautionary instruction. ........................................................................................................ 269

B.   The district court erred in instructing the jury to do equal and exact justice. ........................................................................................................ 270

C.   The reasonable doubt instruction was unconstitutional. .......................... 271

D.   The malice instructions were unconstitutional........................................... 273

E.   First and second-degree murder. ................................................................. 277

F.   The anti-sympathy instruction was unconstitutional. .............................. 278

G.   Singly and cumulatively, the jury instructions prejudiced Mr. Richardson. ........................................................................................................ 280

Claim Eleven: Sufficiency of the Evidence ............................................................ 281

A.    The State engaged in misconduct during the grand jury proceedings and failed to present sufficient evidence to establish probable cause............. 281

   1.    The State's presentation of evidence at the preliminary hearing was insufficient to establish probable cause against Mr. Richardson. ......... 282

     a)    Although the State attempted to connect Mr. Richardson to the scene of the murders by a baseball cap, officers admitted that they did not accurately document the scene, including the location of the baseball cap. ...................................................................................................... 282

     b)    Testimony from lay witnesses did not definitively establish that the hat in the crime scene photographs was the same hat owned by Mr. Richardson. .............................................................................. 284

     c)    Only Dehnart had a connection to Folker................................................ 284

     d)    The State called Ross to corroborate Mr. Richardson's involvement in the murders with a missing pair of boots; however, the preliminary hearing court excluded this evidence. ................................................ 285

     e)    The forensic evidence recovered from the scene of the murders, specifically bloody fingerprints belonged to Dehnart............................. 286

   2.    The State improperly submitted Mr. Richardson's case to the grand jury on evidence the State knew to be insufficient. ....................................... 287

     a)    The State improperly presented Dehnart's case to the same grand jury panel to prejudice the panel against Mr. Richardson. ........................... 288

     b)    The State presented the same insufficient evidence that was previously rejected by the preliminary hearing court to the grand jury................ 288

       (1)    None of the fingerprints recovered from the scene of the murders matched Mr. Richardson. ................................................. 289

       (2)    Ross again testified about the hat photographed at the crime scene, but this time she identified the hat as belonging to Mr. Richardson. ...................................................................................... 289

     c)    The additional evidence presented to the grand jury did not bolster the insufficient evidence presented at the preliminary hearing................. 290

       (1)    The State admitted a surveillance video from a Taco Bell location that did not prove Mr. Richardson's presence in the trailer at the time of the murders. ....................................................................... 290

(2)    The State improperly presented recorded phone calls from Mr. Richardson while detained to prejudice the grand jury with Mr. Richardson's pretrial detention........................................................ 291

(3)    The State presented the testimony of a forensic pathologist for the sole purpose of inflaming the grand jury with the gruesome nature of the murders........................................................ 292

(4)    The State improperly presented the statements from Mr. Richardson's co-defendant against him. .......................................... 293

B.    The State failed to present sufficient evidence to convict. ........................ 293

C.    The only evidence linking Mr. Richardson to the trailer where the murders occurred was the self-serving and inconsistent testimony of Dehnart. .... 294

1.    The Taco Bell surveillance video could not corroborate Dehnart's testimony that Mr. Richardson was present during the murders because the video was captured prior to the murders.......................................... 295

2.    Evidence of cash given to Ross by Mr. Richardson is not unique and therefore does not corroborate Dehnart's testimony that Mr. Richardson acquired the cash from Folker's murder. ................................................. 296

3.    The fact that the green Ford Taurus was not at Ross's home when she had originally expected to be able to use it was not a unique occurrence and therefore cannot be used to corroborate Dehnart's testimony........ 297

4.    The fact that Mr. Richardson had discarded a pair of faulty boots cannot corroborate Dehnart's testimony when the State did not introduce any evidence at trial that boot prints had been found at the scene of the murders. .................................................................................................. 299

5.    The Home Depot receipt introduced at trial could not corroborate Dehnart's purchase of the murder weapon........................................... 300

6.    Evidence of a baseball cap found in the trailer where the murders occurred cannot corroborate Dehnart's testimony that Mr. Richardson was a participant in the murders.......................................................... 302

Claim Twelve: Judicial Bias................................................................................... 305

A.    The trial court demonstrated bias by failing to disclose its assurances to Dehnart that he would receive concurrent sentencing with his California conviction if he complied with the terms of his guilty plea agreement..... 306

B.   Animosity existed between Judge Leavitt and Mr. Richardson's state postconviction Attorney Dayvid Figler, as a result of Attorney Figler's representation of Eugene Ross; such animosity carried over from Ross's case to prejudice Mr. Richardson. ................................................. 309

1.   Judge Leavitt failed to follow constitutional safeguards during Eugene Ross's trial despite Attorney Figler's objections. ................................... 309

a)   Gina Dotson, a defense witness, contacted a jury member. ................... 310

b)   Judge Leavitt's mishandling of Dotson's contempt hearing prejudiced the defendant and Attorney Figler ................................................. 311

c)   Judge Leavitt's mishandling of Dotson's contempt proceeding led to a public reprimand by the Nevada Judicial Discipline Commission. ...... 314

2.   Attorney Figler's Argumentative Briefing in connection with Eugene's case and in his recusal motion filed in this case created a risk of bias that prejudiced Mr. Richardson. ................................................. 316

Claim Thirteen: Death Penalty ................................................. 319

A.   Nevada's capital sentencing scheme is unconstitutionally vague. ............ 319

1.   The Nevada Supreme Court's recent decisions represent a sharp divergence from Nevada Statutes and its own precedent. ..................... 320

a)   For more than three decades, the Nevada Supreme Court's opinions were aligned with the plain language of the capital-sentencing scheme. ...... 321

b)   In 2015, the Nevada Supreme Court began departing from its precedents and the statutory sentencing scheme. .................................. 322

2.   The Nevada Supreme Court's unforeseeable expansion of narrow and precise statutory language defining death eligibility cannot be applied retroactively to cases on collateral review. ............................... 325

3.   The Nevada Supreme Court's unforeseeable expansion of the narrow and precise statutory language defining death eligibility has rendered the statute unconstitutionally vague. ......................................... 330

4.   The Nevada Supreme Court's reinterpretation of the capital sentencing scheme violates Mr. Richardson's right to a jury trial as jurors make findings; they do not "walk back" findings ................................. 334

B.   Nevada's lethal-injection protocol is unconstitutional ............................. 336

1.     Lethal injection is unconstitutional in all circumstances. ...................... 336

2.     Lethal injection in Nevada is unconstitutional. ..................................... 347

   a)   Nevada's September 5, 2017, execution protocol. ................................. 347

   b)   Nevada's November 9, 2017, execution protocol. ................................. 349

   c)   Nevada's June 11, 2018, execution protocol. ............................................ 351

   d)   Nevada's 2021 execution protocol. ............................................................ 352

      (1)   The unconstitutional risk created by the six drugs in Nevada's execution protocol. ............................................................................ 354

        (a)   Risks created by Nevada's intended use of either fentanyl or alfentanil. ................................................................... 354

        (b)   Risks created by Nevada's intended use of ketamine. ................ 355

        (c)   Risks created by Nevada's intended use of cisatracurium. ............ 356

        (d)   Risks presented by Nevada's intended use of potassium chloride or potassium acetate. ........................................................ 359

      (2)   The protocol contains no assurances that state officials will properly store, transport, and administer the execution drugs to decrease the risk of unconstitutional pain and suffering. ................................... 359

      (3)   Risks presented by inadequate provisions for staff training. ......... 360

      (4)   Risks presented by the execution chamber. .................................... 364

      (5)   Failure to provide right of access to counsel and to the courts. ...... 365

3.     Mr. Richardson's challenge to Nevada's lethal-injection scheme is cognizable. ................................................................................................. 366

C.    The Death Penalty is Cruel and Unusual. ................................................. 369

D.    Nevada's capital punishment scheme fails to adequately narrow the class of defendants eligible for the death penalty. .............................................. 371

E.    Executive clemency is effectively unavailable in Nevada. ........................ 373

F.      Nevada's death penalty scheme operates in an unconstitutionally arbitrary and capricious manner. ............................................................ 375

G.      The death penalty is excessive in Mr. Richardson's case. ........................ 376

H.      Elected Judges. ........................................................................................ 377

Claim Fourteen: Actually Innocent of the Death Penalty ..................................... 380

A.      The California robbery conviction is constitutionally infirm and may not be used to enhance Mr. Richardson's conviction. ........................................... 380

    1.   The Due Process Clause prevents the State from using constitutionally infirm prior convictions as aggravators. ............................................... 380

    2.   Mr. Richardson's California robbery conviction is constitutionally infirm because counsel was ineffective for failing to advise him of collateral consequences. ..................................................................................... 381

B.      Mr. Richardson's conviction in a military court-martial may not serve as a statutory aggravator. ................................................................................ 383

    1.   The use of military court-martial verdicts as aggravators violates equal protection. ........................................................................................... 383

Claim Fifteen: Preindictment Delay ..................................................................... 387

A.      The preindictment delay violated Mr. Richardson's constitutional speedy trial rights. ............................................................................................... 388

    1.   The length of the delay and the reason for the delay are attributable to the State. .............................................................................................. 388

        a)   The State had all the necessary evidence to prosecute Mr. Richardson in 2005. .................................................................................................. 388

        b)   Despite knowing his whereabouts, the State failed to extradite Mr. Richardson. ......................................................................................... 390

    2.   Key evidence bearing on Mr. Richardson's guilt was destroyed because of the delay. ............................................................................................. 391

        a)   The State relied on their own crime scene photographs to place Mr. Richardson at the scene. ...................................................................... 392

　　　b)　The delay resulted in the destruction of additional, potentially exculpatory, photographs. ........................................................ 393

　B.　The preindictment delay violated Mr. Richardson's Sixth Amendment right to counsel. ................................................................................ 394

　　1.　Mr. Richardson's Sixth Amendment right to counsel was violated because counsel was not appointed at the time the complaint was filed. ........... 394

　　2.　Failure to appoint counsel prejudiced Mr. Richardson by creating an additional statutory aggravator. ........................................... 395

　　3.　Failure to appoint counsel prejudiced Mr. Richardson because key evidence was destroyed. ............................................................ 396

Claim Sixteen: Appellate Counsel was Ineffective for Failing to Raise Meritorious Constitutional Claims. ...................................................... 397

Claim Seventeen: The Cumulative Effect of the Errors Demonstrated in this Petition Deprived Mr. Richardson of a Fundamentally Fair Proceeding and Resulted in a Constitutionally Unreliable Guilt Determination .................. 399

Prayer for Relief .......................................................................... 400

Verification ................................................................................ 401

## PROCEDURAL HISTORY

Petitioner Thomas Richardson is currently in the custody of the State of Nevada, Ely State Prison in Ely, Nevada, pursuant to a Nevada state court first-degree murder convictions and death sentences ECF No. 1-3. Mr. Richardson's Judgement of Conviction was filed on November 5, 2009, in the Eighth Judicial District Court of Clark County, Nevada by the Honorable Michelle Leavitt. ECF No. 1-3. Respondent, William Reubart, is the Warden of Ely State Prison and Aaron Ford is the Attorney General of the State of Nevada. The Respondents are sued in their official capacities.

 On October 21, 2005, a criminal complaint and warrant for his arrest were filed against Mr. Richardson in Justice Court, Las Vegas Township, Clark County. Exs. 57, 20. Mr. Richardson was not present in court because he was incarcerated in California. Ex. 57. Mr. Richardson made his first appearance in court on February 27, 2007, and was represented by the Special Public Defender's Office. *Id.*

The matter proceeded to a preliminary hearing with co-defendant Robert Dehnart on April 3, 2007, in the Las Vegas Justice Court Township. During the preliminary hearing the magistrate judge dismissed the matter on grounds of insufficiency of evidence as to Mr. Richardson: "find[ing] that the State [failed to] met its burden by slight or marginal evidence to prove the crimes alleged in the amended criminal complaint." 4/03/07 Tr. at 45. Mr. Dehnart however was bound over on the charges of murder with use of a deadly weapon, […] counts II, III, IV an VI" *Id.*

1

The State then sought a true bill from the grand jury when it failed to meet its preliminary hearing burden against Mr. Richardson. Subsequently, Mr. Richardson and Mr. Dehnart were charged by way of Indictment on April 13, 2007. An Amended Indictment was filed on April 16, 2007, the indictment was amended to include: conspiracy to commit murder; murder with use of a deadly weapon; murder with use of a deadly weapon—victim 60 years of age or older; burglary while in possession of a deadly weapon; conspiracy to commit robbery; robbery with use of a deadly weapon. Ex. 21. Mr. Richardson and Mr. Dehnart pled not guilty on April 19, 2007. 4/19/07 Tr. at 1.

The state filed their Notice of Intent to Seek the Death Penalty against both Mr. Richardson and Mr. Dehnart on May 11, 2007. Ex. 42.

A motion was filed by Mr. Richardson's counsel to Dismiss or in the Alternative Suppress Testimony Based on lost evidence. Ex. 89. This motion was related to a baseball cap that was not taken into evidence by the Las Vegas Metropolitan police department when detectives and crime scene analysts were processing the scene looking for suspects. *Id.* An evidentiary hearing was held, and the motion denied. Ex. 90.

Mr. Richardson's co-defendant, Robert Dehnart, entered into an agreement with the State and pled guilty on July 28, 2009. Ex. 91.

Trial and jury selection for Mr. Richardson began on August 17, 2009, and he was found guilty on August 28, 2009. 08/28/09 Tr. at 155. Ex. 92. Mr. Richardson was found guilty of the following counts:

Count 1—Conspiracy to Commit Murder

Count 2—First Degree Murder with Use of a Deadly Weapon

Count 3—First Degree Murder with use of a Deadly Weapon Victim 60 years of age or older Count 4—Burglary while in Possession of a Deadly Weapon

Count 5—Conspiracy to Commit Robbery

Count 6—Robbery with use of a Deadly Weapon

ECF No. 1-3 at 3.

Mr. Richardson's penalty hearing began on August 31, 2009, and concluded on September 2, 2009.09/02/09 Tr. at 83–84. Exs. 93–94. Finding the two following aggravating circumstances the jury sentenced Mr. Richardson to death for both murders: Mr. Richardson's penalty hearing began on August 31, 2009, and concluded on September 2, 2009.09/02/09 Tr. at 83–84. Exs. 93–94. Finding the two following aggravating circumstances the jury sentenced Mr. Richardson to death for both murders:

1.  The murder was committed by a person who is or has been convicted of a felony involving the use or threat of violence to the person of another: Attempted Sodomy, Rape and

2.  The murder was committed by a person who is or has been convicted of a felony involving the use or threat of violence to the person of another: Second Degree Robbery. *Id*. The jury did not find one single mitigating factor that was presented by the defense.

Ex. 95.

An order of execution and warrant of execution were filed on November 5, 2009. Exs. 104–05. The Judgement of Conviction was filed on November 6, 2009. Ex. 106. An Oder to Stay Execution was filed on November 6, 2009. Ex. 107.

3

## A.    State Direct Appeal

Mr. Richardson appealed his conviction and sentence to the Nevada Supreme Court. Ex. 96. On June 22, 2010, Mr. Richardson filed an Opening Brief raising the following issues:

A. The District Court Deprived Richardson of his Right to Present a Defense and Right to a Fair Trial by Prohibiting a Defense Closing Argument.

B. The District Court violated Richardson's Right to Present Evidence in his Defense and Thereby Deprived him of a Fair Trial.

C. The State Failed to Preserve Evidence of a Hat found at the Crime Scene Which the State Alleged Belonged to Richardson. The State's Failure to Preserve the Evidence and the Trial Court's Failure to Give a Negative Inference Instruction Deprived Richardson of his State and Federal Constitutional Rights.

D. Richardson's Right to Due Process was Violated Because there was Insufficient Evidence Presented to the Grand Jury to Bind him over to the District Court. The Grand Jury's Findings of Probable Cause was Attributed to the state's Misconduct During the proceedings.

E. There is insufficient Evidence to support the Conviction as there is insufficient corroboration of the Accomplices testimony.

F. The District Court violated Richardson's State and Federal Constitutional Rights to Due Process and a Fair Trial due to its Erroneous Evidentiary Rulings.

G. The District Court Failed to Properly Instruct the Jury for the Culpability Phase of the Trial.

H. The Prosecutors Committed Misconduct During the Culpability Phase of the Trial.

I. The Trial Court's Failure to Preclude Victim Impact Evidence from Richardson's Prior Offenses During the

Penalty Hearing Violated his State and Federal Constitutional Rights to Due Process and a Fair Trial.

J. The District Court Violated Richardson's Right to a Fair Trial by Refusing to Instruct the Victims' Family Member to Avoid Emotional Outbursts in the Presence of the Jury.

K. Richardson's Rights to Due Process, Fair Trial, and Equal Protection of the Laws were Violated when the Trial Court Improperly Instructed the Jury Regarding the Weighing of Mitigating and Aggravating Circumstances During the Penalty Phase.

L. Richardson was Deprived of his Right to a Fair Penalty Trial, and Right to be Free from Cruel and Unusual Punishment Based Upon the Jury's Failure, at the State's Urging, to Find any Mitigating Circumstances.

M. The Prosecution Committed Extensive Misconduct During the Penalty Trial and Thereby Violated Richardson's Rights.

N. The Death Penalty is Unconstitutional.

O. New Trial and Penalty Phase is Mandated Because of Cumulative Error.

ECF No. 1-4 at 3–4.

On December 7, 2010, Respondent's filed an Answering Brief. ECF No. 1-5. Mr. Richardson filed a Reply Brief on February 8, 2011. ECF No. 1-6. The Respondent's filed a Motion for Leave to file Supplemental Brief and Supplemental Brief on April 12, 2011. ECF No. 1-7. Mr. Richardson filed a Response to States Supplemental Brief on May 26, 2011. ECF No. 1-8. An Order of Affirmance was filed on November 9, 2012, ECF No. 1-9, and two justices of the Nevada Supreme Court issued dissenting opinions on multiple claims raised by Mr. Richardson. *Id.* at 23–32. A Writ of Certiorari was filed to the United States Supreme Court for Case

5

No. 54951 on March 4, 2013. Ex. 110. The United States Supreme Court denied certiorari on April 15, 2013. Ex. 101. Remittitur was issued on April 16, 2013. ECF No. 1-20.

## B.    State Postconviction

Mr. Richardson filed a Petition for Writ of Habeas Corpus (Post-Conviction on May 3, 2013, and was appointed counsel. Ex. 97; 6/4/13 Tr. at 1. Mr. Figler filed a Supplement to Defendant's Petition for Habeas Corpus (Evidentiary Hearing Requested) on September 23, 2014. Ex. 102. An Opposition and Motion to Dismiss Petition was filed on February 20, 2015. Ex. 103. The Reply to the Opposition to Motion to Dismiss Petition was filed on August 21, 2015. Ex. 108.

On August 28, 2015, David Figler filed a Motion for Recusal Pursuant to Nev. Rev. Stat. § 1.230 in which he argued that Judge Leavitt was biased. Ex. 109.  In the motion, Figler asserted that Judge Leavitt had been sanctioned in a criminal case in which he was the attorney: "The Honorable Michele Leavitt was sanctioned for numerous ethical violations, which were admitted[,]"and that as a result she was biased against him, other criminal defendants, and Mr. Richardson because he was Mr. Richardson's attorney. Ex. 109 at 3. Figler attached as exhibits to his Motion for Recusal a Certified copy of Stipulation and Order for Public Reprimand. *Id*. at 13. An Opposition for Motion for Recusal was filed by the State on September 3, 2015. Ex. 169. On September 9, 2015, an Affidavit of Michelle Leavitt was filed in Response to Defendant's Affidavit of Prejudice. Ex. 170. Figler filed the Response to State's Opposition to Motion for Recusal Pursuant to Nev. Rev. Stat. § 1.230 on September 9, 2015. Ex. 171. On September 15, 2015, an Order was filed by the

Honorable Chief Judge David Baker denying the motion for disqualification. Ex. 173. Judge Baker stated "there is no evidence Judge Leavitt might somehow entertain a bias against Defendant but not reveal it, and Defendant's 'concern' otherwise is not a basis for disqualification." *Id*. at 4.

On November 10, 2015, the State filed a Supplemental Opposition and Motion to Dismiss Petition for Writ of Habeas Corpus (Post-Conviction) and Supplement to Defendant's Petition for Habeas Corpus. Ex. 174. On December 18, 2015, Judge Leavitt signed an order compelling discovery and subpoenas on the Photo Lab at Las Vegas Metro Police Department, and Crime Scene Investigation Division at Las Vegas Metro Police Department (LVMPD), however the request for Internal Affairs Bureau of the LVMP was denied. Ex. 175. The State filed a Supplemental Exhibits in Opposition on April 14, 2016, consisting of the LVMPD's response to the previous court order. Ex. 43. On that same day, Figler filed a Supplemental Exhibits to Defendant's Post-Conviction Evidentiary Hearing. Ex. 48. The documents consisted of Mr. Richardson's court-martial records and transcripts that were not presented or used during the penalty phase of the trial because trial counsel failed to obtain them. *Id*.

A Supplemental Brief to the Petition for Writ of Habeas Corpus was filed on January 10, 2017. Ex. 176. On January 17, 2017, Exhibits to Supplemental Brief to Petition for Writ of Habeas Corpus were filed. Ex. 177.

An Evidentiary hearing was held on May 30, 2017. 5/30/17 Tr. at 1. This hearing focused on the Special Public Defender. Specifically, issues relating to the baseball cap, the hammer and related expert testimony. 0/30/17 Tr. at 2. Testimony

did not begin, however, until April 12, 2018. 4/12/18 Tr. at 1. Three of Mr. Richardson's prior attorneys testified at the hearing, David Schieck, Alzora Jackson and JoNell Thomas. 4/12/18 Tr. at 2.

Following the evidentiary hearing a Second Supplemental Brief to Petition for Writ of Habeas Corpus was filed on June 19, 2018. Ex. 180. The Opposition to Second Supplemental Brief to Petition for Writ of Habeas Corpus was filed on July 6, 2018. Ex. 181. On July 19, 2018, the Reply to the State's Opposition to Second Supplemental Brief to Petition for Writ of Habeas Corpus was filed. Ex. 182.

The trial court denied the petition and filed a 119-page Findings of Facts and Conclusions of Law on September 12, 2018. Ex. 98. A notice of appeal was timely filed on October 11, 2018. Ex. 99.

On May 23, 2019, Mr. Richardson filed an opening brief raising the following claims:

I.    Failure to appoint counsel after the criminal complaint had been filed amounted to a fundamental error and/or a violation of speedy trial rights requires a reversal of the convictions.

II.   Trial counsel was ineffective for failure to adequately impeach, investigate, and/or object to the admission of testimony about a hat which was not preserved but still used prejudicially to support a finding of guilt.

III.  Trial counsel and appellate counsel were ineffective for failure to adequately impeach, investigate and/or object to the admission of both a hammer and a receipt for a hammer which was used to suggest corroboration, but which were ostensibly admitted as merely demonstrative of the possible murder weapon.

IV.   Trial counsel was ineffective for failing to introduce evidence that the co-defendant had previously been involved in an incident where the co-defendant wielded a hammer in a threatening manner.

8

V.    Trial counsel was ineffective for failing to investigate the most serious aggravating circumstance in a death penalty case, failed to adequately move to limit the testimony of the victim-witness, failed to adequately impeach the witness with prior testimony, failed to ask for a curative instruction regarding inadmissible evidence from the victim-witness, and failed to properly inquire and/or request a curative instruction regarding an audible expression of sympathy for the victim-witness contemporaneous to her testimony by a juror.

VI.   Appellate counsel was ineffective for failing to properly frame dispositive issues resulting in a misapplication of facts to law in the order of affirmance.

VII.  Judge Michelle Leavitt should have recused herself.

VIII. The trial court erred by not allowing a broader evidentiary hearing or allowing more inquiry into facts which had bearing on the issues raised in the petition which were not belied by the record.

IX.   The trial court erred by denying the petitioner's motion for expert fees related to the hat, the hammer and crime scene reconstruction which were not done by trial counsel.

X.    The cumulative errors in a close case warrant the reversal of the death penalty and/or a new trial.

ECF No. 1-12 at 3–5.

Respondents filed their Answering brief on July 3, 2019. ECF No. 1-13. Mr. Richardson filed his Reply Brief on September 18, 2019. ECF No. 1-14. The Nevada Supreme Court heard oral argument on November 2, 2020. Ex. 100. The Nevada Supreme Court filed an Order of Affirmance on February 24, 2021. ECF No. 1-15.

On August 26, 2001, a Petition for Writ of Certiorari was filed in the United States Supreme Court. Exs. 183–84. Respondent's Brief in Opposition was filed on September 2, 2021. Ex. 185. On October 12, 2021, the Petition was denied. Ex 184 at 1.

9

Remittitur was issued on November 19, 2021. ECF No. 1-21.

## C.    28 U.S.C. § 2254 Proceedings

On January 12, 2022, Mr. Richardson filed an application to Proceed in Forma Pauperis, a Petition for Writ of Habeas Corpus with supporting exhibits and a Motion for Appointment of Counsel in this Court, Case No. 3:22-cv-00017. ECF Nos. 1, 1-1 to 1-21, & 2. On January 13, 2022, it was ordered that the Federal Public Defender of Nevada would be appointed. ECF No. 3. A notice of conditional acceptance of appointment as counsel for the Petitioner and Disclosure of Conflict was filed on February 23, 2022. ECF No. 10.

On April 14, 2022, the Court filed a scheduling order giving Mr. Richardson 60 days after the entry of this order to file an amended petition.  ECF No. 13 at 2. On June 13, 2022, Mr. Richardson's counsel filed an Unopposed Motion for Extension of Time to File his Amended Petition. ECF No. 14. The Court granted that motion in an Order filed on July 21, 2022, to extend the date to file the Amended Petition to October 7, 2022. ECF No. 15. Mr. Richardson now files the instant Amended Petition.

## STATEMENT REGARDING 28 U.S.C. § 2254(D)

With respect to each ground for relief in this petition, Mr. Richardson alleges any ruling from the Nevada Supreme Court denying him relief on the merits are/or would be: (1) contrary to, and/or an unreasonable application of clearly established Federal law as determined by the United States Supreme Court; and/or (2) are/would be based on an unreasonable determination of fact in light of the evidence presented in state court proceedings. *See* 28 U.S.C. § 2254 (D)(1)–(D)(2).

**STATEMENT WITH RESPECT TO EXHAUSTION AND PROCEDURAL DEFAULT**

The exhaustion of each claim is noted below.

The following claims or subclaims have been presented, or arguably presented, to the Nevada Supreme Court: Claim One(C)(1)–(C)(2), (G)–(H); Claim Two(A)(1)(a)(closing arguments), (F)(1); Claim Four(A), (A)(1)–(4); Claim Five(A), (A)(1)(a), (A)(2)–(A)(4); Claim Seven; Claim Nine (A)–(E), (G); Claim Ten(A); Claim Eleven(A)–(C), (C)(1)–(C)(2), (C)(4), (C)(6); Claim Twelve(B); Claim Thirteen(B)–(G); Claim Fifteen(A), (B)(1), (B)(3); Claim Seventeen.

The following claims/subclaims have not been presented to the Nevada Supreme Court: Claim One(A)–(B), (D)–(F), (I); Claim Two(A)(1)(a)–(b), (B)–(E), (F)(2), (G), (I); Claim Three; Claim Four(A)(5)–(A)(6), (B)–(C); Claim Five(A)(1)(b), (A)(5); Claim Six; Claim Eight; Claim Nine (F); Claim Ten(B)–(G); Claim Eleven(C)(3), (C)(5); Claim Twelve(A); Claim Thirteen(A), (H); Claim Fourteen; Claim Fifteen(B)(2); Claim Sixteen.

The claims/subclaims that have not been presented in state court have not been previously raised because of ineffective assistance of trial, appellate, and state postconviction counsel. *See Martinez v. Ryan*, 566 U.S. 1 (2012); *Maples v. Thomas*, 565 U.S. 266 (2012); *Evitts v. Lucey*, 469 U.S. 387, 395-97 (1985); *Strickland v. Washington*, 644 U.S. 668 (1984); *Crump v. Warden*, 934 P.2d 247, 254 (Nev. 1997).

Mr. Richardson also alleges that the state trial court prevented counsel from litigating his constitutional claims/subclaims in state postconviction proceedings, which violated Mr. Richardson's state and federal constitutional rights to due process, by preventing him from developing facts necessary to prove his claims. The

limitations imposed by the state court constitute circumstances rendering the state corrective process ineffective to protect Mr. Richardson's rights. 28 U.S.C. § 2254(b)(1)(B)(ii). Moreover, Mr. Richardson is not at fault for any failure to develop the facts to support his claims under 28 U.S.C. § 2254(e)(2).

Mr. Richardson was also prevented from raising certain claims by the State's failure to disclose material exculpatory and impeachment evidence. *See Brady v. Maryland,* 373 U.S. 83, 87 (1963). The State's suppression of evidence constitutes cause to overcome any state procedural default and also means that Mr. Richardson is not at fault for any failure to raise and develop the facts of his claims under 28 U.S.C. § 2254(e)(2).

At this point, there is no valid default ruling imposed by the state courts against any of Mr. Richardson's claims, which could properly bar their consideration in proceedings to exhaust state remedies, and this Court cannot anticipate such a default ruling. *See Cassett v. Stewart.* 406 F.3d 614 (9th Cir. 2005).

#### PRIOR COUNSEL

| | |
|---|---|
| Trial Counsel: | David M. Schieck and Alzora B. Jackson<br>Clark County Special Public Defender Office |
| Direct Appeal: | JoNell Thomas<br>Clark County Special Public Defender Office |
| Postconviction Counsel: | Dayvid Figler, Attorney at Law |

12

## GROUNDS FOR RELIEF

Thomas Richardson alleges the following grounds for relief from the judgment of conviction and sentence. References in this pleading to the accompanying exhibits incorporate the contents of the exhibit as if fully set forth herein.

**Claim One: Ineffective Assistance of Trial Counsel—Culpability Phase**

Mr. Richardson's convictions and death sentences are invalid under the federal constitutional guarantees of the right to due process, confrontation, effective counsel, equal protection, fair trial, freedom from cruel and unusual punishment, and a reliable sentence due to the ineffective assistance of trial counsel during the culpability phase of trial. U.S. Const. amends. V, VI, VIII, and XIV.

**Supporting Facts**

1.     The Sixth and Fourteenth Amendments guarantee the right to effective assistance of counsel at trial. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984). Here, counsel was ineffective for: (a) failing to adequately develop and present evidence that rebuts when the State alleges the murders occurred; (b) failing to adequately develop and present evidence that challenges the State's investigation; (c) failing to adequately impeach, investigate, and/or object to the testimony about the Auto Club 500 baseball cap; (d) failing to object to Marcia LaFrance's identification of Mr. Richardson; (e) failing to object to the introduction of phone calls between Mr. Richardson and Wes McCoy by individuals who were not a party to those conversations; (f) failing to challenge Kimberly Ross's credibility; (g) failing to adequately challenge evidence and testimony related to the alleged murder weapon; and (h) failing to introduce evidence that its star witness Dehnart had a prior offense involving a hammer.

14

**A.      Counsel were ineffective for failing to adequately develop and present evidence that rebuts the State's allegation that the murders of Feldman and Folker occurred on September 7, 2005.**

2.      The State's case against Mr. Richardson rests largely on its claim that the murders of Feldman and Folker occurred on September 7, 2005. This is because the State had evidence that on September 7, 2005: (1) Mr. Richardson's car was not in California because Ross was unable to use it to bring her daughter to a scheduled dentist appointment; (2) the State had a surveillance video from a local Las Vegas Taco Bell showing Mr. Richardson was in Las Vegas; and (3) the State had a receipt from a local Home Depot store showing a hammer was bought on that day. *See, e.g.,* 8/24/09 Tr. at 104, 113–15, 117–19, 121, 176; 8/25/09 Tr. at 13–14, 38–39; 8/26/09 Tr. at 64, 74–75, 93, 130–31, 174–81, 193–95; *see also* 8/28/09 Tr. at 139 (State arguing to the jury that detectives were aware this crime occurred on September 7, 2005). And this evidence is consistent with co-defendant Dehnart's testimony that Mr. Richardson murdered Folker and Feldman on September 7, 2005. *See, e.g.,* 8/28/09 Tr. at 79–80, 83, 88, 139, 145–47; *see also id.* at 83 (State admitting that Dehnart had information critical to the case).

3.      While the State had evidence that Mr. Richardson was in Las Vegas on September 7, 2005, it also had evidence that the murders did not occur on that date.

4.      As part of discovery, the State turned over a photograph showing a Southwest Gas Corporation bill found inside Feldman's home, which is postage metered for September 8, 2005, the day after the alleged murders occurred:

15

Ex. 32 at 3.

5.     If the State and law enforcement are to be believed—that law enforcement followed proper procedure and nothing was brought into the crime scene—then reasonably competent counsel should have presented this critical piece of evidence to argue that the murders of Feldman and Folker occurred sometime after Mr. Richardson returned to California in the early morning hours of September 8, 2005. *See* Ex. 118 at 1 ¶4 (Juror Karen Kotter stating that she knows based on employment "at the local corporate offices of Southwest Gas and . . . from personal work experience that all bills are usually sent out to the Post Office on the same day that they are processed[,] which means [the Southwest Gas bill] would not have made it to Ms. Feldman's home until September 9th, 2005, at the earliest").

16

6.     When shown this photograph, Attorney Jackson, one of Mr.

Richardson's trial attorneys, stated:

> I do not remember seeing this photograph, in part because I do not remember going through the crime scene photographs with a fine-tooth comb. Had I seen this photograph I would have used it to cast doubt on the State's case. Specifically, I would have used this photograph to show . . . that the murders of Feldman and Folker did not occur on September 7, 2005, which was the only time the State could prove Mr. Richardson was in Las Vegas . . . . It is my belief that this photograph could have been "another brick" in building the wall of doubt . . . .

*See* Ex. 37 at 2 ¶6. Attorney Jackson stated that she had no strategic reason not to

use this evidence. *See id*.

7.     When Attorney Schieck, Mr. Richardson's other trial attorney, was

shown the photograph, he stated:

> The photograph shows a metered postage stamp dated September 8, 2005. I do not specifically remember seeing this photograph, although I had seen and reviewed all the photographs associated with the case. Had I noticed the postage metered date in the photograph at the time of Richardson's trial, I would have used it to cast doubt on the State's case. Specifically, I could have used this photograph to show . . . that the murders of Feldman and Folker did not occur on September 7, 2005, which was the only day the State could prove Mr. Richardson was in Las Vegas, and it would have been proof that Folker and Feldman were alive after September 7, 2005, because only Folker and/or Feldman would have brought that bill into the residence.

Ex. 38 at 1–2 ¶4; *see also* Ex. 118 at 1 ¶4. Attorney Schieck concluded stating "I had

no strategic reason for failing to use this crime scene photograph or present it to the

jury." Ex. 38 at 5 ¶4.

17

8.     The failure to use this photograph to defend Mr. Richardson is further exacerbated by the fact that had counsel properly consulted with a forensic pathologist, they would have learned that based on the decomposition of Feldman's and Folker's bodies—their murders could have occurred on September 8th or 9th. *See* Ex. 39 at 2–3. Such evidence would have seriously challenged the State's case, as the jury might have reasonably concluded that the murders occurred sometime after Mr. Richardson returned to California. *See* Ex. 118 at 1 ¶¶3–4 (Juror Kotter noting that had the bill's presence at the crime scene "been highlighted and discussed, it is definitely something that the jury would have wanted to know about and include in our deliberations[,]" and noting based on her employment and knowledge the Southwest Gas bill would have gotten to Feldman on September 9, 2005, at the earliest).

9.     Trial counsel's failure to present this evidence constituted deficient performance. This failure prejudiced Mr. Richardson as there is a reasonable probability that the jury would not have found him guilty. *See Kimmelman v. Morrison,* 477 U.S. 365 (1986).

**B.     Counsel were ineffective for failing to develop and present evidence that challenged the investigation and the evidence presented by the State.**

10.     Trial counsel firmly believed the State's investigation was "slopp[y]" and "inadequate." Ex. 37 at 3 ¶7; Ex. 38 at 2 ¶5. However, counsel made no such argument to the jury. *See* 8/28/09 Tr. at 90–131. The failure to make such an attack or to present evidence to the jury to support such an attack cannot be deemed

1   strategic. *See* Ex. 37 at 2–3 ¶¶6–7; Ex. 38 at 1–2 ¶¶4–5; *see also Morrison,* 477 U.S.

2   365; *Strickland,* 466 U.S. 668.

3       11.     To begin, the jury was never reminded that: (1) officers had no idea

4   where the baseball cap was before it was picked up, played with, joked about, and

5   then promptly discarded, without any care, somewhere in the crime scene, and (2)

6   law enforcement failed to document where items were found before they were

7   moved. *See, e.g,* 8/21/09 Tr. at 176–77, 204; 8/24/09 Tr. at 164–66; 8/26/09 Tr. at

8   196–97, 209, 212; *see also* 8/24/09 Tr. at 70 (purpose of photographing crime scene is

9   to accurately document condition of crime scene and where evidence is located), 89

10  (photographed items before they are moved, but would not necessarily photograph

11  items found under other items).

12      12.     More importantly, the jury was never presented with concrete

13  evidence, within the possession of both the State and the defense, showing just how

14  careless law enforcement was at the crime scene. Evidence, which not only

15  demonstrates the sloppiness of law enforcement and their inadequate investigation,

16  but also challenges the very basis of the State's case against Mr. Richardson—the

17  baseball cap, which according to the State proved that Mr. Richardson was in/at the

18  crime scene.

19      13.     For example, reasonable competent counsel could have used at least

20  crime scene photographs showing law enforcement officers, standing very near the

21  bodies of Feldman and Folker, without any shoe protection to demonstrate that law

22  enforcement officers did not undertake any precautions to ensure that they didn't

23  inadvertently cause blood transfer. *See, e.g.,* Ex. 29; Ex. 30 at 3; Ex. 31 at 2.  Such

evidence would have been particularly important given that officers portrayed the crime scene as extremely bloody. *See, e.g.,* 8/24/09 Tr. at 180 (Detective McGrath testifying that there was an enormous amount of blood at the crime scene—blood on the walls, the carpet, everywhere).

14.     Reasonably competent counsel could have also used the photograph of the Southwest Gas Corporation bill and where it was found to attack the adequacy of the investigation and crime scene integrity. *See, e.g.,* Ex. 37 at 2–3 ¶¶6–7, Ex. 38 at 1–2 ¶¶4–5. These photographs—the Southwest Gas Corporation bill and where it was found—demonstrate that law enforcement brought things into the crime scene or moved things within the crime scene without documenting where the items were initially found.  In this first photograph, State's Ex. 39, one can clearly see a side table with some photographs and other miscellaneous items on it. In particular, one can see a photograph in a silver frame:



15.     In State's Ex. 31, a photograph of the same side table, taken at a different angle, there is still no mail on this side table:



Ex. 40. (emphasis added).

16.     In State's Ex. 30, there are no bills or mail on this table, which Detective Vaccaro testified was between the family room and the kitchen.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20    Ex. 55 (emphasis added); *see also* 8/21/09 Tr. at 123.

21        17.    Reasonably competent counsel could have used the crime scene

22    photograph below, which was never shown to Mr. Richardson's jury, to show that

23    law enforcement had either brought something into the crime scene or were moving

things in the crime scene without documenting where the item was found. Because

now, there is mail on that side table in front of the photograph in the silver frame:



Ex. 32 at 2 (emphasis added).

18.     One of those pieces of mail just happens to be the Southwest Gas Corporation bill that has a metered postage date of September 8, 2005, which is the day after the State alleged the murders occurred.



Ex. 32 at 3.

19.     Reasonably competent counsel could have thus demonstrated either: (1) the investigation was inadequate, or (2) law enforcement truly failed to maintain the integrity of the crime scene. In fact, reasonably competent counsel would have been able to argue that officers may very well have moved this mail, and importantly the Southwest Gas bill, from the nearby basket, pictured in State's Ex. 44, which looks like it contained mail type items, and/or from the tables pictured in

24

State's Ex. 59, which have mail items and advertising circulars on them—in support

an argument that the murders did not occur on September 7:



Ex. 151.

1
2
3
4
5
6
7
8
9
10
11
12
13



14   Ex. 152.

15        20.     Because counsel failed to conduct a constitutionally reasonable

16   investigation into the facts/evidence, counsel failed to present these arguments and

17   evidence to the jury.  *See Strickland,* 466 U.S. 668. Without such evidence or

18   arguments, the jury could not adequately assess law enforcement's testimony—

19   particularly in regards to the baseball cap found at the crime scene, which the State

20   and law enforcement needed the jury to believe was in the crime scene and was not

21   brought in by someone in law enforcement, and to assess whether the murders of

22   Folker and Feldman actually occurred when the State alleged they occurred. *See,*

23   *e.g.,* Exs. 25–26.

21.    Trial counsel had no strategic reason for not attacking the State's case with evidence that either: (1) Mr. Richardson was actually innocent because the murders occurred after he had returned to California, and/or (2) prove that law enforcement failed to maintain the integrity of the crime scene. Ex. 37 at 2–3 ¶¶6–7; Ex. 38 at 1–2 ¶¶4–5.

22.    Trial counsel's failure to present this evidence constituted deficient performance. This failure prejudiced Mr. Richardson as there is a reasonable probability that the jury would not have found him guilty.

**C.    Counsel were ineffective for failing to adequately impeach, investigate, and/or object to the testimony about the baseball cap that law enforcement failed to preserve, the State used to corroborate co-defendant Dehnart's testimony, and the State used to support a finding of guilt.**

**1.    The timing of when law enforcement discovered the importance and relevance of the Auto Club 500 baseball cap is unsupportable and demonstrates police misconduct.**

23.    Because there is no forensic evidence linking Mr. Richardson to this offense, the significance of the baseball cap pictured in a crime scene photograph, and what the State could prove about it, was paramount to it obtaining a conviction. *See, e.g.,* 6/27/08 Tr. at 150–51, 170, 186–91; 8/20/09 Tr. at 25–26. Because, according to the State, this hat placed Mr. Richardson at the crime scene. *See, e.g.,* 6/27/08 Tr. at 148–49, 191, 204. Thus, when law enforcement discovered the significance of the baseball cap pictured in Exs. 25–26, which law enforcement allowed to be destroyed, becomes important. *See* 6/27/08 Tr. at 77, 81–82, 146, 149–51, 191–92, 205, 209–10.

27

24.    As articulated in Claim Seven, law enforcement should have known the importance of the hat on September 14, 2005, after watching the Taco Bell surveillance video showing a man with Folker wearing what Detective McGrath described as the Auto Club 500 hat—the same hat law enforcement say they found at the crime scene, which they allege can been seen in Exs. 25–26, and which they allowed to be lost/destroyed. *See* Claim Seven, fully incorporated herein.

25.    However, the State has always alleged that:

> [t]he detectives only realized the evidentiary value of the hat by happenstance. When Detectives McGrath and Vaccaro traveled to Riverside, California to speak with the defendants, they also spoke to Dehnart's mother and Richardson's then-girlfriend, Kimberly Ross. When Detective Vaccaro was inside of Ross's residence, he noticed a photograph of Richardson wearing the Auto 500 hat and recalled that he had seen the hat in the crime scene. After learning the significance of the hat, detectives made every effort to recover [it].

Ex. 41 at 7–8; *see also* ECF No. 1-5 at 42. The State's argument though is misleading because it ignores critical facts.

26.    Detective McGrath, who was with Detective Vaccaro at Ross's Riverside residence on September 28, 2005, testified as follows regarding the discovery of the photograph of Mr. Richardson in the Auto Clu500 hat:

> [w]e were going through the residence looking for . . . information . . . and Detective Vaccaro looked over and saw a photograph of Mr. Richardson wearing a baseball hat.

> . . . .

> As soon as Detective Vaccaro saw the photograph, he picked it up, and he showed it to me, and he said, this is the hat. And he pointed to the hat. And it was Mr. Richardson in a hat that said "Auto Club 500" . . . .

28

. . . .

> [Detective Vaccaro] said this is the hat that you showed me that was in the scene at the trailer on the 14th of September.

8/24/09 Tr. at 159–60.

27.     Detective McGrath was not positive, and questioned Detective Vaccaro's credibility and his identification of the hat:

> *I didn't know whether to believe [Detective Vaccaro] or not believe that that was the hat.* He was so sure that that was the hat . . . . So we—we decided that we were taking that photograph . . . and we were going to go back to Las Vegas to look for that hat.

*Id.* at 160 (emphasis added).

28.     On the way back from California, Detective McGrath made arrangements with Marcia LaFrance to get back into Feldman's trailer the next day, which would have been September 29, 2005. *Id.* at 168. Detective McGrath testified that when they got the trailer on September 29, 2005, the room in which a baseball cap was found had been "gutted" by the Nevada Crime Scene Cleaners and there was no hat. *Id.*

29.     Because the room had been gutted, the detectives searched for anything to confirm what Detective Vaccaro was saying. At a later proceeding, the State questioned Detective McGrath as follows:

> Q.     Okay. And then you turned to the crime scene photographs to see if you had by some happenstance a photo of the hat?
>
> A.     Yes. Detective Vaccaro said, we have to have a picture of that hat somewhere in these photographs.

29

1    Q.    And I'm going to put on the screen here what we've
2          marked as State's Proposed Exhibit—State's Exhibit
           Number 140. Okay. Are you able to see that there?

3    A.    Yes.

4    Q.    I'm going to zoom out a little bit. Okay. And you
5          found this photograph.

6    A.    Yes.

7    Q.    And when you saw this photograph was this—this
           was after you got back?

8    A.    Yes.

9    8/24/09 Tr. at 168–69. In essence, Detective McGrath is intimating that he viewed

10   this photograph of the hat at the crime scene when they got back from Riverside,

11   California, on September 29, 2005, and that Detective Vaccaro had seen such

12   photographs before they even went to California on September 28th. *Cf.* 6/27/08 Tr.

13   at 1787–79 (Detective Vaccaro testified to viewing the crime scene photographs

14   after seeing the Riverside photograph, but not stating when he viewed the crime

15   scene photographs after their return from California). The photographs detectives

16   are referring to are State trial exhibits 281 and 140:

17

18

19

20

21

22

23

30

Ex. 147.



Ex. 25; *see also* Ex. 26.

30.     Detective McGrath went on to testify that after viewing the crime scene photograph on September 29, 2005, he: (1) recalled the conversations and jokes about the hat; (2) drew the conclusion that the hat seen in the crime scene photo was the same as the one seen on Mr. Richardson's head in the photograph taken from Riverside; and (3) could identify the hat Mr. Richardson is wearing in

the Taco Bell surveillance video as the hat he was wearing in the Riverside

photograph. 8/24/09 Tr. at 169–70.

31.    However, this is simply impossible as the crime scene photographs

were not developed/printed until October 13, 2005. Ex. 43 at 8.

32.    Without the information on when the crime scene photographs were

developed, counsel was left without the tools to both discredit the police narrative

and prove it to be false or highly suspect. As Attorney Schieck, trial counsel,

testified, he has never seen any information showing when the crime scene

photographs were printed, does not recall requesting information on when crime

scene photographs were printed, and that this information "would have been helpful

to impeach [detectives'] testimony" if detectives "testified that [they] looked at the

photographs before they were printed." 4/12/18 Tr. at 50–52.

> **2.    Law enforcement failed to obtain crime scene
> photographs from the crime scene cleaning crew and
> failure to enhance the Taco Bell surveillance video
> and the photograph of the crime scene showing a
> baseball cap hanging off the bed frame.**

> **a)    Nevada Crime Scene Cleaners.**

33.    On September 14, 2005, law enforcement released Feldman's trailer

back to her family when Detective McGrath handed Marcia LaFrance the keys. *See,*

*e.g.,* 6/27/08 Tr. at 77, 146. Detective McGrath then gave the LaFrances "the name

of a crime cleanup crew that comes in and takes care of" everything." 8/20/09 Tr. at

76. Arrangements were then made with Nevada Crime Scene Cleaners, who came

out on September 16, 2005, to clean the crime scene and dispose of items and

material. *See id.* at 76–79; *see also* 6/27/08 Tr. at 8.

34.     When called out to a crime scene, Nevada Crime Scene Cleaners would typically take photographs of the condition of the crime scene before and after clean-up and would retain these photographs for a year. 6/27/08 Tr. at 19; 8/21/09 Tr. at 230 (company practice to take digital photographs before and after crime scene clean-up and to keep these photographs for a year).

35.     Any evidence left at the crime scene at that time was taken, and subsequently destroyed on or about September 23, 2005. *See, e.g.,* 6/27/08 Tr. at 11–14; 8/21/09 Tr. at 223–24.

36.     On or about September 29, 2005, detectives, after learning the crime scene clean-up crew had already processed the crime scene, contacted the crime scene company to see if it was still in possession of the materials it cleaned out of Feldman's home. 6/27/08 Tr. at 78–79, 151. Upon contacting the clean-up company, detectives were informed that everything collected had been destroyed. *See id.*

37.     Counsel had an obligation to use this information to demonstrate the gross negligence of the Las Vegas Metropolitan Police Department (LVMPD) detectives.  For example, because Detective McGrath recommended Nevada Crime Scene Cleaners, he should have been familiar with their cleaning practices, and the fact that the company typically takes before and after digital photographs of the crime scene it cleans. *See, e.g.,* 6/20/08 Tr. at 19; 8/20/09 Tr. at 76; 8/21/09 Tr. at 230; *see also* 6/27/08 Tr. at 8 (Nevada Crime Scene Cleaners' owner indicating that his company has been contacted by LVMPD to clean-up crime scenes). Yet, counsel failed to make this point.

38.     Nor did counsel question detectives why it took them more than a year to even ask Nevada Crime Scene Cleaners if the company had taken photographs of the crime scene. *See* 8/21/09 Tr. at 230; *but see* 6/27/08 Tr. at 19 (Nevada Crime Scene Cleaners' owner indicating that from the time of clean-up until June 27, 2008, no one had contacted him asking for photographs of the crime scene). Counsel also failed to make this point as well.

39.     Counsel's performance fell below a reasonable standard of competence. But for counsel's deficient performance, there is a reasonable probability of a more favorable result.

### b)     Image enhancement.

40.     The quality of the crime scene photograph showing a baseball cap hanging from the bedframe, and the surveillance video from Taco Bell are of extremely poor quality. *See, e.g.,* Exs. 25–26; *see also* 8/24/09 Tr.at 195. Despite the bad quality of these images, the State used them as a cornerstone to corroborate co-defendant Dehnart's testimony and to obtain a conviction. Yet, counsel made no inquires about the State's or the detectives' failure to have these images enhanced beyond the pixelated blowup of the baseball cap hanging from the bedframe:

35



Ex. 44.

41.     In fact, trial counsel was put on notice by Kim Ross that the State was in possession of several photographs of the hat, which were close-ups of it but also much clearer versions. *See* 8/25/09 Tr. at 19–20 (Ross testifying that detectives showed her close-up photographs of the hat, which were very clear), 60–61 (Ross testifying that she was shown "4 or 5" photographs of the hat, which were much clearer). Upon learning this information, counsel did not inquire further about these extra images, did not raise a *Brady* claim for the State's failure to turn over these photographs, nor did it move for a mistrial based on the State's failure to disclose these images.

42.     To the extent that defense counsel failed to object to the above instances of prosecutorial misconduct, move for a mistrial, or request some sort of accommodation to view these photographs and have them examined, those omissions amount to ineffective assistance of counsel. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

43.     There is a reasonable probability of a more favorable outcome if trial and direct appeal counsel had raised the appropriate objections and argued the prosecutorial misconduct above.

### D.    Counsel was ineffective for failing to object to LaFrance's identification of Mr. Richardson in the Taco Bell surveillance video.

44.     At trial, Marcia LaFrance, Feldman's daughter and Folker's mother, positively identified Mr. Richardson as one of the individuals seen with Folker in the Las Vegas Taco Bell surveillance video. *See* 8/20/09 Tr. at 97. However, she did not know Mr. Richardson. *See id.*

45.     Counsel failed to object to LaFrance's identification of Mr. Richardson, which is based on her viewing the Taco Bell surveillance video and seeing Mr. Richardson seated at the defense table at trial. *See id.*

46.     Counsel cannot have had a strategic reason for failing to object to LaFrance's in-court identification; especially given the fact that LaFrance did not know Mr. Richardson, had never seen him before, and had not made any previous identification from a line-up given in a less suggestive manner. *See Manson v.*

1   *Brathwaite.* 432 U.S. 98 (1977). The prejudice of LaFrance misidentifying Mr.

2   Richardson is substantial due to the suggestive nature of her in-court identification.

3       47.     Trial counsel's failure to object constituted deficient performance. This

4   failure prejudiced Mr. Richardson as there is a reasonable probability that the jury

5   would not have found him guilty.

6       **E.   Counsel was ineffective for failing to object to the State's**

7       **introduction of phone calls between Mr. Richardson and**
        **Wes McCoy.**

8       48.     During the culpability phase, the State improperly introduced Mr.

9   Richardson's jailhouse calls with Wes McCoy through Kim Ross and Detective

10  Vaccaro. *See, e.g.,* 8/25/09 Tr. at 41–42; 8/27/09 Tr. at 73–74, 76–77.  Neither Ross

11  nor Detective Vaccaro were a party in these jailhouse calls, nor do they work for the

12  Riverside County Jail—an entity that could authenticate that these jail house calls

13  were made. *See*, *e.g.*, Nev. Rev. Stat. §§ 52.015, 52.025, 52.105, 51.135.

14      49.     Counsel's failure to object constitutes deficient performance. This

15  failure prejudiced Mr. Richardson and cannot be considered harmless because the

16  State used Mr. Richardson's calls with McCoy to establish his guilt.

17      50.     For example, in opening statements the State argued Mr. Richardson's

18  consciousness of guilt because he was trying to create an alibi with McCoy during

19  these phone calls:

20          He talks to his uncle and suggests to the uncle, I couldn't
            have been in Las Vegas, remember, I was with you, I was
21          watching the U.S. Open Tennis Tournament. And in his
            desperation to not be in Las Vegas on September the 7th
22          you'll get some very telling information about Tom
            Richardson.
23

1   8/20/09 Tr. at 28.

2       51.   In closing arguments, the State again used Mr. Richardson's phone

3   calls with McCoy to argue to the jury a consciousness of guilt:

4           And so what is Mr. Richardson doing? He's on the
       telephone, spinning his alibis. And we see the development
5       of this. And this is the defense in progress, this is what
       we're seeing. This is something that he was trying to cook
6       up. But he's trying to ram it down [McCoy's] throat, and he
       doesn't want it. You know, he's trying to be a nice uncle;
7       he's getting tired of it.

8           (Portion of State's Unknown Exhibit Number
9       played)

10          These are not the actions of an innocent individual .
       . . . His tone, little slips in things that he says in these . . .
11      phone calls, concocting an alibi, a defense.

12          And the way he does it—I mean, [McCoy] tells him,
       "[l]ook, if you weren't there, you weren't there . . . ." He's
13      trying to cook up his alibi and he's ramming it down their
       throats. Not the action of an innocent person.

14          And his temper comes through. Did you see that in
15      his phone calls, when he goes off on [McCoy] . . . ?

16                      . . . .

17      These are not the actions of an innocent individual. It's the
       evolution of a concocted defense. All of which shows a
18      consciousness of guilt in the defendant, Richardson.

    8/28/09 Tr. at 84–86.
19
        52.   Trial counsel's failure to object constituted deficient performance. This
20
    failure prejudiced Mr. Richardson as there is a reasonable probability that the jury
21
    would not have found him guilty.
22

23

                                    39

### F.      Counsel was ineffective for failing to challenge Kimberly Ross's credibility.

53.      Kimberly Ross, Mr. Richardson's girlfriend at the time of the offense and Dehnart's mother, was used by the State to establish Mr. Richardson's guilt. For example, the State used Ross to: (1) identify the baseball cap Mr. Richardson was seen wearing at the Las Vegas Taco Bell as the Auto 500 baseball cap seen in the photograph of Mr. Richardson taken from her home; and (2) identify the baseball cap seen in the crime scene photograph as Mr. Richardson's Auto Club 500 baseball cap. *See, e.g.,* 8/25/09 Tr. at 5, 16–21, 38–40, 77–78. As such, Ross's credibility was of the utmost importance. Yet, defense counsel was completely remiss when he failed to challenge her credibility.

54.      As defense counsel Schieck stated in his declaration:

> I believe I had *Kim Ross's California criminal record* at the time of Richardson's trial. Ross's record consisted of traffic violations, bench warrants for her failure to appear on her traffic citations, receiving stolen property, and *dealing in counterfeit items. If any of these offenses/convictions involved dishonesty I would have used it to impeach her credibility.* I did not have a strategic reason not to impeach her credibility using her prior record.

Ex. 38 at 2–3 ¶ 6 (emphasis added). Despite Attorney Schieck's declaration that he would use Ross's criminal record to impeach her, he failed to do so.

55.      In case number CR51449, Ross was charged and convicted of violating Cal. Penal Code § 496. *See* Ex. 45. Cal. Penal Code § 496—Receiving stolen property provides:

> (a) Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, *knowing the*

40

> *property to be so stolen or obtained, or who conceals,*
> *sells, withholds, or aids in concealing, selling, or*
> *withholding any property from the owner, knowing the*
> *property to be stolen* [is guilty of receiving stolen
> property].

Cal. Penal Code § 496(a) (emphasis added).

56.   In Nevada, receiving stolen property is a crime of dishonesty that can be used to attack a witness's credibility. *See Robles v. State,* No. 47354, 2008 WL 6101939, at *3–4 (Nev. Sept. 9, 2008) (unpublished disposition). Yet, counsel failed to do so, and had no strategic reasons for this failure. Ex. 38 at 2–3 ¶6.

57.   Trial counsel's failure to use Ross's criminal convictions to attack her credibility constituted deficient performance. This failure prejudiced Mr. Richardson as there is a reasonable probability that the jury would not have found Ross credible and would have voted to acquit Mr. Richardson.

58.   Mr. Richardson's claims of ineffective assistance of counsel, which are raised in this claim, individually and cumulatively warrant relief.

**G.   Trial counsel were ineffective for failing to introduce evidence that Dehnart had a prior offense involving a hammer.**

59.   Trial counsel were ineffective for failing to challenge Dehnart's testimony by failing to present a complete picture of Dehnart: specifically, trial counsel failed to introduce evidence that Dehnart had used a hammer as a weapon in a prior incident.

60.   Dehnart was the primary witness against Mr. Richardson. Accordingly, the State needed Dehnart to be credible to the jury to make its case. Mr. Richardson's trial counsel had a responsibility to challenge Dehnart's testimony

41

at every turn. Trial counsel's failure to cross-examine Dehnart denied Mr.

Richardson of his right to confront the key witness against him. *Pointer v. Texas*,

380 U.S. 400, 403–04 (1965) (holding the Sixth Amendment's right of an accused to

confront the witnesses against him is a fundamental right that is made obligatory

on the States by the Fourteenth Amendment and that the right to cross-

examination is included within the right to confront witnesses).

61.     Trial counsel failed to introduce Dehnart's prior offense in which he

used a hammer against Mr. Richardson. Ex. 148. During this incident, Mr.

Richardson and Dehnart's father, Larry, were involved in an altercation because

Mr. Richardson was dating Dehnart's mother Kimberly Ross. *Id*. at 3. Dehnart

admitted to police that he also became involved in this event with his father. *Id*. at

4. Dehnart admitted that he was the person with the hammer in his hand. *Id*.

> Robert said as he pushed him back, Tom went in the house
> and came back with a baseball bat, so he went to the truck
> and grabbed a hammer.
>
> I asked Robert several times did his father have anything
> in his hand(s) during the incident, he continued saying "no,
> I was the one with the hammer."

*Id.*

62.     This evidence could have been presented by Mr. Richardson's defense

team for the permissible purpose of showing knowledge and identity. *See* Nev. Rev.

Stat. § 48.045; Fed. R. Evid. 404(b)(2). Specifically, counsel could have attempted to

demonstrate that Dehnart knew how to use a hammer to attack someone.

Alternatively, counsel could have used this evidence to demonstrate the identity of

42

the perpetrator: that Dehnart had used a hammer in an attack before and that it was his weapon of choice.

63.    Trial counsel made no effort to present this evidence to the court. Had counsel presented this evidence there is a reasonable probability of a different result, as no physical or forensic evidence linked Mr. Richardson to the murders. Dehnart painted Mr. Richardson as the primary aggressor. But if the jury had known Dehnart had a history of attacking people with hammers, the jury would have been more likely to discredit his testimony and believe Mr. Richardson's defense that he was not the perpetrator.

**H.    Counsel were ineffective for failing to adequately challenge evidence and testimony related to the alleged murder weapon.**

64.    Dehnart was the State's key witness. Dehnart was the only witness who could place Mr. Richardson in the trailer when the murders occurred and could name Mr. Richardson as the murderer. 8/26/09 Tr. at 45–58.

65.    Accordingly, the State needed to have the jury believe Dehnart was credible. To do this, the State needed independent evidence to corroborate Dehnart's testimony. The State attempted to provide independent evidence that Dehnart purchased the murder weapon—a hammer—from a Las Vegas Home Depot shortly before the murders. *Id*. at 36–39. Counsel failed to adequately challenge the admission of evidence regarding the murder weapon.

1

       **1.**   **Mr. Richardson's trial counsel were ineffective for failing to cross-examine Dehnart on his identification of the Home Depot store as the hardware store where the murder weapon was purchased.**

2

3

66.    Although counsel cross-examined Dehnart at trial, counsel did not

4

question Dehnart on all of the points in which his testimony differed from prior

5

statements he gave to detectives, including the written proffer that was provided to

6

Mr. Richardson's counsel before Dehnart testified.

7

67.    At trial, Dehnart testified that after he, Folker, and Mr. Richardson

8

ate at a local Taco Bell, the three of them went to a nearby Home Depot where he

9

purchased a hammer with cash:

10

           Q.    Whose idea is it to go to Home Depot?

11

           A.     I don't remember.

12

           Q,    Okay. When you go from the Taco Bell to Home Depot does it seem like they're a long way away, or what do you—

13

14

           A.    Maybe a 10–to–15—minute drive.

15

8/26/09 Tr. at 36.

16

           Q.    Okay. When you get to Home Depot what happens?

17

           A.    We went in, and Tom was talking about buying a gift for my mother from the garden section, and we were all over by the garden section. And then I asked Steve if I could borrow his phone, and I went over and I purchased a hammer and went out and put it in the car and made a phone call.

18

19

20

21

                                      . . . .

22

           Q.    Okay. How are you able to buy a hammer without Steven Folker asking you, why are you buying a hammer?

23

44

A.   They were both over in the garden section, and it was a little ways away from where the hammers were sold. And I purchased it while I told him I was going to be making a phone call and borrowed his cell phone.

*Id.* at 37.

Q.   Besides the hammer, did you buy anything else?

A.   No.

Q.   And you're the one that paid for it?

A.   Yes.

Q.   How did you pay?

A.   With cash.

Q.   Was either Tom or Steven in line—you know, in line with you as you paid?

A.   No, they weren't.

*Id.* at 39.

68.     In contrast to Dehnart's testimony regarding the acquisition of the hammer, Dehnart had previously told officers an entirely different narrative about the existence of the hammer and how it came to be used in the murders. During his initial statement to police on September 27, 2005, Dehnart told police that he did not know where a hammer came from, and that he guessed that Mr. Richardson "had it in some clothes he brought. . . . I guess he brought it in with his clothes. I honestly don't know where it came from." Ex. 145 at 47.

45

69.     In his second voluntary statement, given the next day on September 28, 2005, Dehnart told the detectives that he knew that Mr. Richardson brought the hammer into the trailer, but guessed that Mr. Richardson must have purchased it:

> Q.    So he goes out to get his clothes and he says hey can I borrow your knife and he must come back into the house at that point with the hammer is what you told us last night right
>
> A.    It was wrapped in his clothes.
>
> Q.    Wrapped in his clothes. And the hammer should of come from your tool belt
>
> A.    No.
>
> Q.    Well where did that hammer come from
>
> A.    I guess he purchased it.

Ex. 28 at 55, *see also* Ex. 59.

70.     Even at the time of his written proffer, mere weeks before trial, Dehnart did not have a consistent statement concerning the acquisition of the hammer. "They purchased the murder weapon (hammer) from an unknown store in Las Vegas." Ex. 60.

71.     According to Dehnart's trial testimony:

> While we were discussing it[,] I had said that we were at a hardware store and I couldn't remember if it was a Lowe's or a Home Depot. And we were describing the area where we were at and . . . *Detective Vaccaro . . . said the only thing there was a Home Depot*. But we were at that store. And they said—they came back and they said they had a receipt for a purchase that day.

8/26/09 Tr. at 130–31 (emphasis added); *cf. id.*at 36–37 (Dehnart told detectives that the Home Depot he, Folker, and Mr. Richardson went to on September 7, 2005, was

only about 10–15 minutes away from the Taco Bell). Dehnart also failed to mention

anything about purchasing a hammer at a local Home Depot store during his

change of plea hearing. 7/28/09 Tr. at 12–16.

72.    As all of Dehnart's statements were provided to Mr. Richardson's trial

counsel, counsel were clearly on notice of Dehnart's conflicting stories at the time of

trial. Trial counsel did cross-examine Dehnart concerning the fact that Dehnart's

proffer did not specify a location for the hammer purchase. *Id*. at 131.

> Q.    And so [Detective Vaccaro] is the one that came up
> with the name of the store that you possibly
> purchased the hammer at?
>
> A.    Prior to that I knew it was either a Home Depot of a
> Lowe's. I wasn't sure. But I knew those were the only
> two possibilities.
>
> Q.    And in your proffer you don't say anything about
> making a cell phone call, anything about on the 7th
> at the Home Depot, or about the other two going to
> the—to look for a gift for Kim, or anything about
> that. Did you leave that out when you talked to the
> police, or—or to the DA on the 28th? Or it's just not
> in your proffer?
>
> A.    I don't remember. I don't remember speaking about
> it that day or not.

*Id*. But counsel did not confront Dehnart any further. Counsel did not question

Dehnart with his prior voluntary statements to police, neither of which included a

trip to the Home Depot in the narrative. Nor did counsel question Dehnart about

the conflicting details between the first two statements: that Dehnart's first

statement that he did not know where the hammer came from, or his later

47

statement that Mr. Richardson had brought the hammer into the trailer and purchased the hammer.

73.    Additionally, counsel failed to cross-examine Dehnart more fully about Detective Vaccaro's involvement in drafting the proffer and whether this detail was merely fed to Dehnart by Detective Vaccaro.

74.    Counsel's failure to cross-examine the State's primary witness fully and adequately about such an important part of the State's narrative—the acquisition of the murder weapon—left the credibility of Dehnart's narrative unchallenged. This failure also permitted the State to present false corroboration evidence, as outlined below. There is a reasonable probability that, but for counsel's deficient performance, the outcome of Mr. Richardson's trial would have been different.

**2.    Counsel were ineffective for failing to object to the September 7, 2005 Home Depot receipt that showed some unknown person purchased a hammer on that date.**

75.    Corroborating Dehnart's story was a difficult task for the State. However, one way they did it was to use a receipt for the purchase of a hammer at a Las Vegas Home Depot. The State introduced testimony from an employee at the Home Depot where Dehnart claimed to have purchased the hammer. The State also introduced the purported receipt from Dehnart's transaction. *See* Ex. 61.

76.    Tony Trenholm testified that he was the manager of the Home Depot and was asked to retrieve a receipt by officers in this case. 8/26/09 Tr. at 173–74. Trenholm was able to pull a record for the purchase of a hammer. Ex. 61. This

receipt indicates that a single hammer was purchased with cash on September 7, 2005. 8/26/09 Tr at 174; Ex. 61. The receipt does not contain identifying information of the purchaser.

77.     Unlike the investigation of the Taco Bell receipt, detectives made no effort to secure, preserve, or even inquire about surveillance footage of the transaction from the Home Depot. Officers made no effort to determine whether the Home Depot registers were even monitored by cameras. Such footage would have confirmed whether Dehnart's version of events: that he, Mr. Richardson, and Folker went to the Home Depot after visiting the Taco Bell was correct. Such footage could have confirmed whether Dehnart purchased the hammer during this transaction. As a result of the inadequate investigation, the identity of the cash purchaser of the hammer in this transaction is unknown, despite the importance of this fact to the State's case.

78.     Instead, officers decided that the existence of the receipt was good enough. Detectives then used the SKU number to identify the hammer purchased and purchased an identical one while the trial was under way. Detectives did this prior to receiving any information or confirmation from Dehnart regarding from which store the hammer was supposedly purchased.

79.     As the receipt of the transaction from September 2005 does not reveal the identity of the purchaser, the receipt, Trenholm's testimony, and the hammer purchased by detectives was wholly irrelevant.

80.     Counsel had an obligation to object to irrelevant evidence. Because counsel did not object, counsel rendered deficient performance. There is a

49

reasonable probability the outcome of these proceedings would have been different if counsel had made an effort to preclude this evidence. Such an objection would have further chipped away at the evidence presented by the State as corroborative of Dehnart's testimony and would have called Dehnart's credibility into question. Without corroboration of Dehnart's narrative, the jury would have found that reasonable doubt concerning Mr. Richardson's guilt.

## I.    Counsel were ineffective for failing to challenge the State's experts.

81.    During Mr. Richardson's trial, the State adduced testimony from Detective Vaccaro and Crime Scene Analyst (CSA) Holstein regarding blood spatter and crime scene reconstruction. *See* 8/21/09 Tr. at 140, 162; 8/27/09 Tr. at 137; 8/24/09 Tr. at 118. Both witnesses testified on blood pattern evidence, and Holstein also testified about crime scene reconstruction.

82.    Although CSA Holstein was noticed as an expert in the State's Notice of Expert Witnesses, Detective Vaccaro was not. Ex. 172. CSA Holstein was only referenced as a blood spatter expert who would provide testimony about "identification, documentation, collection and preservation of evidence in this case in addition to blood spatter analysis/pattern and related procedures." *Id*. As a result, the defense had no notice that Vaccaro and Holstein would provide expert testimony on subjects not noticed.

83.    Also problematic is the fact that at no time did the State present evidence, or testimony to establish Detective Vaccaro as a blood spatter expert or

CSA Holstein as a crime scene reconstruction expert. *See* 8/21/09 Tr. at 102–03; 8/25/09 Tr. at 118–19.

### 1. Counsel failed to object to the introduction of blood spatter evidence by Detective Vaccaro.

84. The State did not notice Detective Vaccaro as an expert witness. Ex. 172. During his testimony, Detective Vaccaro only identified himself as having worked for LVMPD for thirty years and having investigated "four to five hundred death scenes." 8/21/09 Tr. at 102–03. Detective Vaccaro did not provide any testimony regarding his qualifications and training to provide an expert opinion about blood spatter. The State also failed to move to have Vaccaro admitted as an expert witness.

85. Detective Vaccaro offered speculative "expert" opinion testimony about the blood spatter patterns found at the crime scene came from:

> And this trauma to her head has caused a spatter on the wall. And then this pool of blood is part of blood let from the wounds and from aspiration from damage to the head.

8/21/09 Tr. at 140. Attorney Schieck objected:

| Mr. Schieck: | I'm going to object again, Your Honor. Your Honor, if I might. Excuse me. I'm objecting to conclusions again. He can testify to what observations he made, not conclusions that he draws from those observations. That's the jury's province. |
| --- | --- |
| The Court: | Okay. I don't think you're attempting to get conclusions. You're just asking for observations at this point? |
| Ms. Weckerly: | Correct. |
| The Court: | Okay. |

51

1        Det. Vaccaro:        Okay, Your Honor. I understand.

2    8/21/09 Tr. at 141. Despite saying he understood, Detective Vaccaro continued to

3    make conclusions from the blood spatter he saw. For example:

4        Ms. Weckerly:        What were your observations of her
                              clothes?
5

6        Det. Vaccaro:        I understand. The observations are
                              that she's had serious trauma to her
                              head by a blunt object *that's caused*
7                             *blood spatter pattern* to go up on the
                              wall near her head and to cause this
8                             type of a blood pool around the top of
                              her head.
9

10   8/21/09 Tr. at 141 (emphasis added); 8/27/09 Tr. at 11.

         Ms. Weckerly:        And where's the — where's the blood on
11                            the wall there?

12       Det. Vaccaro:        The blood is here, and it has a
                              downward glide to it or trajectory to it.
13                            And its directionality would indicate
                              the blood came from above and struck
14                            the wall and then slid down the wall.

15       Ms. Weckerly:        Now I'm putting on the overhead
                              State's 117. Is that the dresser that you
16                            were speaking of?

17       Det. Vaccaro:        Right. And that is this dresser right
                              here.
18
         Ms. Weckerly:        Okay. And let me zoom in a little bit.
19                            Did the dresser appear to have blood on
                              it, or the TV?
20
         Det. Vaccaro:        Yes. We can see blood spatter in
21                            numerous locations. There's also blood
                              swipe or wipe on there. So it's not just
22                            spots that hit the dresser, but there's
                              transfer from another bloody object.
23                            And then we see on the face of the

television droplets that were projected
blood droplets on the television.

8/21/09 Tr. at 162–63.

86.    Detective Vaccaro's testimony reached beyond his observations, and he in essence offered expert testimony about blood spatter patterns and their meanings when he was neither qualified nor admitted to do so.

87.    Reasonably competent counsel would have objected, as Detective Vaccaro was not qualified to provide such testimony. *See Daubert*, 509 U.S. at 592–95; *see also* Ex. 37 at 4 ¶11. Furthermore, this testimony was highly prejudicial because the State used Vaccaro's blood spatter testimony to corroborate Dehnart's testimony. *See* 8/26/09 Tr. at 50 (Dehnart testimony as to Feldman's position on the ground at the time of the murder). But for counsel's deficient performance, there is a reasonable probability of a more favorable result.

### 2.    Counsel failed to object to the introduction of blood spatter and crime scene reconstruction testimony by CSA Holstein, who was unqualified.

#### a)    Reasonably competent counsel would have objected because CSA Holstein was not qualified to testify as an expert on blood spatter analysis.

88.    On July 10, 2009, the State noticed CSA Holstein as an expert:

**Daniel Holstein, LVMPS P#3861,** is a Crime Scene Analyst with the Las Vegas Metropolitan Police Department. He is an expert in the area of blood spatter patterns, the identification, documentation, collection and preservation of evidence and will give opinions related thereto. He is expected to testify regarding the identification, documentation, collection and preservation of evidence in this case in addition to blood spatter analysis/pattern and related procedures which he performed in this case.

53

Ex. 172 at 2 (bold in original).

89.     Included with the State's notice was a list of Holstein's qualifications as an expert. *Id.* at 20–22. The State listed Holstein's formal education as a Bachelor of Science Degree in criminal justice from the University of Nevada, Las Vegas, in 1987. *Id.* at 20. The majority of Holstein's qualifications were in the form of "additional training/seminars." *Id.* Of the forty additional seminars CSA Holstein had attended, only one concerned blood pattern analysis. *Id.* at 21. That seminar, "Bloodstain Pattern Analysis Workshop," was only forty hours and was completed on December 8, 1995. In the fourteen years between when CSA Holstein attended this "workshop" and when he testified at Mr. Richardson's trial in 2009, he did not attend any other blood spatter training. *Id.* Furthermore, there is nothing in CSA Holstein's curriculum vitae (CV) indicating that he ever attended seminars, classes, workshops, or received training in crime scene reconstruction. *Id.* Nor does CSA Holstein's CV show that he had engaged in any research in either crime scene reconstruction or blood pattern analysis, published any peer reviewed articles, or continued his training and education in crime scene reconstruction or blood spatter analysis. Ex. 172.

90.     The State's notice of Holstein's credentials contradicted Holstein's testimony. *See* 8/25/09 Tr. at 118–19. During his testimony CSA Holstein recounted his certification as a bloodstain pattern analyst, renewals of his certification, attendance at conferences, and teaching responsibilities. *Id.* None of these are substantiated by the notice the State served on defense counsel. *See* Ex. 172. The State also did not move the court to admit Mr. Holstein as an expert.

54

91.   Reasonably competent counsel would have objected to CSA Holstein's testimony as a blood spatter expert as his qualifications, training, and education did not meet the standards to be declared and expert and provide expert testimony. *See Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 592–95 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). But for counsel's deficient performance, there is a reasonable probability of a more favorable result.

> **b)**   **Reasonably competent counsel would have objected because Holstein was not qualified or admitted as an expert to give crime scene reconstruction testimony.**

92.   The State also called CSA Holstein to provide crime scene reconstruction testimony to provide the jury with information related to the location and position of the victims when they were murdered in order to corroborate Dehnart's testimony. CSA Holstein testified:

> What I try to do is find several different bloodstains, individual bloodstains within that area that are all consistent with each other and come under the predominant stain. Once I do that, then I will take what's called a loop, [sic] which is a 10 times magnifying glass that has a millimeter measuring tool underneath the glass itself. I measure the width of the bloodstain, and then the length of the ellipse or the ovoid pattern.
>
> Based on those two I can then use mathematics and trigonometry to come back and find out not only the point of convergence, but the point of origin. Now, when I take those individual bloodstains, like said, there's a tail that tells me the direction that it's going in. I then, using a— using a meter stick, take a black marker and draw a line as a straight line coming from the back end, the non-tail side, back to a certain point. And I do this with all several of those predominant bloodstains.
>
> Once those—all those lines come back, they will come into a certain area. That area is called a point of convergence. I

55

> calculate—remember I said when I measured the width and the length of each one of those stains, then I can use the inverse sine, which is a trigonometric function, to calculate where it came in the third dimension in space. And then using the length of the line that I used, I can use another trigonometric function called the tangent. Using those two functions, I can calculate the approximate area of where the bloodstain originated.

8/25/09 Tr. at 121–23.

93.    CSA Holstein continued his extrapolation. After determining that Folker was 5 feet, 11 inches tall, he used that information to reconstruct where Folker was standing at the time of the murder:

> The person that's standing here [in the diagram] you can see is only there to represent that that's where the person was at the time of bloodshed. I cannot say that the person was facing in the closet or around the closet or away from the closet; I can only put the person I standing in that position only.

8/25/09 Tr. at 128.

94.    At no point during CSA Holstein's testimony, or in the State's notice of expert witnesses, did the State adduce any evidence that CSA Holstein had any expertise, education, or training in crime scene reconstruction. *Daubert*, 509 U.S. at 592–95; *Kumho Tire*, 526 U.S. at 147.

95.    Reasonably competent counsel would have objected to CSA Holstein testifying as to crime scene reconstruction, as he was neither noticed as an expert nor had expert qualifications in that area. But for counsel's deficient performance, there is a reasonable probability of a more favorable result.

56

### 3. Trial counsel failed to object to the introduction of blood spatter pattern evidence on the basis it is junk science.

96. Notwithstanding CSA Holstein's and Detective Vaccaro's lack of qualification regarding blood spatter analysis, blood spatter analysis is unreliable. *See* National Academy of Sciences, Strengthening Forensic Science in the United States: A Path Forward, at 201, (2009) ("[s]cientific studies support some aspects of bloodstain pattern analysis . . . some experts extrapolate far beyond what can be supported") (Ex. 149).

97. Indeed, blood spatter pattern analysis is not based on established scientific principles or practices. Ex. 149 at 200. The National Academy of Sciences makes clear that forensic disciplines are best learned through formal education that is girded by interdisciplinary education in science, statistics, and probability—not apprenticeship. Ex. 149 at 27. To the limited extent blood spatter analysis may be reliable, the expert must possess seven essential qualifications:

- an appropriate scientific education;
- knowledge of the terminology employed (e.g., angle of impact, arterial spurting, back spatter, castoff pattern);
- an understanding of the limitations of the measurement tools used to make bloodstain pattern measurements (e.g., calculators, software, lasers, protractors);
- an understanding of applied mathematics and the use of significant figures;
- an understanding of the physics of fluid transfer;

- an understanding of pathology of wounds; and

- an understanding of the general patterns blood makes after leaving the human body.

Ex. 149 at 200. Neither Detective Vaccaro and nor CSA Holstein possessed any of these qualifications.

98.     At the time of the publication of the NAS report, the National Academy had pointed commentary on blood spatter pattern analysis: "In general, the opinions of bloodstain pattern analysts are more subjective than scientific. In addition, many bloodstain pattern analysis cases are prosecution driven or defense driven, with targeted requests that can lead to context bias." Ex. 149 at 201. *See generally Daubert* 509 U.S. at 592–95; *see also* Ex. 150 at 68 ("[E]xperience or judgment cannot be used to establish the scientific validity and reliability of a metrological method, such as a forensic feature-comparison method. The frequency with which a particular pattern or set of features will be observed in different samples, which is an essential element in drawing conclusions, is not a matter of judgment. It is an empirical matter for which only empirical evidence is relevant.") (internal quotations omitted).

99.     Reasonably competent counsel would have objected to the introduction of junk science which does not rely on standard modes of scientific inquiry or discipline. But for counsel's deficient performance, there is a reasonable probability of a more favorable result.

**Claim Two: Prosecutorial Misconduct—Culpability Phase**

Mr. Richardson's convictions and death sentences are invalid under the federal constitutional guarantees of due process, equal protection, a fair trial, and a reliable sentence because of pervasive prosecutorial misconduct. U.S. Const. amends. V, VI, VIII, and XIV.

**Supporting Facts**

1.     The State engaged in repeated instances of misconduct during the culpability phase, which deprived Mr. Richardson of his constitutional right to a fair trial, equal protection, and due process. The instances misconduct had a substantial and injurious effect individually and cumulatively on the jury's verdict.

A.     **The prosecutor made improper appeals to the emotions and sympathies of the jury.**

1.     **Inflaming the passions and prejudices of the jury during opening statements, throughout Mr. Richardson's trial, and during closing arguments.**

a)     **Improper victim impact—Feldman and Folker.**

2.     During opening statements, the State made highly improper appeals to the passions and prejudices of the jurors. These appeals focused on Feldman being an amazing woman at the age of 91, and how Feldman's daughter, Marcia LaFrance, was traumatized:

> even though she was in her nineties, Ms. Feldman was very self-sufficient and able to get around. She had a car, she made herself breakfast every morning, she made her bed every morning. And although she had some health issues in the past, she had a bout with cancer, she was actually recently given a clean bill of health at the beginning of September of 2005.

59

8/20/09 Tr. at 4–5.

> After the 14th the detectives have concluded their processing . . . . And they do what's called releasing the scene to the family of the—the surviving family of the victims. And in this case that was Marcia LaFrance . . . and she was left with a situation to deal with that no one wants to be faced with. Her mother's home was turned over to her, and she's left with a mobile home that has literally the blood of her mother and her son throughout one room and in the hallway.
>
> . . . .
>
> And so on September 16th of 2005 Marcia LaFrance hired Crime Scene Cleaners to come clean out that southwest bedroom and clean all of the blood out of her mobile home. Obviously, this was an extremely upsetting event for her . . . .

8/20/09 Tr. at 14.

3.    The State continued to refer to evidence designed to inflame the passions and prejudice of the jury by garnering sympathy for Feldman, whom the State thought was an amazing woman at the age of 91. In fact, during a bench conference discussing the admissibility of a surveillance video taken from a Walgreens, the State made it clear that garnering sympathy for Feldman was paramount:

> I mean, it's not enough to say that they're on there. We're trying to show that [Feldman] was able bodied. We want to show what kind of shape [she was in].

*Id.* at 42–43; *see also id.* at 88–93 (Walgreens's surveillance video introduced and commented upon by Marcia LaFrance).

60

4.      The State then elicited a plethora of improper victim impact evidence from LaFrance to garner sympathy for her mom—Feldman. This victim impact evidence focused on Feldman's health, and how active and lively she was.

Q.    How was her health?

A.    Her health was really pretty good at this time. She had had cancer, had a full colostomy when she was 80 years old. And she had just gotten the report from her doctor that she was cancer free. She had gone for chemo and radiation. And she did wonderfully. So, she was in good health.

Q     And she was about 91 years of age at this time?

A.    Yes, 91, in March.

Q.    Was she able to take care of herself and get around?

A.    Absolutely. She was very independent.

Q.    . . . . How were [her] mental faculties at this point?

A.    Her mental faculties were probably better than mine. She was very good, took care of all of her own finances, did her own banking, wrote her own checks, paid all of her own bills. She as very self-sufficient. Her mental capacity was excellent.

. . . .

Q.    Tell us a little bit about the personality of your mom?

A.    My mom was an angel. She was the easiest person to get along with. She was always happy. She was always positive. She always had good things to say about everybody. She loved her family. She loved her children. Her grandchildren—

8/20/09 Tr. at 55, 59; *see also id.* at 56–57 (telling the jury that she and Folker had just purchased a new car for Feldman and how happy she was).

61

5.      At this point, the defense asked to approach. *See id.*at 59. However, the trial court ignored defense counsel's request. *See id.*; *but see id.* at 103–04 (discussion of defense request to approach to lodge objection to victim impact evidence; trial court responded that it understood that the defense did not want LaFrance to go on, and that she did not). Unfazed, the State continued to elicit more victim impact evidence from LaFrance, who told the jury that Feldman "was very social, very outgoing[, and that she would characterize Feldman] as being feisty on occasion." *Id.* at 60.

6.      The State introduced evidence designed to inflame the passions and prejudice of the jury by having LaFrance testify about what an amazing and giving person Folker was. LaFrance testified that Folker "was very outgoing[,] very sweet[, and] a very good kid." 8/20/09 Tr. at 60. He was a "good kid" who went the extra mile for Feldman and who had no problem spending the Labor Day weekend with her. *See, e.g., id.* at 62, 67.

7.      After LaFrance's testimony, the State continued to elicit more victim impact evidence about Feldman from its witness—Susan Lovelace.

> Q.      [D]id you have an opportunity to observe Estelle Feldman's physical condition or maybe how she was relating to people mentally—
>
> . . . .
>
> A.      Well, when I first met her . . . she seemed like she was about four-foot, five, just a firecracker, very alert, very acute to what was going on around her. She drove, had no problems communicating with anyone, and we went out to dinner several times. She gambled. She played video poker—
>
> . . . .

62

1                 [a]nd she was very good a it . . . . Was up to
date on what was going on in the world.
2

3     Q.    She was pretty alert and able to—able bodied, able
to move around.

4     A.    Yes. Absolutely.

5 8/20/09 Tr. at 108–09.

6     8.    The second day of trial, the State continued to elicit victim impact

7 evidence about Feldman from its witness—Gordon William Barrett.

8     Q.    Tell us about [Feldman]. Physically how was she?

9     A.    She was a wonderful woman. I mean . . . you'd never
know her age. I used to marvel at how active she was
10     and just vibrant . . . .

11     [Y]ou'd never know she was 90 years old. Let's put it
that way. [S]he seemed younger than my mom, and
12     my mom was probably about five or six years
younger that she was . . . .
13

14     Q.    And how did [Feldman] seem to be mentally?

15     A.    Oh, very, very competent. Yeah. Remembered—
great memory, just very sharp. She still drove and
got around and, you know, was very active I know
16     with other people . . . and going places . . . .

17 8/21/09 Tr. at 84.

18     9.    The third day of trial, the State elicited further victim impact from

19 Detective McGrath, when it made the following inquiry:

20     Q.    All right. Anything else that you considered
significant about this video and the reason why you
21     impounded it?

22     A.    No. Just that they were, you know, in perfect
physical condition. They were walking together . . . .
23     You could see how small she is in the video. That was
one of the particular things I was interested in. You

63

> could see her standing at the counter . . . and she
> barely—her chest is right up to the counter, which
> shows how small she was.

8/24/09 Tr. at 109–10; *see also id*. at 111 (reiterating how incredibly small Feldman is).

      10.    On the fifth day of trial, the State even elicited from Dehnart, Mr. Richardson's co-defendant, improper victim impact evidence about Feldman.

> Q.    Okay. She's a pretty small person?
>
> A.    Yes.

8/26/09 Tr. at 49.

      11.    The State incited the passions and prejudices of the jury by injecting further comments designed to garner sympathy. In closing arguments, the State told the jury:

> She had lived a full life. Estelle Feldman. She'd had
> a full life. Grandmother, mother in her 90's, survivor of
> cancer. She had just been told that she was cancer free. A
> person of charity who opened her home to two essential
> strangers, because they were friends of her grandson . . . .
>
> . . . .
>
> A story that we can see in the progress of the injuries to
> Steven Folker and to his grandmother, Estelle [Feldman].
> Their first thoughts being to survive, perhaps to get away,
> perhaps to protect.
>
> . . . .
>
> You think about how long it takes to swing that
> hammer on a moving object, and he was a moving object.
> And they tried to confine him. And how accurately and
> consistently they placed those blows on his head, again,
> and again, and again. And the pain to suffer one, much less
> what he had to suffer in the final minutes of his life.

> And little [Feldman] who heard a commotion. And from her concern and from her love, she went to the room. It was a room of death for her as well.
>
> . . . .
>
> As offensive as all of this was to hear about and to see, they do not begin to encompass the agony of these two victims. They do not convey the enormity of the horror that they suffered, and the continuing degradation of their memory, as the most private aspects of their person were necessarily placed before the public . . . .
>
> This is not over, but it will be. And you will write the ending to the pain and the suffering of [Feldman] and [Folker] with your verdict. And the unimaginable and lingering death they suffered. Beside the pain, the knowledge that one they loved struggled nearby and they could do nothing for each other.
>
> . . . .
>
> We're going to spend some time now talking about the law that you've received, and correlating that with the facts and circumstances that we've been hearing from the stand. And then we will be asking you to return a verdict of justice in this case, justice for [Feldman] and [Folker] and justice for those that love them that remain.

8/28/09 Tr. at 42–46.

12. The State's improper introduction of evidence designed to inflame the passions and prejudices of the jury, and its arguments highlighting that improper evidence distracted the jurors from the evidence before them. The State devoted a portion of its case to stirring the passions and prejudices of the jurors in order to secure a conviction.

13. The State continued its misconduct by calling the jury to justice—justice not only for Folker and Feldman, but for everyone that loved them; a justice

65

that could only be served with Mr. Richardson's conviction. *See, e.g.,* 8/28/09 Tr. at 46.

14.     To the extent that defense counsel failed to object to the above instances of prosecutorial misconduct, those omissions amount to ineffective assistance of counsel. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

15.     There is a reasonable probability of a more favorable outcome if trial and direct appeal counsel had raised the appropriate objections and argued the prosecutorial misconduct in this section.

### b)     Improper victim impact—Kimberly Ross.

16.     Kimberly Ross, is co-defendant Robert Dehnart's mother, and was Mr. Richardson's girlfriend at the time of Feldman's and Folker's murders in Las Vegas. *See* 8/25/09 Tr. at 5. Ross was a linchpin in the State's case against Mr. Richardson. To present her in a good light, the State presented evidence that Ross also suffered as a result of Mr. Richardson's alleged actions in the murders of Feldman and Folker.

17.     For example, when questioning Ross about when she became aware that Folker had been murdered—the State presented Ross as someone the jury should feel sorry for and allowed her to testify how she had also suffered/been victimized:

> Q.     Now, at what point in time, in your mind, *you said you weren't feeling well*, and there was a shock to what was going on. But at what point in time did you make the mental connection between the [Folker] that you knew, and the victims in this homicide in Las Vegas that these detectives were investigating?

. . . .

A.    The first time I spoke to my son . . . .

Q.    Okay. And that's when you sort of made that connection? Was that based on something he said?

A.    I don't understand why you're asking me to make a connection. I was aware of this at that point, so there wasn't a—

Q.    But I'm saying—

A.    —connection to be made.

Q.    —that's when you became aware of it?

A.    When the Las Vegas detectives came to my home . . . that was when I became aware of who the victims were.

Q.    Okay. That's good.

A.    And that would've been September 27th.

Q.    Okay. All right. We're now going to get—

A.    I recall that, because *that was my birthday present that day. It was my birthday.* That's how I recall it so clearly, the Las Vegas detectives getting there.

Q.    That's not one you'll forget.

A.    Right.

8/25/09 Tr. at 45–46 (emphasis added).

18.    After allowing the jury to sympathize with Ross for receiving the worst birthday gift ever, it then provided another reason for the jury to sympathize with Ross and to make her out as victim as well:

Q.    *And an unfortunate circumstance of all this was that you lost your job?*

67

A.   *Yeah, the one I had just gotten a degree to obtain.*

Q.   And that was because the police were out in front of your business processing the car.

A.   They moved my car from where it was parked out to in front of my boss's office to do their investigation.

8/25/09 Tr. at 46–47 (emphasis added).

19.   The State's improper introduction of evidence designed to make the jury feel sorry/sympathy for Ross constituted misconduct.

20.   To the extent that defense counsel failed to object to the above instances of prosecutorial misconduct, those omissions amount to ineffective assistance of counsel. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

**B.   The State improperly vouched for the credibility of Detective James Vaccaro.**

21.   During closing arguments, the State argued to the jury:

[a]nd they go to the house and they find the hat. And it's at that point that we see what is truly amazing technical work. Detective Vaccaro sees this little photo sitting up there on a stand and makes the connection. *This is the work of a seasoned, experienced, and excellent detective.*

And he beats himself up about not grabbing the hat at the scene . . . . *This thing that he does here is a truly amazing piece of detection.*

8/28/09 Tr. 78–79 (emphasis added).

22.   The prejudice from the State's improper argument was amplified because the hat, which the State alleged was the piece of independent evidence that

68

placed Mr. Richardson at the crime scene was lost and destroyed due to the

detectives' failure to collect it. *See* Claim Seven, fully incorporated herein.

### 1. Detective Vaccaro was not the excellent detective the State presented to the jury.

23.     The State vouched for a detective it knew was not an "excellent

detective" providing a "truly amazing piece of detection." 8/28/09 Tr. at 78–79. In

fact, Detective Vaccaro was a detective who: (1) failed to follow the law; and (2)

either allowed or participated in the failure to secure the crime scene from

contamination.

### a) Detective Vaccaro knowingly violated a suspect's constitutional rights in order to obtain inculpatory evidence.

24.     The United States Supreme Court has held that once a person invokes

his right to remain silent the police must cease questioning. *See generally Miranda*

*v. Arizona,* 384 U.S. 436 (1966). Yet, Detective Vaccaro did not comply with

*Miranda* when he was questioning Mr. Richardson's co-defendant Dehnart.

25.     On September 27, 2005, at approximately 11:25PM, Detectives

McGrath and Vaccaro began interviewing co-defendant Dehnart at the Riverside

County Jail. Ex. 28 at 1. Detective Vaccaro took on the responsibility of questioning

Dehnart, and Dehnart was informed of his rights. *See generally* Ex. 28; *see also* Ex.

27 at 1–2.

26.     After Dehnart voluntarily answered some of Detective Vaccaro's

questions, and was informed that he could be forensically linked to the crime scene,

he invoked his right to remain silent and not answer any more questions:

Q. You're getting all knotted up right now, buddy. You're getting all knotted up. Just take another deep breath. Think about it.

A. *I just wanna stop talking* so *I'm going to shut my mouth for now*, and I'll talk to you a little bit later, if that's okay.

Ex. 28 at 37 (emphasis added).

27.     Despite Dehnart's clear indication that he wanted to stop talking, Detective Vaccaro continued to question him.  Eventually, this questioning led to Dehnart making his first statement exculpating himself and inculpating Mr. Richardson in the murders of Folker and Feldman. *See, e.g.,* Ex. 28 at 37–87, 89– 110.

28.     Not satisfied with Dehnart's initial statement, Detectives McGrath and Vaccaro went back the next day at approximately 4:05PM to interview Dehnart. *See, e.g.,* Ex. 27 at 1–2.

29.     Once again, Detective Vaccaro took on the responsibility of questioning Dehnart and informing him of his rights. *See, e.g., id*. Dehnart agreed to waive his rights and talk to detectives. *See id.* at 2.

30.     Dehnart then inculpated Mr. Richardson in the murders of Feldman and Folker. *See, e.g., id*. at 3–50.

31.     However, Detective McGrath became suspicious of Dehnart's story and told Dehnart that he believed Dehnart was making things up. *See, e.g. id*. at 50–51. At which point, the following interaction between Detective McGrath and Dehnart occurred:

70

MM.[2] And you're trying to get your story straight.

A.      No, I'm not.

MM.      And_____ (both talking).

A.      *I'm going to stop talking . . . .*

Ex. 27 at 51 (emphasis added).

32.      Once again, not to be dissuaded by Dehnart's invocation of his rights—Detective Vaccaro told Dehnart that he was "blowing this[,]" and then continued to question him. *See, e.g., id at 51*. At which point, Dehnart continued to exculpate himself and inculpate Mr. Richardson. *See, e.g., id.* at 51–67.

33.      The prejudice of the State improperly vouching for Detective Vaccaro was even more egregious because it was aware that Detective Vaccaro was willing to violate a suspect's constitutional rights in order to gather evidence.

34.      Trial counsel failed to object to this misconduct. This failure prejudiced Mr. Richardson. As such, there is a reasonable probability of a more favorable outcome at trial if trial counsel had objected and presented this evidence to the jury.

> **b)      Detective Vaccaro allowed the crime scene to be contaminated.**

35.      At trial, the State portrayed the investigation as "by-the-book" because detectives followed proper procedure and secured the crime scene to prevent contamination. *See, e.g.*, 8/20/09 Tr. at 12–13; 8/21/09 Tr. at 168–69. However, that portrayal was simply not true.

---

[2] MM is Detective Michael McGrath. *See* Ex. 27 at 1.

36.     The State alleged that Feldman and Folker were murdered on September 7, 2005, and that the crime scene was not contaminated. *See, e.g.,* 8/20/09 Tr. at 9, 12–13, 20, 23, 26, 29,118, 128; 8/21/09 Tr. at 88–91, 125, 168–69; 8/24/09 Tr. at 104, 112–15, 158; 8/25/09 Tr. at 13–14, 30, 89; 8/26/09 Tr. at 67–68, 118, 174, 176; 8/27/09 Tr. at 49, 79; 8/28/09 Tr. at 72, 139–40. This was incorrect.

37.     For example, despite the fact the State described the crime scene as extremely bloody, law enforcement officers did not undertake any precautions to ensure that they did not step in blood and then transfer that blood to other areas. *See, e.g.,* 8/24/09 Tr. at 180 (Detective McGrath testifying that there was an enormous amount of blood at the crime scene—blood on the walls, the carpet, everywhere).  In fact, there are at least half a dozen crime scene photographs showing law enforcement officers, standing very near the bodies of Feldman and Folker, without any protective coverings for their shoes. *See, e.g.,* Ex. 29; Ex. 30 at 2; Ex. 31 at 2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

38.     Additionally, and more importantly, it is clear from the following crime scene photographs that either: (1) law enforcement brought things into the crime scene; or (2) law enforcement moved things inside the crime scene; and/or (3) the murder of Feldman and Folker did not occur on September 7, 2005.







Ex. 30 at 3; Ex. 32 at 2–3.

39.    Simply put, there is no way: (1) that in one photograph there is no mail on the side table and in another photograph there is mail on the same side table unless law enforcement brought things into the crime scene or moved items around the crime scene without documenting where they initially found the item; and/or (2) the murders of Feldman and Folker did not occur on September 7, 2005, because the Southwest Gas Corporation bill  is *metered September 8, 2005—a day after the State alleges the murders occurred. See* Ex. 140 at 1 ¶3 (Juror Norma Dennis expressing concern because "[t]here were items at the crime scene that were clearly moved around and displayed in different positions in different photographs") Ex. 140**;**  Ex. 118 at 1 ¶4 (Juror Karen Kotter stating that she knows based on employment "at the local corporate offices of Southwest Gas and . . . from personal work experience that all bills are usually sent out to the Post Office on the same day that they are processed[,] which means [the Southwest Gas bill] would not have made it to Ms. Feldman's home until September 9th, 2005, at the earliest"). Ex. 118.

40.    Therefore, it was misconduct for the State to express its personal belief or opinion as to Detective Vaccaro's credibility based on the quality of the investigation, particularly when there exists evidence to demonstrate otherwise.

41.    The prejudice from the State's improper argument is amplified because: (1) the State's theory was that the baseball cap found at the crime scene was not brought into the crime scene by anyone in law enforcement because proper procedures were followed; and (2) Detective Vaccaro the only detective to initially identify the baseball cap at the crime scene as the baseball cap Mr. Richardson was

seen wearing in the photograph found in Ross's California residence was a credible witness. *See, e.g.,* 8/24/09 Tr. at 159–60 (Detective McGrath testifying that he didn't know if he believed Detective Vaccaro when he identified the baseball cap at the crime scene as the same baseball cap seen on Mr. Richardson's head in the photograph found in California).

42.    Trial counsel failed to object to this misconduct and this failure prejudiced Mr. Richardson. As such, there is a reasonable probability of a more favorable outcome at trial if trial counsel had objected and presented this evidence to the jury. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

## C.    The State improperly shifted the burden of proof.

43.    The State charged Mr. Richardson as follows: Count 1, conspiracy to commit murder; Count 2, murder with use of a deadly weapon (Folker); Count 3, murder with use of a deadly weapon (Feldman); Count 4, burglary while in possession of a deadly weapon; Count 5, conspiracy to commit robbery; and Count 6, robbery with use of a deadly weapon. *See, e.g.,* 8/28/09 Tr. at 155.

44.    Thus, in order to convict, the State had to prove "beyond a reasonable doubt . . . every fact necessary to constitute the crime[s for] which [Mr. Richardson] [was] charged." *In re Winship,* 397 U.S. 358, 364 (1970). However, the State felt otherwise.

45.    During its rebuttal argument, the State told the jury:

> *[i]t is not our burden to establish that [Mr. Richardson] committed the crime[s]* without Robert Dehnart's testimony *beyond a reasonable doubt.*

76

8/28/09 Tr. at 145 (emphasis added).

46.    This argument constitutes misconduct, as the State in essence told the jury: (1) the burden of proof to establish all the elements of the offense is lower than beyond a reasonable doubt; and/or (2) Mr. Richardson had the burden of establishing his innocence. Mr. Richardson suffered prejudice as a result of this improper argument.

47.    Trial counsel failed to object to this misconduct and this failure prejudiced Mr. Richardson. As such, there is a reasonable probability of a more favorable outcome at trial if trial counsel had objected and presented this evidence to the jury. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

48.    Considered singly and cumulative the misconduct of the State discussed above had a substantial and injurious effect on the guilt and penalty verdicts.

### D.    The prosecutor committed misconduct during guilt phase opening statements.

49.    Mr. Richardson's conviction is invalid due to prosecutorial misconduct. The State committed misconduct during its opening statements in the culpability phase of the trial when it referred to Mr. Richardson's pretrial detention status. The State also committed misconduct when it impeded the jury's fact-finding obligations by making improper arguments during opening statements.

### 1. The State committed misconduct by telling the jury that Mr. Richardson was in custody and a prisoner in opening statements.

50.     The State improperly told the jury that Mr. Richardson was detained by police before trial. The State did this by: (a) referencing that Dehnart was in custody and informing the jury that Dehnart was with Mr. Richardson, and (b) informing the jury that Mr. Richardson did not have complete freedom of movement.

### a) The State informed the jury that Mr. Richardson was at the same location as Dehnart.

51.     The State told the jury that Dehnart was in custody and that Mr. Richardson was with him during its opening statement

52.     The State told the story of the investigation chronologically, and outlined the steps that the LVMPD detectives took in the course of their investigation. 8/20/2009 Tr. at 4–30. The State told the jury that the LVMPD detectives "tell the Riverside detectives that they're looking for Robert Dehnart." *Id*. at 17. The State then recounted that the Riverside Detectives informed the LVMPD that Dehnart was already in custody in Riverside:

> They tell the Las Vegas detectives, look, we have Dehnart, and the Las Vegas detectives go down to Riverside with the intention of speaking with Robert Dehnart.

*Id*. The State then informed the jury that the Riverside detectives mentioned Mr. Richardson for the first time during the investigation:

> When the Las Vegas detectives get down to Riverside they meet with Riverside detectives first, and the Riverside detectives tell them, hey, look, before you talk to Robert Dehnart you may want to talk to his mom's boyfriend,

78

> Thomas Richardson, because he may be willing to tell you information about Robert Dehnart.
>
> So the detectives end up talking to Thomas Richardson first, and this occurs on September the 27th of 2005. The detectives go in and speak with Thomas Richardson…

*Id.* at 17–18. The State distinctly informed the jury that Dehnart was in the custody of the Riverside detectives and that Mr. Richardson was in the same location. The State also noted, "So the detectives end up talking to Thomas Richardson first…."

53.    By indicting that Dehnart was in police custody and that Mr. Richardson was with him, the State improperly informed the jury that Mr. Richardson was detained prior to trial.

> **b)    The State informed that jury that Mr. Richardson was in custody when the State told the jury that Mr. Richardson did not have freedom of movement.**

54.    During the opening statement, the State informed the jury Mr. Richardson was not free to do as he pleased. He was not able to leave the room on his own or move about the facility. He was also not at liberty to make phone calls or smoke a cigarette without "facilitation" or "arrangement" by officers. The State informed the jury that Mr. Richardson was already locked up when detectives first spoke with him:

> [s]o the detectives end up talking to Thomas Richardson first, and this occurs on September the 27th of 2005. The detectives *go in* and speak with Thomas Richardson . . . .
>
> . . . .
>
> [However,] Mr. Richardson said before he says any more (sic) he wants to talk to Kim Ross, Robert's mother and his girlfriend, before he says any more to detectives about

79

> Dehnart. The *detectives arrange this. They let Mr. Richardson speak to Kim Ross.*

8/20/09 Tr. at 18–19 (emphasis added).

55. The State also made Mr. Richardson's custody status abundantly clear to the jury by telling them about Mr. Richardson's requests. The State told the jury that detectives needed to "arrange" a phone call; the State did not tell the jury that Mr. Richardson went out to make the call on his own or that he stepped into the hallway to make a phone call and came back. It is clear from the State's statement that Mr. Richardson was not free to act on his own and that he was detained.

56. Similarly, the State referred to specific requests that Mr. Richardson had during this conversation with detectives:

> At that point Mr. Richardson says that he wants to speak to a local detective, he wants a cigarette*, he has varying requests that the Las Vegas detectives aren't able to accommodate* at that time…

*Id.* (emphasis added). There would be no reason, other than detention, to explain why Mr. Richardson would need to make "requests" while speaking with detectives that they would need to accommodate.

57. The State also indicated to the jury that Mr. Richardson was detained in a jail facility by describing how officers were required to transport interviewees:

> once the Las Vegas detectives finish talking with Mr. Richardson *in the facility they're in*, he's in one area, *and an officer starts walking* Robert *Dehnart into the office* area to speak to the Las Vegas detectives. And the configuration of the room in the hallway is such that Thomas Richardson can see Robert Dehnart *being walked* into this interview room. And as Robert Dehnart walks by Thomas Richardson, Richardson makes a comment to him.

8/20/09 Tr. at 19 (emphasis added).

58.     The State improperly referenced that Mr. Richardson was in custody and in detention at the time detectives questioned him on September 27th. This improperly colored the jury's perception of Mr. Richardson from the outset.

59.     Trial counsel failed to object to these comments on Mr. Richardson's pretrial detention during the State's opening statements. Nor did trial counsel move for a mistrial. Trial counsel also failed to request a curative instruction from that court that would have directed the jury to disregard the location of Mr. Richardson's interaction with the LVMPD detectives.

60.     The failure to object, request a mistrial, or to request a curative jury instruction constitutes deficient performance on the part of trial counsel. Had trial counsel objected or requested a mistrial due to the State's improper reference to Mr. Richardson's pre-trial detention, there is a reasonable probability that the outcome of the proceedings would be different because the jury's perception of Mr. Richardson would not have been improperly colored from the start by the fact of his pretrial detention.

61.     Counsel on direct appeal was also deficient for failing to raise this issue. Similarly, counsel for Mr. Richardson during his first state postconviction proceedings was deficient for failing to present this issue to the state court.

## 2. The State committed misconduct during opening statements when it impeded the jury's fact-finding obligations by giving improper argument.

62.     The State improperly infringed on the jury's obligations to determine the facts and to determine which witnesses were credible. During opening

statements, the State improperly told the jury how to interpret the evidence rather than referencing what it believed the evidence would show at trial. When describing forensic testing completed on the scene, the State told the jury:

> However, all of the blood inside the southwest bedroom belonged to Steven Folker, and the blood above where Estelle Feldman was laying, all of that blood was Estelle Feldman's blood, as well, *indicating that Thomas Richardson and Robert Dehnart likely were not hurt at all in the incident.*

8/20/09 Tr. at 26 (emphasis added).

63.     This interpretation improperly colored the evidence for the jury. This interpretation also improperly bolstered the credibility of the officer who collected the evidence and the officers who performed forensic examination before they took the stand.

64.     Similarly, when discussing Dehnart's interactions with officers and various statements to police, the State injected its opinions of the evidence:

> And obviously from the detectives' point of view this didn't match up with the crime scene. . . .

*Id.* at 28.

65.     The State infringed on the jury's ability to act as an impartial fact-finder when it imparted its opinion of the evidence and its own conclusions to the jury. This misconduct had a substantial and injurious effect on the proceedings.

66.     Again, trial counsel did not object to the State's opinion or arguments made during opening statement. Nor did trial counsel object to the State's conclusions at the end of the opening statement.

67.   Again, trial counsel failed to request a mistrial based the State's introduction of improper arguments. Nor did trial counsel ask that a curative instruction be relayed to the jury to disregard the opinions and conclusions of the State, remind them of their obligation to use their own judgment and make their own determinations of fact.

68.   Mr. Richardson's counsel on direct appeal was also deficient for failing to raise this issue. Counsel for Mr. Richardson during his first state postconviction proceedings was also deficient for failing to present this issue to the state court. There is a reasonable probability of a different result had the trial counsel objected, and/or asked for a curative instruction, and/or postconviction and/or appellate counsel raised this issue.

### E.   The State committed misconduct by continuously referencing Mr. Richardson's pretrial detention throughout its case in chief.

69.   The State committed misconduct when it allowed several of its witnesses make references to the fact that Mr. Richardson was in custody when officers spoke with him about the Steven Folker and Estelle Feldman's murders in Las Vegas. This improperly colored the jury's perception of Mr. Richardson as a dangerous person and deprived him of the presumption of innocence.

70.   The presentation of Mr. Richardson as incarcerated pretrial, by references and in a photograph, signaled to the jury that Mr. Richardson was not an innocent person, in clear violation of his right under the Fifth and Fourteenth Amendments to remain an innocent person in the eyes of the jury until proven guilty with proof beyond a reasonable doubt. *Estelle v. Williams*, 425 U.S. 501, 503–

05, (1976). In *Estelle*, the defendant was forced to appear in court, in front of the jury, in clearly-marked prison clothing. *Id.* at 502. The jury convicted. *Id.* at 503. The Court determined that, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment," and that a "defendant's clothing is so likely to be a continuing influence throughout the trial." *Id.* at 504–05. Here, the State continued to improperly make references to Mr. Richardson's pretrial condition as a prisoner, and even went as far as displaying a photograph of Mr. Richardson in the exact conditions that the *Estelle* Court clearly prohibited.

71. The State set out to demonstrate that Mr. Richardson was jailed and a dangerous prisoner when it had witnesses testify that Mr. Richardson was: (1) not free to move about and had to be escorted around the building; and (2) that Mr. Richardson was not free to perform simple activities on his own. The State also displayed a photograph of Mr. Richardson at the time of his interaction with police that showed him clearly in a jail uniform and in a holding cell.

> **1.    The State made it clear that Mr. Richardson was a prisoner when the witnesses described how Mr. Richardson was not free to move about the facility on his own.**

72. Detectives testified that they needed to transport Mr. Richardson into the interrogation room and away from the room after the interrogation had concluded. For example, Detective McGrath testified about how his interaction with Mr. Richardson began.

Q.    Okay. And who did you have him bring to you first?

A.    Mr. Richardson was the first person.

84

Q.   And who was with you at the time?

A.    Detective Vaccaro.

Q.   And if you can kind of tell us the setup there. How did you meet with him. Where were you at there?

A.   *Mr. Davalos brought Mr. Richardson to us*. We met with Mr. Richardson in an office. And we spoke to Mr. Richardson there.

8/24/09 Tr. at 131 (emphasis added). Detective McGrath testified that he needed

Mr. Richardson to be "brought" to the room for the conversation. Additionally,

Detective McGrath stressed Mr. Richardson's prisoner status when he testified:

A.   Yes. Mr. Davalos was in charge of transporting both Mr. Dehnart and Richardson to meet with us.

Q.   Okay. Were you still in the same office?

A.   Yes, in the same building.

Q.   Okay.

A.   Mr. Richardson was *put in* another room in the hallway.

8/24/09 Tr. at 138 (emphasis added). By indicating that Mr. Richardson had to be

"put" in a room, rather than permitted to leave, Detective McGrath clearly indicated

that Mr. Richardson was a prisoner. There can be no other implication than that

Mr. Richardson was detained at the time that he spoke with Detective McGrath.

73.   Similarly, Officer Davalos from the Riverside Police Department

testified that he was assisting the detectives from the LVMPD.

Q.   And you were helping them -- you were bringing some people to them for interview, a Mr. Richardson, as well as Mr. [Dehnart]?

A.   Correct.

| | | |
|---|---|---|
| Q. | And they were located in a room and you were bringing these individuals to them. First you brought Mr. Richardson to them? |
| A. | Yes, sir. |
| Q. | And then you had Mr. Richardson waiting in another room while you brought Mr. [Dehnart] to visit with the detectives? |
| A. | Correct. |
| Q. | And something happened between Mr. Richardson and Mr. [Dehnart] when you were bringing Mr. [Dehnart] into the room to speak with the detectives? |
| A. | Correct. |
| Q. | Tell us what happened. |
| A. | *Upon walking by the holding cell where Mr. Richardson was being held* at for the moment, he told his -the other individual not to say anything. He, quote, "Robert, don't say anything." |

*Id.* at 212 (emphasis added). Officer Davalos's testimony left no doubt to the jury that Mr. Richardson was a prisoner because (1) a law enforcement officer was needed to escort Mr. Richardson from one place to another place in the "facility," and (2) Mr. Richardson needed to be placed in a "*holding cell*" so that Dehnart could be escorted to the interview room. *Id.* (emphasis added).

74.     During a sidebar, Mr. Richardson's trial counsel objected to the witness's continued references to Mr. Richardson's status as a prisoner. 8/24/09 Tr. at 151–53. Defense counsel also requested a mistrial. *Id.* at 151.

75.     The State acknowledged that Detective McGrath had referenced that Mr. Richardson was detained in a "jail facility." *Id.* at 152. The State argued that

86

the comment was "innocuous" and that "we're doing the best we can here." *Id*. The

State further argued that the reference was generally harmless because there had

been no mention of the charges for which Mr. Richardson had been arrested. *Id*. The

court denied the motion for mistrial, but specifically directed the witness to refrain

from referring to a "jail facility" for the remainder of his testimony. *Id*. at 153—154.

76.     Despite the State's understanding that this type of phrasing was

problematic, the State's witnesses continued to reference Mr. Richardson's

incarceration status, as Officer Davalos did, as outlined above. *Id* at 212.

> **2.     The State made it clear that Mr. Richardson was a prisoner when witnesses described how Mr. Richardson needed the permission and assistance of police officers to perform simple activities.**

77.     Mr. Richardson needed the permission and assistance of the detectives

to make a phone call and to smoke a cigarette—activities that he would have been

free to do on his own had he not been detained.

78.     Detective McGrath testified that Mr. Richardson asked permission to

call and speak with Kimberly Ross before officers continued his interrogation.

However, Mr. Richardson was not able to step into the hallway and use his own

cellphone. As Detective McGrath described,

> Detective Vaccaro called Kim Ross. We had the home phone number there. The other detectives were actually at the residence with Kim Ross. Kim Ross spoke with Mr. Richardson. I could hear the entire conversation on the phone.

8/24/09 Tr. at 137. When Detective Vaccaro testified, he also described having to

"facilitate" the phone call between Mr. Richardson and Ross. 8/27/09 Tr. at 21.

87

79.    When this phone call concluded, Mr. Richardson requested to smoke a cigarette. 8/24/09 Tr. at 137.  It was at this point that Detective McGrath directly informed the jury that this interrogation was occurring while Mr. Richardson was in jail:

> And *we couldn't let him smoke a cigarette inside the jail facility*, so we couldn't give the opportunity to smoke the cigarette there. So after that and approximately two hours of the interview with Mr. Richardson we just discontinued the interview.

*Id*. (emphasis added); *see also* 8/27/09 Tr. at 22 (Detective Vaccaro also described how he would not permit Mr. Richardson to have a cigarette).

80.    Detention by police would be the only reason that Mr. Richardson would not have been able to make his own phone calls or smoke. Accordingly, when the witnesses described these restrictions on Mr. Richardson's freedom of movement, they clearly signaled to the jury that Mr. Richardson was a prisoner.

81.    The State knew better, as referenced by the response to trial counsel's objection. Despite the objection, the State continued to allow its witnesses to refer to Mr. Richardson's pretrial detention status.

> **3.    The State made it clear to the jury that Mr. Richardson was a prisoner at the time detectives interviewed him when they showed the jury a photograph of Mr. Richardson in jail attire in front of a cinderblock wall.**

82.    The State presented a photograph of Mr. Richardson during trial that Detective McGrath testified showed Mr. Richardson as he appeared at the time of their interaction. Detective McGrath identified the photograph:

> Q.    And show you what's been marked as Proposed Exhibit 168.

88

1  A.    Yes.

2  Q.    Okay. And this is a photograph of an individual?

3  A.    Yes.

4  Q.    Who is that?

5  A.    Mr. Thomas Richardson.

6  Q.    And was this how he appeared when you had your
7        initial contact with him?

        . . . .

8  Q.    And this photograph was taken at that time?

9  A.    Yes.

10  8/24/09 Tr. at 122; *see also* Ex. 142, below.

11

12

13

14

15

16

17

18

19

20

21

22

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    83.    In the photograph, it is clear that Mr. Richardson is in an orange

jumpsuit. *See* Ex. 142. It is also clear that he is standing in front of an industrial,

cement block wall. *Id*. This is a far cry from Detective McGrath's prior

characterization that his interaction with Mr. Richardson occurred in an "office."

23

8/24/09 Tr. at 138. This photograph clearly and impermissibly depicts Mr. Richardson in a jail before trial.

84. Accordingly, the admission of this photograph was improper.

85. The prosecution's repeated references to Mr. Richardson's incarceration status through its witnesses and the admission of the photograph violated his constitutional right to the presumption of innocence. Mr. Richardson had the right to appear at his trial as an innocent person. References to his status as a prisoner destroyed that image. Worse, the State not only knew better, but had been warned by the trial court, and continued to violate Mr. Richardson's rights. This violation of Mr. Richardson's rights had a substantial and injurious effect on the outcome of the proceedings.

86. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

**F.    The State committed misconduct when it offered evidence of a hammer and boots that it knew to be inauthentic during the trial phase.**

87. The State improperly presented items of evidence to the jury that were admitted into the record that the State knew to be inauthentic, specifically: (1) a hammer that was not the actual murder weapon, and (2) boots that did not belong to Mr. Richardson.

1.   **The State committed misconduct when it admitted into evidence a hammer, not the actual murder weapon, that was used for more than mere demonstrative purposes.**

88.     The State offered a hammer and a photograph of that hammer as evidence that a like item was used to murder Folker and Feldman.

89.     The State was not able to properly authenticate the photograph.

90.     The State went beyond the bounds of demonstrative evidence when it permitted this hammer and photograph to provide the basis for conclusions by expert witnesses.

a)   **The State introduced a photograph of a hammer that it could not authenticate.**

91.     The State introduced a photograph of a hammer. Ex. 33. This hammer was identified as being similar to the hammer used in the murders, however, it was not the actual weapon used. 8/26/09 Tr. at 73–75.

92.     The photograph of the hammer was presented through witness Robert Dehnart. *Id.* Dehnart testified that he believed that the photograph was taken in the "past two weeks." *Id.* at 75.

93.     Dehnart had no personal knowledge of this hammer. There was no evidence in the record to establish that Dehnart knew when this photograph was taken or was present at the time it was taken.

94.     The State improperly attempted to argue that the hammer was the same as the murder weapon that Dehnart testified to purchasing at the Home Depot. *Id.* at 75. However, Dehnart's conflicting statements about how the hammer was acquired call the State's argument into question. *See* Claim One(H).

95.     The State was also aware of the conflicting narratives Dehnart provided to police concerning the acquisition of the murder weapon. Accordingly, the State had reason to know that this evidence was not authentic and it was misconduct for the State to admit it into evidence.

> **b)      The State improperly introduced the physical hammer from the photograph that the State argued, without any basis, was identical to the murder weapon.**

96.     The State argued that the hammer displayed in the photograph was identical to the hammer used to commit the murders. The State also introduced a hammer through a witness, Tony Trenholm, who was employed at Home Depot. 8/26/09 Tr. at 181.

97.     Trenholm was unable to determine whether the price of the item had changed. *Id*. at 182. Although Trenholm explained the process by which the retail skew number was traced in the Home Depot computer system, print-outs were not provided.

98.     Accordingly, the veracity of this trace, and thus the representation that the hammer presented in the courtroom was identical to the hammer alleged to have been used in the murders, is dubious.

99.     Admission of evidence admitted for illustrative purposes into the jury room during deliberations has been discouraged by this circuit and would constitute reversible error in certain circumstances. *United States v. Cox*, 633 F.2d 871, 874-75 (9th Cir. 1980) (citing *United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974); *United States v. Krasn*, 614 F.2d 1229 (9th Cir. 1980)). Importantly, in these cases, the

93

defense had an opportunity to challenge the factual basis for the admission of the "illustrative evidence," ***and*** a limiting instruction was provided to inform the jurors of the limits on their consideration of that evidence.

100.    Here, the defense did not have an opportunity to challenge the factual basis for the admission of this evidence, nor was the jury provided any limiting instruction for the consideration of this evidence.

> **c)      The State improperly went beyond the limited purpose of demonstrative evidence when it used the hammer presented in court as the basis for improper expert conclusions.**

101.    The inauthentic hammer introduced in court was presented to the jury as identical to the murder weapon. The State then improperly offered expert testimony about the weapon and how it was used.

> **(1)      The State first called Dr. Simms, who improperly concluded that a hammer identical the one presented in court was the murder weapon.**

102.    Dr. Simms was a forensic pathologist who testified about the autopsy on decedent Folker. 8/20/09 Tr. at 147. Dr. Simms determined that Folker's injuries were "consistent" with a hammer being used to create the injuries. *Id.* at 176–77, 186. However, the pathologist did not testify concerning a specific type or size of hammer used, other than to describe it as a "claw hammer." *Id.* at 205.  But even Dr. Simms questioned whether a hammer caused the wounds. In fact, Dr. Simms testified

> I haven't actually seen a hammer cause this type of wound before. I guess it's possible, but to me it's a little bit more characteristic of a stab wound.

94

8/20/09 Tr. at 207.

103.    In closing, the State argued that a hammer was, in fact, the murder

weapon. 8/28/09 Tr. at 44. Despite Dr. Simms's doubts about whether a hammer

caused the deaths of Feldman and Folker, the State picked up the demonstrative

hammer and described its feel, weight, and dimensions to the jury in an effort to

imply that this was an exact replica of the murder weapon:

> This is not a large framing hammer, this is a little finishing
> hammer. It's got about a one-inch diameter on the face. It's
> got a one-inch diameter on the back part. Easy to swing.
> Very easy to swing. It's not a really heavy hammer. But it's
> plenty heavy to be able to create the damage that we saw
> on the skulls of these two victims. And it's one that could
> be swung very easily by particularly the individuals we
> have in this case.

*Id.* at 44.

104.    Accordingly, the State's argument that a hammer identical to the

hammer presented in court was used as the murder weapon was improper.

> **(2)    The State then called Detective Holstein as
> an improper expert in tool mark evidence,
> who testified about the damage in the
> trailer from the hammer.**

105.    CSA Holstein improperly gave opinions about the damage that a

hammer could cause and determined that a hammer identical to the hammer in the

courtroom caused the hole in the wall of the bedroom in the trailer. CSA Holstein

opined that a hole in the wood laminate wall was "consistent with a tool mark,

possibly a hammer." 8/25/09 Tr. at 105. CSA Holstein was never noticed as a tool

mark expert, qualified as a toolmark expert, or otherwise admitted to testify as a

tool mark expert.

106.    Additionally, the validity of toolmark evidence has been called into question by leading scientists and has been determined to be unreliable. *See* Ex. 149 at 42 (noting that forensic testing used to determine the source of toolmarks has never been exposed to stringent scientific scrutiny), *and* Ex. 150 at 103 (noting that the subjective nature of the comparison analysis is problematic and the identification criteria is circular).

107.    None of the testimony from the officers investigating the crime scene, nor the testimony from the medical examiner, definitively linked the type of hammer presented in the courtroom and shown to the jury to the injuries sustained by the decedents. None of the witnesses who testified for the State, including investigating officers and the pathologist, were properly qualified or admitted as experts in toolmarks.

108.    The State improperly misled the jury to speculate that the hammer presented in court was similar to the weapon used against the decedents. The jury was never instructed of the limited purpose for which they could consider this hammer as demonstrative. *See* 8/20/09 Tr. at 16–42, instructions to the jury.

### 2.    The prosecution committed misconduct when it offered evidence of boots that Ross had presented to officers from her own unsupervised investigation.

109.    The State committed misconduct when it introduced evidence of Ross's unsupervised, independent investigation into the shoes Mr. Richardson allegedly wore during the murders. The evidence of the second set of boots that Ross purchased after she began talking to detectives was irrelevant.

**a)** **Ross testified that that she acquired the receipt for the second set of boots after the murders, making them irrelevant.**

110.   At trial, Kim Ross testified that she had purchased a pair of brown hiking boots for Mr. Richardson. 8/25/09 Tr. at 23. Ross stated that she went with Mr. Richardson to purchase the boots, but that he returned home on the evening of September 8 without them. *Id*. at 24. Ross questioned Mr. Richardson about what happened to the boots and he reported that they broke, so he threw them away. *Id*. Mr. Richardson also reported throwing the receipt away. *Id*. at 25.

111.   Ross went to the store, obtained the receipt from when she purchased the boots, and then proceeded to purchase what she asserted was an identical pair of boots. *Id*. at 25. Ross then took a photograph of the boots and then returned them to the store. *Id*. at 26. Ross clarified that she used a scanner to scan both the profile and the sole of the boots. *Id*. at 27. The State also admitted a receipt from October 2, 2005, showing that Ross purchased the boots that she photographed. 8/25/09 Tr. at 33.

112.   Over defense objection, the State used a copy of Ross's bank statement showing a transaction at the store from which Ross bought Mr. Richardson the first pair of boots. *Id*., at 32. The State also admitted the receipt from the store for the boots. *Id*.; Ex. 62. The State also showed Ross a photograph of the scan she took of the boot, and she acknowledged that this image was not the same as the original image that she sent to investigators. 8/25/09 Tr. at 33; Ex. 63. The State knew that Ross had purchased this second set of boots on her own after the fact. The State knew that this evidence was irrelevant and presented it to the jury anyway.

97

**b)**    **Ross provided inconsistent statements to detectives concerning the type of shoes that Mr. Richardson usually wore and only determined to investigate the work boots to save her son.**

113.    Ross provided conflicting accounts of the shoes that Mr. Richardson usually wore to police, changing her story later in an effort to save her son—Dehnart.

114.    Originally, Ross did not even remember that Mr. Richardson owned a pair of boots. When officers originally asked her about what type of shoes Mr. Richardson wore, Ross replied that Mr. Richardson wore shoes with tassels, rather than work boots. Ex. 64 at 35–36. Ross told officers that she observed Mr. Richardson wearing a type of "slipper shoes," or "Italian loafers with the little tassels," and black tennis shoes for work. *Id.* at 35. Ross did not think that either of these pairs of shoes were missing from the house. *Id.* at 36. In fact, at the time that Ross originally met with officers, neither she nor the officers mentioned any kind of hiking-style work boots worn by Mr. Richardson. *Id.*

115.    Ross acknowledged that she only began to think of the work boots after Mr. Richardson was arrested with her own son. *Id.* at 36. Ross was not asked or directed by police to provide a receipt for the boots, but rather, took it upon herself to "investigate." *Id.* During this conversation, Ross indicated to police that she did *not* want to help officers pursue her son. *Id.* at 49 (emphasis added).

116.    Ross testified that she believed the boots were important "after Tom and Rob got arrested," around the time she spoke with police. *Id.* On October 1, 2005, Dehnart spoke with his sister on a recorded phone line from the jail. Ex. 65 at

1. Dehnart told his sister his version of what happened. *Id*. Dehnart and his sister also discussed seeing Mr. Richardson throw away the hiking boots and recalled that Mr. Richardson stated that he was throwing the boots away because they were broken. *Id*. Notably, neither Dehnart nor his sister mentioned seeing any blood on the boots. Nor did they discuss any attempt to stop Mr. Richardson from throwing the boots away. The next day, Dehnart called Ross, who said that she was going to the store to purchase the same style of boots. *Id*.

117. At 6:21 AM on October 2, 2005, Ross left a voicemail for Detective Vaccaro stating that she spoke with her son, who had reminded her that Mr. Richardson recently threw away a pair of hiking boots. *See* Ex. 66. Later that day, Ross retrieved the store receipt from the boots and purchased a second set. Ex 62. After purchasing a second pair of boots, Ross scanned a picture of them and emailed the picture to officers on the evening of October 3, 2005. *See* Ex. 67. In this same email, Ross again referenced that she came to the realization that Mr. Richardson owned another pair of shoes "after a bit of discussion" with her children. *Id*.

118. On October 5, 2005, and November 2, 2005, Ross gave new tape-recorded statements specifically discussing the boots—both the photographs she provided to officers and the story about Mr. Richardson throwing the boots away. *See* Ex. 68, Ex. 69.

119. There was no significance to the boots that Mr. Richardson owned until Dehnart attempted to influence his mother by overstating the importance of these shoes. As demonstrated by the conflicting statements Ross gave to police about the

99

boots, Ross began her own investigation to shift the blame for the murders away from Dehnart.

  **c)**   **The work boots provided by Ross were irrelevant because they were provided after the fact and no boot prints were introduced by the State during trial.**

120.   The testimony elicited from Ross was irrelevant as the look-alike boots were purchased after the time of the murders.

121.   Trial counsel objected to the admission of the photograph of the boots both because these were not the same boots and there was insufficient corroboration. 8/25/09 Tr. at 30.

122.   Photographs from the scene did not reveal the presence of any shoe prints. This made any evidence related to the shoes Mr. Richardson wore irrelevant.

123.   The trial court did not provide a limiting instruction to the jury as they considered this evidence.

124.   As Mr. Richardson's conviction is based on this misleading evidence, he has suffered prejudice. But for the prosecution's misconduct in presenting this misleading evidence, the jurors would have been exposed to irrelevant and prejudicial evidence. The presentation of this evidence had a substantial and injurious effect on the outcome of the proceeding. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

100

**G.    The State committed misconduct when it commented upon and introduced evidence that commented upon Mr. Richardson's Fifth Amendment rights.**

125.    During opening statements, the State told the jury:

> once the Las Vegas detectives finish talking with Mr. Richardson in the facility they're in, he's in one area, and an officer starts walking Robert Dehnart into the office area to speak to the Las Vegas detectives. And the configuration of the hallway is such that Thomas Richardson can see Robert Dehnart being walked into this interview room. *And as Robert Dehnart walks by Thomas Richardson, Richardson makes a comment to him. He tells—he yells to Robert Dehnart, don't tell them anything, Robert keep your mouth shut.*

8/20/09 Tr. at 19 (emphasis added). The State then had Detective McGrath, Officer Davalos, and Dehnart provide testimony to the jury to support this argument.

126.    On September 27, 2005, Detectives McGrath and Vaccaro went to the Riverside County Jail in California to meet with and interview Mr. Richardson about the murders of Feldman and Folker in Las Vegas. *See, e.g.,* Ex. 141; 8/24/09 Tr. at 131.   Detective McGrath told the jury the goal of this interview was to get information about Robert Dehnart and the murders in Las Vegas, and not to get any information about Mr. Richardson's California offense (K-Mart robbery). *Id.* at 135–36; *see also* Ex. 141 at 1.

127.    According to Detective McGrath, upon hearing the mention of Las Vegas and Dehnart, "Mr. Richardson says . . . '[t]his is about Steve the Jew.'"[3] 8/24/09 at 136. Mr. Richardson then provided Detectives McGrath and Vaccaro with a general description of Folker, that Dehnart worked for Folker, and that Dehnart

---

[3] "Steve the Jew" is Seven Folker.

101

called Folker, "Steve the Jew" because Folker didn't pay Dehnart well. *See id.* at 136. Detective McGrath then told the jury how Mr. Richardson made requests: (1) to speak with Kim Ross on the phone; (2) speak with the California detective; and (3) smoke a cigarette; and that because they were not able to give Mr. Richardson a cigarette or make contact with the California detective— the detectives decided to "discontinue[] the interview." *Id.* at 137–38.

128.    Mr. Richardson was subsequently placed in a holding cell so that detectives could interview Dehnart. The State then elicited the following from Detective McGrath as to what happened when Dehnart passed by Mr. Richardson in the holding cell:

> Q.    Then you decided that you were going to talk to Mr. Robert Dehnart?
>
> A.    Yes. Mr. Davalos was in charge of transporting both Mr. Dehnart and Richardson to meet with us.
>
> Q.    Okay. Were you still in the same office?
>
> A.    Yes, in the same building.
>
> Q.    Okay.
>
> A.    Mr. Richardson was put in another room in the hallway.
>
> Q.    Okay.
>
> A.    Mr. Richardson was put in another room in the hallway.
>
> Q.    Okay.
>
> A.    Mr. Dehnart came downstairs, and he walked by the door. I was standing in the hallway outside the door where Mr. Richardson was. It was a door with a little

102

rectangle window. I could see Mr. Richardson at the window.

Q.   What happened?

A.   Mr. Richardson looked out the window and yelled something to Mr. Dehnart.

Q.   What did he say?

A.   He said, "Don't say anything, Robbie. Keep your mouth shut." And he was yelling that through the door so Mr. Dehnart . . . could hear it.

8/24/09 Tr. at 138–39; *see also* Claim Two(B)(1)(a), fully incorporated herein (noting that Dehnart invoked his Fifth Amendment rights when he was questioned at the Riverside County Jail, and that Detective Vaccaro violated Dehnart's Fifth Amendment rights when he continued to question him).

129.   The State then presented Officer Davalos, of the Riverside County Jail, to provide further testimony about Mr. Richardson instructing Dehnart to invoke his constitutional right to remain silent:

Q.   And you were helping them—you were bringing some people for them to interview, a Mr. Richardson, as well as Mr. Dehnart?

A.   Correct.

Q.   And they were located in a room and you were bringing these individuals to them. First you brought Mr. Richardson to them?

A.   Yes, sir.

Q.   And then you had Mr. Richardson waiting in another room while you brought Mr. Dehnart to visit with the detectives?

A.   Correct.

1       Q.    And something happened between Mr. Richardson
2                 and Mr. Dehnart when you were bringing Mr.
Dehnart into the room to speak with detectives?

3       A.    Correct.

4       Q.    Tell us what happened.

5       A.    Upon walking by the holding cell where Mr.
Richardson was being held at for the moment, he
6                 told his—the other individual not to say anything.
7                 He, quote, "Robert, don't say anything."

        Q.    And when you heard him say that[,] what tone of
8                 voice was he using?

9       A.    It was loud.

10   8/24/09 Tr. at 212.

11      130.   The State then called its star witness, Dehnart, to provide further

12  testimony about being instructed to invoke his constitutional rights:

13       Q.    Okay. I want to talk about when the Las Vegas
Homicide detectives came and sp[oke] with you.
14                 What time of night was that?

15       A.    About 11:30 at night.

16       Q.    Obviously, you didn't know they were coming?

17       A.    No.

18       Q.    As you are being walked in to speak with them, does
[Mr. Richardson] say anything to you?
19

        A.    Yes, he did.
20

        Q.    What did he say?
21

        A.    Told me not to say anything and just keep my mouth
22                 shut.

23   8/26/09 Tr. at 61.

131.    After speaking with and obtaining a taped statement from Dehnart, and despite Mr. Richardson having invoked his rights, the State elicited from Detective McGrath what they did next:

> Q.    And at the end of the recorded statement from Mr. Robert Dehnart[,] what's the next thing you decided to do in this investigation?
>
> A.    Myself and Detective Vaccaro decided that we were going to bring Mr. Richardson in and we were going to play a portion of Mr. Dehnart's recorded statement for him[,] so he could actually hear what Mr. Dehnart was saying about him.
>
> Q.    So[,] what happened next?
>
> A.    We—Mr. Dehnart went upstairs, Mr. Richardson came into the same room that he was in earlier. He sat down, and we played the digital tape recording to him. And then he responded to the digital recording.
>
> . . . .
>
> Q.    And what did he say?
>
> A.    He said, you're not pinning this murder on me, I was never in Las Vegas. And you want me to continue what—
>
> Q.    Yeah. What else did he say?
>
> A.    Detective Vaccaro said, you'd never been to Las Vegas; and he replied, never.

8/24/09 Tr. at 139, 147–48.

132.    The State then used Mr. Richardson's comment to Dehnart—to invoke his constitutional rights—in closing arguments, as a means of demonstrating Mr. Richardson's guilt:

105

> Then they talk to [Dehnart]. They bring him down
> the hallway; they bring him past Mr. Richardson's room.
> And as he goes by, Richardson yells out to him, "Don't say
> anything, Robert. Keep your mouth shut." And what had
> they been talking about, and what's he referring to? The
> murder down in Las Vegas. The murder in Las Vegas.

> Is he concerned for [Dehnart]? No. . . . *He doesn't*
> *want [Dehnart] flapping his mouth about his participation*
> *in the crime.*

8/28/09 Tr. at 78 (emphasis added).

133.  In its rebuttal, the State continued to use and stressed the importance

of Mr. Richardson's comment to invoke the right to remain silent:

> And inadvertently, the person who corroborates
> Robert Dehnart the absolute most in this case is Tom
> Richardson himself. "Don't say anything, Robby. Keep your
> mouth shut." Well, if he didn't have anything to do with it,
> and even if he's only the ride to Las Vegas, why?

> Why doesn't he want Robert Dehnart to tell them the
> whole story? If he's the ride, and Robert Dehnart talks, he's
> in the clear. But the problem for Tom Richardson should be
> obvious. If Robert Dehnart talks, he's on the hook for the
> murder too, because he did it with him.

*Id.* at 147–48.

134.  The problem with the introduction of this evidence and the State's

comments about it—is the fact that Mr. Richardson instructed Dehnart to invoke=

his right to remain silent, prior to the detectives questioning Dehnart. *See generally*

Ex. 141.

135.  In Detective McGrath's report regarding Mr. Richardson's Riverside

County Jail interview on September 27, 2005, he specifically noted that Mr.

Richardson invoked his right not to answer any more questions after speaking with

106

Kim Ross and because they could not accommodate a guarantee that Mr.

Richardson wanted:

> Richardson to tell everything he knew about her son and Las Vegas. After hanging up the phone with Ross, Richardson refused to answer any questions about Dehnart. Richardson asked to smoke a cigarette and detectives attempted to find Richardson a cigarette. Richardson asked to speak with Steve Chumway, who arrested him in Riverside. After approximately two hours, detectives could not accommodate Richardson. Richardson wanted a guarantee that he would not do more than five years for the charges in Riverside in exchange for telling detectives what he knew about Las Vegas. Richardson was returned to his holding cell in the jail.

Ex. 141 at 1 (emphasis added).

136.    Because Mr. Richardson invoked his rights, it was wholly improper and misconduct for the State to circumvent his invocation of rights, through Mr. Richardson's statement to Dehnart to exercise his own constitutional rights. *See Miranda v. Arizona,* 484 U.S. 436 (1966). It was also improper and misconduct for the State to then use that as evidence to support and inference of guilt. *See Doyle v. Ohio,* 426 U.S. 610 (1976).

137.    To the extent that defense counsel failed to object to the above instances of prosecutorial misconduct, those omissions amount to ineffective assistance of counsel. To the extent direct appeal counsel failed to raise this error on direct appeal that failure amounts to ineffective assistance of appellate counsel.

138.    There is a reasonable probability of a more favorable outcome if trial and direct appeal counsel had raised the appropriate objections and argued the prosecutorial misconduct in this section.

107

**Claim Three: Culpability Phase—*Brady* Violation**

Mr. Richardson's convictions are invalid under the federal constitutional guarantees of due process, equal protection, a fair trial, confrontation, a reliable sentence, and freedom from cruel and unusual punishment due to the State's failure to comply with its constitutional disclosure obligations, and its presentation of false and misleading testimony Robert Dehnart. U.S. Const. Amend V, VI, VIII, XIV.

**Supporting Facts**

### A.   The State violated *Brady* when it withheld Kimberly Ross impeachment evidence.

1.   The State is required to turn over exculpatory evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963). This includes impeachment material. *Giglio v. United States*, 405 U.S. 150, 153 (1972).

2.   On August 25, 2009, Kim Ross testified against Mr. Richardson. Ross was Mr. Richardson's girlfriend at the time of the Feldman and Folker murders in Las Vegas, and the mother of Robert Dehnart, Mr. Richardson's co-defendant who turned State's witness as part of his plea agreement. Ross provided testimony that: (1) Mr. Richardson took the car she needed to take her daughter to the dentist on September 7, 2005; and (2) the hat seen in the crime scene photographs, and seen on Mr. Richardson's head in the September 7, 2005, Las Vegas Taco Bell surveillance video was Mr. Richardson's Auto Club 500 baseball cap—the same baseball cap that appears on Mr. Richardson's head in the photograph that Las Vegas detectives took from her home. This testimony bolstered her son's credibility

108

and helped to convict Mr. Richardson. *See* Claim Three(B), below; *see also* Claim Seven.

3.    At the time of her testimony, Ross had a history of dishonest bad acts, flouting court-imposed sanctions, and had active bench warrants for her arrest. None of this information was disclosed to defense counsel.

1.    **The State violated *Brady* by failing to disclose Kim Ross's prior convictions for crimes involving dishonesty, prior bad acts, and her outstanding warrants.**

a)    **Ross's credibility is called into question because she had a prior conviction involving dishonesty.**

4.    The State relied heavily on Ross, and her credibility was of paramount importance. As a result, the State had a duty to disclose impeachment evidence to the defense. The State—either actually or constructively—knew that Ross had a conviction for receiving stolen property in California. On December 27, 1993, Ross pleaded guilty to one count of possessing stolen property in Riverside Superior Court and was sentenced to 24 months probation. *See* Ex. 45 at 11 (Riverside Superior Court case CR51449); Cal. Penal Code § 496.

5.    Cal. Penal Code §496 states:

> (a) Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, *knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be stolen* [is guilty of receiving stolen property] (emphasis added).

Cal. Penal Code §496(a) (emphasis added).

6.    In Nevada, receiving stolen property is a crime of dishonesty that can be used to attack a witness's credibility. *See Robles v. State,* 238 P.3d 850, 2008 WL 6101939 (Nev. 2008) (unreported) (holding that prior conviction for crime of dishonesty is proper subject for cross examination even if more than ten years old); *see also* Nev. Rev. Stat. § 50.085(3).

7.    The State's failure to disclose this information was prejudicial as it: (1) deprived Mr. Richardson of his right to confront and cross-examine his accusers; and (2) left the jury without the means to properly assess Ross's credibility. *See* Ex. 38 at 2–3.

### b)    Ross' credibility could have been undermined because of prior bad acts.

#### (1)    Ross was charged with additional crimes which call her truthfulness into question.

8.    When Ross pleaded guilty to receiving stolen property on December 27, 1993, two additional charges were dismissed. Ross was charged with unlawful possession of forged, altered or counterfeit items:

> Every person who possesses or receives, with the intent to pass or facilitate the passage or utterance of any forged, altered, or counterfeit items,[. . .] *with intent to defraud,* knowing the same to be forged, altered, or counterfeit, is guilty of forgery.

Cal. Penal Code § 475(a) (emphasis added).

9.    Although not convicted, Ross's bad acts form the basis for impeachment as the conduct underlying those acts consist of dishonesty and false statements. *See Robles v. State,* 238 P.3d 850, 2008 WL 6101939 (Nev. 2008) (unreported).

### (2) Ross constantly and consistently broke promises she made to the Riverside County Court, which ultimately issued warrants for her arrest.

10.    Following Ross's plea of guilty in case CR51449 on December 27, 1993, the Riverside Superior Court sentenced Ross to 24 months probation. Ex. 45 at 11. Ross violated probation by failing to appear for court. Ex. 45 at 13. On February 14, 1994, the Honorable Judge Richard T. Fields ordered a bench warrant and set bail at $2500.00. *Id*. On January 14, 1998, Ross violated a written promise to appear and was charged with Cal. Penal Code § 853.7 for willfully failing to appear. Bail was raised to $7500.00. *Id*. at 15. On September 28, 1998, Ross again failed to appear, and was charged with an additional count of Cal. Penal Code § 853.7. Bail was raised to $9999.00. *Id*. at 16. Yet again, Ross failed to appear on January 24, 2000, and yet another count of Cal. Penal Code § 853.7 was added. Bail was raised to $12,500. *Id*. at 17.

11.    On February 11, 2003, Ross appeared in court and pleaded guilty to the violation of probation. She was sentenced by the Honorable Judge Bernard J. Schwartz to a reinstated term of probation and to 120 days custody in the Riverside County Jail, to be served on consecutive weekends beginning on March 3, 2003. Ex. 45 at 4–5, 25. On March 28, 2003, Ross had failed to appear. *Id*. at 5.

12.    On May 9, 2003, Ross had still not appeared and Judge Schwarz issued a bench warrant and set bail at $15,000.00. *Id*. at 27. On April 24, 2004, Ross was cited by the Riverside Police Department for her outstanding warrant and ordered to appear in court on June 7, 2004. *Id*. at 6. On June 7, 2004, Ross did not appear,

111

and an additional charge of Cal. Penal Code §853.7 was added. Bail was raised to $30,000.00. *Id*. at 28. On October 27, 2007, Ross was cited by the Riverside County Sheriff and ordered to return to court. *Id*. at 8. On December 10, 2007, Ross again failed to appear in court, and additional charge of Cal. Penal Code §853.7 was added. Bail was raised to $40,000.00. Finally, on April 21, 2009, Ross failed to appear, and the bench warrant remained outstanding.[4] *Id*.

13.     For years Ross flouted the authority of the Riverside Superior Court by constantly promising to the court to appear, and then breaking her promise by her constant failures to appear. At the time of her testimony against Mr. Richardson, Ross was not only the subject of an active bench warrant, but also should have been serving weekends incarcerated.

14.     Considered singly and cumulatively, there is a reasonable probability of a more favorable outcome if the State had complied with its constitutional disclosure obligations by disclosing the information above.

> **2.     The State violated *Brady* by failing to provide the additional 4–5 photographs of the Auto Club 500 hat that Kim Ross testified were of good quality, which she saw and used to identify the hat, but were not provided to the defense or entered into evidence.**

15.     During her testimony, the State asked Ross to identify the Auto Club 500 hat in the crime scene photograph marked as State's Ex. 307. 8/25/09 Tr. at 77. Ross identified the hat in State's Ex. 307 as belonging to Mr. Richardson. However,

---

[4] Records retrieved from the public access of the Riverside Superior Court on April 20, 2022, indicate that Case CR51449 is, at the time of the instant petition, still in warrant status, along with four additional warrants from other cases. Ex. 159.

on three occasions Ross testified that her identification of the hat was based on

additional, clearer photographs shown to her by detectives but not provided to the

defense or shown to the jury:

> Q.  I'm going to show you what's been marked as State's Exhibits No. 140 and 141 and have you take a look at those. Are those the photographs that the police showed to you?
>
> A.  Yes, they did. But when they showed it to me they also showed me an extreme closeup so that I could see the detail on the bill and the front of the logo on the hat.
>
> Q.  Okay. Let's—we'll see if we can do that. But we have varied success with our monitor here.
>
> A.  Okay.
>
> Q.  But we'll see if we can zoom in on this. Okay. Is that close to what they had shown you?
>
> A.  No. It was very clear. I could very clearly see the logo in the photograph that they showed me.

8/25/09 Tr. at 19–20.

. . . .

> Q.  . . . And you indicated on your direct that the picture —the photograph that you were shown by detectives was focused and clear to the point to where you could see sweat stains; is that correct?
>
> A.  I could see the logo very clearly and the sweat stains on the bill, yes.
>
> Q.  And was it the one I'm showing you on the screen now?
>
> A.  It appears to be the photograph that I saw that was much clearer. The hat was positioned the same way, and it appeared to be in the same room.

113

1   Q.   Can you see the detail in this exhibit that you've
2        testified you saw in the original photograph that you
         were shown?

3   A.   No, I can't.

4   Q.   Showing you 141 in evidence, can you see the hat in
5        this photograph?

6   A.   Barely, yes. I can barely see it.

7   Q.   Is this the photograph that you were shown
         originally by the detectives in this case?

8   A.   No. I was shown many more photographs than just
9        these two.

10  Q.   I understand, ma'am. We're talking about the hat.
         You were shown how many photographs of this hat?

11  A.   Several. I would think four or five, one of them being
12       a closeup that was focused enough to read the logo
         on this hat.

13  Q.   And was the hat—did it appear to be in the same
14       position, perched atop of some item or some object?

15  A.   It appeared to be a bed frame, the bottom box spring
16       that was leaned up against the wall and hung on one
         leg of the box spring.

17  Q.   And you will agree with me that in this exhibit, 141,
18       that this is not a clear enough shot for you to be able
         to see the detail as you did in the first shot, in the
         original photograph that you were shown; correct?

19  A.   I cannot see clear detail in this photograph, no.

20  Q.   And the one that you were shown you clearly could?

21  A.   Absolutely.

22  Q.   Have you seen the photograph that you were
23       originally shown any more since the first time you
         were shown it, the one that showed the vivid detail?
         Have you seen it again?

114

1          A.     No, I have not.

2     8/25/09 Tr. at 60–61.

3                                          . . . .

4          Q.     Okay. I'd like to show you a photo which we've just
                  had marked as Number 307 for identification. It was
5                  an exhibit that was shown to you at the grand jury.
                  At the grand jury it was Exhibit Number 24, being a
6                  closeup of the other photograph that you've been
                  saying wasn't clear enough.

7
           A.      Oh. Okay. Yes, it's the racing "500" hat, and you can
8                  clearly see where the stains and sweat stains are on
                  the bill and the fading.
9
           Q.     Is this the photograph that you were talking about
10                 that you had seen earlier that was the closeup of the
                  other one?
11
           A.     I think it was even clearer than this. The print is
12                 bad. I think maybe if the resolution was bumped up
                  on the printout I could read it even better.
13
                                          . . . .
14
           Q.     Okay. And for the record, we've got that on the
15                 screen. You can see the bed frame in that. It's just a
                  different photo -- I mean, a closeup of that same
16                 scene; is that correct?

17         A.     Yes.

18    8/25/09 Tr at 77–78. *See also* Ex. 44.

19         16.    There can be little doubt that additional, clearer, photographs of the

20    hat existed, and that they were not disclosed to the defense. The State's failure to

21    disclose these photographs is a violation of *Brady,* as these photographs could

22    reveal whether the baseball cap found at the crime scene is an Auto Club 500 hat,

23

                                          115

and if so, if it could properly be identified as the actual one Mr. Richardson is seen

wearing in the photograph taken from Ross's home in California.

17.     The State's failure to turn this information over was prejudicial as it:

(1) deprived Mr. Richardson of his right to cross-examine and confront his accusers;

and (2) left the jury without the means to properly assess Ross's credibility. There is

a reasonable probability of a more favorable outcome if the State would have

complied with its constitutional disclosure obligations.

18.     To the extent that counsel failed to challenge the nondisclosure of

Ross's criminal history and/or the additional photographs Ross identifies law

enforcement as having—counsel were ineffective. There is a reasonable probability

of a more favorable outcome if counsel had performed effectively.

**B.     The State violated *Brady* and *Napue* when it: (1) permitted Robert Dehnart, the State's key witness and Mr. Richardson's co-defendant, to present false and misleading testimony about the terms of his plea agreement; and (2) failed to provide the defense with the complete terms of Dehnart's agreement with the State.**

19.     During his testimony, Dehnart recounted the terms of his plea

agreement on the record as follows:

> Q.     And as you—as you sit here today can you explain what—what the deal is. I mean, you're testifying on behalf—or as a State's witness.
>
> A.     Yes.
>
> Q.     And what are you getting in exchange for that?
>
> A.     I was to plead guilty to one count of first degree murder, and I was also to testify against Thomas Richardson and that I would receive a sentence between 24 and 80 years in prison.

116

Q.    Okay. And you don't have to give me the exact date, but when was that deal made?

A.    I think at the end of July.

Q.    Of this year?

A.    Of this year.

. . . .

Q.    Were you there?

A.    Yes, I was.

. . . .

A.    It was also part of my plea agreement that I would cooperate in any investigation that the detectives had. And they picked me up from the jail and took me for a drive at night to see if I could remember around what area of the freeway where I threw the hammer out of the window.

8/26/09 Tr. at 70–71.

20.    The written Guilty Plea Agreement (GPA) signed by Dehnart stated that he was pleading guilty to a second count, robbery with the use of a deadly weapon, in addition to the first degree murder charge.

COUNT I— FIRST DEGREE MURDER to a term of LIFE without parole; twenty (20) years — LIFE; or, a definite term of twenty (20) years to fifty (50) years with eligibility for parole beginning at twenty (20) years.

COUNT 2— ROBBERY WITH USE OF A DEADLY WEAPON the Court must sentence me to imprisonment in the Nevada Department of Corrections for a minimum term of not less than two (2) years and a maximum term of not more than fifteen (15) years plus a consecutive two (2) to fifteen (15) years for the deadly weapon enhancement. The minimum term of imprisonment may not exceed forty percent (40%) of the maximum term of imprisonment.

117

Ex 91 at 2. The written agreement also stated that Dehnart "testifies in the case of the co-defendant truthfully and cooperates with authorities, he will receive the minimum sentence on the Robbery charge." *Id*. at 1.

    21.    The State also filed an Agreement to Testify, outlining that Dehnart was to provide true statements during the investigation and on the stand, to the State, the defense, and the Court. Ex. 167 at 2.

    22.    However, the terms of the GPA did not include all the terms agreed upon, and the State and the trial court knew this. *See* Claim Twelve(A), fully incorporated herein.

    23.    On July 28, 2009, Dehnart changed his plea in open court. 7/28/09 Tr. at 1–16. During the change of plea proceedings, it became apparent that part of Dehnart's deal was that his California sentence would be run concurrently with any sentence he would receive in Nevada:[5]

> THE COURT:    And it's my understanding the matter has been resolved. Mr. O'Brien do you want to state the negotiations?
>
> MR. O'BRIEN:    Yes, thank you, Your Honor. For the record, Judge, we've signed and filed the guilty plea agreement. I believe there's also been an Amended Indictment that's been filed to the Court. Additionally, we've filed an agreement to testify, pursuant to this case, attached to the guilty plea.
>
>     The terms of the agreement is that Mr. [Dehnart] will plead guilty to a First Degree Murder and to a Robbery with Use of a Deadly Weapon.

---

[5] The Judge who accepted Dehnart's plea agreement and who was to preside over his sentencing was the same judge who presided over Mr. Richardson's trial.

1              The parties agreed to a sentence of 20
2    to 50 years for the First Degree Murder.

3              Additionally, in regards to the Count 2, this Robbery with Use of a
4    Deadly Weapon. The parties agreed to
5    a sentence of 2 to 15 years plus a consecutive 2 to 15 years for the
6    Robbery with Use of a Deadly Weapon. We agree that's to run consecutive to
7    the First Degree Murder charge.

8              Furthermore, the Guilty Plea Agreement states that both the State
9    and Court have both agreed that if the Defendant testifies in the case of the co-
10   defendant, truthfully and corroborates with the authorities, he will receive the
11   minimum sentence on the robbery charge.

12            . . . .

13   MR. O'BRIEN:      *Judge, Mr. [Dehnart] did ask me about*
14   *what would be the posture—this case with the time he's doing in California,*
15   *right now? I informed Mr. [Dehnart] that I believed that he would get*
16   *concurrent time if he testified in a manner that he got the benefit of the*
17   *deal—the benefit of the bargain detailed in the Guilty Plea Agreement.*

18   THE COURT:      *Right. And the attorneys did speak to*
19   *me about that and I gave an indication—the State indicated that*
20   *they would not propose any objection to that—*

21   MR. O'BRIEN:      Okay.

22   THE COURT:      *—and if you testify consistent with the*
23   *agreement to testify and you testified truthfully I would see no reason why I would not grant you concurrent time.*

MR. O'BRIEN:        Okay.

THE COURT:        Does that answer your question

THE DEFENDANT:        Yes it does.

24.    The terms relating to concurrent sentencing with Dehnart's California and Nevada sentences appear only in the transcript of proceedings and are not mentioned in Dehnart's GPA. Regardless of its omission in the GPA, it's clear from the exchange above that Dehnart anticipated getting the additional benefit of concurrent sentences if he testified against Mr. Richardson. In fact, Dehnart's deal to run his California sentence concurrently with his Nevada sentence was significant—as Dehnart had received a twelve year sentence. *See* Ex. 189.

25.    Trial counsel was only provided with a copy of the GPA, the agreement to testify, and the written proffer. Mr. Richardson's attorneys, though, were unaware of the additional benefit that Dehnart would receive for testifying against Mr. Richardson and relied solely on what the State provided and Dehnart testified to. *See, e.g.,* 8/26/09 Tr. at 76–79, 84.

26.    Due process requires the prosecution to disclose evidence that is favorable to the defendant and "is material either to guilt or punishment." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). A *Brady* claim consists of three elements: (1) the State suppressed the evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *Strickler v. Greene,* 527 U.S. 263, 280 (1999).

27.    A prosecutor's knowing use of perjured or misleading testimony is a threat to the concept of "ordered liberty." *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *see also Mooney v. Holohan,* 294 U.S. 103 (1935) (deliberate deception of a jury is

"inconsistent with the rudimentary demands of justice").  The same result is obtained when the State, although not soliciting false testimony, allows it to go uncorrected when it appears. *See Alcorta v. Texas,* 355 U.S. 28, 30–32 (1957) (finding that the prosecution's failure to correct a key witness's testimony about the nature of his relationship with the defendant's wife violated the defendant's rights). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269.

28.    A *Napue* claim succeeds only if three elements are satisfied. *See U.S. v. Zuno-Arce,* 339 F.3d 886, 889 (9th Cir. 2003). First, the testimony or evidence in question must have been misleading. *See id.*; *see also Alcorta,* 355 U.S. at 31 (considering whether "testimony, taken as a whole, gave the jury [a] false impression"). Second, the State must have known or should have known that it was false or misleading. *See Zuno-Arce,* 339 F.3d at 889; *see also Maxwell v. Roe,* 628 F.3d 486, 506 (9th Cir. 2010) ("even false evidence presented in good faith . . . hardly comports with fundamental fairness") (quoting *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002)). Third, because "*Napue* does not create a 'per se rule of reversal,'" the testimony or evidence in question must be material. *Sivak v. Hardison,* 658 F.3d 898, 912 (9th Cir. 2011) (quoting *Jackson v. Brown*, 513 F.3d

121

1057, 1076 (9th Cir. 2008)). Materiality under *Napue* requires a "lesser showing of harm . . . than under ordinary harmless error review." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

29.    Dehnart received an additional benefit—saving himself an additional twelve years—for his testimony against Mr. Richardson that he failed to disclose when he testified. This was a benefit that both the State and the trial court knew about, but did not disclose. *See, e.g.,* Ex. 189.

30.    After informing the jury of the benefits he (Dehnart) received in exchange for his testimony against Mr. Richardson neither the State nor the court made any effort to correct his misstatement—even though both the State and the court knew it to be incomplete. *See* 8/26/09 Tr. at 70.

31.    The State's failure to correct Dehnart's false or misleading testimony left the jury without an accurate way to assess his credibility and to determine whether the State proved its case against Mr. Richardson beyond a reasonable doubt. This evidence was particularly important and material in light of the fact that Dehnart was the primary witness against Mr. Richardson, and was the only person who placed Mr. Richardson in the trailer where the murders occurred. Unlike Mr. Richardson, Dehnart was connected to Folker, and there was forensic evidence linking him (Dehnart) to the murders. 8/26/09 Tr. at 9–10 (Dehnart's connection to Folker); 8/24/09 Tr. at 177 (only Dehnart's bloody fingerprints were found in the room where the murders occurred).

32.    There is a reasonable probability of a more favorable outcome if the State had complied with its constitutional disclosure obligations by revealing

Dehnart's deal to obtain concurrent time with his California sentence.  There is a reasonable likelihood that the existence of Dehnart's testimony had an effect on the jury's guilt and penalty verdicts.

1    **Claim Four: Ineffective Assistance of Trial Counsel—Penalty Phase**

2         Mr. Richardson's death sentences are invalid under the federal constitutional

3    guarantees of due process, confrontation, effective counsel, equal protection, fair

4    trial, freedom from cruel and unusual punishment, and a reliable sentence due to

5    the ineffective assistance of trial counsel at the penalty phase of trial. U.S. Const.

6    amends. V, VI, VIII, and XIV.

7    **Supporting Facts**

8         1.    Trial counsel were on notice that the State would be seeking the death

9    penalty based on three aggravating circumstances: a prior violent felony stemming

10   from the burglary of a K-Mart in 2005, a prior violent felony stemming from a court-

11   martial conviction for rape from 1992, and the fact that Mr. Richardson was

12   convicted of multiple murders. *See* Ex. 42.

13        2.    Clearly established federal law recognizes that the standard of practice

14   at the time of Mr. Richardson's trial required counsel to rebut these aggravators,

15   both by undermining the State's proof of each of the aggravators themselves, and

16   also by investigating and presenting mitigating evidence to affirmatively

17   demonstrate that Mr. Richardson was not morally deserving of a death sentence.

18   *See Rompilla v. Beard*, 545 U.S. 374 (2005). Trial counsel failed in both regards.

19   Trial counsel's failure to investigate and rebut the aggravators, as well as their

20   failure to investigate and present mitigating evidence, fell below objective standards

21   of reasonableness. There is a reasonable probability of a more favorable outcome if

22   trial counsel had performed effectively.

23

124

1

## A.    Mr. Richardson's 1992 Court-Martial Conviction.

2

3.    Mr. Richardson received ineffective assistance of counsel during the

3

sentencing phase of his trial due to counsels' failure to obtain and use his court-

4

martial records to: (1) demonstrate that Staci Sokol (Sokol) was not a credible

5

witness; (2) to limit/prevent her testimony regarding her son; (3) to request a

6

curative instruction; and (4) to challenge the use of his court-martial conviction as

7

an aggravating circumstance. Counsel were also ineffective for failing to meet with

8

and interview Sokol prior to Mr. Richardson's trial.

9

### 1.    Counsel unreasonably failed to obtain Mr. Richardson's court-martial records, which were easily obtainable.

10

11

4.    Pursuant to the ABA Guidelines for the Appointment and Performance

12

of Defense Counsel in Death Penalty cases, the Special Public Defender (SPD) had a

13

mitigation specialist on staff; who was responsible for "requesting records" and

14

assisting the attorneys "with mitigation interviews." Ex. 37 at 1 ¶4; Ex. 38 at 4 ¶9;

15

*see also* ABA Guidelines for the Appointment and Performance of Defense Counsel,

16

Guideline 4.1 (2003). However, the SPD's only mitigation specialist, at that time,

17

was not assigned to Mr. Richardson's case, and she was not asked to assist or

18

consult in any way. *See id.* (Attorney Schieck noting that Maribel Yanez, SPD's only

19

mitigation investigator, was not part of Mr. Richardson's team); Ex. 161 at 1–2

20

¶¶4–5 (Yanez stating that at the time of Mr. Richardson's trial she was the only

21

mitigation specialist at SPD, that she was not part of Mr. Richardson's team, and

22

she was not consulted or informed of any problems obtaining records, and she was

23

not asked to assist); Ex. 187 at 1 ¶¶2–3 (Blackwill stating that she was the only

125

investigator assigned to Mr. Richardson's case, and that at the time of Mr.

Richardson's trial, Yanez was the only mitigation witness). As a result, the task fell

to Ms. Blackwill to obtain Mr. Richardson's court-martial records. *See* Ex. 38 at 4

¶9; Ex. 187 at 1 ¶3; Exs. 162–65.

     5.    Ms. Blackwill, after consulting with SPD Investigator—Joe Perez, who

was a military veteran—appeared to have sent a fax to the attention of "JALS-CCO"

at the Office of the Clerk of Court U.S. Army Judiciary.[6] Ex. 164 at 2; *see also* Ex.

187 at 2 ¶6. In response to her request for court-martial record information,

Blackwill received certified copies of: the Post-Trial Recommendation in *U.S. v.*

*Richardson*; the Addendum to Post-Trial Recommendation; a corrected copy of the

General Court-Martial Order; the Memorandum Opinion of the United States Army

Court of Military Review; Order Denying Petition; Corrected Copy of General Court-

Martial Order; and a Time Line and Summary of Military Records. *See* Exs. 163,

165. Importantly, in the discussion section of the February 5, 1993, Addendum to

Post-Trial Recommendation it is noted:

> [i]n brief, the defense submission by Captain Mitchell
> requests that the findings of guilty be disapproved and that
> Private First Class Richardson's chapter 10 discharge be
> approved . . . . *[Captain Mitchell] contends that the victim*
> *lied as to the events surrounding the crime of rape and*
> *attempted sodomy. [Captain Mitchell] also maintains that*
> *there are numerous inconsistencies in the testimony of*
> *several witnesses.*

---

[6] When entering Office of the Clerk of Court U.S. Army Judiciary into a Google search, the first "hit" is to the Army Court of Criminal Appeals. *See* https://www.google.com/search?q=U.S.+Army+Judiciary&rlz=1C1CHBF_enUS931US931&oq=U.S.+Army+Judiciary&aqs=chrome..69i57j0i22i30j0i390l2.11248j0j15&sourceid=chrome&ie=UTF-8  (last visited Octpber 2, 2022).

126

1   Ex. 163 at 6 ¶c (emphasis added).

2       6.    Reasonably competent counsel would have seen this information and

3   made every effort to obtain Mr. Richardson's court-martial file/pleadings, located

4   and contacted Mr. Richardson's defense attorney Captain Mitchell to inquire about

5   what he remembered about the case and who the witnesses were, and transcripts to

6   find out the specific facts and/or evidence defense counsel found to allege Sokol lied

7   and if the inconsistent witness testimony directly affected the strength of the court-

8   martial case against Mr. Richardson. *See Wiggin v. Smith,* 539 U.S. 510 (2003).

9   However, there was no follow-up regarding this information, counsel failed to obtain

10  the court-martial pleadings and transcripts, and in fact there was no indication by

11  counsel that they needed "further investigation into Mr. Richardson's court-martial

12  records or track down Mr. Richardson's court-martial attorney[,] or any of the

13  witnesses from that case." Ex. 187 at 2 ¶7. Counsel's only response for failing to

14  obtain Mr. Richardson's court-martial records is that they tried, but had a hard

15  time. *See* Ex. 37 at 4–5 ¶13.

16      7.    Contrary to counsel's assertions, it was easy for Mr. Richardson's state

17  postconviction counsel to obtain Mr. Richardson's court-martial records almost ten

18  years after Mr. Richardson's trial counsel made their "attempt." *See generally* Ex.

19  139. Richard Franky, Mr. Richardson's state postconviction investigator, outlined

20  who he contacted and when, he followed-up on his requests, and as a result was

21  able to obtain Mr. Richardson's court-martial records. *See id.* The only difference

22  between what Mr. Richardson's trial team did and what Franky did—is that Franky

23  followed-up with all his requests to ensure that state postconviction counsel

obtained Mr. Richardson's court-martial file/records, which included pleadings and

transcripts. *See id.*

> **2.     The penalty phase testimony of Sokol played a critical role in the jury's imposition of a death sentence; yet, the defense failed to conduct an adequate investigation to demonstrate that Sokol was not credible.**

8.     The State relied on Sokol and her testimony as an aggravating

circumstance in support of the death penalty. *See, e.g.,* 9/2/09 Tr. at 15 (referring to

Sokol as victim who came forward to tell her story more than a decade later), 26

(telling the jury that Sokol had to relive this event during her testimony), 64, 66–68.

The State made this abundantly clear in its rebuttal closing argument:

> This crime occurred in 1992. He was convicted. It's done. She was vindicated. She reported that crime, it was investigated, pictures were taken of this woman. She underwent a very invasive medical exam, and there was a full-blown trial. Witnesses were called. She was cross-examined then and he was convicted.
>
> *And besides that, you heard her description of the events and you saw her testify. Her ability to recall this is stunning. You judge her credibility. Do you think she's lying about one aspect of that*?
>
> And she's probably tried to forget this incident a million times. She probably wishes she has never heard the name Tom Richardson. And yet, she's asked to come here 17 years later and relive it. And *what a good time she must have had talking to a whole group of strangers about the most private parts of her body being invaded by him, only— only to go through the suspicion and disdain and cross-examination all over again, on crime that she's already— that he's already been convicted for.*
>
> Yeah, *that was a really, really great thing for her to do 17 years later*. She should be proud of herself for coming here and telling you about Tom Richardson. *Because a piece of paper, that Judgment of Conviction, doesn't tell you the*

*whole story*. It's just like saying double homicide. It doesn't really tell you the facts of the case.

But when she came here and she spoke to you and she told you what he did to her, you had a very full picture of whom Tom Richardson is. And to attack her and dismiss her after she's been vindicated for all these years is offensive.

*She wants him dead? Who could blame her?* . . . If she didn't want him dead, wouldn't we be wondering . . . why . . . what happened in that incident? She may very well want that, and that would be a completely legitimate feeling given the violence inflicted on her. 17 years later she's still feeling that. Why wouldn't she want that?

9/2/09 Tr. at 67–69 (emphasis added).

9.       However, the basis for the State's impassioned plea—Sokol's credibility to tell the story of what Mr. Richardson did to her and the trauma it caused her—is not based on the testimony and evidence presented at Mr. Richardson's court-martial.

### a)       Summation of Sokol's penalty phase story.

10.      Sokol testified that during the early morning hours of February 9, 1992, she woke up with Mr. Richardson on top of her "attempting to rape" her—that she felt his weight on top of her, and that he smelled of smoke, alcohol, and cologne. 8/31/09 Tr. at 41–42.

11.      She then described the following:

I asked him what the hell he was doing. And he said basically, it's none of my business. And I'm like, what are you doing? Why are you here? How did you get in the house? And *he proceeded to just mess me up*.

. . . .

[He] hit my face. I wasn't too pretty afterwards.

129

8/31/09 Tr. at 42, 44 (emphasis added); *see also id.* at 52 (Sokol testified that her friend McElroy knew something bad happened because of the way her face looked). And when asked what damage Mr. Richardson inflicted upon her during the assault, she testified "*I had a black eye and a split lip*[,]" and "*had cuts on my arm*[,]" which she had to wrap up. *Id.* at 44, 48 (emphasis added).

12.   Sokol testified that once Mr. Richardson left, after he had sexually assaulted her for two and a half hours, she checked on her children, and then called Mr. Richardson's roommate. *See id.* at 42–47.

> I called his roommate, of all things. I don't know why. But I called his roommate. And I was like, "Why did you let him do this to me?" He was like, "What are you talking about?" And I said, "Why did you let him rape me?" And he's like, "Staci, I have no idea what you're talking about."
>
> . . . .
>
> And I said, "*Go look at his clothes. Go look in his front pocket and tell me what you find.*"

*Id.* at 47 (quotation marks in original, emphasis added). When asked what Mr. Richardson's roommate would find she testified:

> *My blood. And when he found that, he told me to get the kids, get out of the house and meet him* at a . . . club called Midnight Rodeo and it had a huge parking lot. . . . And so I started gathering the kids up.

8/31/09 Tr. at 47 (emphasis added).

13.   Sokol then told the jury that as she was getting ready to leave her home with her kids, Mr. Richardson came in carrying her son. *Id.* at 48–49. She

then proceeded to talk her and her kids way out of the her home because she was scared of Mr. Richardson:

> *I could see the gun [in the front waist band of Mr. Richardson's pants]. And I just assumed because of everything that he had done the last few hours, he was coming back to finish us.*

*Id.* at 50 (emphasis added).

14.     Sokol then testified that once Mr. Richardson allowed her to leave, she met up with his roommate, who took her to her friend McElroy's home to drop her kids off there. *See id.* at 51–52. She and Mr. Richardson's roommate then went back to her home, where they called 9-1-1. *See id.* at 53.

15.     Sokol testified that when law enforcement arrived they ransacked her home to process it for evidence. *See id.*  Once law enforcement was done, and she had answered their questions, she went to the hospital—where "they did specimen collection[,] a rape kit[,] took photos[,] and scraped [under] her nails." *See id.* at 54.

16.     Sokol then told the jury that Mr. Richardson's court-martial proceedings lasted two days; from October 30, 1992, until October 31, 1992, and that he was convicted on October 31, 1992. *See* 8/31/09 Tr. at 75. She further informed the jury there were other witnesses who testified against Mr. Richardson. *See id.*

**b)  Trial counsel were ineffective for failing to impeach Sokol's credibility using the court-martial records.**

**(1)  Sokol's credibility was a major problem during Mr. Richardson's court-martial proceedings.**

17.     Because Sokol's credibility was tantamount to the State having the jury find the prior violent felony aggravator related to her, reasonably competent counsel should have used Mr. Richardson's court-martial records to demonstrate: (1) that U.S. Army investigators didn't believe Sokol, and (2) Sokol perjured herself during Mr. Richardson's court-martial proceedings.

18.     First, reasonably competent counsel could have used the fact that the U.S. Army's Criminal Investigation Division (CID) agent investigating Sokol's allegation against Mr. Richardson *Mirandized* her on three separate occasions, and had her sign on each of those occasions a "Rights/Warning Procedure/Waiver Certificate[,]" wherein she was warned that she was "[s]uspected of false swearing in connection with a rape and sodomy[]" allegations she was making against Mr, Richardson. Ex. 48 at 454–55; *see also id.* at 780–94 (CID Special Agent Reed Morell testified that he discussed with Sokol a number of inconsistencies in her statement, his problems with her story, and that there were concerns based upon Sokol's "first set of polygraph charts").

19.     Second, reasonably competent counsel could have used these records to show that Mr. Richardson's defense attorney proved that Sokol perjured herself at Mr. Richardson's sentencing hearing. At the hearing, Sokol testified that she was in counseling talking about her feelings and the effects of the rape with her "church

bishop [and] the missionaries . . . ." *Id.* at 993. However, this testimony was

patently false. Upon learning that Sokol was Mormon, defense counsel, who is also

Mormon, went to the Mormon Wards surrounding the army base and discovered

that none of the Ward Bishops had ever heard of Sokol, and that there was no

record of Sokol being a member of any Ward. *See* Ex. 48 at 92–93, 97–100. Defense

counsel further provided information about the Mormon Church, it's leadership and

organization, and then explained that no Mormon missionary would counsel

anyone. *See id.* at 97–98; *see also* Ex. 37 at 5 ¶14 (Attorney Jackson stating she

would have used the information that Sokol lied to impeach her).

### (2)   Documented injuries do not support Sokol's penalty phase testimony.

20.   According to Sokol's testimony at his capital trial, Mr. Richardson

"messed" her up so badly when he assaulted her that she "wasn't too pretty

afterwards." 8/31/09 Tr. at 42, 44, 48. In fact, she went so far as to tell the jury that

Mr. Richardson hit her in the face, giving her a black eye and a split lip, and that he

cut her arms so badly that she had to wrap them. *See id.*

21.   Sokol's sentencing phase testimony regarding the injuries she suffered

are simply not true. Reasonably competent counsel would have used Sokol's

testimony from the court martial proceeding to impeach her testimony regarding

her injuries at the instant trial. *See* Ex. 48 at 414–16 (Sokol testifying at Mr.

Richardson's court-martial that after the alleged rape she had a "cut on each middle

knuckle; and three bruises, and a small scratch on the front of [her] head").

22.     Reasonably competent counsel would have further impeached her testimony using the testimony of other witnesses from the court martial proceeding. At Mr. Richardson's court-martial, the Government presented the testimony of Detective Angela Ruks of the San Antonio Police Department and Major Bryan Hughes (Dr. Hughes)—both of whom saw and documented Sokol's injuries.

23.     Detective Ruks testified that she took pictures of Sokol's injuries on February 11, 1992. *See* Ex. 48 at 548, 550–51. In these photographs, which Detective Rucks stated were a fair and accurate representation of what she saw, one can see some "faint bruises" on the top part of the back of her hands, a faint bruise on her upper left thigh, and a bruise on her left buttock. *See* Ex. 48 at 551, 553–54.

24.     Dr. Hughes testified he performed the standard rape protocol exam on Sokol the afternoon of February 9, 1992. *See* Ex. 48 at 573–74, 596. Dr. Hughes documented the following injuries:

> there was a contusion on the left buttock[,] a contusion on the left posterior lateral thigh and the left medial thigh[,] . . . an abrasion on the right dorsum proximal ring finger and the metacarpal phalanges joint which is the knuckle[,] an abrasion on the left metacarpal phalanges joint[,] and an abrasion at the left interior superior iliacrest.

*Id.* at 577. In layman's terms, Dr. Hughes found a scratch on each of Sokol's middle fingers, a scratch near her belt area, a bruise on her buttock, and two bruises on her legs. *Id.* at 585–86. Dr. Hughes testified that he did not find any severe or unusual trauma on Sokol's body. *See id.* at 589–90.

**(3)    No evidence exists to support Sokol's self-proclaimed confirmations of her allegations against Mr. Richardson.**

25.    Sokol presented herself as a highly credible witness, a witness whose allegations against Mr. Richardson were supported by other witnesses. To that end, Sokol told the jury that she was believable and credible because: (1) McElroy saw her bruised and battered face; and (2) Mr. Richardson's roommate, Jeff Florio, confirmed she was telling the truth about the rape because he found her blood in the front pocket of the pants Mr. Richardson was wearing, when she told Florio it would be there. *See, e.g.,* 8/31/09 Tr. at 47, 52. However, this was untrue for two reasons.

26.    First, there is no testimonial and/or documentary evidence from Mr. Richardson's court-martial to support Sokol's allegation that McElroy confirmed the injuries Mr. Richardson inflicted upon her, thus proving how credible she was.  *See* Ex. 48 at 458–80, 548, 550–51, 573–74, 577, 585–86, 589–90; *see also* Ex. 48 at 414–16) (Sokol testifying she had a "cut on each middle knuckle; and three bruises, and a small scratch on the front of [her] head"). In fact, at no time, does McElroy testify to seeing any injuries on Sokol's body, much less Sokol's face. *See* Ex. 48 at 458–80.

27.    Second, there is no testimonial and/or documentary evidence from Mr. Richardson's court-martial to support Sokol's allegation that Florio confirmed her allegations of rape when he found her blood in Mr. Richardson's pocket, blood that she said would be there. This is because this didn't happen.

28.    At Mr. Richardson's court-martial both Sokol and Florio testified about the morning after phone call.  Sokol testified to it as follows:

> [Florio] answered the phone and I asked him how he could
> let [Mr. Richardson] do that to me. And he proceeded to ask
> me what I was talking about and I told him that [Mr.
> Richardson] raped me. And I could hear [Mr. Richardson]
> in the background and then, [Mr. Richardson] got on the
> phone and he denied ever being there.

Ex. 48 at 375. Florio confirmed this version of the morning after phone call. *See, e.g.,*
*id.* at 699.

**(4)    No evidence existed to support that Mr.
Richardson had a gun when he went to
Sokol's home after the alleged rape
occurred.**

29.    To demonstrate to the jury how scared she was of Mr. Richardson, and

the threat he posed to her and her children Sokol testified that when Mr.

Richardson came back to her home, he had a gun in his front waist band and that

she felt that he was going to use that gun to kill her and her children. *See* 8/31/09

Tr. at 51. No evidence of this was presented during Mr. Richardson's court-martial.

30.    At Mr. Richardson's court-martial, Sokol described what happened as

follows:

> I was getting my little girl ready in the back bedroom
> and my son let [Mr. Richardson] into [our home]. And I
> didn't want to say much because my son—being at his age
> and everything—I didn't want him to know that I was
> scared or upset. And [Mr. Richardson] was hugging on my
> kids like nothing was wrong and he kept trying to hug me
> and kiss me. And he told me he was sorry, that he never . .
> . meant to hurt me.

Ex. 48 at 376.

31.    Trial counsel's failure to obtain Mr. Richardson's court-martial records

constitutes deficient performance. *See* Ex. 37 at 4–5 ¶¶14–15 (Attorney Jackson

136

acknowledging that she had no strategic reason not to obtain and use Mr.

Richardson's court-martial records to impeach Sokol's credibility); Ex. 38 at 5 ¶12

(Attorney Schieck acknowledging that he had no strategic reason not to use Mr.

Ricardson's court-martial records to impeach Sokol's credibility). This failure

prejudiced Mr. Richardson because it allowed the State to present false and

misleading aggravating evidence against Mr. Richardson, and it left Sokol's

credibility unchallenged. As Attorney Schieck stated:

> *I have since learned that Mr. Richardson's court-martial records contained information that could have been used to impeach Sokol by demonstrating that she lied.* Specifically, her testimony at Mr. Richardson's capital sentencing hearing was not only markedly different than her testimony at Mr. Richardson's court-martial, it was also not supported by the evidenced adduced at that hearing . . . . *This is information I would have used to defend* Mr. Richardson if I had it at the time of his trial.

*Id.* (emphasis added); *see also* Ex. 37 at 5 ¶14 (Attorney Jackson also stating that

she would have used Mr. Richardson's court-martial records to impeach Sokol).

### 3. Counsel were ineffective for failing to obtain and use Mr. Richardson's court-martial records to prevent Sokol from providing victim-impact testimony related to her son.

32. During the sentencing phase, Sokol in response to the State's question

about whether her children testified at Mr. Richardson's court-martial relayed the

following story to the jury:

> So they interview my son. And I was against it. I didn't want my kids involved. And the officer was amazing. He was really, really good to my son. And they start[ed] playing—back then, Teenage Mutant Ninja Turtles were really, really popular. So he would assign different people to play Michelangelo, etc.

137

> And then he's like, "Well who's Shredder?" And Craig's like, "Shredder's a bad guy." And he says, "Well, is Uncle Tom Shredder?" And my son would go sit in the corner in the fetal position and cry.

8/31/09 Tr. at 56–57.

33. Defense counsel interposed an objection to this testimony. *See id.* at 57–60. The State responded that this testimony was relevant, admissible, and:

> . . . she's talk[ing] about what she observed. The encounter with the military official and her son is an observation that she's speaking about.

> . . . .

> And to understand the full nature of what occurred . . . she's able to recall details about something that happened 10 years ago, which *lends a lot of credibility and illustrates the nature of what happened to her.*

8/31/09 Tr. at 50 (emphasis added); *see also id.* at 57. The State then informed the court that it was not going to go into any more detail about Sokol's child, *that this "was part of the court proceedings that she went through in [the court-martial] case[, and that] [t]here was an aspect of where the son—was interviewed." Id.* at 61.

34. However, the State's representation that it would not ask any more questions about Sokol's son was not true. On re-direct, the State asked Sokol if her children had any memory of Mr. Richardson raping her. *Id.* at 75. Sokol responded:

> My son does. They videotaped him in April . . . . During the videotaping, I was not allowed to be in the room, so I was sitting outside the room in a chair. And that's when I was explaining. They were playing Teenage Mutant Ninja Turtles, and . . . .

8/31/09 Tr. at 75–76. Defense counsel objected once again, and the parties argued the objection outside the presence of the jury. *See, e.g, id.* at 76–84.

138

35.     During this bench conference, the State made the following arguments for the admission of this testimony:

> a.  anything that happened during the course of the court-martial is relevant to sentencing given the nature of what happened, *id.* at 76;
>
> b.   the defense opened the door because it challenged Sokol's veracity about Mr. Richardson having a gun and the threat he made to Sokol's children, *id.* at 77–81;
>
> c.  that the State is asking these questions because "*it gives [Sokol] credibility as to her version of events*[,]" *id.* at 82 (emphasis added); and
>
> d.  Sokol will only be testifying to what she saw and heard her son say about the incident. *Id.* at 82–84.

36.     The court found that Sokol could testify as to "what the child said he saw[,]" but could not testify about the impact this event had on her child because that "is not appropriate." *Id.* at 84.

37.     Sokol then testified:

> In April he was being videotaped because they had an idea that he was the one that let [Mr. Richardson] in the house. And during that videotaping the officer had asked me if they could go take a break and get a soda. And on the way out I had tears. And my son asked me, he says, "Mommy, what's wrong?" And I said, "Mommy doesn't feel good. Mommy has a tummy ache." *He says, "No, mamma, it's because [Mr. Richardson] made you bloody in the bedroom.*"
>
> . . . .
>
> That's why you're crying.

8/31/09 Tr. at 84–85 (emphasis added).

38.     However, Sokol's story about her son was false.  There is no evidence or information anywhere in Mr. Richardson's court-martial file to support this story. *See generally* Ex. 48.  Furthermore, the evidence/testimony presented at Mr. Richardson's court-martial doesn't support Sokol's story about her son seeing her "bloody" because the scratch on each of her middle finger knuckles would not cause her to be "bloody in the bedroom." *See, e.g.,* Ex. 48 at 414–16, 551, 553–54, 577, 585–86, 589–90.

39.     Trial counsel's failure to bring forth this evidence constitutes deficient performance. This deficient performance prejudiced Mr. Richardson because: (1) it left the jury without the ability to properly assess Sokol's credibility; and (2) it allowed the State to present false and untrue evidence in aggravation.

### a)     Counsel were ineffective for failing to request a curative instruction.

40.     Despite the court sustaining defense counsel's objection regarding victim impact evidence regarding Sokol's son, defense counsel failed to request a curative instruction. *See* 8/31/09 Tr. at 84.  A curative instruction would have lessened the impact of Sokol's earlier testimony about her son allegedly going into a fetal position and crying in the corner when he was allegedly asked if Mr. Richardson, who was a close family friend, was a bad guy. *Id.* at 56–57.

41.     Counsel's failure to request such a curative instruction is readily apparent as even the court recognized that Sokol's testimony about the impact the alleged event had on her son was inappropriate. *See id.* at 84. Thus, the failure to

request this curative instructive constitutes deficient performance, which prejudiced Mr. Richardson.

> **4.     Counsel were ineffective for failing to rebut the Sokol aggravating evidence with evidence from Mr. Richardson's court-martial, which demonstrate Mr. Richardson's court-martial was not a forgone conclusion.**

42.     Instead of just relying on Mr. Richardson's court-martial judgment, the State undertook the burden of recreating the facts of Mr. Richardson's court-martial to establish that he had been convicted of a felony involving the use or threat of violence aggravating circumstance:

> [w]hile serving in the United States Army, Defendant Richardson was convicted of Attempted Sodomy on or about 1992. The State will rely on police reports, witness statements, court minutes, Defendant's statements . . . , and/or judgments of conviction to establish the existence of this aggravating circumstance . . . . [T]he State may call Ray P. Cox, JA, Trial Counsel, and Staci Sokol to explain the facts of the case.

*See* Ex. 49 at 3; *see also* 9/2/09 Tr. at 68 (in closing argument, State told the jury: "a piece of paper, that Judgment of Conviction, doesn't tell you the whole story. It's just like saying double homicide. It doesn't really tell you the facts of the case").

43.     Counsel was thus put on notice that the facts surrounding Mr. Richardson's court-martial were important, and needed to be investigated:

> I knew the court-martial information was important because I was aware that the State alleged Mr. Richardson's court-martial as a prior violent felony aggravator and that we needed to defend against it.

Ex. 38 at 4 ¶10. Yet, counsel failed to obtain this critical information, and as demonstrated in the above sections, fully incorporated herein, and in this

subsection—Mr. Richardson was prejudiced. *See, e.g.,* Ex. 37 at 5 ¶13 ("I think we should have done more to try and get [Mr. Richardson's court-martial information]. To me, this is very much like a *Rompilla* situation where we had an obligation to attack the aggravator and we failed").

44.    To begin, there was ample evidence presented at Mr. Richardson's court-martial trial to establish he had a reasonable belief that Sokol consented to the sexual encounter between herself and Mr. Richardson. *See Carter v. State,* 121 P.3d 592 (Nev. 2005); *Honeycutt v. State,* 56 P.3d 362 (Nev. 2002), *modified by Carter,* 121 P.3d 592.

45.    Prior to the alleged incident, Sokol made advances towards Mr. Richardson and demonstrated her interest in him. For example:

- The night of the alleged incident, Sokol sat between Mr. Richardson's legs, as he sat on a bar stool and rested her hands on his legs/thighs Ex. 48 at 427 (Sokol admitting that she sat between Mr. Richardson's legs with her hands on his legs), 784 (same), 875–76 (Mr. Richardson confirming Sokol had her hands on his legs, but clarifying that her hands were on his inner thigh, slightly above his knee).

- Sokol pursued Mr. Richardson: in the months preceding the alleged incident, Sokol called Mr. Richardson so frequently at night that he would avoid her calls because he didn't want to talk to her (Ex. 48 at 685–87) (court-martial witness for the Government, Jeff Florio); Sokol knew what bar Mr. Richardson was going to be at, and she showed up there as well (Ex. 48 at 687-88) (court-martial witness for the Government, Jeff Florio).

1    46.    In fact, when the Government questioned its witness, Jeff Florio, about

2    Mr. Richardson and Sokol's interactions the night of the alleged incident, he

3    testified as follows:

> **Q.**    Did you witness [Mr. Richardson] and [Sokol] dancing together that night?
>
> **A.**    Yes.
>
> **Q.**    Did you witness them kiss?
>
> **A.**    Yes.
>
> **Q.**    What happened?
>
> **A.**    [I]t was a few times—it was out in the middle of the dance floor. They were around each other . . . sitting close together—joking around, hugging each other—stuff like that.
>
> **Q.**    Did you ever see [Sokol] in any way rebuff any of [Mr. Richardson's] advances?
>
> **A.**    No.
>
> **Q.**    Did this appear to be merely [Mr. Richardson's] doing or did it appear to be more mutual?
>
> **A.**    No, it was mutual.
>
> **Q.**    You said they kissed more than once—is that correct?
>
> **A.**    Yes.
>
> **Q.**    How about sitting close together or any of those things—did that end at a certain point?
>
> **A.**    No. It was all the way until the time we left.
>
> **Q.**    At the time that you got prepared to leave, did [Mr. Richardson and Sokol] have any time together alone[?]

143

1    A.    Yes . . . outside by the valet parking area.

2  Ex. 48 at 690–91. Florio also testified that at no time did Sokol indicate that she

3  didn't want to be with Mr. Richardson. *See id.* at 692.

4    47.    Furthermore, there were no signs of forced entry into Sokol's home,

5  which could be seen as evidence that Sokol voluntarily let Mr. Richardson into her

6  home. *See* Ex. 48 at 565–67 (San Antonio Police Detective Michael Saenz testifying

7  that other than a ripped screen, which would only get someone onto the back patio,

8  there were no signs of forced entry into Sokol's apartment); *see also id.* at 782 (CID

9  Agent Reed Morrell testified that when he interviewed Sokol, Sokol informed him

10 that there "was a stick along the bottom part of the [patio] door[,] which [prevented]

11 the sliding door [from being] open[ed; s]o she couldn't figure out how anybody would

12 get in . . . because the stick was in place"). Nor did the Government, at Mr.

13 Richardson's court-martial, present forensic evidence demonstrating his guilt or

14 that he broke in.

15   48.    Trial counsel's failure to present this evidence—from Mr. Richardson's

16 court-martial—constituted deficient performance. *See, e.g.,* Ex. 38 at 5 ¶12

17 (Attorney Schieck stating that he would have used the information contained in Mr.

18 Richardson's court-martial file "to challenge the use of the court-martial conviction

19 as an aggravator"). This failure prejudiced Mr. Richardson as there is a reasonable

20 probability that the jury would not have found this aggravating circumstance.

21   49.    Insofar as trial or postconviction counsel failed to raise any of the

22 subclaims presented herein in a prior proceeding, they were ineffective and there is

23

a reasonable probability of a more favorable result if these subclaims had been

raised.

### 5. Counsel were ineffective for failing to interview Sokol prior to her penalty phase testimony.

50. There was a need to interview Sokol, as counsel was well aware that

the facts of the court-martial needed to be investigated. *See, e.g.,* Ex. 38 at 4 ¶10;

Ex. 37 at 4–5 ¶¶13–14.  As Attorney Jackson stated:

> I believe we tried to get the court-martial records and had
> a hard time, but I think we probably *should have done more
> to try to get them*. To me, this is very much like a *Rompilla*
> situation where we had an obligation to attack the
> aggravator and we failed.

Ex. 37 at 5 ¶13 (emphasis added). Had counsel spoken to Sokol, she would have

informed them:

> I met with the district attorneys at their office to discuss
> my testimony. *I asked them if they needed a copy of my
> testimony from the court martial because I had a copy, but
> they said no need, we already have it.* I was also shocked
> that they had some of the physical evidence from the court
> martial . . . .

Ex. 70 at 5 ¶16 (emphasis added); *see also id.* at 7 ¶22 (Sokol stating that she would

have talked to trial counsel and postconviction counsel and would have provided

them information regarding the court-martial).

51. Had counsel spoken with Sokol prior to her penalty phase testimony—

they would have learned that she had a copy of her own testimony from Mr.

Richardson's court-martial; at which point, they could have requested a copy from

her.  Had they gotten a copy of Sokol's court-martial testimony, counsel would have

been able to impeach her credibility with her own testimony and would have

learned the identities of at least two other court-martial witnesses—McElroy and Florio. Florio would have been especially important because he could have provided evidence that Mr. Richardson had a reasonable belief that Sokol consented to the sexual encounter. *See Carter,* 121 P.3d 592; *Honeycutt,* 56 P.3d 362; *see also* subsection A(3) above, fully incorporated herein.

52.     Trial counsel's failure to interview Sokol constituted deficient performance, as counsel was aware how important the facts of the court-martial were. This failure prejudiced Mr. Richardson, as there is a reasonable probability that the jury would not have found this aggravator. *See also* Claim Six, fully incorporated herein.

### 6. Counsel were ineffective for failing to find and interview Captain Mitchell, Mr. Richardson's court-martial attorney.

53.     In their search for Mr. Richardson's military records, the SPD received certified copies of: the Post-Trial Recommendation in U.S. v. Richardson; the Addendum to Post-Trial Recommendation; a corrected copy of the General Court-Martial Order; the Memorandum Opinion of the United States Army Court of Military Review; Order Denying Petition; Corrected Copy of General Court-Martial Order; and a Time Line and Summary of Military Records. See Exs. 163, 165. Importantly, in the discussion section of the February 5, 1993, Addendum to Post-Trial Recommendation it is noted:

> [i]n brief, *the defense submission by Captain Mitchell* requests that the findings of guilty be disapproved and that Private First Class Richardson's chapter 10 discharge be approved . . . . [*Captain Mitchell*] *contends that the victim lied as to the events surrounding the crime of rape and attempted sodomy. [Captain Mitchell] also maintains that*

> *there are numerous inconsistencies in the testimony of several witnesses.*

Ex. 163 at 6 ¶c (emphasis added).

54.     With this information in hand, trial counsel could have interviewed Captain Mitchell, who could have provided them with the names of witnesses and individuals who could have impeached Sokol. As discussed above in Claim Four(A), (A)(1)–(A)(4), fully incorporated herein, these witnesses would have provided testimony impeaching Sokol, as well as provided a defense to this aggravating circumstance. In other words, even without the court-martial records, counsel had a viable option of getting the information another way.  Thus, the failure to interview Captain Mitchell was prejudicial.

**B.     Counsel were ineffective for failing to conduct a constitutionally adequate mitigation investigation and for failing to present compelling mitigation evidence to the jury.**

55.     Clearly established federal law recognizes that the standard of practice at the time of Mr. Richardson's trial required counsel to investigate and present mitigating evidence to affirmatively demonstrate that Mr. Richardson was not morally deserving of a death sentence. *See, e.g., Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Williams v. Taylor,* 592 U.S. 362 (2000). Trial counsel failed in both regards, and as a result ended up presenting—as described by one juror:

> mitigating circumstances [that] did not carry any weight with the jury . . . because th[e mitigating circumstances] did not seem serious or relevant enough to consider.

Ex. 119 at 2 ¶6; *see also id.* (Juror Aivaz noting that jurors laughed at several of the mitigating circumstances defense counsel provided, and could not see how some of the circumstances were mitigating or even relevant).

56.     Counsel's failure to conduct a constitutionally adequate mitigation investigation, and to present powerful and compelling mitigation evidence of Mr. Richardson's traumatic childhood and brain damage, fell below objective standards of reasonableness. *See, e.g.,* Exs. 80–88, 113, 115, 166, 178. There is a reasonable probability of a more favorable outcome if counsel had performed effectively and presented the evidence discussed below.

### 1.     Counsel unreasonably failed to investigate Mr. Richardson's childhood and brain/frontal lobe damage.

57.     Counsel were highly experienced capital litigators, had done a lot of mitigation investigation, and understood the importance of mitigation. *See, e.g.,* Ex. 37 at 1, 5–7 ¶¶2–3, 15–17; Ex. 38 at 1, 5–6 ¶¶2, 13–15. Yet, when Mr. Richardson's father ignored them, his sister and brother refused to speak with them, and his mom provided some limited information—counsel really did nothing to investigate Mr. Richardson's childhood and life, with the exception of talking to "one family friend from Seattle—who[] . . . was a Seattle police officer." *See* Ex. 37 at 5–6 ¶¶15–16; Ex. 38 at 5–6 ¶¶13–15. Counsel's decision not to do anything else fell below objective standards of reasonableness.

58.     Prior to trial, Mr. Richardson's mom, Ellie, provided counsel with information about Mr. Richardson's childhood head trauma when the family was living in Seattle, and how the head trauma changed him drastically; that the head

trauma caused Mr. Richardson to display inappropriate impulsive behaviors when he was going to school in Seattle; that Mr. Richardson was diagnosed with frontal lobe damage, Attention Deficit Disorder (ADD), and dyslexia in Seattle; that Mr. Richardson underwent counseling in Seattle; that Seattle doctors warned them that raising Mr. Richardson would be difficult because of the location of the damage to his brain; how Seattle doctors prescribed medicine to combat Mr. Richardson's impulsivity; and how Seattle school teachers used alternative measures to help improve Mr. Richardson's behavior. *See* Ex. 50 at 2–4, 8–9 ¶¶6–10, 12–14, 29. Ellie also told counsel that the family left Seattle and moved to Republic, Washington, in 1981, that Mr. Richardson did not adjust well to Republic and started running away, that Republic lacked the resources to help Mr. Richardson, and that she and her husband got so frustrated with Mr. Richardson they dropped him off by himself in Seattle even though he was only 16 years old at the time. *See id.* at 5–7, 8–9 ¶¶16, 21–23, 29; *see also* Ex. 88 at 2 ¶5 (Naomi Smith, one of Mr. Richardson's teachers in Republic, Washington, stating Republic did not have the resources to help someone like Mr. Richardson, who was diagnosed with learning disabilities, frontal lobe damage, dyslexia, and ADHD; and that someone with Mr. Richardson's special needs "would most likely have fallen through the cracks" in the Republic School District). Yet, counsel did nothing with this information. *See, e.g.,* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1, 10.11.

59.     Counsel also missed interviewing close family friends in Seattle and Republic, and Mr. Richardson's classmates in Republic—despite counsel's belief

that they had interviewed people in both places. *See* Ex. 187 at 1–2 ¶4 (Blackwill stating that Mr. Richardson's defense team "did not have a chance to travel to Seattle to speak with [Mr. Richardson's] relatives and others who knew Mr. Richardson and his family during the first fourteen years of his life"); Ex. 146 at 1 ¶2 (Penalty Phase witness Robert Christophersen stated he met with the trial defense team in Republic, Washington for about fifteen to twenty minutes). Witnesses like: David Meyers, long-time Richardson family friend; Robert Slagle, Richardson family friend in Republic; John Gianukakis, Richardson family friend in Republic and Mr. Richardson's classmate; and Kim Smith-Wahler, classmate and friend of Mr. Richardson in Republic; would have provided a wealth of information warranting investigation to determine if Mr. Richardson had brain/frontal lobe damage. *See, e.g.,* Exs. 81, 83, 86, 178; *see also* Ex. 37 at 7 ¶18 (Attorney Jackson implying that they conducted a good mitigation investigation in Republic because they talked to people); Ex. 38 at 5–6 ¶14 (Attorney Schieck implying that they conducted a constitutionally adequate mitigation investigation in Seattle because they talked to more than one family friend there); *cf.* Ex. 187 at 1–2 ¶4.

### a)    A history of impulsive and risky behavior, and not understanding consequences.

60.    Not only did counsel ignore Mr. Richardson's mom telling them that Mr. Richardson had mental health issues and frontal lobe damage; they failed to interview Richardson family friends and Mr. Richardson's classmates who would have provided a wealth of information supporting that Mr. Richardson has frontal

1  lobe/brain damage because they have seen his impulsive behavior, his inability to

2  understand consequences, and behavioral problems.

3       61.    David Frederick Meyer has known Mr. Richardson's parents since the

4  1960s and has known Mr. Richardson since he was an infant. *See* Ex. 81 at 1 ¶1. In

5  fact, Meyer was the person who introduced the Richardson family to Robert

6  Christophersen—the only family friend trial counsel had testify on behalf of Mr.

7  Richardson during the penalty phase. *See id.* at 2 ¶6; 9/1/09 Tr. at 2 (Defense

8  counsel presented the testimonies of: Michele Blackwill, SPD Investigator; Robert

9  Christophersen, Richardson family friend; Ellouise Patricia Richardson, Mr.

10 Richardson's mom; and Louis Mortillaro, clinical psychologist). However, because

11 Christophersen only met the Richardson family in 1981, and only saw them once a

12 year, he could not provide the insight into Mr. Richardson that Meyer could. *See id.*

13 at 50–51, 53 (Christophersen testified that he met the Richardsons in 1981, and

14 that he would see the family once a year); Ex. 146 at 1 ¶3 (Christophersen told Mr.

15 Richardson's defense team that "they needed to speak with . . . David Meyer

16 [because] Meyer and his family knew the Richardsons [for] a much longer [time]").

17 According to Meyer:

18        [Mr. Richardson] has always struggled with impulse
          control and understanding limits. He always had the need

19        to fulfill urges immediately. If [Mr. Richardson] was in a
          store with his family, he may pick up a piece of candy that

20        he wanted and place it in his pocket without thinking about
          whether his action was right or wrong. [Mr. Richardson]

21        also acted without understanding or considering the
          consequences of the things he sometimes did.

22
                              . . . .

23

151

> [Mr. Richardson] just couldn't manage his behavior and actions whenever he was left on his own. For example, whenever [Mr. Richardson] was left on his own, he would hang out with the wrong crowd, have accidents, and experience various mishaps. It seemed at times like he did not know how to avoid trouble.

Ex. 81 at 2–3 ¶¶7–8. In fact, when discussing an example of Mr. Richardson's impulsivity; Mr. Richardson's inability to understand limits; and a failure to manage behavior—Meyer brought up the incident where Mr. Richardson's parents left him in Seattle, by himself.

> When [Mr. Richardson] was about sixteen years old, he had a huge argument with this parents over not being able to do the things that his siblings and peers did . . . . The argument went on for a while until his parents got fed up and gave in. They drove [Mr. Richardson] to Seattle to let him see for himself that there was nothing there for him, and that he could not survive on his own . . . .

> Tom, Sr., and Ellie expected [Mr. Richrdson] would be calling them within three days begging to come home. Instead, they ended getting a call from me and [Christophersen] informing them that [Mr. Richardson] had been arrested. [Mr. Richardson] was in town no more than 36 to 48 hours before he was arrested . . . .

>                          . . . .

> [Mr. Richardson] was charged with burglary. Apparently, [he] was with two other minors who committed the burglary, but he never entered the premises. When the police responded to the scene, the other two minors escaped but [Mr. Richardson] was caught. However, [Mr. Richardson] was not in possession of the stolen property. He was simply in the wrong place at the wrong time.

Ex. 81 at 3–4 ¶¶9–11. Meyer went on to explain:

> [b]eing in the wrong place at the wrong time was commonplace when it came to [Mr. Richardson]. [Mr. Richardson] always lacked self-confidence and followed others without giving thought to the possible outcomes and

consequences, especially when he was in the presence of those with stronger personalities. He always gave in to the influences around him.

*Id.* at 4 ¶13.

62.    John Gianukakis, teammate and classmate of Mr. Richardson, also discussed Mr. Richardson's impulsivity and his failure to understand consequences:

> Although [Mr. Richardson] was a good kid, he did have some struggles. [Mr. Richardson] suffered from a bit of kleptomania. He impulsively took things for no reason from the lockers of other students. [Mr. Richardson] didn't even realize he was stealing, even when he was asked what he was doing.

Ex. 83 at 2 ¶9.

63.    Robert Slagle, a Richardson family friend in Republic, provided additional information about Mr. Richardson's impulsivity problems:

> [Mr. Richardson's] mind was like a race car running out-of-control at 100mph. It did not always take him to the right places, and he often did not seem to know where he would end up. [Mr. Richardson] did not have the capacity to stay out of trouble no matter how hard he tried or how much his parents and others tried to talk sense into him.
>
> [Mr. Richardson's] negative behaviors were puzzling to me, because [he] was a good kid in many ways . . . . However, he had poor impulse control and did things that were opposite of the good manner in which he presented himself. He was kind of like Dr. Jekyll and Mr. Hyde. [Mr. Richardson] just did not have the tools to help himself.

Ex. 86 at 1 ¶¶3–4.

153

### b)    Mr. Richardson has an inability to understand and comply with social norms and cues.

64.    Kathy Smith-Wahler, Mr. Richardson's friend and classmate, also provided information, which suggested Mr. Richardson suffered from brain damage. According to Smith-Wahler:

> [Mr. Richardson] was socially awkward[,] did not fit in with many of his peers outside of sporting events[, and] was almost never present [at school sponsored social events, and student parties].
>
> . . . .
>
> [Mr. Richardson also had] an[] inability to understand social norms/cues. [He] seemed to have no idea how offensive, insensitive, or absurd his responses could be taken at times. He did not gauge people very well or pick up on social cues. These things just went over his head.

Ex. 178 at 2–3 ¶¶6–7. As a result

> *[Mr. Richardson] tried hard to fit-in with other classmates but did not seem to find his place.* [He] was a sports jock, and most jocks were popular, but this wasn't the case for him. [He] knew the cool kids in school, but he was not part of their circle. [He] was also not smart enough to hang out with the school's geeks and nerds. *[His] sports abilities kept him from being a complete outcast, but he . . . did not seem like he had a comfortable place or community in school. [He] was just there.*

Ex. 178 at 3 ¶8 (emphasis added); *see also* Ex. 186 at 1 ¶4 (Debbie Almquist stating that she did not know Mr. Richardson's reputation at school because he "didn't stand out [and] was simply in the background").

154

c)   **It's highly likely that Mr. Richardson sustained numerous head injuries while playing contact sports in Republic, Washington.**

65.   Attorney Schieck was well aware that Mr. Richardson played contact sports.  Ex. 38 at 6 ¶15. However, neither he, nor anyone on Mr. Richardson's trial defense team spoke to anyone in Republic, Washington, about the hits Mr. Richardson sustained while playing high school football despite the recognition in medicine that repeated brain trauma can cause chronic traumatic encelphalopathy (CTE), which can cause behavioral and personality changes, and executive functioning problems. *See* Ann C. McKee, MD, Robert C. Cantu, MD, Christopher J. Nowinski, AB, E. Tessa Hedley-White, MD., Brandon E. Gavett, PhD, Andrew E. Budson, MD, Veronica E. Santini, MD, Myo-Soon Lee, MD, Caroline A. Kubilus, Robert A. Stern, MD, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury,* volume 68, Issue 7 Journal of Neuropathology & Experimental Neurology 709–35 (2009). Had trial counsel spoken to: John Gianukakis, a teammate and classmate of Mr. Richardson in Republic, or Kim Smith-Wahler, classmate and friend of Mr. Richardson in Republic; counsel would have seen red flags warranting further investigation. *See, e.g.,* Exs. 83, 178.

66.   Gianukakis, possessed information that Mr. Richardson may have suffered from numerous traumatic brain injuries (TBI) as a football player. According to Gianukakis:

> [o]n our football team, [Mr. Richardson] played . . . wide receiver and cornerback. Receivers routinely took hard hits on the field in most games. Helmets and other protective gear were not as good as they are today.

Ex. 83 at 1 ¶4.

67.    Smith-Wahler provided similar information:

> I saw [Mr. Richardson] play football more than any other
> sport because I was the football team's statistician and
> attended every game. I saw [Mr. Richardson] . . . take
> tremendously hard hits on the field during games. The hits
> were sometimes so hard that I wondered how they
> managed to continue playing. I have no recollection of any
> concussion symptoms checklist protocols being in place at
> that time, nor do I recall Emergency Medical Services
> (EMS) or anything of the like being on the field or nearby
> to assist players.

Ex. 178 at 1–2 ¶4.

68.    With all this information, reasonably competent counsel had plenty of
evidence to warrant: (1) investigating Mr. Richardson's head trauma and the effect
it had on him; (2) hire and provide an expert with information related to Mr.
Richardson's traumatic head injury, and ask the expert to conduct
neuropsychological testing; (3) investigate and interview people who had known and
dealt with Mr. Richardson and his family in Seattle, given Ellie's history of events
in Seattle; and (4) investigate and interview people who had known the Richardsons
to learn why the family moved from a resource rich area like Seattle to Republic,
which lacked the resources to help Mr. Richardson. *See Wiggins,* 539 U.S. 510; Ex.
37 at 5–6 ¶¶ 15–16 (Attorney Jackson stating she felt there "is a huge family secret"
that no one wants to talk about; admitting that they knew about Mr. Richardson's
head trauma as a young child, which caused him to change drastically; that she
does not recall Dr. Mortillaro testifying about this injury, the effect it had on Mr.
Richardson, or conducting any neuropsychological tests; and that they typically

have neuropsychological testing done in capital cases); Ex. 38 at 5–6 ¶¶13–15

(Attorney Schieck stating that he had a belief that the Richardsons left Seattle for a

reason; that the defense was well aware that Mr. Richardson spent a majority of his

life in Seattle, and that he does not recall speaking to former Seattle neighbors and

friends, or anyone who may have babysat Mr. Richardson as a child; that he was

aware of Mr. Richardson's head injury as a child that caused his behavior to change

drastically, his diagnosis of ADHD, poor academic performance, and that Mr.

Richardson played contact sports; but it was Dr. Mortillaro's job to draw his own

conclusions based on the examination he conducted); Ex. 187 at 3 ¶8 (Blackwill

stating that she was "aware of Mr. Richardson's possible traumatic head injury as a

young child[, but the] decision to use, not use, or investigate this information was

left solely to the discretion of the attorneys on the case"). However, trial counsel was

not reasonable because they did nothing.

### 2. Counsel failed to develop and present compelling mitigation evidence about Mr. Richardson's traumatic childhood.

69.     In closing arguments, defense counsel painted Mr. Richardson's

childhood and family life as idyllic—"nobody beat" Mr. Richardson; "[n]obody

starved" him; he "grew up on . . . beautiful property[; n]obody deprived [him] of

anything[;]" and that Mr. Richardson has "a solid family." 9/2/09 Tr. at 54, 57. But

this picture is simply wrong and inaccurate, and counsel would have known this if

they had done a constitutionally adequate investigation.

### a)   Mr. Richardson's life in Seattle, Washington, is reminiscent of the movie *The Great Santini*.

70.   *The Great Santini* tells the story of United States Marine Corp fighter pilot Lt. Col. Wilbur "Bull" Meechum and what appears to be the typical wholesome 1950's/1960's American family with no familial problems. *See The Great Santini (*Lewis John Carlino dir., 1979). Meechum, though is no Ward Cleaver, and the Meechum family is not the Cleaver family. *See id., cf.  Leave it to Beaver* (Joe Connelly, Bob Mosher, Harry Ackerman exec. producers, 1963). Meechum is stern, a strict disciplinarian, has a temper, uses his military rank to control and intimidate others, and is not afraid to use rough physical tactics and humiliating insults to get his family to do what he wants them to do. In fact, in one particularly poignant scene, showing Meechum's control of his family, Meechum orders his son to attack a basketball player who had fouled his son during a game. Meechum's son subsequently breaks the opposing player's arm. *See The Great Santini* (Lewis John Carlino dir., 1979).

71.   The Richardson family is eerily similar to the Meechum family in *The Great Santini*—as life imitates art—and Mr. Richardson experienced: (1) a father who, like Meechum, abused his powers; (2) parents who order him to harm and assault another child; and (3) a life far removed from what appeared to the outside observer a wholesome family.

158

**(1)    Thomas Richardson, Sr., is like Lt. Col. Wilbur "Bull" Meechum in *The Great Santini*.**

72.    Seattle friends and neighbors, described Mr. Richardson's father, Thomas Richardson, Sr. (Sr.), as controlling and a strict disciplinarian, who used his position as a police officer to intimidate and control others. *See, e.g.,* Ex. 80 at 2–3 ¶¶7–8; Ex. 82 at 1–2 ¶¶4–6; Ex. 84 at 1–2 ¶¶3–4; *see also* Ex. 85 at 2 ¶5; Ex. 87 at 1–2 ¶4 (Sr. "was stern in a manner that was over the top . . . and everyone in the house had to follow his orders . . . ."; Sr. "was controlling, highly critical, and intimidating . . ."). When discussing how Sr. abused his powers as a police officer; Mr. Richardson's childhood friend and neighbor, Anthony Bevilacqua stated:

> Outside of their home, Tom, Sr. allowed his badge to go to his head and acted like he had more rights than other people and would abuse his authority.
>
> I recall an instance when I was sitting in front of my house one evening with my friend Rob Peas and some other neighborhood kids when, suddenly [Mr. Richardson's] dad pulled up in his squad car and began attacking Robbie without saying a word. [Mr. Richardson's] dad beat Robbie mercilessly, punching and kicking him all over his body. Me and the other kids were stunned and too weak to help Robbie. [M]y dad heard the commotion and immediately ran outside to pull [Mr. Richardson's] dad off Robbie.

Ex. 80 at 2–3 ¶¶7–8. Frederick Bevilacqua, another childhood friend and neighbor, stated:

> [Mr Richardson's] dad was an overzealous cop who harassed kids, and sometimes adults, in the community. [Sr.] seemed to enjoy lecturing people in the neighborhood about things that were legal and illegal to do and liked giving out warning tickets. [Sr.] was particularly hard on the neighborhood children. He was always telling kids where they should and shouldn't play or ride their bikes and skateboards . . . .

159

1

2

3

4

> I recall an instance where [Mr. Richardson's] dad spotted a kid riding his bike on the sidewalk near a parking lot where me and other children were playing. [Mr. Ricardson's] dad immediately turned on his police siren and came speeding through the parking lot almost hitting me and another friend as we played, just to order the kid to get off the sidewalk.

5   Ex. 82 at 3 ¶¶ 5–6. John Houck, a close childhood friend of Mr. Richardson, who

6   lived two doors down from the Richardsons, stated:

7

8

9

10

> [Mr. Richardson's] father was a police officer who acted very bizarre in his dealings with people in the community. He seemed to let his position of authority go to his head and was always telling people in the neighborhood what they could and could not do. [Mr. Richardson's] dad was always very mean to the neighborhood, and frequently harassed us and accused us of things we did not do.

11

12

13

14

15

16

17

18

19

> I remember one instance when I was riding a wooden go-cart that I made from scratch. I was about thirteen (13) years old at the time. As I was coasting down a hill in the community, I suddenly noticed flashing lights and a police siren following closely behind me. I knew it was [Mr. Richardson's] father when he spoke on the loudspeaker ordering me to pull my go-cart over, and I complied. When I tried to get out of the go-cart, [Mr. Richardson's] dad got back on the loudspeaker and ordered me to stay in the go-cart. We were in front of my house at the time, so my late stepfather, Fred Bevilacque, Sr., came outside and asked [Mr. Richardson's] dad what the hell he was doing. [Mr. Richardson's] dad told my father that I was driving an illegal vehicle on a public road, and he was going to give me a ticket. My stepdad . . . told me to get in the house, and [Mr. Richardson's] dad left without issuing me a ticket.

20   Ex. 84 at 1–2 ¶¶ 3–4.

21

22

23

160

1

2

>    **(2)    Like the scene in *The Great Santini*, Mr.
>    Richardson was ordered to hurt/assault
>    another kid.**

3     73.    Seattle friends also described two incidents eerily similar to the scene

4   in *The Great Santini*, where Meechum ordered his son to attack another child for a

5   perceived wrong-doing. *See, e.g.,* Ex. 80 at 4 ¶10; Ex. 82 at 2 ¶7; Ex. 84 at 3 ¶5. The

6   only difference being in the incidents involving Mr. Richardson, Mr. Richardson's

7   parents were active participants in the assault. Anthony Bevilacqua described the

8   following incident involving Mr. Richardson's father, his brother Fred, and Mr.

9   Richardson:

10
>    I was present for [an] incident where [Mr.
>    Richardson] and my brother, Fred Bevilacqua, were play
11   wrestling in [Mr. Richardson's] yard when [Mr.
>    Richardson's dad] suddenly came outside. [Mr.
12   Richardson's] dad grabbed Fred's arms, held them behind
>    his back, and ordered [Mr. Richardson] to punch Fred.

13

14  Ex. 80 at 3 ¶10. Fred Bevilacqua described a different incident involving Ellie,

himself, and Mr. Richardson:

15
>    I remember one occasion when [Mr. Richardson]
16   challenged me to play wrestle in the street outside his
>    house . . . . As [Mr. Richardson] and I were play wrestling
17   on this occasion, Ellie happened to look outside and
>    mistakenly thought we were engaged in a real fight. Ellie
18   immediately ran outside, leapt on top of me, placed me in
>    a headlock, and started ordering [Mr. Richardson] to kick
19   me in the head. I was only nine years old and couldn't
>    believe this grown woman was doing this to me. When [Mr.
20   Richardson] did not kick me in the head, Ellie started
>    chiding him and threatened to put [Mr. Richardson] out of
21   the house until he kicked me in the head.

22  Ex. 82 at 2–3 ¶7; *see also* Ex. 84 at 2 ¶7 (John Houck recounted this same event, but

23  stated that Mr. Richardson actually hit Fred while Ellie held Fred down).

161

### (3) Mr. Richardson's life was far removed from the wholesome family life portrayed to the outside world.

74.     Terrie Shanko, Mr. Richardson's former babysitter in Seattle, described the reality of life in the Richardson home, and the torment Mr. Richardson faced at the hands of his entire family. *See generally* Ex. 87. According to Shanko:

> When I first met the Richardson family, they all seemed very nice and normal like any other family that I interacted with at that time. However, as the years went on and I came to know the family better, especially when I was babysitting [Mr. Richardson], a different and dark picture began to emerge. Although [Mr. Richardson] lived in a full house, with both his parents and two siblings, he was very much alone and oppressed. [Mr. Richardson] was singled out as the black sheep of the family, and not treated well.

> [Mr. Richardson's dad] was a hard core gruff ex-military man and police officer. He was stern in a manner that was over the top because he was very rule oriented and everyone in the house had to follow his orders. Nothing was open for debate. It was either his way or nothing at all . . . . [Mr. Richardson's dad] was controlling, sarcastic, highly critical, and intimidating when he addressed [Mr. Richardson]. He acted like [Mr. Richardson] was the son he never wanted to have and frequently expressed his disappointment in [him]. [Mr. Richardson's mom,] Ellie[,] was a nicer and softer person, but she was also critical of [Mr. Richardson] and did nothing to protect him from his father's harsh treatment.

> No matter how hard [Mr. Richardson] tried, nothing was ever good enough for his parents, especially his dad. They were always very critical of [Mr. Richardson] in the comments they made to and about him. I never heard his parents give him compliments or any words of encouragement.

> Whenever [Mr. Richardson] made a mistake, both [his father and mother] would make comments like, "Oh

162

well, what do you expect, it's Tommy, and he can't do anything right," or "you're not good for anything." These things were said to [Mr. Richardson] repeatedly no matter who was around, even in a room full of people. It was just a continuous flow of put-downs and belittlements . . . .

. . . .

[Mr. Richardson's siblings,] Vickie and Jack adopted their parents' impression of [Mr. Richardson]. In their eyes, [Mr. Richardson] was the bad guy who did everything wrong, and it was alright to bash his character. Vickie and Jack spoke negatively about [Mr. Richardson] and were very critical of everything he did. In many ways, [Mr. Richardson was like the entire family's personal punching bag.

*Id.* at 1–3 ¶¶ 3–6, 8; *cf. id.* at 2–3 ¶7 (noting that Mr. Richardson's siblings, Vickie and Jack, "were treated much better" and were nurtured by their parents).

75.    Importantly, Shanko noted: (1) how Mr. Richardson felt when his family verbally abused him, and (2) how bad Mr. Richardson's parents treated him. First, according to Shanko, Mr. Richardson was hurt by his family's abuse:

[h]e just shrugged his shoulders and acted like he was not fazed by their comments, but *the look on his face told a different story. I could see that he was suffering inside* . . . .

*Id.* (emphasis added).

> **b)    The Richardson family abruptly fled Seattle to avoid the black cloud hovering over one or both of Mr. Richardson's parents.**

76.    In either the summer of 1980 or 1981, the Richardson family moved from Seattle, Washington, to Republic, Washington. *See* 9/1/09 Tr. at 67. The move was "abrupt and unplanned." Ex. 80 at 4 ¶13; *see* Ex. 38 at 5 ¶13 (Attorney Schieck stating "[i]t has always been my belief that the Richardsons moved from Seattle,

163

Washington, to Republic, Washington for a reason; this has always been my speculation, but I was never able to validate this belief [because] Mr. Richardson's mother[,] Ellie, . . . did not disclose anything regarding why the family left Seattle"). According to Mr. Richardson's childhood friend and neighbor, Anthony Bevilacqua:

> [n]o one in the family ever spoke about wanting to leave Seattle and no one ever mentioned anything about Republic. [Mr. Richardson] and his siblings told me they had no idea that they were moving until the week before they moved, and none of them had ever been to Republic. They also told me that they had no idea why their parents had decided to move to Republic, and it was a surprise to them.

*Id*. While the Richardson children may have been unaware of why their parents decided to leave Seattle—friends/neighbors provide three possible reasons why the Richardsons moved: (1) Sr.'s misconduct as a police officer; (2) Mr. Richardson's parents' terrible reputation in the neighborhood; or (3) the shame that Sr. felt because the community knew his wife was having an affair. *See* Ex. 80 at 3 ¶¶8–9; Ex. 82 at 3–4 ¶¶9, 12; Ex. 84 at 2–3 ¶6; Ex. 85 at 2 ¶8.

          **(1)    Mr. Richardson's father physically assaulted a child, while in uniform and on-the-job.**

      77.    It's possible that the Richardsons moved to Republic because the Peas family had begun looking into suing Sr., or Sr. was quietly asked to transfer to a new area as a result of the internal affairs investigation. According to Anthony Bevilacqua, one day Sr. "pulled up in his squad car and began attacking Robbie [Peas, one of the kids in the neighborhood,] without saying word." Ex. 80 at 3 ¶8.

Anthony went on to describe Sr.'s attack on Robbie as "merciless[]"—"punching and kicking [Robbie] all over his body." *Id.*

78. Anthony went on to explain:

> Robbie Peas's parents filed a police complaint against [Mr. Richardson's] dad and threatened to sue him. An internal affairs investigation was conducted, and [Sr.'s] commanding officer came out to our home to interview my dad. I never found out if [Mr. Richardson's] dad was ever disciplined for assaulting Robbie, but this incident occurred the year before the Richardson family[] relocated to Republic.

*Id.* at 3 ¶9.

### (2) Mr. Richardson's parents had a terrible reputation in the community.

79. As discussed in subsection (B)(2)(a)(1) and (B)(2)(a)(2), above, fully incorporated herein, Mr. Richardson's parents "developed a terrible reputation in the neighborhood" due to Sr. abusing his powers as a police officer and both his parents holding down a child and then ordering Mr. Richardson to attack that child. *See, e.g.,* Ex. 82 at 4 ¶12. Thus, it's possible that Mr. Richardson's parents decided to make this impromptu move as a result of communal pressure for them to leave, or they simply felt that they couldn't live there comfortably and outside the prying eyes of others because they had burned too many bridges in the community. *See id.* (Frederick Bevilacqua stated that "everyone was glad to see [Mr. Richardson's parents] go. It was a weight off the community's collective shoulders"); *see also* subsection (B)(1)(c), below (noting how Mr. Richardson's parents reinvented themselves).

### (3)   Shame drove Mr. Richardson's father to move the family.

80.   According to Mr. Richardson's friend and neighbor, John Houck:

> [Mr. Richardson's] mother[,] Ellie][,] was ultimately the cause of why the family ended up moving to Republic, Washington. Ellie was carrying on an illicit affair with the local milkman. Some of the adults in the community knew about it, but [Mr. Richardson's] dad did not find out until he came home early from work one day and found Ellie and the milkman together having sex in their bedroom. [Mr. Richardson's] dad became violent with Ellie, and I remembered seeing her sitting down outside talking with another neighbor about the situation with a busted lip that was swollen and bleeding. The milkman kept his job but was assigned to another route. However, [Mr. Richardson's] dad decided to leave the community out of embarrassment. [Mr. Richardson's dad] already did not have a good relationship with many people in the community because of the way he misused hi authority to harass folks, but he could not deal with everyone knowing that his wife cheated on him and that he had beaten her.

Ex. 84 at 2–3 ¶6; *see also* Ex. 82 at 3 ¶9 (same); Ex. 85 at 2 ¶8 (allegation that Mr. Richardson's father was also having an affair).

### c)   Life in Republic, Washington, was not better for Mr. Richardson.

81.   While Mr. Richardson's parents were able to reinvent themselves in Republic as pillars of the community, and great, caring, and loving parents; life for Mr. Richardson, though, only got worse. *See, e.g.,* Ex. 86 at 1 ¶2 (describing Ellie as a good person and a dedicated mother); Ex. 179 at 1 ¶¶1, 3 (Richard Baldwin, former Sheriff of Ferry County Washington, stated "Tom, Sr., and Ellie were two of the best people I knew in town. They were a hardworking, loving, God-fearing, and family-oriented couple . . . I never saw or heard of Tom abusing his authority as an

officer and he was well respected by everyone in town. When Tom passed away in 2009, there was an overwhelming outpouring of sympathy from the local community. His funeral service was pack with his family, friends, neighbors, various members of the community and law enforcement officials. Tom lived a good life and was appreciated by just about the whole town of Republic").

82. Mr. Richardson was isolated and lonely in Republic because: (1) the family lived in a remote area; (2) the town of Republic isolated newcomers; and (3) Mr. Richardson did not fit in despite all his efforts to do so.

83. First, Mr. Richardson lived far outside of town, so he was not able to build meaningful friendships and relations:

> [Mr. Richardson] did not adjust well to the family's relocation from Seattle to Republic . . . . [H]e constantly complained how much he disliked living in Republic because . . . he did not have as many friends as he did . . . in Seattle . . . . *[The Richardson] home in Republic, was approximately 12 miles out from the center of town where all the shops and activities were. Because [the Richardsons] lived so far away, the only thing that [Mr. Richardson] and his sibling had to occupy their time was homework and the little handheld games they played.*

Ex. 60 at 6 ¶21; *see also* 9/1/09 Tr. at 61 (Robert Christophersen, a Richardson family friend, testified that the Richardson family home in Republic is in a remote wooded area).

84. Second, Naomi Smith, one of Mr. Richardson's twelfth grade teachers, who was also a newcomer in Republic, described the problem of making close friendships in Republic:

> *[it] was a challenging place to relocate for adults, but more so for children because the generational families had their own relationships and treated newcomers like outsiders.*

167

> The town's people treated everyone nicely, but their
> *relationships with newcomers was mainly superficial*. My
> children were around the same age as [Mr. Richardson]
> and his siblings, and they had a terrible time adjusting to
> Republic's social life . . . . *A child with the special needs that
> [Mr. Richardson] had would have experienced even greater
> difficulty fitting in than normal children.*

Ex. 88 at 4 ¶9 (emphasis added); *see also* Ex. 186 at 1 ¶2 (indicating that town's people weren't really friends, and did not really hang out, with newcomers to Republic).

85.   Third, because Mr. Richardson suffers from the effects of his brain damage, has dyslexia, and ADD/ADHD, he was socially awkward and simply could not fit in with the other kids in Republic. Kathy Smith-Wahler, who went to Republic High School with Mr. Richardson and knew him, stated:

> [Mr. Richardson] was socially awkward[,] did not fit
> in with many of his peers outside of sporting events[, and]
> was almost never present [at school sponsored social
> events, and student parties].
>
>                    . . . .
>
> [Mr. Richardson also had] an[] inability to understand
> social norms/cues. [He] seemed to have no idea how
> offensive, insensitive, or absurd his responses could be
> taken at times. He did not gauge people very well or pick
> up on social cues. These things just went over his head.

Ex. 178 at 2–3 ¶¶6–7. As a result

> *[Mr. Richardson] tried hard to fit-in with other classmates
> but did not seem to find his place.* [He] was a sports jock,
> and most jocks were popular, but this wasn't the case for
> him. [He] knew the cool kids in school, but he was not part
> of their circle. [He] was also not smart enough to hang out
> with the school's geeks and nerds. *[His] sports abilities kept
> him from being a complete outcast, but he . . . did not seem
> like he had a comfortable place or community in school. [He]
> was just there.*

168

Ex. 178 at 3 ¶8 (emphasis added).

### d)    Mr. Richardson was traumatized when his parents abandoned him in Seattle.

86.    Ellie told Mr. Richardson's trial attorneys that on one occasion, he and her husband got so frustrated with Mr. Richardson that they drove from Republic to Seattle, and left Mr. Richardson in Seattle by himself with no money or anyplace to stay. *See* Ex. 50 at 6–7 ¶23; *see also* 9/1/09 Tr. at 62, 64; Ex. 81 at 1, 3 ¶¶1, 9–12 (David Meyers, long time and close family friend, describing how Mr. Richardson was arrested for being in the wrong place at the wrong time, shortly after his parents abandoned him in Seattle).

87.    Robert Slagle, Ellie's boss in Republic, and family friend, recounted how Mr. Richardson was traumatized when his parents abandoned him in Seattle:

> [Mr. Richardson] did not tell me what happened during his time in Seattle, but *I could tell that he was traumatized because he seemed like a different person.* [He] was less talkative, more street smart, and less outgoing. His story telling increased, was less trustworthy, and I had a harder time believing anything he told me. *It seemed like [Mr. Richardson] was deeply impacted by whatever bad experiences he encountered in Seattle. He seemed more broken than before.*

Ex. 86 at 3 ¶12 (emphasis added).

88.    Because counsel failed to conduct a constitutionally reasonable mitigation investigation, counsel failed to present this compelling and powerful mitigation evidence. *See, e.g., Rompilla,* 545 U.S. 374; *Wiggins,* 539 U.S. 510; *Williams,* 592 U.S. 362. If the jury had been presented with this evidence, which showed Mr. Richardson's life was filled with abuse, abandonment, loneliness, and

trauma—there is a reasonable probability the jury would have come to a different conclusion. This evidence is more powerful and compelling then defense counsels' proposed mitigating factors: (1) he has anti-social personality disorder, which is not true, *see* argument below; (2) he graduated high school; (3) he went to college; (4) he was in the military; (5) his father was in law enforcement; (6) he had periods of employment; (7) his high school baseball coach cared enough to speak on his behalf; and (8) he has been incarcerated since the age of 25. *See, e.g.,* 9/1/09 Tr. at 43, 48, 52, 67, 75–76, 96–97, 103–05.

## C. Trial counsel were ineffective for failing to investigate and present expert testimony regarding Mr. Richardson's brain damage.

89. Despite the numerous red flags revealed to trial counsel through their cursory mitigation investigation, trial counsel failed to investigate or present evidence concerning Mr. Richardson's brain injury and the impact of that injury on his cognition and behavior.

90. Instead, trial counsel hired psychologist Louis Mortillaro for the limited purpose of "what we call a predisposition psychological evaluation, which means prior to the trial, to identify *behavioral* characteristics, strengths and weaknesses that, you know, could be used during the trial or after the trial." 9/01/09 Tr. at 91 (emphasis added). At trial, Dr. Mortillaro explained that "the purpose of this examination [was] basically to identify *personality* traits of Mr. Richardson that might be relevant to these proceedings." *Id.* at 92 (emphasis added). The only testing Dr. Mortillaro conducted was personality testing. Ex. 75 at 1. His opinions were based exclusively on the personality tests and two interviews with Mr.

170

Richardson—he did not conduct any background interviews or review any other background information from collateral reporting sources. 9/01/09 Tr. at 133; Ex. 75 at 1–2.

91.    As a result of the limited nature of Dr. Mortillaro's assessment, his testimony was far from compelling. Dr. Mortillaro testified that he conducted some personality testing, and as a result of that limited testing and his interviews with Mr. Richardson, he diagnosed ADHD, marijuana dependence in remission, alcohol abuse, and antisocial personality disorder. 9/01/09 Tr. at 116. He testified that Mr. Richardson had a "salesman like personality" that might serve him well in prison, and that he enjoyed attention, even negative attention. *Id.* at 106, 109–11. He explained that antisocial personality disorder is nothing more than a "personality defect," 9/01/09 Tr. at 119, and stated that "I'm not excusing behavior, I'm just describing it." *Id.* at 126.

92.    Dr. Mortillaro testified that Mr. Richardson experimented with drugs after he left his father's home but failed to give any details or explain the severity or significance of Mr. Richardson's drug use, beginning at age 18. 9/01/09 Tr. at 94–95. He testified that the testing revealed Mr. Richardson was addicted to marijuana and alcohol, but again failed to explain the significance of this from a psychological perspective. 9/01/09 Tr. at 113. Regarding the impact of Mr. Richardson's drug and alcohol use, Dr. Mortillaro testified simply that drugs gave him a false sense of security, and caused him to experience a "fantasy reality." 9/01/09 Tr. at 112.

93.    Trial counsel failed to elicit details of Mr. Richardson's drug and alcohol dependence contained in Dr. Mortillaro's report, which indicated that

171

> At 18 years of age, Mr. Richardson began smoking marijuana once a week. When he was 21-years old, he was drinking approximately 4 beers per night and smoking marijuana on military leave because he was drug tested during his active duty. This continued until he was incarcerated in October 1992, after being accused of sexual assault while in the Army in February 1992. He also started using cocaine once a month and one marijuana joint once a week. He increased his drinking to 6 beers per night. When he was released from prison in 2003, he began drinking alcohol and smoking marijuana daily. He stopped drinking alcohol completely in December 2003, but he smoked marijuana daily until he was arrested in 2005.

Ex. 75 at 4.

94.   Trial counsel also failed to elicit Dr. Mortillaro's conclusion that

> The PAI clinical profile was marked by a significant elevation on the DRG scale indicating that his use of drugs has had many negative consequences on his life at a level that is above average even for individuals in specialized treatment for drug problems. Such a pattern indicates that his drug use has had numerous ill effects on his life functioning. Problems associated with drug abuse are probably found across several life areas including strained interpersonal relationships, legal difficulties, vocational failures, financial hardship and/or possible medical complications resulting from prolonged drug abuse. He reports having little ability to control the effect that drugs had on his life. With this level of problems, it is increasingly likely that he is drug dependent.

Ex. 75 at 8.

95.   Due to trial counsel's failure to adequately investigate and provide their expert with relevant information, Dr. Mortillaro stated in his report that "there was no evidence of . . . a traumatic brain injury." Ex. 75 at 12. He similarly testified that Mr. Richardson had no brain injuries. 9/01/09 Tr. at 117. He told the jury there was no way to explain Mr. Richardson's behavior.

> Well, again, even though people have had the kind of
> lifestyle that he had, it doesn't necessarily mean that he
> was, you know, as well socialized as he is. Because how do
> you explain someone coming from the environment that he
> allegedly comes from, from what I heard the mother, you
> know, talk about, you know, and then all of a sudden, you
> know, you get this charge, you know, this behavior. And,
> you know, and what caused it. I mean, we really don't
> know. I mean, we can hypothesize about what may have
> caused it. But how are we to know, okay?

9/01/09 Tr. at 132.

96.    In truth, however, trial counsel were aware that Mr. Richardson did, in

fact, suffer from a traumatic brain injury that significantly impacted his behavior as

a child.  According to trial counsel Alzora Jackson:

> I remember vividly that when we spoke with Ellie, the first
> thing she said was that she always knew there was
> something wrong with Mr. Richardson because he had
> suffered a head trauma as a young child, which caused him
> to change drastically.

Ex. 37 at 6. She admitted "I would not have had a strategic reason to withhold this

information from Dr. Mortillaro." *Id.* Trial counsel David Schieck similarly admitted

that "I was aware of Mr. Richardson's social history, including that he had

sustained a head injury as a young child that caused his behavior and demeanor to

change drastically, his diagnosis of ADHD, poor academic performance, and that he

played contact sports." Ex. 38 at 6.

97.    Trial counsel Jackson further admitted that she lacked a strategic

reason for failing to ask Dr. Mortillaro to conduct neuropsychological testing, rather

than simply personality testing.

> Dr. Mortillaro was a big mistake. I do not remember a
> reason why we would not have had neuropsychological
> testing done on Mr. Richardson as testing is something we

173

normally do in capital cases. We knew Mr. Richardson had
a history of head trauma and there was no strategic reason
I can recall for not having neuropsychological testing done
on Mr. Richardson to reveal possible brain damage. I think
we probably should have requested an MRI as well. In light
of the lack of mitigating evidence provided by the family, I
believe we should have done more to develop evidence of
brain damage to give the jury a reason to spare his life.

Ex. 37 at 6–7.

98.     Trial counsel's failure to provide Dr. Mortillaro with relevant

materials, and failure to ask him to conduct testing, fell below objective standards

of reasonableness. *See* ABA Guidelines for the Appointment and Performance of

Defense Counsel in Death Penalty Cases 4.1, Commentary (rev. ed. 2003) ("ABA

Guidelines"), reprinted in 31 Hofstra L. Rev. 913, 1061–62 (2003) ("Since an

understanding of the client's extended, multi-generational history is often needed

for an understanding of his functioning, construction of the narrative normally

requires evidence that sets forth and explains the client's complete social history

from before conception to the present. Expert witnesses may be useful for this

purpose and may assist the jury in understanding the significance of the

observations. For example, expert testimony may explain the permanent

neurological damage caused by fetal alcohol syndrome or childhood abuse, or the

hereditary nature of mental illness, and the effects of these impairments on the

client's judgment and impulse control. Counsel should choose experts who are

tailored specifically to the needs of the case, rather than relying on an "all-purpose"

expert who may have insufficient knowledge or experience to testify persuasively.

In order to prepare effectively for trial, and to choose the best experts, counsel

174

should take advantage of training materials and seminars and remain current on developments in fields such as neurology and psychology, which often have important implications for understanding clients' behavior. Counsel should also seek advice and assistance from colleagues and experts in the field of capital litigation").

99.    Reasonably competent counsel in 2009 would have known that "[a] personality test is of limited value as it is only designed to assess personality traits and psychopathology." Ex. 113 at 5. Competent counsel would also have known that Dr. Mortillaro"s finding of antisocial personality disorder was flawed because

> To receive a diagnosis of ASPD, at that time, there were specific criteria that had to be met. Dr. Mortillaro had to find evidence that Mr. Richardson exhibited behaviors that showed disregard for an individual and violated his/her rights. Additionally, there had to be evidence of a diagnosis of conduct disorder prior to the age of 15. There is no indication or history of that sort with regards to Mr. Richardson. Thus, the finding of ASPD is unsupported.

Ex. 113 at 6; *see also* Ex. 166 at 7–8 (explaining why Dr. Mortillaro's ASPD diagnosis was unsupported).

100.    Competent counsel, presented with the information contained in trial counsel's file, would have sought neuropsychological testing of Mr. Richardson. A neuropsychological evaluation would have revealed significant and compelling evidence of brain damage that would have been highly mitigating. If trial counsel had performed effectively, they would have discovered and presented the following information concerning Mr. Richardson's neuropsychological functioning.

101.    Neuropsychologist Joan Brennan, who was retained by undersigned counsel to analyze and explain the results of a neuropsychological screening battery conducted by psychologist Cheryl Paradis, explains the significance of neuropsychology and neuropsychological testing.

> Neuropsychology is the study of brain-behavior relationships. It requires understanding that the brain controls and is responsible for behaviors. Neuropsychology is a specialty field that joins the medical fields of psychology, psychiatry, and neurology. Neuropsychology is also used in the forensic setting. Since the 1980's, neuropsychologist have been retained to assess individuals and testify about the presence of brain dysfunction. This information provides the trier of fact with specialized information for use in the legal decision -making process.
>
> A neuropsychologist is a licensed psychologist with specialized training in assessing how learning and behavior are associated with the development of brain structures and systems. A neuropsychologist works in conjunction with a neurologist. A neurologist looks at the anatomical construction of the brain. Working with the neurologist, neuropsychologists are able to determine the functional deficits regardless of etiology. Neurologists use advanced neuroimaging techniques (such as MRI, PET, fMRI, etc.) of brain regions, while neuropsychologists focus on behavior and cognition in order to offer educational help and remediation strategies to family members, vocational specialists, and counselors.

Ex. 113 at 2.

> The purpose of this evaluation is to measure the functioning of the brain (e.g., cognitive strengths and weaknesses), as opposed to other diagnostic procedures (such as brain imaging) that looks at the structures of the brain. The neuropsychological evaluation consists of a set of standardized procedures designed to assess and quantify brain functions. The instruments used in the neuropsychological evaluation are sensitive to functional variances of specific areas in the brain. The evaluation is especially helpful when a person has sustained injury to the brain (for example, traumatic brain injury (TBI) or

concussions, stroke, brain tumors, seizures, etc.) to determine cognitive strengths and weaknesses and assist with appropriate recommendations and treatments. The results are also helpful in understanding the cause of problems with thinking, understanding, and behaviors.

A typical neuropsychological evaluation assesses: general intellect, achievement skills, executive functioning (such as organization, planning, inhibition, and cognitive flexibility), attention, learning and memory, language, visual-spatial skills, motor functioning, and behavioral functioning. Depending on results, additional testing in specific areas may be required. A detailed history (including medical and psychological history, and educational background) is provided by the person or caregivers. Motivation, cooperation, and behavior are important aspects of the evaluation.

After the testing is completed, the person's test scores are compared to others of similar age. This allows the neuropsychologist to create a profile of cognitive strengths and weaknesses which would be presented in a report. This report would include history, testing results, diagnosis, strengths and weaknesses, and recommendations. Testing results can also provide understanding of a person's behavioral functioning.

Ex. 113 at 2–3.

102.    This sort of information about the role, function, and importance of neuropsychological testing were well known to capital defense attorneys in 2009–10. *See* John Matthew Fabian, *Forensic Neuropsychological Assessment and Death Penalty Litigation,* 33 APR Champion 24, 24 (2009) ("More than one-third of capital defendants have histories of neuropathological damage, and it appears a 'no-brainer' to request neuropsychological assessment in capital cases. What should counsel do with this evidence? The capital defense attorney and his expert must attempt to educate the jury about what the neuropsychological testing and

assessment mean in the context of the defendant's cognitive functioning, history of head injury, history of neuroimaging data or lack thereof, and the commission of the homicide.").

103. Psychologist Cheryl Paradis conducted a screening battery of neuropsychological tests on Mr. Richardson on August 15, 2022.[7] Ex. 115 at 1. She administered the Wide Range Achievement Test-5th Edition (Word Reading Subtest), the Wechsler Adult Intelligence Test-4th Edition, the Wechsler Memory Scale- 4th Edition, the Test of Memory Malingering (TOMM) (Trial 1), and the Delis-Kaplan Executive Function System. *Id.*

104. Dr. Paradis observed that

> During testing, Mr. Richardson often responded impulsively and quickly without taking the necessary time to think though the task and devise the best approach to solving the problem/task. I noticed this several times throughout testing.

> For example, one task required Mr. Richardson to copy a complex design that included a large rectangle, squares, and circles. Mr. Richardson drew this design very quickly and made several errors. He did not carefully draw a line to bisect the triangle and end neatly at the four corners of the rectangle. He also did not carefully draw the lines of the square to connect neatly. His errors were not simply the result of grapho-motor problems; 1 because when I asked him to again copy the design, this time being careful and to slow down, his copy was much better.

> I observed Mr. Richardson's impulsivity in his approach to solving arithmetic problems. On this subtest he was read arithmetic questions that he needed to solve without using a pencil and paper. On some items he blurted out answers, without even waiting for me to finish the entire question. On many items he gave answers in one or two seconds,

---

[7] Due to scheduling issues caused by the pandemic, undersigned counsel were unable to conduct a complete neuropsychological testing battery on Mr. Richardson.

without taking the time to carefully check his answer before responding. I also observed Mr. Richardson act impulsively when completing a subtest in which he viewed a puzzle model and was required to select three out of six choices of puzzle pieces, that when combined would reconstruct the model puzzle. On this subtest he blurted out responses very quickly and many of his first choice responses were incorrect, and he would need to change his answer.

Mr. Richardson's impulsivity and tendency to perseverate appeared in several tasks which measured planning and cognitive shifting. On one task, Mr. Richardson was required to draw a visual design while observing rules and inhibiting previously drawn responses. Mr. Richardson responded quickly, even though he made many errors. Even when he was encouraged to work more carefully, he continued to respond impulsively. On this task he also showed a perseveration of response. Although he was instructed several times to "draw different designs" he kept repeating the same design, over and over again. After the task was completed, when asked about this, he stated: "I know [about the rules], but my hand starts going and I just can't stop." He had difficulty coming up with new strategies and perseverated with incorrect responses.

Mr. Richardson also demonstrated impulsivity and poor planning on another task, which assessed planning, rule learning, and inhibition of impulsive and perseverative responding. On this task, while viewing a model tower, he was required to move disks of different sizes (from small to large) across three pegs to build the same tower in the fewest number of moves possible. Though he was able to complete very simple items, when the items became more difficult, he reacted quickly, without planning. He responded at random, doing the same move over and over again, and did not plan ahead.

Ex. 115 at 3–4.

105.   Dr. Paradis concluded that Mr. Richardson's "performance on these tests was consistent with him having executive functioning problems." Ex. 115 at 4.

As described above he is an impulsive individual who perseverates. When presented with challenging tasks he

179

> had difficulty planning ahead and inhibiting ineffective responses. These difficulties, along with his history of head injuries, are indications that he may have significant impairment in frontal lobe functioning. Impairment in frontal lobe functioning would be an important mitigating factor in his legal case, since frontal lobe functioning affects judgment, planning, problem solving, emotion modulation, and behavioral control.

Ex. 115 at 4.

106. Though Dr. Paradis was unable to conduct a complete neuropsychological battery, she recommended one. "Further neuropsychological testing could identify the presence and severity of brain functioning impairment. . . . I would highly recommend that Mr. Richardson undergo a full battery." Ex. 115 at 4.

107. Neuropsychologist Joan Brennan reviewed the testing and observations recorded by Dr. Paradis and came to similar conclusions regarding the presence of executive functioning problems and the need for further testing. *See* Ex. 113.

> Mr. Richardson is the perfect example of one who would have benefitted from a neuropsychological evaluation. At the age of 2, Mr. Richardson sustained a traumatic brain injury. Records indicated that while at his babysitter's, he slipped on a rug and did a "face plant." He had a knot and bruise on his right forehead that lasted several months. Per his mother's report, Mr. Richardson had a marked change in his behavior. Prior to this injury, he was a loving, happy, talkative, and inquisitive child. After the injury, he was different. He was irritable, did not like to be touched or picked up, distant and disinterested in others, and less playful and talkative. Mr. Richardson's mother reported that he began to display inappropriate impulsive behaviors, immediately after this incident, at 2 years of age.

> Research indicates that brain injury in early childhood may alter a child's developmental trajectory. Specifically, brain injury may impact the development of cognitive skills. Chronic cognitive effects of pediatric TBI include impairment of attention, memory, processing speed, and executive functioning. Mr. Richardson's "acting out" behaviors continued in elementary school. He was continually in trouble with teachers and school authorities for not listening and/or controlling himself. His parents observed the same behaviors at home. Mr. Richardson was taken to counselors, psychologists, and a psychiatrist. At the age of 6 or 7, he was given several batteries of tests including a brain scan. He was diagnosed with Frontal Lobe Brain Damage. He received treatment with Dr. Nelson and Dr. Hyde in Seattle, Washington, who provided diagnoses of Attention-Deficit Disorder (ADD), Dyslexia, and Frontal Lobe Damage.

> According to Mr. Richardson's mom, these doctors informed her that because of Mr. Richardson's brain damage; Mr. Richardson did not have the ability to control his impulses, that Mr. Richardson's brain damage made it challenging for him to understand right from wrong, and that raising Mr. Richardson would not be easy.

Ex. 113 at 4.

108. There is no question trial counsel were aware of Mr. Richardson's ADHD diagnosis in childhood, as even their ill-prepared expert Dr. Mortillaro testified to this fact. Reasonably competent counsel would have investigated further based on this information, and would have discovered, as Dr. Brennan explains, that

> As a result of his ADHD diagnosis, Mr. Richardson was prescribed Dexedrine. He took this medication from approximately age 7 to 11. The medication was helpful; however, it was stunting his growth. Therefore, he was taken off that medication. His teachers discovered that giving Mr. Richardson a cup of coffee calmed his behaviors.

> His behavioral problems continued into his teenage years. He exhibited impulsive behaviors, had difficulty

understanding limits, and failed to self-regulate (putting himself in precarious situations, kleptomania, etc.) . He exhibited learning problems at school. One friend stated that Mr. Richardson did not know how to avoid trouble, and it was common for him to be in the wrong place at the wrong time. The friend also reported that Mr. Richardson lacked self-confidence, was influenced by others around him, and followed others without thinking about outcomes or consequences.

Mr. Richardson actively participated in sports and was on the varsity basketball team for one year, the varsity baseball team for three years, and the varsity football team for four years. Mr. Richardson reported that he sustained multiple concussions while participating in these activities. Due to the brain injury in childhood (frontal lobe dysfunction), multiple concussion, and subsequent learning and behavioral difficulties (specifically problems with attention, distractibility, self-regulation/self-control, inhibition, inability to see consequences) that he has experienced from early childhood, a comprehensive neuropsychological evaluation would have provided insight into his strengths and weaknesses, and made recommendations to assist his teachers and parents in understanding his learning and behavioral challenges. It should be noted that there is a growing body of literature that suggests that individuals who have been diagnosed with secondary Attention -Deficit/Hyperactivity (ADHD) following a brain injury are at-risk of having emotional, cognitive, academic, vocational, substance abuse, and criminal activity in adulthood. Specifically, deficits in memory functioning and executive functioning in ADHD adults are similar to deficits experienced by children with ADHD, suggesting frontal lobe involvement in the manifestation of ADHD symptomatology. Based on the information provided in this evaluation, it would have been helpful for Mr. Richardson to have had a neuropsychological evaluation prior to his trial in 2009 to provide the trier of fact with this valuable information.

Ex. 113 at 4-5.

109. Regarding the neuropsychological screening tests that were conducted by Dr. Paradis, Dr. Brennan explains the following

Mr. Richardson presented with weaknesses in the areas of working memory, perceptual reasoning skills, and visuospatial/constructional skills. He continued to have difficulty on a task requiring him to generate visual designs while observing the rules and restrictions of the task, and inhibiting previously drawn responses. He was impulsive, "got stuck", and perseverated on repeating the same design. He had the same problem on a different visual problem-solving task requiring spatial planning, rule learning, inhibition of impulsive and perseverative responses. He tended to respond in an impulsive/random manner and did not benefit from prior learning. These difficulties with visual spatial tasks and visual problem-solving tasks are generally associated with right hemisphere and frontal lobe difficulties.

In terms of memory skills, Mr. Richardson generally performed in the low average range with a few scores in the average range. He demonstrated weaknesses in the immediate and delayed recall of verbal and visual material. Initially he benefited from verbal information when presented with verbal associations with his performance in the average range. However, after a delay, he recalled information with a below average ability indicating difficulties with retrieval of information.

The initial testing completed by Dr. Paradis was limited and did not assess all of the components of a comprehensive neuropsychological evaluation. These testing results serve as a partial picture of Mr. Richardson's cognitive abilities. To provide a complete picture of Mr. Richardson's cognitive strengths and weaknesses, it will be necessary to complete the neuropsychological evaluation as described below.

Ex. 113 at 6-7.[8]

110.   Dr. Brennan concluded the following:

Based on a review of the records, the limited testing that was administered, and with a reasonable degree of neuropsychology certainty, the following opinion is

---

[8] Dr. Brennan recommended a battery of additional tests. Undersigned counsel have been unable to complete those tests due to issues related to the pandemic and scheduling, but will be undertaking those tests at the earliest possible opportunity. *See* Ex. 113 at 7.

183

provided. Mr. Richardson sustained a TBI complicated by secondary attention-deficit hyperactivity disorder and numerous concussions resulting in deficits in cognitive, emotional, and behavioral area. These deficits are specifically related to the frontal lobe and right hemisphere. Damage to these areas of the brain, affected Mr. Richardson in the following ways: (1) he is more impulsive, as his damaged brain prevents him from considering the consequences of his actions; (2) he lacks the ability to plan, and as a result would be more susceptible to following anyone who had a plan; and (3) he has a significantly diminished ability to learn to solve problems, and will perseverate despite continual failures. It is also important to note that the prison's highly structured environment remediates the problems caused by Mr. Richardson's brain damage.

Ex. 113 at 7-8.

111.    Reasonably competent counsel would have recognized the significance of Mr. Richardson's brain damage and understood the need to explain the effects of such damage to the jury. An expert in traumatic brain injury, like Dr. Lyn Turkstra, could have explained to trial counsel that many of Dr. Mortillaro's observations were consistent with traumatic brain injury (TBI).

Most salient was evidence throughout the assessment that Mr. Richardson had impairments in executive functions. . . .

Dr. Mortillaro stated:

[Mr. Richardson's] pattern of responses suggests that he tends to portray himself as being relatively free of common shortcomings to which most individuals will admit…

. . . .

There is no evidence to suggest he made an effort to intentionally distort the profile. However, the results may under-represent the extent and degree of any significant findings in certain areas due to the

184

client's tendency to avoid negative or unpleasant aspect of himself.

This description is consistent with impairments in awareness, particularly awareness of cognitive limitations, also called metacognitive awareness. When Dr. Mortillaro's assessment was completed in 2009, impaired awareness had been known for many years to be a common sequel of TBI (Prigatano and Schacter, 1991, Sherer et al., 1998), leading to underestimation of performance errors on specific tasks (Hart et al., 1998) as well as lack of insight into one's own behaviour and its consequences (Sherer et al., 1998).

Dr. Mortillaro interpreted Mr. Richardson's lack of awareness as indicating "defensiveness," and contrasted it with areas in which Mr. Richardson "described problems of greater intensity than is typical of defensive respondents including drug abuse or dependence, history of antisocial behavior, poor anger control, alcohol abuse or dependence, failures in close relationships, impact of traumatic events, stress in the environment, unsupportive family or friends, sensation seeking behavior, and compulsivity or rigidity."

This list is a classic description of executive dysfunction associated with TBI (Kimberg and Farah, 1993, Busch et al., 2005, Mazaux et al., 1997): poor self-control and limited cognitive flexibility, leading to problems in contexts in which goal-directed, flexible, controlled behaviour is critical, such as interpersonal relationships, responses to provocative events, when goals require delay in gratification, and any activity in which self-regulation must be sustained over time.

The symptom cluster Dr. Mortillaro described is referred to as "frontal lobe syndrome," which is described in medical literature as early as the 1930s (Bennett and Keegan, 1935), the most classic case of which was the railway worker Phineas Gage (Harlow, 1993). A seminal paper by Eslinger and Damasio (Eslinger and Damasio, 1985) is relevant to the case of Mr. Richardson. The authors described patient EVR, a successful, churchgoing, married father of two, who underwent resection of a frontal-lobe tumour at age 35 years. After the surgery, he had normal or above-average performance on standardized cognitive tests, in the context of profound behavioural dysfunction in

185

everyday life. EVR invested unwisely and had to declare bankruptcy, lost a series of jobs because of complaints about his work habits, divorced and remarried and divorced again, and ultimately moved back in with his parents, all without insight into his behaviours. He would spend hours stuck on an individual idea or behavioural routine and struggled to make the smallest decisions.

EVR's deficits were clearly more severe than those of Mr. Richardson. The cognitive impairments underlying EVR's behavioural problems, however, i.e., impairments in self-regulation and cognitive flexibility, similarly explain signs and symptoms described by Mr. Richardson and everyone who knew him. Some aspects of the description of EVR echo Dr. Mortillaro's description of Mr. Richardson, in that EVR presented as "alert, cooperative, and oriented to time, place, and information…[and had] fluent, nonparaphasic, and well-articulated speech." (Eslinger and Damasio, 1985) EVR's social and moral reasoning also were intact when he was asked to respond to basic verbal problems, i.e., he knew right from wrong but did not act accordingly. Likewise, Mr. Richardson gave reasonable explanations for his actions and, from Dr. Mortillaro's report, clearly knew right from wrong, e.g., that it was wrong to steal. By contrast to his reasonable, "normal" performance in the clinical interview, Mr. Richardson clearly failed to demonstrate "normal" reasoning in his everyday life, and persisted in behaving in ways that had major negative consequences for him and for others.

. . . .

Dr. Mortillaro quoted Tom as saying, "I am whatever level the other person is at." These comments illustrate the lack of in-the-moment awareness that epitomizes executive function impairments after TBI, and how Mr. Richardson did not self-regulate but rather responded to actions of others. Responding to the actions of others also explains Mr. Richardson's relative success in in structured environments like high school sports and the military, versus unstructured environments, such as when his parents dropped him off in Seattle with no supports and he was arrested within hours.

Also consistent with the gap between knowing the right thing and doing the right thing, Mr. Richardson was

186

described by Dr. Mortillaro and others (e.g., childhood friends John Gianukakis and John Houck) as taking responsibility for the things he did and facing the consequences of his actions. Mr. Houck said that Mr. Richardson "always confessed when he did something wrong, with no thought about whether he was going to get into trouble." A common scenario for individuals with frontal-lobe syndrome after TBI is acting impulsively, failing to realize that one's action is inappropriate in the moment, realizing it afterward, and feeling guilty and incompetent for having done the wrong thing. This "downward spiral" can repeat over time, as the person becomes less confident in their own abilities and judgement (Ylvisaker and Feeney, 1998).

Ex. 166 at 3–5.

112. Evidence contained in trial counsel's file, which trial counsel failed to provide to Dr. Mortillaro, further supported a finding of executive dysfunction.

Comments by Mr. Richardson's then-girlfriend, Kim, and his mother show further evidence of impairments in executive functions. For example:

On page 33 of her interview, Kim said she believed the "K-Mart" thing was her son's idea and "Tom was stupid to go along with it".

On page 32 of her interview, Kim said Tom is a "blabbermouth" and would have told her everything about his trip to Vegas. On page 40 of her interview, Kim said that Tom had given his credit card and PIN to "a couple of [her] kids".

A typical adult who has good executive function can show self-control in the moment, delay gratification, and resist pressure from others, especially if the cost of not doing so is high. For example, most people can stop themselves from stealing a chocolate bar in the grocery store, as the potential cost of getting caught outweighs the potential benefit of eating the chocolate. The key word here is "potential" – i.e., a person with good executive function can think back to their past experience and ahead to possible consequences of their actions, and make decisions based on hypothetical outcomes.

By contrast, persons with poor executive function are more likely to make decisions based on the immediate context and whatever is most salient and rewarding at that time. These salient context influences are referred to as "prepotent", meaning they have great power. Prepotent stimuli can be people or things, and in the former case would have caused Mr. Richardson to "go along with it" and "give into the influences" of others around them. This does not mean a person with poor executive function will never make a prosocial decision, as a prepotent stimulus can be positive or negative. This vulnerability to prepotent stimuli is likely why Mr. Richardson sometimes picked up objects that did not belong to him (low cost in the moment), the "mindless offenses" mentioned by his mother, and equally followed why he followed positive rules in football. It also explains why Mr. Richardson did not obey his parent's instructions to punch a friend in the head while the parent restrained that friend. In that case, the prepotent stimulus was Mr. Richardson's aversion to harming a friend in a face-to-face situation, added to his history of being abused by his parents, which would outweigh his tendency to "go along" with whatever was suggested by his parents.

A critical difference between Mr. Richardson and patient EVR, described earlier, is that Mr. Richardson sustained brain damage at a time when his brain was still developing. It is well known that childhood brain injury can damage the brain structures needed for executive function development (Gioia et al., 2002, Mangeot et al., 2002, Brookshire et al., 2004, Ewing-Cobbs et al., 2004, Levin and Hanten, 2005, Dennis, 2010). Falls like that reported for Mr. Richardson can result in both focal injuries to parts of the brain that made contact with a hard surface, and diffuse damage to connections throughout the brain. This diffuse damage can have equally diffuse effects on cognition and cognitive development, as the child's brain is still organizing functions. There is evidence that diffuse and focal effects can persist through a child's lifetime (Ewing-Cobbs et al., 2016, Ryan et al., 2018, Kohler et al., 2020) particularly effects on "higher" cognitive functions such as executive functions, which require integrated functions of multiple brain regions. A child's ability to control their own behavior immediately after injury – Mr. Richardson's mother stated that "Tommy displayed inappropriate impulsive behaviors from the time of his injury" – can predict executive functions years later

(Smith-Paine et al., 2022). For that reason, brain injury in childhood is a developmental disorder (Salley et al., 2020).

Ex. 166 at 5–7.

113.    Dr. Turkstra explains that in addition to the observations by Dr. Mortillaro that are consistent with executive dysfunction, and the additional evidence in the record not provided to Dr. Mortillaro that indicated executive disfunction, neuropsychological testing could and would also have revealed executive disfunction.

> At the time of Dr. Mortillaro's assessment, there were several standardized neuropsychological tests available for assessment of executive functions. Among those were the Trail-Making Test, originally published in 1958 (Reitan, 1958), and the Wisconsin Card-Sorting Test (Kongs et al., 2000), an earlier version of which was published in 1991 (Dehaene and Changeux, 1991), both of which were designed to measure working memory and cognitive flexibility. In 2001, the WCST and Trails were modified and added to several other purported tests of executive functions to create the Delis-Kaplan Executive Function Systems (D-KEFS) (Delis et al., 2001), a group of standardized tests designed to measure working memory, cognitive flexibility, mental control, and cognitive functions derived from these (planning, organization, using strategies to achieve goals).

Ex. 166 at 8. Trial counsel were ineffective for failing to ask Dr. Mortillaro to conduct these tests.

114.    Having reviewed the testing that was conducted, as well as relevant documents contained in trial counsel's file, and reports from family and friends regarding Mr. Richardson's behavior that were not obtained by trial counsel, Dr. Turkstra concluded that:

> Mr. Richardson has impaired executive function, manifest in poor decision making, poor in-the-moment awareness of

potential consequences of his actions, and behavior that in general shows he is strongly influenced by prepotent stimuli in the moment rather than considering previous experience and potential future consequences before he acts. While executive dysfunction is the hallmark of frontal lobe injury, and indeed has been referred to as a "frontal lobe syndrome", a TBI in childhood could cause diffuse brain damage that could derail development of executive function. so while identifying a focal lesion can be helpful, it is not necessary for executive dysfunction in TBI.

Friends, family, and the three experts who evaluated Mr. Richardson were consistent in describing him as a person who tried to do the right thing and took responsibility for his actions, even if he couldn't explain his reasoning at the time. The combination of poor self-control and limited cognitive flexibility would translate into the everyday "mindless offenses" reported by Mr. Richardson's mother, as well as potentially dangerous behaviors if there were negative prepotent stimuli in the environment at that time. Mr. Richardson's behavior and actions have the hallmarks of executive dysfunction after TBI.

Ex. 166 at 10.

115.    Trial counsel's failure to investigate and present the expert testimony regarding TBI and executive dysfunction outlined above fell below objective standards of reasonableness.

116.    There is a reasonable probability of a more favorable outcome if trial counsel had investigated and presented this evidence. Dr. Mortillaro's testimony was uncompelling at best and harmful at worst. He himself said he was not explaining Mr. Richardson's behavior, simply describing it. Yet a competent expert who was prepared by trial counsel could have explained Mr. Richardson's behavior as a function of his brain damage. If the jury had understood that Mr. Richardson's behavior was consistent with and a result of brain damage, there is a reasonable

190

probability at least one juror would have voted for a sentence less than death. *See* Ex. 140 at 4 (Juror Dennis wondering "Did he suffer from mental health problems? . . . I walked away with the impression that I did not know much about Mr. Richardson's background."); Ex. 119 at 3 (Juror Aivez stating "If Mr. Richardson suffered from some type of brain damage that effected his judgment, impulses, or his ability to reason, I believe the jury would have wanted to hear this type of mitigating circumstance."); Ex. 117 at 2 (Juror Clark stating "If Mr. Richardson suffered from some type of brain damage that affected his judgment, impulses, or his ability to reason, I believe the jury would have wanted to hear this type of mitigating circumstance much more so than anything on the list of circumstances that were provided by his defense counsel.").

**Claim Five: Prosecutorial Misconduct—Penalty Phase**

Mr. Richardson's death sentences are invalid under the federal constitutional guarantee of due process, equal protection, and a fair sentencing hearing because of pervasive prosecutorial misconduct during the penalty phase. U.S. Const. amend. V, VI, VIII, and XIV.

**Supporting Facts**

1. The prosecutor engaged in repeated instances of misconduct during the penalty phase, which deprived Mr. Richardson of his constitutional right to a fair sentencing hearing, equal protection, and due process. The instances of prosecutorial misconduct had a substantial and injurious effect individually and cumulatively on the jury's decision to sentence Mr. Richardson to death.

> **A.      The State's penalty phase closing argument was rife with misconduct.**

2. In its closing argument, the State committed misconduct when it: (1) argued facts not in evidence; (2) urged the jury to send a message to the community with their verdict; (3) improperly argued proportionality; (4) improperly appealed to the jury's emotions; and (5) urged the jury not to find or recognize the mitigation evidence Mr. Richardson presented. *See Viereck v. United States,* 318 U.S. 236 (1943); *U.S. v. Berger,* 295 U.S. 78 (1935).

> **1.      In closing argument, the prosecutor impermissibly argued facts not in evidence.**

3. Throughout the penalty phase closing arguments, the prosecution made comments/references to Mr. Richardson's personality traits and sweeping generalizations about how "normal people" would act in a given situation. 9/2/09 Tr.

at 20–22. The prosecutor also offered his own opinion about Mr. Richardson's life of incarceration. *Id*. at 40.  None of these comments were based on any evidence that had been presented to the jury during the penalty phase.

> **a)** **The prosecutor made sweeping generalizations about Mr. Richardson's personality traits and about how "normal people" would react differently from Mr. Richardson, despite not presenting any evidence to support such arguments.**

4.    The prosecutor argued to the jury that Mr. Richardson was a bad man by telling the jury that Mr. Richardson had certain personality traits. Whether Mr. Richardson actually possessed such traits had never been proven through the admission of competent evidence. The State argued that Mr. Richardson was:

> domineering. He has a strong need to control others. A tendency to intimidate or exploit. He is skillful in exploiting the goodwill in others. He is skillful? He revels in it. We can see him gloating as he describes this K-Mart crime, and tells the police how it's going to be, and how the deal's going to be, and what they're going to do, and what they're going to do with Robert and the whole thing. He loves the control.
>
> He obtains gratification by humiliating others. He gets enjoyment from doing that.
>
> . . . .
>
> These are his personality traits that he's chosen to exercise. This is what he likes. And everything about it says selfishness. And these last two things do, as well. Punishment reinforces rebelliousness in him. It makes it worse. He's not going to be told by anybody what to do. Punishment reinforces hostile feelings.

9/2/09 Tr. at 20–21.

5.      There was no evidence that Mr. Richardson was "domineering," "controlling," or "exploitative." No witness described Mr. Richardson as having these traits. This characterization of Mr. Richardson's personality traits was speculative. The State was improperly attempting to profile Mr. Richardson as a bad man or a criminal by using sweeping generalizations about personality type.

6.      The prosecutor also improperly opined that Mr. Richardson was bad and not a "normal" person.  The prosecutor then went on to opine about "normal people," stating:

> But because there's a guilt that goes with this kind of a thing, a crime like we see here, normal people wouldn't do that. They wouldn't commit that kind of a crime. But people who commit these kind of horrible crimes like we've got here don't have that kind of a guilt problem. They don't have remorse. They're only thinking of themselves. They're thinking minute by minute.

*Id.* at 21. However, there was no evidence presented about how individuals express remorse. No statistical evidence concerning the average person or how an individual might react in a like situation was presented to the jury.

7.      Accordingly, the prosecutor's arguments were not based on evidence and were improper. The prosecutor impermissibly asked the jury to believe that Mr. Richardson was a bad person because, in the prosecutor's opinion, Mr. Richardson did not react in a manner consistent with what the prosecutor considered "normal."

**b)      There was no evidence presented during the penalty phase to demonstrate what Mr. Richardson's incarcerated life would be like.**

8.      Despite the fact that there was no evidence concerning the quality of life Mr. Richardson might have if sentenced to a life in prison, the prosecutor still

194

commented on this, arguing that Mr. Richardson would have a good life and that life in prison would not be just. The prosecutor argued that if Mr. Richardson was sentenced to anything other than the death penalty, his life would be enjoyable:

> Life, even life without parole, means the defendant—and once again, he's not an individual that feels any remorse or anything, it just means that he lives his life in a more confined environment. But he still gets his life. And he has enjoyments. And he gets to enjoy food. He gets to enjoy visits. He gets to enjoy reading, and the internet, and all of these other things. And it's in a smaller area that he gets the life that he has denied these other people.

9/2/09 Tr. at 40. He opined that Mr. Richardson is "not going to sit in prison for the rest of his life and worry or fret about the consequences of what he did." *Id*. at 42. On rebuttal, the State re-emphasized this opinion:

> But keep in mind that the sentence you impose will be one that's served out by Tom Richardson. And if he is sentenced to a prison term, he is not going to spend one day, one minute, one hour reflecting on what he's done. He'll be sitting there feeling sorry for himself, and he'll be sitting there trying to scheme and figure out what he can do to exploit weaknesses in others. That's what he'll spend his time doing.

*Id*. at 66.

9.      There was no evidence presented regarding the conditions of any potential lifetime confinement that Mr. Richardson might face as an alternative to death. The State's arguments about Mr. Richardson's ability to "enjoy reading" and "enjoy the internet" among other activities were purely speculative and inaccurate, and not based on the evidence presented. *Id*. at 40.

10.      To the extent that trial counsel failed to object, and appellate counsel failed to raise this claim—such actions constitute deficient performance. Had trial

counsel objected, and/or appellate counsel raised this claim—there exists a reasonable probability of a different outcome.

11.    The arguments the State made above in subsections (a) and (b) were not based on evidence presented to the jury. *See Guy v. State*, 839 P.2d 578, 585 (Nev. 1992); *Collier v. State*, 705 P.2d 1126, 1129 (Nev. 1985). As a result, these arguments constitute misconduct that violated Mr. Richardson's right to a fair and reliable sentence and had a substantial and injurious effect on the verdict. Relief is therefore warranted.

> **2.    The State urged the jury to send a message to the community by arguing that the imposition of a sentence less than the death penalty would be sending the wrong "moral statement."**

12.    The State impermissibly asked the jury to send the right message to the community by imposing a death sentence. The State argued:

> Well, what do you impose for her? Life without? Well, he's already doing that. I mean, he would already be doing that for Steven Folker.

> If you only impose a life without sentence for the murder of Estelle Feldman you're imposing no sentence for the murder of Estelle Feldman. Because he's not going to do anymore time on it, right? And beyond that, what are you telling people? If you're going to murder somebody you might as well be sure to kill the person who might be the witness later. You might as well.

9/2/09 Tr. at 75–76. In essence, the State argued that Mr. Richardson would get some sort of "freebie" murder if the jury didn't sentence him to death. *See id.*

13.    This argument improperly diverted the jury from determining the proper sentence for Mr. Richardson by asking the jury to solve a societal problem.

*Darden v. Wainright*, 477 U.S. 168, 180 (1986); *Evans v. State*, 28 P.3d 498, 514–15 (Nev. 2001); *Collier*, 705 P.2d at 1130; *United States v. Moreno*, 991 F.2d 943, 947 (1st Cir. 1993); *but see Williams v. State*, 945 P.2d 438, 445 (Nev. 1997).

14.    This continued appeal to morality improperly prejudiced the jurors. Furthermore, this direction clouded the instructions that the jury was given concerning how they should consider the aggravating and mitigating circumstances. The continued appeal to morality further encouraged jurors to disregard the mitigation evidence presented, so much so that not a single mitigating factor was found by the jury.

### 3.    The State improperly argued that the jury should consider a sentence for Mr. Richardson's offenses in proportion to sentences for other crimes in Nevada.

15.    The State improperly asked the jury to consider proportionality when imposing a sentence for Mr. Richardson by directing the jury to consider this crime along with the possible sentencing outcomes for other crimes in Nevada. The State specifically asked the jury to "balance the scales" when a person in the State of Nevada could "get life without parole for stealing things:"

> We don't have one life on the scale, we don't have just two murdered lives on the scale, we don't have two murdered lives and a rape victim on the scale, we have the lives of all of these people that surround them that have been hurt, that have been crippled from the ripple effects of Mr. Tom Richardson.
>
> It's time for an accounting now, ladies and gentlemen. And it's important in that accounting that you discuss it -- that you consider all of the potential forms of punishment, including the death penalty, because it's certainly available to you in this case.

> What needs to happen in this case to balance those scales? There's nothing you can do to balance the scales, even if you come back with the death penalty. A person in this state can get life in prison for stealing things. They can get life without parole for stealing things if they're habitual criminals.
>
> What's appropriate for a person who steals lives? Lives? Who steals innocence? A penalty that's portioned out to people that steal inanimate objects?
>
> When you think about all of the circumstances in this case, the only thing that can bring any balance to the scales of justice is the death penalty. It's a moral statement about the value that we place on life.

9/2/09 Tr. at 39–40.

16. Proportionality review has been abolished in Nevada. *Dennis v. State*, 13 P.3d 434, 440 (Nev. 2000) (citing Nev. Rev. Stat. § 177.055(2)(d)). It is a misstatement of the law to state that the scales of justice can be balanced only through imposition of the death penalty. It is also improper to argue outside the record by referencing habitual criminal sentencings for theft to argue for the death penalty.

17. As a result of the State's improper argument, the jury found no mitigators, despite the clear evidence of their existence. Without the plea from the prosecution to disregard the specific instructions from the court, the jurors may have reached a different conclusion. The comments by the prosecutor had a substantial and injurious effect on the sentence.

### 4. The State improperly urged the jury to impose a sentence based on emotion, rather than the evidence.

18.     The State also committed misconduct in its closing when it attempted to play on the sympathies and emotions of the jurors. The State argued that Mr. Richardson had harmed numerous people and repeatedly referred to the facts of Mr. Richardson's prior conviction in graphic detail.

19.     The State told the jury "we have the lives of all of these people that surround them that have been hurt, that have been crippled from the ripple effects of Mr. Tom Richardson." 9/2/09 Tr. at 39. The State then told the jury to not be "manipulated" by Mr. Richardson, that "there's absolutely nothing here that suggests that mercy has a place in this proceeding." *Id*. at 43. This improperly advised the jury that they should impose a penalty based on emotion instead of the evidence.

20.     The State then repeated the details of Mr. Richardson's prior conviction over and over to inflame the jury.

21.     The State highlighted Mr. Richardson's court-martial conviction as a means to re-victimize Sokol, and as call to arms for the jury to sentence Mr. Richardson to death:

> And we heard from this victim who was willing to come in and relive this event, and put herself out to you, so that you could hear what is really a very important fact to know in this case.
>
> . . . .
>
> And she bared her soul on it, so she had to go through it again.

199

*Id.* at 26, 39.

22.     The State began rebuttal argument in a similar manner, by providing a graphic, detailed, recitation of the alleged facts of Mr. Richardson's previous rape conviction.

> He pried her legs open, he forced himself inside of her, and it was some kind of apparent social event to him. He forced himself on her in multiple ways. She was the wife of one of his colleagues, a buddy's wife. And then he approaches her afterwards and threatens her about telling.

9/2/09 Tr. at 64. The State continued:

> And she's probably tried to forget this incident a million times. She probably wishes she has never heard the name Tom Richardson. And yet, she's asked to come here 17 years later and relive it. And what a good time she must have had talking to a whole group of strangers about the most private parts of her body being invaded by him, only— only to go through the suspicion and disdain and cross-examination all over again, on a crime that she's already— that he's already been convicted for.

. . . .

> She wants him dead? Who could blame her?

*Id.* at 68. This type of argument was wholly unnecessary to prove the fact of the prior conviction and could serve no other purpose than to inflame the passions nd prejudice of the jury. This argument also impermissibly demanded that the jury consider additional punishment for an offense that Mr. Richardson had already served time.

23.     The State's arguments were inflammatory appeals to the emotions of the jurors, improper, and run contrary to a juror's obligation . *Darden*, 477 U.S. at 180; *Viereck*, 318 U.S. at 247 (1943); *California v. Brown*, 479 U.S. 538, 545 (1987)

200

(O'Connor, J., concurring). This misconduct had a substantial and injurious effect on the verdict.

> **5.     The State urged the jury not to find or recognize the mitigation evidence presented by Mr. Richardson by misstating the role and function of mitigating circumstances.**

24.     First, the State improperly told the jury that it did not have to consider the mitigating evidence presented by Mr. Richardson. The State incorrectly advised the jury that it had to consider whether Mr. Richardson was "morally culpable" as a prerequisite to finding that mitigating circumstances existed. Next, it was obvious that the jury did, in fact, follow this direction, despite the specific instructions from the court to consider all of the evidence, because the jury failed to find a single mitigating factor out of the 16 presented on the record.

> **a)     During the penalty phase closing arguments, the prosecution misstated the role and function of mitigating circumstances by telling the jury that it did not have to consider the mitigating evidence.**

25.     The State improperly directed the jury to disregard and not consider any of Mr. Richardson's mitigation evidence by misstating the role and function of mitigating evidence in its closing argument. As outlined below, the State informed the jury that consideration of Mr. Richardson's mitigation evidence was optional, and that the mitigation evidence needed to pass a test of "moral culpability" before it could be considered.

26.     The State incorrectly told the jury that they did not have to consider Mr. Richardson's mitigation evidence. The State told the jury that the mitigators

"may be considered by you, but it's not compelled." *Id.* at 27. The State argued that mitigators should be found only if they mitigated against the two murder offenses, and not if they mitigated the sentence of death. *Id.*

27.    The State then erroneously mislead the jury to equate their task of considering both aggravating and mitigating circumstances with determining Mr. Richardson's "moral culpability." *Id.* at 27–37. The State told the jury:

> He has moral culpability in this crime. Moral culpability. And so it requires you to look at what he did here, and the amount of moral culpability that he has.

*Id.* at 27.

28.    The State specifically argued to the jury that, before the jury could consider the mitigation evidence, it needed to pass a test of reducing the degree of the defendant's moral culpability.

> Whether these items -- and we're going to talk about them now, and you've got a list of them in there, and you can review that list that they've given to you, to determine whether these items are extenuating or reducing the degree of the defendant's moral culpability.
>
> . . . .
>
> All things go to moral culpability and we're going to talk about that. And then you take a look at these mitigators that have been thrown out to you to see if they pass this test.

*Id.* at 27.

29.    The State characterized the mitigating factors as "choices" that Mr. Richardson made, and that "[n]ot a single one of them is anything that mitigates this crime." *Id.* These improper and incorrect statements from the State were

counter to the trial court's instructions to the jury to consider *both* the aggravating and mitigating circumstances.

30.     It is unconstitutional to prevent a sentencing jury from considering any mitigating evidence proffered by the defendant. *Lockett v. Ohio*, 438 U.S. 586, 602–08 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Williams v. Taylor*, 529 U.S. 362, 393 (2000) (At the penalty phase, a capital defendant has a "constitutionally protected right to provide the jury with . . . mitigating evidence"). It is well established that misconduct by the State during closing arguments may be grounds for reversal. *See Berger*, 295 U.S. 78. It is misconduct for the State to argue an erroneous statement of the law. *Evans*, 28 P.3d at 515–17.

31.     There is no requirement that mitigators serve as an excuse or justification for the murder offenses, such arguments were improper and misleading to the jury. Furthermore, "mitigating circumstances" may bear on "moral culpability," but a defendant is not limited to presenting mitigating evidence that speaks directly to his commission of the crime. Contrary to the State's arguments to the jury, mitigating circumstances include "any aspect of a defendant's character . . . that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Bell v. Thompson*, 545 U.S. 794, 796 (2005) (recognizing defense counsel's strategy of focusing on the defendant's positive qualities and capacity to adjust to prison life). *See also Woodson v. North Carolina*, 428 U.S. 280, 304–05 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 110–13 (1982); *Caldwell v. Mississippi*, 472 U.S. 320, 328–41 (1985) (the Eighth Amendment

203

protects defendants from arguments that misinform juries on their roles in

sentencing phase of capital trials); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986)

(defendant's behavior in prison after the murder, while awaiting trial, is relevant

mitigating evidence).

32.     Accordingly, the State improperly misstated the role and function of

mitigation evidence to the jury. As outlined below, this was highly prejudicial to Mr.

Richardson because the jurors did not find a single mitigating circumstances.

>   **b)     It's clear that the jurors listened to the State's improper argument because the jury failed to find any mitigating circumstances despite the clear evidence of these circumstances in the record.**

33.     Mr. Richardson presented mitigation evidence to the jury. Despite this,

the jury did not find that any mitigating circumstances even existed. It is clear that

the jury was swayed by the State's inappropriate and inaccurate definition of

mitigating evidence, despite the court's instructions to consider the mitigating

evidence.

34.     Despite the presence of mitigating circumstances in the record of

proceedings, the jury in this case found no mitigating circumstances. In the penalty

phase instructions, Mr. Richardson set forth the following mitigators that were

supported by evidence on the record:

>   1.   The lack of any significant juvenile record. *See* 9/1/09 Tr. at 118.
>
>   2.   He can be safely housed as he adjusts well to incarceration. *See* 9/1/09 Tr. at 98–99.
>
>   3.   He has an anti-social personality disorder *See* 9/1/2009 Tr. at 103–105.

4. The involvement of Co-Defendant Robert Dehnart. *See* 8/26/09 Tr. at 20–61.

5. The less severe punishment of Co-Defendant Robert Dehnart. *See* 8/26/09 Tr. at 70.

6. He graduated high school. *See* 9/1/09 Tr. at 43, 75.

7. He went to college *See* 9/1/2009 Tr. at 43, 75–76.

8. He was in the military service. *See* 9/1/09 Tr. at 76.

9. He has the love and support of his mother. *See* 9/1/09 Tr. at 86.

10. He had the love and support of his father. *See* 9/1/09 Tr. at 56, 79.

11. His father was a career law enforcement officer *See* 9/1/09 Tr. at 52, 67.

12. He has struggled with alcohol and drug abuse. *See* 9/1/09 Tr. at 95

13. He has had periods of employment. *See* 9/1/09 Tr. at 75–76.

14. Coach Rickard cared enough to speak on his behalf. *See* 9/1/09 Tr. at 48

15. He has been incarcerated since the age of 25 (except for a period of about 2 years) and is institutionalized. *See* 9/1/09 Tr. at 96–97.

16. Any other mitigating circumstance. *See* 9/2/09 Tr. at 10–11.

35.    The State improperly urged the jury to ignore the mitigating factors by improperly emphasizing Mr. Richardson's previous rape conviction that was already accounted for as an aggravating factor. 9/2/2009 Tr. at 39. The State also improperly urged the jury to disregard their duty to consider all possible sentencing options. "The idea of possibly letting him ever out of prison shouldn't even be occurring to you." *Id*. at 75.

36.     The State's inflammatory appeals to the jurors' emotions and sympathies, specifically citing "moral culpability," prevented the jury from even considering whether the mitigation evidence that was clearly presented on the record, existed in the first instance.

37.     The law *requires* jurors to give due consideration to mitigating evidence. *McKoy v. North Carolina*, 494 U.S. 433, 444 (1990); *Mills v. Maryland*, 486 U.S. 367, 375 (1988); *Lockett*, 438 U.S. at 608. Mitigating factors of the type set forth by Mr. Richardson have been routinely recognized in other cases. *See e.g., Mack v. State*, 75 P.3d 803–04 (Nev. 2003) (recognizing mitigators based upon adjustment to prison, controlled substance use, and relationship with his family); *Collman v. State*, 7 P.3d 426, 435 (Nev. 2000) (recognizing mitigators based upon the lighter sentence of a co-defendant); *Porter v. McCollum*, 558 U.S. 30 (2009) (recognizing military service as a mitigator); *Card v. State*, 992 So.2d 801, 812 (Fla. 2008) (same); *State v. Powell*, 138 P.3d 453, 455-56 (Nev. 2006) (recognizing mitigation based upon family relationships).

38.     The failure of the jury to find clearly applicable mitigators plainly demonstrates that the jury ignored the court's instructions to consider the mitigation evidence. The only reason the jury could have for not following the court's instructions was the improper and inappropriate arguments from the State to disregard the evidence presented by Mr. Richardson.

39.     Directing the jury to not follow the court's given instructions is clearly prosecutorial misconduct. This misconduct had a substantial and injurious effect on the outcome of the sentencing proceeding. The jury's consequent failure to give any

weight to evidence of substantial mitigating value renders the death sentence that was imposed unreliable and requires that the sentence be vacated.

40.     To the extent that trial counsel failed to object, and appellate counsel failed to raise this claim—such actions constitute deficient performance. Had trial counsel objected, and/or appellate counsel raised this claim—there exists a reasonable probability of a different outcome.

41.     Individually, and/or cumulatively, all these instances of misconduct by the State outlined herein had a substantial and injurious effect on the outcome of the proceeding.

207

1

**Claim Six: Penalty Phase—*Brady/Napue***

2

Mr. Richardson's death sentence is invalid under federal constitutional

3

guarantees of due process, equal protection, effective assistance of counsel, and a

4

reliable sentence due to the prosecutor's suppression of exculpatory evidence

5

regarding Staci Sokol, and its presentation of false and misleading testimony from

6

Sokol. U.S. Const. amends. V, VI, VIII, XIV.

7

**Supporting Facts**

8

1.      Due process requires the prosecution to disclose evidence that is

9

favorable to the defendant and "is material either to guilt or punishment." *Brady v.*

10

*Maryland,* 373 U.S. 83, 87 (1963). A *Brady* claim consists of three elements: (1) the

11

State suppressed the evidence; (2) the evidence was favorable to the defendant; and

12

(3) the evidence was material. *Strickler v. Greene,* 527 U.S. 263, 280 (1999).

13

**A.      The State violated *Brady* when it withheld the transcript of Staci Sokol's court-martial testimony from the defense.**

14

15

2.      The State noticed two aggravating circumstances against Mr.

16

Richardson based on prior violent felony convictions: one based on a robbery at a K-

17

Mart in 2005 and one based on a sexual assault that occurred while Mr. Richardson

18

was in the Army in the early 1990's. *See* Ex. 42.

19

3.      On September 17, 2008, Mr. Richardson filed a Motion for Discovery of

20

Potential Penalty Hearing Evidence. Ex. 116. The State filed a Notice of Evidence in

21

Support of Aggravating Circumstances on October 3, 2008, wherein it represented

22

that "[t]he State has also provided the defense with the records from the

23

1    Department of the Army regarding the defendant's prior criminal history." Ex. 114

2    at 1–2.

3              While serving in the United States Army, Defendant
               Richardson was convicted of Attempted Sodomy on or
4              about 1992. The State will rely on police reports, witness
               statements, court minutes, Defendant's statements, guilty
5              plea agreements, and/or judgments of conviction to
               establish the existence of this aggravating circumstance
6              against Defendant Richardson. The State may also call
               Timothy A. Raimey, the Commanding Officer who reported
7              Richardson's disciplinary action on November 12, 1992. In
               addition, the State may call Ray P. Cox, JA, Trial Counsel,
8              and Staci Sokol to explain the facts of the case.

9    *Id.* at 3. The State did not, however, provide counsel for Mr. Richardson with any of

10   these documents at the time it filed its notice.

11          4.    At a hearing on Mr. Richardson's motion, defense counsel represented

12   that

13           MR. SCHIECK:    . . . we have reviewed what is purported
                             to be all of the evidence that they have
14                           in this case, and I think that perhaps
                             their notice of aggravation has some
15                           generic language in it of things they
                             intend to introduce that they don't
16                           actually have or intend to introduce
                             because it's not in the detective
17                           notebook and it's not in the DA's files.

18                           So, I assume that they've gone—they've
                             listed things that are—that are—that
19                           they don't actually have or intend to
                             introduce. And I would just—if they
20                           can confirm that we have seen the
                             detectives notebook and the DA's file
21                           and there's nothing additional. The
                             reason for that is—is, for instance,
22                           there's a prior conviction of Mr.
                             Richardson while he was in the Army
23                           where he served some time—

209

| | | |
|---|---|---|
| THE COURT: | Right. That's in one of these motions. | |
| MR. SCHIECK: | —in Ft.—Ft. Leavenworth. It refers, in the notice of aggravation, that there are witness statements and transcripts. There's nothing like that in their files. I—I assume that it's just— | |
| THE COURT: | Oh. | |
| MR. SCHIECK: | —when they list a prior conviction, they say minutes, judgment of conviction, witness statements, and just typical language that they don't actually— | |
| MR. OWENS: | And we just don't want to be cut off when those come into our possession. We'd like to use them. We're hoping that we'll get those or something like that so we put them on notice. We don't have anything like that right now. | |
| THE COURT: | Okay. | |
| MR. SCHIECK: | And if they do get them, we just want to be sure that we get it as soon as they do. | |

10/16/08 Tr. at 13–14. Between the time of the motion hearing and the time of trial, the only document related to the sexual assault the State ever provided defense counsel was the judgement of conviction, which it received in 2005. *See generally* Ex. 138.

5.    During the penalty phase, defense counsel proffered to the court that "the parties" could not get Mr. Richardson's court-martial transcript. The State sat silent, thus, agreeing with defense counsel's proffer. *See* 8/31/09 Tr. at 59; *see also Beccard v. Nevada National Bank,* 657 P.2d 1154, 1156 (Nev. 1983) (citing *Curtis*

210

*Publishing Co. v. Butts,* 351 F.2d 702, 714 (5th Cir. 1965), aff'd, 388 U.S. 130 (1967)) ("[t]he failure to object to [an] allegedly prejudicial[] remark[] at the time [the remark] is made . . . strongly indicates that the [opposing] party . . . did not consider the [remark] objectionable at the time they were delivered"). However, this was not true.

6.     Sokol was recently interviewed by members of the Federal Public Defender Office (FPD), District of Nevada, and provided a declaration. *See generally* Ex. 70. In her declaration, Sokol informed the FPD that she was in Las Vegas for two and a half weeks, and that the Clark County District Attorney's Office had her "under a very tight watch that entire time." Ex. 70 at 4 ¶16. She then provided the following information:

> I met with the district attorneys at their office to discuss my testimony. *I asked them if they needed a copy of my testimony from the court martial because I had a copy, but they said no need, we already have it.* I was also shocked that they had some of the physical evidence from the court martial, such as the rape kit, my robe, and a section of my grandmother's quilt.

*Id.* (emphasis added).

7.     Contrary to the State's prior representation at trial—it had a copy of Mr. Richardson's court-martial file/case; or at the very least a copy of Sokol's court-martial testimony. The State, though, withheld this information from the defense.

8.     As explained in great detail in Claim Four(A), (A)(1)–(A)(4), fully incorporated herein, this evidence was material, and favorable to Mr. Richardson—as it demonstrates that Sokol either perjured herself, or knowingly provided misleading testimony. Evidence from Mr. Richardson's court-martial would have

provided a defense to this aggravator—that Mr. Richardson had a reasonable belief that Sokol consented to the sexual encounter between herself and Mr. Richardson. *See Carter,* 121 P.3d 592*; Honeycutt,* 56 P.3d 362*; see also* Claim Four(A)(4), fully incorporated herein. Furthermore, there can be no question that this evidence was material in light of the fact that this was one of the two prior violent felony aggravating factors alleged by the State against Mr. Richardson, against which he had to defend himself. *See* Ex. 42; Ex. 106.

9.     The State's failure to turn over this *Brady* material left Mr. Richardson without any means to attack Sokol's credibility and defend against this aggravating circumstance. *See, e.g.,* Ex. 118 at 2 ¶5 (Juror Kotter stating "[m]y fellow jurors and I would have wanted to know about any inconsistencies in [Sokol's] statement [as] this information would have been important to our deliberations during the penalty phase of the trial") Ex. 118; Ex. 117 at 2 ¶8 (Juror Helen Clark stating "[a]ny discrepancies in Ms. Sokol's testimony would have been important to the subject matter of our deliberations") Ex. 117; Ex. 140 at 3 ¶¶8–9 (Juror Norma Dennis stating that Sokol's "testimony made an impact on the jury[,]" and that "[i]f there were discrepancies between what she said [at Mr. Richardson's court-martial] and at his trial in 2009, then [the jury] should have been told [because] [s]uch information would have had an impact on [jury] deliberations"). Ex. 140.

10.    There is a reasonable probability of a more favorable outcome at the penalty hearing if the State had complied with its constitutional disclosure obligations.

### B. The State committed misconduct when it knowingly allowed Sokol to provide false and misleading testimony.

11. A prosecutor's knowing use of perjured or misleading testimony is a threat to the concept of "ordered liberty." *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *see also Mooney v. Holohan,* 294 U.S. 103 (1935) (deliberate deception of a jury is "inconsistent with the rudimentary demands of justice"). The same result is obtained when the State, although not soliciting false testimony, allows it to go uncorrected when it appears. *See Alcorta v. Texas,* 355 U.S. 28, 30–32 (1957) (finding that the prosecution's failure to correct a key witness's testimony about the nature of his relationship with the defendant's wife violated the defendant's rights). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269.

12. A *Napue* claim succeeds only if three elements are satisfied. *See U.S. v. Zuno-Arce,* 339 F.3d 886, 889 (9th Cir. 2003). First, the testimony or evidence in question must have been misleading. *See id.*; *see also Alcorta,* 355 U.S. at 31 (considering whether "testimony, taken as a whole, gave the jury [a] false impression"). Second, the State must have known or should have known that it was false or misleading. *See Zuno-Arce,* 339 F.3d at 889; *see also Maxwell v. Roe,* 628

F.3d 486, 506 (9th Cir. 2010) ("even false evidence presented in good faith . . .

hardly comports with fundamental fairness") (quoting *Killian v. Poole*, 282 F.3d

1204, 1209 (9th Cir. 2002)). Third, because "*Napue* does not create a 'per se rule of

reversal,'" the testimony or evidence in question must be material. *Sivak v.*

*Hardison,* 658 F.3d 898, 912 (9th Cir. 2011) (quoting *Jackson v. Brown*, 513 F.3d

1057, 1076 (9th Cir. 2008)). Materiality under *Napue* requires a "lesser showing of

harm . . . than under ordinary harmless error review." *Dow v. Virga*, 729 F.3d 1041,

1048 (9th Cir. 2013).

> **1.    Sokol's penalty phase testimony about how Mr.
> Richardson beat her during the alleged sexual
> assault, her self-proclaimed confirmations of her
> allegations against Mr. Richardson, the overall
> strength of the court-martial case against Mr.
> Richardson, and victim-impact testimony about her
> son was patently false or misleading and the State
> knew it.**

13.    As explained in great detail in Claim Four(A), (A)(1)–(A)(4), fully

incorporated herein, Sokol presented patently false and misleading testimony

regarding the injuries that were inflicted, how she was scared for her life and her

kids' lives because Mr. Richardson came back to her home with a gun in the

waistband of his pants, the strength of the court-martial case against Mr.

Richardson—particularly in regards to her testimony that McElroy, Florio, and her

son knew what Mr. Richardson allegedly did to her because they had seen her

bloody and bruised body, and the victim impact evidence about her son. The State

knew—because it had Mr. Richardson's court-martial records, and in particular had

a copy of Sokol's court-martial testimony— and did absolutely nothing to correct

Sokol's false and misleading testimony about: (1) her traumatic and bloody injuries; (2) witnesses who could confirm her allegations against Mr. Richardson because they had either seen her traumatic and bloody injuries, or had found her blood on Mr. Richardson's clothing; (3) Mr. Richardson returning to her home with a gun; (4) the impact the rape had on her son; and (5) the strength of the Army's case against Mr. Richardson. *See* Ex. 70 at 4 ¶16; Claim Four(A), (A)(1)–(A)(4), fully incorporated herein.

14. The State's failure to correct Sokol's false or misleading testimony left the jury without any way to assess Sokol's credibility and to determine whether the State proved this aggravator beyond a reasonable doubt. *See, e.g.,* Ex. 118 at 2 ¶5; Ex. 117 at 2 ¶8; Ex. 140 at 3 ¶¶8–9. This evidence was particularly important and material in light of the fact that this was one of the two prior violent felony aggravating factors alleged by the State against Mr. Richardson, which he had to defend himself against. *See* Ex. 42; Ex. 106.

15. There is a reasonable likelihood that the presentation of false and misleading testimony had an effect on the jury's penalty verdict.

16. The State has yet to acknowledge that it has this material and continues to hide the basis of this violation.

**Claim Seven: Failure to Preserve Evidence**

Mr. Richardson's convictions and sentence of death are invalid under the federal constitutional guarantees of due process, a fair trial, equal protection, right to the effective assistance of counsel, and right to a reliable sentence because the trial court refused to dismiss Mr. Richardson's charges, allowed the introduction of evidence the State failed to preserve, and refused provide a jury instruction concerning the State's failure to preserve important evidence. U.S. Const. amend. V, VI, XIV.

**Supporting Facts**

**A.    The Auto Club 500 Hat.**

1.     The key piece of evidence the State presented against Mr. Richardson, was a hat it alleged had the "Auto Club 500" logo on it. *See, e.g.,* 6/27/08 Tr. at 150–51, 170, 186–91; 8/20/09 Tr. at 25–26. According to the State, this hat placed Mr. Richardson at the crime scene. *See, e.g.,* 6/27/08 Tr. at 148–49, 191, 204.

2.     On September 10, 2005, the bodies of Feldman and Folker were discovered in Feldman's Las Vegas home, and police were dispatched to the scene. 6/27/05 Tr. at 67, 81, 113, 143, 174. Detective Teresa Kyger was the primary detective assigned to crime scene investigation and oversaw the crime scene analysts, while Detectives Michael McGrath, James Vaccaro, and Marty Wildeman were assigned to interview witnesses. *See, e.g.,* 6/27/08 Tr. at 67 (Detective Kyger testifying it was her responsibility to "document[] the scene with the help of the crime scene analyst[s]"), 87–88, 90, 175; 8/24/09 Tr. at 99 (Detective McGrath

testifying that Detective Kyger was the primary detective, and that he was assigned to interview witnesses); *see also* 6/27/08 Tr. at 112, 115.

3.      Detective Kyger readily admitted that after conducting their investigation on September 10, 2005, they had "no suspects" and were "looking for anything that [they] could find that would possibly lead [them] to a suspect [or suspects]." 6/27/08 Tr. at 70.

4.      While detectives were not able to identify suspects on September 10, 2005, they were able to develop a timeline of when they believed the murders might have occurred based in part on receipts found at the crime scene. *See* 6/27/08 Tr. at 138; *see also* 8/24/09 Tr at 100, 104–05, 112–13. One of those receipts, was from a local Taco Bell dated September 7, 2005, at 4:09PM—a receipt that became very important to the State's theory of the case. *See* 8/21/09 Tr. at 109; 8/24/09 Tr. at 112–13.

5.      Upon discovering the local Taco Bell receipt, Detectives Vaccaro and Wildeman were tasked with going to the Taco Bell to watch and obtain a copy of the surveillance video of the purchase. *See* 8/24/09 Tr. at 112–13. On September 14, 2005, Detectives Wildeman and Vaccaro went to the Taco Bell, prior to going back to help finish processing Feldman's home. *See* 8/26/09 Tr. at 193. Upon viewing the September 7, 2005, Taco Bell surveillance video (video) the detectives were able to locate Folker and made arrangements to obtain a copy of it. *See* 8/26/09 Tr. at 193–94. In the video, detectives alleged that they could see Mr. Richardson standing near Folker having a conversation with him, and that Mr. Richardson was wearing gray sweatpants, a t-shirt, and was wearing a baseball cap with a light color top

with a darker color brim. *See* 8/24/09 Tr. at 114, 117–19; 8/26/09 Tr. at 195. Any logo on the front part of the cap was blocked by the wearer's sunglasses, which were resting on the top part of the baseball cap bill. *See* 8/24/09 Tr. at 114–15, 117. However, Detective McGrath, stated that in his opinion the baseball cap that the individual seen in the video was seen wearing was the Auto Club 500 baseball cap. 8/24/09 Tr. at 170–71; *see also* 8/28/09Tr. at 141; 8/28/09 Tr. at 141 (in rebuttal argument, the State argued "[t]hat's the Auto 500 hat. That's the hat that he has on his head in the Taco Bell video . . .").

6.     With this information in hand, Detectives Vaccaro and Wildeman then went to Feldman's home to help Detective McGrath and the crime scene people with some additional processing of the crime scene. *See* 8/26/09 Tr. at 195.

7.     When processing the southwest bedroom, where Folker's body was discovered, and after moving items and the bed—Detective McGrath found and picked up a baseball cap, which he alleged had the Auto Club 500 logo on it, from an unknown location; then proceeded to joke with Detectives Vaccaro and Wildeman about it being adjusted and sized for someone with a small head, and then promptly set it down somewhere but doesn't remember where. *See* 6/27/08 Tr. at 133–34, 139, 141, 146, 154, 166, 169, 186–88, 191, 200–01; 8/24/09 Tr. at 176–77.

8.     Despite not having any suspects or anyone under arrest, and after further processing the crime scene further on September 14, 2005, the police released the crime scene back to the Feldman/Folker family. 6/27/08 Tr. at 77, 81–82, 146. On or about September 16, 2005, the Feldman/Folker family then had a crime scene cleaning crew clean the crime scene and the baseball cap, which was

left at the crime scene by police officers, and allegedly had the Auto Club 500 logo on it was destroyed. 6/27/08 Tr. at 149–51, 191–92, 205, 209–10.

9.      Because the baseball cap was destroyed, and there is no law enforcement record of any baseball cap being found at the crime scene; the only evidence of a baseball cap being found at the crime scene is in a general photograph taken on September 14, 2005, showing the conditions of the southwest bedroom after law enforcement moved objects, including the bed.[9]



Ex. 25; *see also* Ex. 26.

---

[9] The southwest bedroom is where Folker's body was discovered.

10.    The photograph was not taken of the baseball cap specifically, and it is unknown who put the baseball cap there, or how it ended up where it was. *See, e.g.,* 8/24/09 Tr. at 195; 8/26/09 Tr. at 195–97.

> ### 1.    Mr. Richardson's federal due process rights were violated when the trial court allowed the introduction of evidence related to the baseball cap.

11.    Mr. Richardson's federal due process rights were violated when the police, acting in bad faith, failed to preserve the baseball cap they allegedly found at the crime scene. *See Arizona v. Youngblood*, 488 U.S. 51 (1988).

12.    Police detectives acknowledged that items readily identified as having been worn by a possible suspect were of paramount importance in developing that person as a suspect. 6/27/08 Tr. at 96; *see also id.* at 86, 100 (Detective Sergeant Michael Thompson testified that with no eyewitnesses, no suspects, the general proposition is that any item of clothing might have trace evidence on it that would be helpful in developing a suspect), 105 (noting that if detectives were aware that the hat of one of the suspects was left at the scene they would have absolutely seized and tested it). This is because one of the primary sources to develop a suspect or suspects would be trace evidence, and that trace evidence would/could be found on a hat worn by a possible suspect that could lead to the discovery of the identity of said suspect. *See* 6/27/08 Tr. at 136, 138–39, 191.

13.    Despite knowing the valuable nature of trace evidence that can be found on items worn or belonging to a possible suspect, detectives nonetheless acted in bad faith in not impounding the baseball cap, which allegedly had the Auto Club 500 logo on it, found in the very room in which Folker's body was discovered. The

bad faith of the detectives is clear—they saw a surveillance video of Folker talking to someone, on the day they alleged the murders occurred, wearing a baseball cap, which allegedly had the Auto Club 500 logo on it; yet, when they saw a baseball cap in the very room Folker's body was in, which they also alleged had the Auto Club 500 logo on it, they failed to impound it. *See* 6/27/08 Tr. at 133–35, 139, 141, 146, 154, 166, 169, 186–88, 191, 200–01; 8/24/09 Tr. at 114–15, 117, 170–71, 176–77.

14.    Any excuse by experienced police detectives that they couldn't have known the evidentiary value of the hat before their trip to Riverside, California— where they viewed a photograph of Mr. Richardson wearing an Auto Club 500 hat— is baseless as detectives had the ability to have the Feldman/Folker family identify items found at the crime scene as belonging or not belonging to Feldman and Folker prior to releasing the crime scene back to them. *See, e.g.,* 6/27/08 Tr. at 170, 178, 187; *see also* 8/20/09 Tr. at 84–85 (sometime after the baseball cap was lost/destroyed, officers showed Marcia LaFrance a photograph of a hat, and she informed them that her son, Folker, did not wear those kind of racing inspired hats, and never had a hat like that). This is particularly true when "looking for clues . . . as to who did this." 6/27/08 Tr. at 138.

15.    The importance of the baseball cap for the defense cannot be understated for two reasons. First, DNA evidence found on the hat could prove that Mr. Richardson was not the killer. Second, Mr. Richardson could have tried on the baseball cap to demonstrate that it did not fit his head—as detectives testified that it was sized for someone with a small head.

16. The failure to preserve this evidence, and its subsequent use at trial, warrants a finding that the conviction is invalid and should be reversed. Mr. Richardson can show both that the State acted in bad faith in failing to preserve the hat and that the hat was potentially useful in his defense.

17. Because Mr. Richardson can demonstrate bad faith, he need not prove prejudice, and is entitled to be retried without the use of the hat evidence.

18. Moreover, the trial court's failure to grant Mr. Richardson's motion to suppress/prohibit the introduction of this lost evidence was prejudicial, and had a substantial and injurious effect on the jury's verdict.

### 2. Mr. Richardson's federal equal protection rights were violated due to the introduction of evidence related to the baseball cap.

19. Even assuming *arguendo* the police did not act in bad faith in failing to preserve the alleged baseball cap they found at the crime scene, Nevada law still provides that the "State's failure to preserve material evidence can lead to dismissal of the charges [if the defendant can show] he was prejudiced by the loss of evidence." *Higgs v. State,* 222 P.3d 648, 660–61 (Nev. 2010) (quoting *Daniels v. State*, 956 P.2d. 111. 115 (Nev. 1998)). A defendant is prejudiced when the State benefits from its failure to preserve evidence. *See Higgs,* 222 P.3d at 661.

20. Mr. Richardson was entitled to relief because he was prejudiced in three ways by the State's failure to preserve the baseball cap detectives found at the crime scene. *See, e.g.,* 6/27/08 Tr. at 133–35, 139, 141, 146, 154, 166, 169, 186–88, 191, 200–01; 8/24/09 Tr. at 114–15, 117, 170–71, 176–77. First, the failure to preserve/collect the baseball cap prevented Mr. Richardson from demonstrating that

it did not fit his head as it was sized for someone with a small head, and/or that it was not an Auto Club 500 baseball cap. *See, e.g.,* 6/27/08 Tr. at 134; 8/24/09 Tr. at 209 (Detective McGrath admitting that they did not examine any hats found in Kim Ross's residence to see if they were sized similarly to the baseball cap that was found at the crime scene).[10] Second, because the baseball cap was the only physical evidence allegedly connecting Mr. Richardson to the crime scene, as there was no forensic evidence linking him to the scene, the loss of it prevented him from having the hat tested for DNA to demonstrate the hat did not belong to him. *See, e.g.,* 6/27/08 Tr. at 211; 8/20/09 Tr. at 27 (State admitting during opening statements that there was no DNA evidence linking Mr. Richardson to this crime); 8/24/09 Tr. at 175 (print evidence matched only Robert Dehnart, the co-defendant); 8/26/09 Tr. at 218, 224–35, 261, 264–74, 283, 290 (No DNA evidence linking Mr. Richardson to the crime scene or the crime). Third, because there was no forensic evidence linking Mr. Richardson to the murders, the State needed to use this specter of evidence to corroborate Mr. Richardson's co-defendant's testimony—Dehnart—without which the State would not have been able to obtain a conviction. *See, e.g.,* 8/28/09 Tr. at 60, 78–80, 83 (State recognizing that Dehnart's testimony was critical to its case); *see also* Nev. Rev. Stat. § 175.291(1).

21.     Mr. Richardson suffered prejudice as a result of the State's failure to preserve material evidence; yet, he was not treated as similarly situated defendants. *See Sanborn v. State,* 812 P.2d 1279 (Nev. 1991); *Sparks v. State,* 759

---

[10] Kim Ross is co-defendant Robert Dehnart's mother, and was Mr. Richardson's girlfriend at the time of the Las Vegas murders. *See* 8/25/09 Tr. at 5.

P.2d 180 (Nev. 1988). For example, in *Sparks*, the Nevada Supreme Court found *if* the defendant was able to test the evidence and it came back with favorable results, it would have critical to the defendant's theory of the case. *See id*. at 182. Similarly, if Mr. Richardson was able to run testing on the baseball cap found at the crime scene and testing came back with favorable results, it would have been critical to the defense theory of the case that Mr. Richardson was not involved in the murders of Folker and Feldman. Second, the Nevada Supreme Court found that the State cannot benefit from its own failure to preserve evidence. *See id.*; *see also Sanborn* 812 P.2d at 1286. However, as described above, that's precisely what the State did here.

22.     Mr. Richardson's federal constitutional rights were violated when the trial court failed to suppress evidence regarding the baseball cap. As a result of the court's failure to suppress, Mr. Richardson was not treated the same as similarly situated criminal defendants and a new trial with the exclusion of this evidence is warranted.

> **3.     Mr. Richardson's federal constitutional rights were violated due to the trial court's refusal to give a proper negative inference instruction concerning the loss of evidence.**

23.     The district court failed to instruct the jury about the State's mishandling and loss of the baseball cap. This failure rises to the level of constitutional error as it "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe,* 431 U.S. 145, 154–55 (1977) (citing *Cupp v. Naughten,* 441 U.S. 141, 147 (1973)).

24.     On August 28, 2009, the parties met outside the presence of the jury panel to settle the jury instructions. *See* 8/28/09 Tr. at 3. At that time, the defense requested the court give the following instruction:

> You may infer that lost or destroyed evidence is unfavorable to the party who could have produced it and did not, if the evidence was (a) under the party's control and reasonably available to it and not reasonably available to the adverse party, and (b) lost or destroyed without satisfactory explanation after the party knew or should have know[n] of the significance of the [evidence].

Ex. 22 at 5; *see also* 8/28/09 Tr. at 13–14.

25.     In support of this instruction, defense counsel made the following argument:

> Court's Exhibit Number 34 . . . ties into a number of pretrial filings, arguments, and hearings that were actually held in this case concerning the loss of the hat that we've heard so much about both pretrial and during trial.
>
> . . . .
>
> And so the record is clear, in our view[] . . . it is clear that the State, through the hands of Detective Sergeant McGrath, held this evidence for a period of time in his hand and even had a conversation concerning this piece of evidence. And it's not—it's not something that just wasn't collected, it's something that was lost or destroyed without really a satisfactory explanation. And we would just ask that the instruction be given and to in essence perfect the issues that we've raised all along in this case concerning the hat.

*Id.*

26.     The trial court declined to give the requested instruction. *See id.*

27.     Mr. Richardson was entitled to have this instruction given to the jury for two reasons. First, the hat was material because there is a reasonable

225

probability the outcome of his case would have been different had the hat been made available. For example, it is likely that testing of the hat would have revealed to whom the hat belonged, which is important given there were multiple hats found at the crime scene, as well as male DNA belonging to unknown male(s). *See* 6/27/08 Tr. at 127–28; 8/26/09 Tr. at 268–69, 271–72, 290. Additionally, without documentation of the location where the hat was initially discovered, no analysis could be made as to whether the hat was present in the bedroom during the homicides. Finally, as discussed above, the State would not have been able to secure a conviction on Dehnart's testimony alone.  The hat was necessary to corroborate his testimony.

28.     Second, the police were grossly negligent in failing to collect the hat. The detectives were at the scene of a double homicide. However, they failed to photograph the hat in its original location. A detective picked up the hat, then detectives commented and joked about it. Yet, they failed to document it in any meaningful way, failed to put it back in its original location, and then failed to preserve it. *See, e.g.,* 6/27/08 Tr. at 133–34, 139, 141, 146, 154, 166, 169, 186–88, 191, 200–01; 8/24/09 Tr. at 176–77. The detectives knew the hat could be tested for trace evidence, they had a video showing a potential suspect wearing a baseball cap; yet, they allowed the baseball cap to be lost and destroyed in the face of the information on hand and with no leads. *See, e.g.,* 6/27/08 Tr. at 77, 81–82, 100, 136, 138–39, 146, 149–51, 191–92, 205, 209–10; *See* 8/24/09 Tr. at 114, 117–19; 8/26/09 Tr. at 195.

29.   The trial court's failure to provide a negative inference instruction regarding the mishandling and loss of the baseball cap by the State violated Mr. Richardson's federal due process rights and the error had a substantial and injurious effect on the guilt and penalty verdicts. A new trial with such an instruction is warranted.

### 4.   Mr. Richardson suffered prejudice as a result of the trial court's erroneous rulings.

30.   The trial court's rulings were not harmless. As discussed above, the hat was essential to the State's case. Accordingly, Mr. Richardson was entitled to have a negative inference jury instruction, and the failure to provide one deprived him of his federal due process rights.

31.   Finally, the prejudice was compounded by the State's extensive closing arguments concerning the hat, which took advantage of its failure to preserve the evidence. For example, the State argued the hat corroborated Dehnart's testimony:

> [t]hat is the progress of the fight. And that's exactly the way that Robert Dehnart describes it. We're going to be talking about a lot of corroboration of the things that Mr. Dehnart, the other murderer, has told us.

> But he doesn't see the whole fight. He doesn't tell us anything about the closet. Why? Because it's avoid [sic] in his knowledge of the fight. He knows about this area over here, where there's a huge scuffle. This is where the hat gets knocked up, right up at the beginning when fists are flying, and things are coming apart.

8/28/09 Tr. at 60.

32.   The State also used the baseball cap to bolster its case and its witnesses when it argued:

227

> *[a]nd they go to the house and they find the hat. And it's at that point that we see what is truly amazing technical work.* Detective Vaccaro sees this little photo sitting up there on a stand and makes the connection. *That is the work of a seasoned, experienced, and excellent detective.*
>
> And he beats himself up about not grabbing the hat at the scene, when they didn't have any idea that it was anything other than the victim's as part of all that clothing that was there. *The thing that he does here is a truly amazing piece of detection.*
>
> And they follow up on that, and they go back. And one thing leads to another, and they don't get the hat. But *they get the defendant in the Taco Bell wearing the hat. And they find the hat in the photograph at the crime scene.* Because some of the photographs taken back on the 14th by Marnie Carter show that in the room, we've seen it.

8/28/09 Tr. at 78–79.

     33.    Finally, in rebuttal, the State used the missing baseball cap to not only criticize the defense's arguments, but to argue that the missing baseball cap bolstered its case against Mr. Richardson:

> Now, Mr. Schieck suggested to you that, well, you know this wasn't collected. And we've gone on and on about this Auto 500 hat. And he implied to you that the detectives on the 14th of September should have realized that when they watched the Taco Bell video at Taco Bell that, boy, Steven Folker's interacting with two people in line there, and one of them I notice is wearing a hat.
>
> So they immediately should have alerted to the fact that they should collect every possible hat in the crime scene. That's hardly a realistic standard. They watch about [sic]
>
> Seconds of tape. They see him interacting with two people who are strangers to them at that point. And they see their victim, but there's no way to connect it to their crime scene.

228

And all of their information they have at that point is that Steven Folker is visiting his grandmother. But even if you assume that it's true that they should have collected that hat, I mean, what does it mean at this point? Does it mean that his hat wasn't at the crime scene? It doesn't mean that. Does it mean that this guy wasn't in Las Vegas on the 7th? Doesn't mean that.

They have the hat. It's in a photographic form rather than the actual item. But the fact that it's in a photograph at the crime scene doesn't dilute its importance in any—by any stretch. That's the Auto 500 hat. That's the hat that he has on his head in the Taco Bell video, and also in the photograph at Kim Ross's house. There's nothing different about this hat, the fact that it's in a photographic form at the crime scene, versus the actual hat itself.  It has the same importance.

8/28/09 Tr. at 140–41.

34.    The trial court's erroneous rulings on the baseball cap issues were prejudicial, had a substantial and injurious effect on the verdicts, and deprived Mr. Richardson of his constitutional right to a fair trial.

229

**Claim Eight: Ineffective Assistance of Counsel—Voir Dire**

Mr. Richardson's convictions and death sentence are invalid under the federal constitutional guarantees of due process, a fair trial, and the effective assistance of counsel due to the failure of his trial counsel to perform within the range of professional conduct expected in capital cases during the voir dire phase of trial. U.S. Const. amends. V, VI, VIII, XIV.

**Supporting Facts**

1.      Trial counsel moved for and were granted leave to present the prospective jurors in this case with questionnaires intended to ferret out potential bias. Though several jurors provided answers indicating potential bias, trial counsel either failed to follow up, failed to challenge for cause, or failed to exercise peremptory challenges to remove them. As a result of trial counsel's ineffectiveness, Mr. Richardson was deprived of his right to a fair trial and impartial jury.

2.      The most egregious failure by trial counsel was their failure to challenge for cause or remove via peremptory challenge Janet Noble-Levi. Noble-Levi provided a number of responses on her questionnaire indicating that she could not be a fair and impartial juror. She indicated that she worked for the Las Vegas Metropolitan Police Department, and that she did not believe she could serve on the jury "because of my employment w/ LVMPD in records w/ info re case on file." Ex. 46 at 3, 7. She indicated that many of her relatives had been crime victims: "ex-husband—victim of burglary; cousin husband murdered in Michigan; brother's son murdered in LV, NV." Ex. 46 at 4. She also suggested the death penalty was the appropriate punishment for practically every murder:

> If a defendant is found guilty of using a deadly weapon in the commission of the murder, the sentence is doubled.   A death verdict must be unanimous.   As a juror, you may select the appropriate sentence.
>
> 23.   Do you believe in the Death Penalty? ☒ Yes ☐ No  Please explain why or why not:
>
> _When a crime so dangous + vicious as murder, yes I do believe in Death Penalty, mostly in cases of innoscent bystanders of children or any human being murdered for no apparent reason other than self defense._

3.      During voir dire, Noble-Levi explained, regarding her employment, that she would have access to all the police reports in this case. 8/17/09 Tr. at 29. Working in the records department at LVMPD also caused her to "have a lot of contact with police officers." *Id*. at 126. Her employment by the same police department that investigated and was assisting in the prosecution of Mr. Richardson, made Noble-Levi more likely to believe the testimony of police officers in his case. Despite her assurances that she would not look at the records in this case, the fact that she even had access to such records posed an intolerable risk of prejudice in this case.

4.      Not only did Noble-Levi work for the same police department that arrested Mr. Richardson, multiple family members had been murdered. Noble-Levi stated that her cousin's husband was murdered eight years earlier and her cousin "took it bad" and still "ha[d]n't come out of that grief." 8/17/09 Tr. at 132.

5.      What is worse, Noble-Levi's nephew was murdered, and his alleged murderer was represented by both of Mr. Richardson's trial counsel. During voir dire, Noble-Levi indicated that her nephew was "shot in the back" in 1998. 8/17/09 Tr. at 128. She noted that the killer received a life sentence but that his conviction

was "overturned" on appeal. *Id.* at 130. When trial counsel questioned her about the details, she explained that her nephew "was sitting at a bus stop and friends drove by. His best friend killed him." *Id.* at 142. In response to that answer, trial counsel requested a bench conference because the case she described "sounds like the *State v. Polk* case, which Mr. Schieck and I, Mr. Owens, tried last summer." *Id.* The trial court asked her nephew's name and confirmed that her nephew was the victim in a murder trial where both of Mr. Richardson's attorneys represented the defendant and Chris Owens prosecuted the case. *Id.* at 144. The trial court asked counsel "do you want me just to excuse her?" *Id.* Trial counsel did not take the trial court up on its offer, and instead the court conducted individual voir dire on the issue. *Id.* at 145.

6.      During the individual voir dire, trial counsel informed Noble-Levi—as she claimed not to be previously aware—that they represented the man charged with murdering her nephew. 8/17/09 Tr. at 147. Noble-Levi said she was "sort of close" to her nephew: "I loved him dearly, you know, because—and I loved him dearly because he's my brother's son." *Id.* at 150. She saw him weekly the first 15 years of his life. *Id.* Rather than challenge her for cause, trial counsel submitted the issue. *Id.*

7.      There can be no question that Noble-Levi would be prejudiced against Mr. Richardson given two of her family members were murdered, including her nephew who she was close to. This is particularly true where both of Mr. Richardson's defense attorneys represented the man accused of murdering her nephew. Reasonably competent counsel would have taken the trial court up on its

offer to remove her from the venire for cause. At the very least, competent counsel would have removed Noble-Levi using one of their peremptory challenges. There is no reasonable trial strategy for failing to remove Noble-Levi from the jury panel. Mr. Richardson could not receive a fair trial with Noble-Levi on the panel.

8.     As if Noble-Levi's presence on the jury was not bad enough, several other jurors harbored biases and were not adequately questioned or removed from the panel. Virginia Carrigan wrote on her questionnaire that "[i]f someone takes a life for any reason they should have to forfeit their life." Ex. 47 at 5. She also indicated that she could not consider all four forms of punishment "[b]ecause the defendant thought it out and carried it out." *Id.* at 6.

9.     Helen Clark worked at the Clark County Detention Center for 5 years. 8/17/09 Tr. at 157. Clark indicated, both on her questionnaire and during voir dire, that "charges and a court case would not have been brought forth if the—some evidence was not there. There had to have been some evidence there to bring the charges against the individual." *Id.* at 165; Ex. 72 at 7. She admitted that Mr. Richardson was starting "at a disadvantage." *Id.* at 168.

10.     Karen Kotter indicated in her questionnaire that she was molested when she was seven years old. Ex. 71 at 4. Trial counsel failed to ask her a single question about this issue or how it might impact her ability to be fair and impartial in the penalty phase of trial, despite knowing the State intended to present a prior rape conviction as an aggravator against Mr. Richardson. During voir dire, Kotter indicated she had been involved in the criminal justice system as a young girl, but

she did not explain the context of her involvement and trial counsel ineffectively failed to follow up. 8/17/09 Tr. at 76–77.

11.     John Conn indicated on his questionnaire that he would have "no problem sending someone found guilty beyond a reasonable doubt to death, as in a rape case or deliberate murder." Ex. 73 at 5. Conn volunteered that he would give police officer testimony more weight than the testimony of other witnesses. 8/18/09 Tr. at 170. Trial counsel made no attempt to demonstrate his bias on this issue or to challenge him for cause.

12.     Trial counsel were ineffective for failing to remove these individuals from the jury, either for cause or by using a peremptory challenge. Mr. Richardson could not receive a fair trial before a jury composed of so many individuals harboring bias. Noble-Levi could not have been fair and impartial given that multiple family members had been murdered, including one whose killer was represented by Mr. Richardson's trial lawyers. Carrigan would automatically impose a death sentence in any deliberate murder case. Clark could not impose a presumption of innocence. Kotter was a sexual assault victim and would be more likely to impose a death sentence in light of Sokol's testimony. And Conn gave more weight to the testimony of police. There is no reasonable strategy for leaving so many biased people on the jury.

13.     There is a reasonable probability of a more favorable outcome if trial counsel had removed one or all of these jurors from the panel.

234

**Claim Nine: Trial Court Error**

The trial court erred in entering various rulings prior to and during trial, thereby denying Mr. Richardson his constitutional guarantees of due process, equal protection, a fair trial, and the right to counsel, rendering his conviction and sentence of death invalid under the federal constitution. U.S. Const. amends. V, VI, VIII, XIV.

**Supporting Facts**

**A.    The trial court violated Mr. Richardson's right to counsel and right to a fair trial by interfering with his ability to present a defense.**

**1.    Clearly established federal law establishes a defendant's right to present a defense.**

1.    Clearly established federal law holds that a trial court cannot interfere with a defendant's right to participate meaningfully in the adversarial process by limiting their right to present a defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments." *Herring v. New York*, 422 U.S. 853, 857 (1975); *see, e.g., Geders v. United States*, 425 U.S. 80 (1976) (bar on attorney-client consultation during overnight recess); *Brooks v. Tennessee*, 406

U.S. 605, 612–13 (1972) (requirement that defendant be first defense witness); *Ferguson v. Georgia*, 365 U.S. 570, 593–96 (1961) (bar on direct examination of defendant).

2.    Specifically, the Supreme Court has held that, in presenting a defense, there are "few rights more fundamental than that of an accused to present witnesses." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The right of a defendant to call witnesses in his favor is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967). Criminal defendants have the right "to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). Criminal defendants also have the right to make closing argument in support of their chosen defense. *Herring*, 422 U.S. at 862 ("And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt."); *see In re Winship*, 397 U.S. 358 (1970). Here, the trial court violated Mr. Richardson's constitutional right to counsel and due process by preventing him from presenting witnesses in support of his defense, and preventing him from making certain closing arguments.

### 2.    Mr. Richardson presented a valid theory of defense supported by the evidence.

3.    The prosecution's theory of the case, as presented largely through the testimony of Mr. Richardson's do-defendant, Robert Dehnart, was that Dehnart and Mr. Richardson came to Las Vegas with a plan to rob Folker, who they believed to have a lot of money possibly from the recent sale of a home. 8/26/09 Tr. at 21–22. On

the way to Las Vegas the plan evolved into a plan to kill Folker and his grandmother, with whom the men knew Folker was staying. *Id.* at 23–28. Once in Las Vegas, Folker, Dehnart, and Mr. Richardson went to Bank of America, Taco Bell, and lastly Home Depot, where Dehnart purchased a hammer to use as the murder weapon. 8/26/09 Tr. at 37. When the men got back to the trailer, Dehnart gave Mr. Richardson the hammer, which Mr. Richardson then used to bludgeon Folker and Feldman to death. 8/26/09 Tr. at 46–50. Dehnart claimed to play a minor role, helping to hold Feldman down while Mr. Richardson killed Folker, then retrieving money from each of the victim's bodies while Mr. Richardson attempted to remove any fingerprint or DNA evidence from the trailer. 8/26/09 Tr. at 48–52.

4.      The defense theory was that Mr. Richardson drove Dehnart to Las Vegas so Dehnart could party with Folker, but left Las Vegas before Dehnart committed the murders of Folker and Feldman by himself or with someone other than Mr. Richardson. 8/20/09 Tr. at 35; 8/28/09 Tr. at 127–28. The defense theory was also that Folker had been engaging in erratic drug-induced behavior in the months leading up to his death and that Folker's violent and erratic behavior contributed to an altercation between him and Dehnart, likely related to Folker owing Dehnart money. *See* 8/20/09 Tr. at 124 ("because being owed money by Mr. Folker gives Mr. Dehnart the motive to come and bring a hammer to try to collect the money that's owed to him"). The defense also argued that the jury should discredit Dehnart's testimony completely because he changed his story significantly over the four years between the crime and the trial, he received a plea bargain to

avoid the death sentence in exchange for his testimony, and he was an accomplice whose testimony was insufficiently corroborated. 8/28/09 Tr. at 105, 112, 124–26.

5.     The defense theory was supported by the evidence. Dehnart's fingerprints were found in blood in the trailer, but Mr. Richardson's were not. See 8/20/09 Tr. at 16. Trial counsel pointed out that there was no forensic evidence tying Mr. Richardson to the crime scene, arguing that Dehnart's testimony that Mr. Richardson wiped down the trailer was a lie intended to explain the lack of forensic evidence. 8/20/09 Tr. at 26, 41; 8/28/09 Tr. at 95–96, 103–04. There was no evidence of Mr. Richardson having any prior contact with Folker, though there was a lot of evidence that Dehnart and Folker had a relationship of some kind. 8/20/09 Tr. at 34; 8/28/09 Tr. at 96–98. There was also evidence Folker had methamphetamines in his system. 8/20/09 Tr. at 39. No one saw Mr. Richardson's vehicle at the trailer park. And Dehnart testified that Folker offered to give him a ride back to California from Las Vegas—supporting the defense theory that Mr. Richardson left before Dehnart committed the murders.

### 3.     The trial court prevented Mr. Richardson from presenting evidence in support of his defense.

6.     Defense counsel argued that "part of our defense is that Mr. Folker was behaving in an erratic fashion and that something went horribly wrong in the trailer between him and [Dehnart] and that this is the behavior that's consistent with the way he was acting during that time frame." 8/27/09 Tr. at 105. "[O]ur theory of the case is that Mr. Folker and Mr. Dehnart had a very violent altercation and essentially his behavior, her observations [sic], he was easily agitated, flying off

238

the handle, his temper." 8/27/09 Tr. at 107. In support of that theory, trial counsel

attempted to present testimony from real estate agent Joyce Ann Miller that in May

2005 she was hired to sell a home for Folker, but that thereafter his behavior

became so threatening and harassing that she filed a police report and assigned

another agent to handle the sale of the home. *See* 8/27/09 Tr. at 104.

       7.     The State argued and the trial court agreed that the testimony was not

relevant. 8/27/09 Tr. at 111. Defense counsel explained that

> We've had all of this evidence that Robbie and Tom—
> Robbie and Steve were friends, that everything was just
> fine. And so the State's inference to the jury is that it was
> Tom's idea to come in and rob him because they were such
> good friends, Robbie and the victim. And essentially what
> we're trying to do is to lay a correct background for the jury
> in terms of Mr. Folker's behavior and the people that he
> was running around with, i.e., Robbie, nothing to do with
> our client, that there was a very—we have from the
> autopsy proof that he was involved in methamphetamines,
> it was in his system, that this whole drug culture lends
> itself to what happened in this trailer, that Mr. Folker and
> Robert got into a very violent altercation and that this is
> the type of— this is what they were doing. It's not
> character. It's what they were doing.

8/27/09 Tr. at 112. The court held a hearing outside the presence of the jury and

defense counsel explained, specifically as to Miller, that

> she started out being his realtor and that when she met
> him in April, May, everything was fine, and then there
> came a time, I think she testified— or would testify in
> August even where he had family members, his mother, his
> sister, and his daughter calling her asking her— looking
> for him because they could not contact him, which directly
> contradicts some of the testimony that we've had here in
> this trial.
>
>      And she would further testify, if allowed to, that Mr.
> Folker's behavior became such with her to where she
> actually had one of her employees, Fred Theimann, take

over this transaction because Mr. Folker became so threatening to her and finally culminating in what would be Defense Proposed Exhibit V, which is a police report that she actually filed with the San Bernardino Sheriff's Department back on August 12th of 2005 because of the situation between her and Mr. Folker in that he was stalking her, he was coming over and shaking the building that she was in, and engaging in rather erratic behavior.

. . . .

And the point of that, Your Honor, is to give some context to how could such a violent attack take place that we've heard about in this case now for two weeks. And it gives some context. Robbie essentially has testified, we were friends, it was Tom's idea to rob him. And essentially that's just not true. What we would like to present to the jury is that Mr. Folker's behavior was in a decline mode and that the culmination of that was that Robert Dehnart, on his own, because of this drug, this methamphetamine that was in this victim's system, that this is what escalated and caused the situation to result in what this jury has seen and heard about for the past two weeks.

And we actually have set the contextual framework for this particular—our theory of the case since opening statements, Your Honor. And we explained to the jury what we were attempting to do in terms of giving them a full picture of what was going on in Mr. Folker's life. And, as we know, Ms. Feldman was killed because she was home. This is a battle between Mr. Folker and Mr. Dehnart.

8/27/09 Tr. at 114–15; Ex. 112. The trial court sustained the objection and would not allow Miller to testify regarding Folker's violent and erratic behavior. 8/2/09 Tr. at 118–19.

8.    Defense counsel then made a proffer as to additional testimony they wished to present concerning Folker's behavior leading up to the instant offense.

Mr. Neufeld was a reporter for the Mountain News during the relevant time frames, August—July, August. His wife, Susan Neufeld, was employed in the same real

estate office that Ms. Miller managed. I think she was the only licensed relator there, or at least the one which was in charge of this transaction. And he would testify that his wife, Susan Neufeld, would call him on many occasions because Mr. Folker and another young man—again, he could not identify Robbie Dehnart, but the description that he provides is consistent with Robbie Dehnart, would engage in intimidating-type activity and that he actually would come down to the office in efforts to protect his wife, and that he has personally—Mr. Folker came into his office August of 2005 to place an ad, and the nature of the ad was such that I think he wanted to complain about Ms. Miller's handling of his escrow. Mr. Neufeld would testify that he told him that they do not handle those types of ads, and whereupon Mr. Folker became loud, vulgar, threatening the staff to the point to where once again the San Bernardino Sheriff's Department had to be called.

8/27/09 Tr. at 129–30.

9.    Defense counsel made a further record that, due to their belief they would be able to present the testimony of Miller and Neufeld, they failed to cross examine Folker's mother, Marcia LaFrance, regarding her concern close to his death that his behavior had become erratic, she believed him to be using methamphetamines, and had consulted with a doctor to see about getting Folker some help. 8/27/09 Tr. at 139–40.

10.    Defense counsel could also have presented testimony from Jennifer Ross that two weeks before Folker was killed, Dehnart was complaining about Folker owing him money. Ex. 111 at 8–9.

11.    The trial court prevented Mr. Richardson from presenting a defense by refusing to allow testimony from two witnesses supporting his theory that Folker had been behaving erratically leading up to his death—evidence which would have supported his theory that Folker's death resulted from a violent altercation between

241

Dehnart and Folker over money Folker owed Dehnart. The precluded testimony

would have rebutted the State's contention that Folker had a lot of money on hand

from the sale of his home, would have shown that Folker was behaving in a violent

and erratic way, and would have supported Mr. Richardson's argument that

Dehnart and Folker had been having conflicts leading up to the murder. This

evidence supported the theory that Mr. Richardson did not concoct a plan to kill

Folker on the way to Las Vegas, but rather that Folker's death resulted from an

altercation with Dehnart over money owed. This evidence may have created a

reasonable doubt in the minds of the jurors, particularly where the evidence linking

Mr. Richardson to the murders was extremely weak—consisting merely of

Dehnart's biased testimony and photographic evidence of a hat that was itself of

questionable evidentiary value.

> ### 4. The trial court prevented Mr. Richardson from making certain closing arguments in support of his defense.

12.     In an attempt to create a reasonable doubt as to Mr. Richardson's

guilt, trial counsel argued to the jury in closing that it was possible Mr. Richardson

drove Dehnart to Las Vegas, dropped him off to party with Folker, returned to

Riverside, and Dehnart killed Folker and Feldman on his own. 8/28/09 Tr. at 127–

28. The State objected that the argument was based on speculation as "not a single

witness" testified to that scenario. *Id.* at 129.

| | |
|---|---|
| MR. SCHIECK: | Robby testified and his statements indicate that when—that the deal was with Folker that he was invited to come to— |
| THE COURT: | I— |

1    MR. SCHIECK:    — Las Vegas to stay with him. And
2    that he would—that Folker would give
him a ride back to Arrowhead.

3    MS. WECKERLY: Um-hum.

4    THE COURT:    Okay.

5    MR. SCHIECK:    And that's what I just argued.

6    THE COURT:    Okay.

7    MR. SCHIECK:    That Richardson was the one that gave
8    him that ride and dropped him off.
Richardson in his phone call
9    statements says, "Robby told me what
he did in Las Vegas."

10    THE COURT:    Okay, but—

11    MR. SCHIECK:    So Robby comes back and tells him
what he did in Las Vegas.

12    THE COURT:    But how did you get from that to what
13    you just argued to the jury?

14    MS. WECKERLY: That he dropped him off

15    MR. SCHIECK:    That's what I just said.

16    MS. WECKERLY: and drove home to Southern

17    THE COURT:    Yeah.

18    MS. WECKERLY: California? There's no—

19    THE COURT:    That he dropped him off

20    MS. WECKERLY: — evidence of that.

21    THE COURT:    and drove home to Southern California
22    and all that.

MS. WECKERLY: Who's testified to that?
23

MS. JACKSON:    Well, that's reasonable (indiscernible).

243

MS. WECKERLY:   No way.

MS. JACKSON:   That's (indiscernible).

MR. SCHIECK:   Who testified to the scenario that Mr. Owens played out for what happened in the room? The parts that Mr. Dehnart, you know, didn't see, or forgot to see.

THE COURT:   I mean, I think you can argue that he drove him here to Las Vegas. But the whole thing about dropping him off and turning around and coming back, there's no evidence of that.

*Id.* at 129–30.

13.     The trial court violated Mr. Richardson's right to present a defense and his right to counsel by unnecessarily limiting his closing argument. Defense counsel have wide latitude in drawing inferences from the evidence in an attempt to create reasonable doubt in the minds of the jurors. The evidence was consistent with the inference that Mr. Richardson drove Dehnart to Las Vegas then left and that Dehnart committed the murders on his own—there was no forensic evidence linking Mr. Richardson to the scene, the blood spatter expert testified the murders could have been perpetrated by a single killer, and only Dehnart had a relationship with Folker that led to a possible motive. The trial court's insistence that Mr. Richardson present specific testimony laying out the scenario he proposed was improper, and interfered with trial counsel's ability to present a defense as they saw fit.  The trial court's ruling prevented Mr. Richardson from creating a reasonable doubt.

14.     Despite the trial court preventing Mr. Richardson from fully arguing his theory, the State was permitted to respond to it.

244

And I guess this is the latest scenario that Mr. Schieck was suggesting, that after a little Taco Bell on— at 4:00 in the afternoon, Robert Dehnart told his step-father, essentially, "Hey, why don't you take off for a little bit. I'm going to commit a double homicide here. And then just pick me up when it's done, and drive me back to Southern California."

That's the sort of scenario you would have to believe if you think he is just in town for the ride, and that somehow Robert Dehnart commits this crime without him, and they arrive back in Southern California and he has no idea what happened.

Although he gets a cut of the money, he is the guy who is lying about being here, he's the guy whose hat is left in the crime scene. I mean, what happened on the ride home? Robert Dehnart commits this double homicide, Tom Richardson sees him tossing a hammer outside the car?

Do you think something like that occurred? Or is he in it? He knows what's going on, he was a participant. He wasn't a ride, he was his partner in crime. And all of that that I just discussed doesn't depend one word on the testimony of Robert Dehnart. There were two people who committed this crime.

8/28/09 Tr. at 137–38.

15.  The trial court's error was particularly egregious in light of the fact that, while Mr. Richardson was not permitted to draw inferences from the evidence, the prosecution was. For example, the prosecution argued that Feldman heard her grandson "screaming in agony," 8/28/09 Tr. at 136, though there was no evidence of that.

MS. WECKERLY: Yes. Might it hurt a little bit to be hit in the head with a hammer multiple times? Might that have caused Steven Folker to scream out in pain? And might his grandmother, who is in the very small trailer, heard it, and started to check on her grandson? Or, as Mr. Schieck suggested, maybe she waited a few minutes before she went in there.

245

> That is not plausible. She would have jumped up and checked on her grandson. And when she did she was neutralized at the doorway while her grandson was still being attacked. That is a crime that can only be accomplished by two individuals.

8/28/09 Tr. at 136–37. It was fundamentally unfair to allow the State to make inferences based on the evidence, but not Mr. Richardson.

16.    What is more, the trial court's conclusion that there was no evidence presented to support the inference that Mr. Richardson left Las Vegas before Dehnart is factually inaccurate. As two Justices on the Nevada Supreme Court pointed out when they dissented from the denial of this claim on direct appeal:

> The district court abused its discretion in limiting Richardson's closing argument. *See Glover v. Dist. Ct.*, 125 Nev. 691, 704, 220 P.3d 684, 693 (2009) (providing that this court reviews the latitude allowed counsel in closing arguments for abuse of discretion). *Richardson elicited evidence (his statements during recorded phone conversations) that he had left Las Vegas before Dehnart.* Therefore, he should have been allowed to argue that he had returned to California before the murders. *Id.* at 705, 220 P.3d at 694 ("[D]efense attorneys must be permitted to argue all reasonable inferences from the facts in the record.") (quoting *U.S. v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992). As there was conflicting evidence of this crucial fact and no physical evidence placing Richardson in the home or even in the state at the time of the murders, counsel's argument became that much more vital to the defense. *See United States v. Sawyer*, 443 F.2d 712, 713 (D.C. Cir. 1971) (providing that a district court abuses its discretion when it "prevents defense counsel from making a point essential to the defense").

ECF No. 1-9 at 23 (emphasis added).

### 5. This error had a substantial and injurious effect on the outcome of the proceeding.

17.     Singly and cumulatively, the trial court's refusal to allow Mr. Richardson to present evidence in support of his defense, and subsequent refusal to allow counsel to make the closing argument the defense wanted, had a substantial and injurious effect on the outcome of the proceeding. The State's evidence against Mr. Richardson was extremely weak. Self-serving and biased testimony from Dehnart that Mr. Richardson was the primary perpetrator combined with photographic evidence of a hat that looked similar to a hat Mr. Richardson owned were the sum total of evidence connecting Mr. Richardson to this offense. The hat was not preserved by police, thereby preventing Mr. Richardson from proving it was not his. In the face of such weak evidence, evidence that Folker was behaving violently and erratically would have helped cast a reasonable doubt on the State's theory and supported Mr. Richardson's theory that the murders were a result of a violent altercation between Dehnart and Folker over money. If trial counsel had been able to argue, based on reasonable inferences from the evidence, that Mr. Richardson may have driven Dehnart to Las Vegas, but then left, the jury would have had even less reason to believe the State's theory of the case. This Court should be left in grave doubt as to whether Mr. Richardson would have been convicted if not for the trial court interfering with Mr. Richardson's ability to present a defense.

247

### B.   The trial court violated Mr. Richardson's Constitutional rights to due process and a fair trial due to erroneous evidentiary rulings.

18.    The State's evidence indicated that Folker and Feldman were beaten to death with a hammer. According to Dehnart, he threw the hammer used to kill the victims out the window of the car as he and Mr. Richardson drove back to Riverside, California from Las Vegas. 8/26/09 Tr. at 58–59. Police took Dehnart to the location where he claimed to have discard the hammer, but they were not able to locate it, and the hammer was never recovered. 8/26/09 Tr. at 71. During his testimony, prosecutors admitted a picture of a hammer which Dehnart testified looked like the one used to kill the victims. 8/26/09 Tr. at 75; Ex. 33. Trial counsel did not object.

19.    The State then called Home Depot employee Tony Trenholm to testify based in a transaction history when the hammer that was used as the murder weapon was purchased. 8/26/09 Tr. at 173, 177–80. Trenholm was then given a physical hammer which he identified as being the same as the hammer purchased by Dehnart in 2005. 8/26/09 Tr. at 181–82; Ex. 34. Trial counsel objected that

> the picture satisfactorily shows the hammer. This is not the same hammer. It is a similar hammer. It's not the murder weapon, but it's the prejudicial impact of showing this type of hammer to the jury, I think, is outweighed by the probative value. They can look at the picture and see what the similar hammer looks like.

8/26/09 Tr. at 183. The trial court overruled the objection and admitted the hammer.

20.    The trial court erred in admitting the hammer and allowing it to go back into the jury room as it was not the actual murder weapon, and its admission

was more prejudicial than probative. The district court abused its discretion in

admitting the hammer, and interfered with Mr. Richardson's right to due process

and a fair trial.

21.    Two justices of the Nevada Supreme Court agreed that the trial court

erred in admitting the hammer. ECF No. 1-9 at 25.

> The hammer, as demonstrative evidence, had little
> probative value. Dehnart's testimony about purchasing the
> hammer for the crimes and the medical examiner's
> testimony were sufficient to establish that a hammer was
> used to kill the victims. It can further be assumed that the
> jurors brought with them the common knowledge of how a
> hammer can be used. The record does not indicate that
> there was anything extraordinary about this hammer that
> required its presence to explain the wounds or manner in
> which they were inflicted.

ECF No. 1-9 at 26. The dissenting justices pointed out that "[d]emonstrative

evidence of murder weapons carries a unique potential for unfair prejudice,"

concluding that

> The exhibit permitted the State to capitalize on the gravity
> that introducing a physical weapon might exert on the jury
> without producing the actual weapon. While such a latent
> emotional effect would be tolerated where the evidence had
> more probative value, I conclude that the danger of unfair
> prejudice far outweighs the probative value of the hammer
> in this instance.

ECF No. 1-9 at 27.

22.    Dehnart and Folker's friend, Daniel James, was also a possible suspect

in the murders. *See* 8/21/09 Tr. at 35–36, 51–53, 77–79; 8/25/09 Tr. at 69, 75; 8/26/09

Tr. at 10–12; 8/27/09 Tr. at 23. During Detective Vaccaro's testimony, the State

moved to introduce a record from the California Department of Corrections

249

purporting to prove that Daniel James was incarcerated at the time of the instant offense. 8/27/09 Tr. at 24; Ex. 35. Trial counsel objected that "[t]here's no foundation which Daniel James we're talking about. If you run a records check on Daniel James, you'll come back with about 500 Daniel James' in the California system." 8/27/09 Tr. at 24. Trial counsel argued that he received the document for the first time on the final day of trial, and had no ability to verify the accuracy of the document. *Id.* Trial counsel argued that the prosecution had unique access to unique identifiers and tools that trial counsel did not have access to which allowed them to locate him and confirm he was in custody. 8/27/09 Tr. at 34–35 ("They have access obviously to [Dehnart] and the information [Dehnart] can give them with identifiers for this Daniel James that we don't have access to. I mean, they need the date of birth and social security number on somebody to run an NCIC. We don't have access to NCIC either"). Trial counsel objected on Sixth Amendment confrontation grounds under *Crawford v. Washington*, 541 U.S. 36 (2004). 8/27/09 Tr. at 38. The record was ultimately admitted through Detective Vaccaro, even though Detective Vaccaro neither obtained nor relied on that record to verify— through the course of his own investigation— James was in custody at the time of the instant offense. 8/27/09 Tr. at 80–81.

      23.    Mr. Richardson has a liberty interest in the fair application of state law under *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Nevada law requires authentication of business records. *See* Nev. Rev. Stat. § 51.135. There is no authentication on the record, however, that the Daniel James referred to in State's Exhibit 316 is the same Daniel James who was an alternative suspect in this case.

Indeed, the record itself contains no notation of the name or any identifiers of the individual it refers to. Ex. 35 at 2. While the certificate of the custodian of record contains the name Daniel James and some identifying information, the custodian was not called to testify as to how they concluded the attached records pertained to the Daniel James who knew Folker and Dehnart, nor was there any evidence presented proving the Daniel James referenced in the documents was the Daniel James at issue in this case. Admission of this evidence violated Mr. Richardson's rights to due process and a fair trial.

24.     Admission of this record was prejudicial as it undermined Mr. Richardson's defense that perhaps James was the other perpetrator. The record was then highlighted for the jury during closing argument.

> The defense theory was it was a two-person job, but Richardson wasn't the one who did it. And we heard kind of reference to this Daniel James character, the friend of Robert Dehnart. And maybe – you know, maybe it was him who committed the crime.
>
> Of course, then we found out through the trial that he was actually in custody on September the 7th of 2005, and he couldn't have been the second man there. Even Mr. Richardson in his phone calls to Kim Ross talks about this second person who committed this crime with Robert Dehnart.

8/28/09 Tr. at 133.

251

C.    **The trial court violated Mr. Richardson's right to a fair trial by failing to grant a mistrial during the culpability phase and failing to caution the victims' family members during the penalty phase regarding inflammatory and prejudicial emotional outbursts.**

25.    During the testimony of Detective Vaccarro regarding his discovery of Feldman and Folker's bodies, the trial court noted an audible emotional outburst by the Feldman/Folker family. 8/21/09 Tr. at 142 ("Ms. Weckerly, your family is having a really hard time. I mean, they were making noises that I could hear up here").

26.    Trial counsel immediately moved for a mistrial.

> At this time we'd move for a mistrial, Your Honor, based on that conduct before the jury. We made a point that they not be allowed in the courtroom if they were going to make noises and be emotional and gasping back there. And that's exactly what they were doing. And the prosecutors knew what Detective Vaccaro was going to be testifying to. They knew they were going to be showing those photographs. And, you know, we've warned them. To my knowledge they've been warned. I know Mr. Owens at one point after we approached the bench went before one of the crime scene analysts testified and spoke to them. And now here this afternoon during Detective Vaccaro's testimony we get just exactly what we were worried about when we indicated we didn't want them in the courtroom after Ms. LaFrance testified. And here we are—

8/21/09 Tr. at 142–43. The trial court noted "[t]here was some whimpering." *Id.* at 143. Trial counsel noted someone was "shaking her head, making—making demonstrative signs that I felt the jury could see. I could see it and I could hear it from where I'm seated, and I'm the furthest attorney in the courtroom from those particular family members." *Id.* at 143. Trial counsel further noted she was sitting near the family and "they were reacting to the pictures through the home as anyone would expect." *Id.* at 146; *see also* 8/21/09 Tr. at 147 ("I know he can hear them. I

know he can."); *id.* at 149 ("it is inappropriate to have the jury view family members reactions to their loved ones in this condition."). The trial court denied the motion. *Id.* at 146. The trial court also failed to admonish the family to keep emotional reactions to the evidence under control.

27.  Then, during the penalty hearing, the family again displayed visible emotional reactions to the proceeding. Trial counsel made a record that "the family members are embracing profusely in front of the jury." 8/31/2009 Tr. at 119. Trial counsel asked "that that type of conduct take place outside the presence of the jury." *Id.* The trial court refused to ask the family not to embrace. *Id.*

28.  The trial court's refusal to grant the mistrial or admonish the Feldman/Folker family not to display emotional reactions in front of the jury, deprived Mr. Richardson of his right to a fair trial and a reliable sentence. The jurors were exposed to repeated, loud, and obvious displays of emotion by the victims' family. This so infected Mr. Richardson's trial with unfairness as to deprive him of due process. The jury could not have been expected to render a fair and impartial verdict in the face of constant and pervasive emotional reactions by the family. With the family present throughout the trial, the jurors likely suspected the family would be present for the reading of the verdict and sentence. Wanting to avoid a similar reaction in the face of a not guilty verdict or sentence less than death, a juror who was on the fence would likely have felt pressure to reach a result the family would approve of. The family emotional outbursts were certain to inflame the passions or prejudices of the jury in violation of Mr. Richardson's constitutional rights.

### D. The trial court abused its discretion in failing to grant a mistrial after an experienced homicide detective referenced the fact that Mr. Richardson was in jail when he was interviewed by officers.

29.    Detective McGrath testified that he met with Mr. Richardson and Dehnart "in the same building" with "some assistance" from "Officer Davalos from the Riverside Police Department." 8/24/09 Tr. at 131. The prosecutor asked "who did you have him bring to you first?" *Id.*  Detective McGrath said Mr. Richardson and proceeded to describe his conversation with Mr. Richardson. At some point he testified that Mr. Richardson asked for a cigarette and Detective McGrath said "we couldn't let him smoke inside the jail facility." 8/24/09 Tr. at 138. During a bench conference on a different issue, trial counsel pointed out that Detective McGrath "did refer to the fact that Mr. Richardson was in jail at the time of this interview during his testimony." 8/24/09 Tr. at 146–47.

> MR. SCHIECK: Your Honor, during Detective—excuse me, Sergeant McGrath's testimony he made reference to the fact that Mr. Richardson was in fact in jail when he first got down and talking with him. I realize that the facts of this case are that both Mr. Dehnart and Mr. Richardson were in custody in Riverside when on the 27th of September when they got down there, and they were in custody, as the Court knows and the record should reflect, because of a K-mart kidnapping/robbery that had occurred prior to the 27th. That information can't come in during this portion of the proceedings, and we've now told the jury that Mr. Richardson was in jail when this interview took place.
>
> I realize we're dancing around here saying we brought him into one room and brought him downstairs. There was a further description of him looking through a door with a little window in it, which was almost like a jail description in and of itself. I think this jury has no other -- has no other choice but to have -- to now know that Mr. Richardson has other criminal charges against him having nothing to do

with this case down in Riverside and that therefore he's
been prejudiced by the admission of that information. And
we would ask for a mistrial.

8/24/09 Tr. at 151.

30.     The court and the State both referred to the comment as "innocuous."
8/24/09 Tr. at 152. According to the trial court, "I think everyone could presume that
if you're being questioned by the police about a murder in Las Vegas that the
Riverside police are going to take you to some type of facility in order to question
people." 8/24/09 Tr. at 153. The motion for mistrial was denied. *Id*.

31.     Later, during the testimony of Officer Davalos, he described walking
up to the "holding cell where Mr. Richardson was being held." 8/24/09 Tr. at 212.
Trial counsel argued that this reference to the holding cell "harkens back to the
testimony from Detective McGrath, and we just want to make a further record that
now the jury has two—two inferences to draw from that they were in custody on
other charges." 8/24/09 Tr. at 215.

32.     Nevada law prohibits introduction of evidence of prior unrelated
criminal acts because it affects the presumption of innocence, thereby violating due
process. *Cf. Manning v. Warden*, 659 P.2d 847, 850 (Nev. 1983). Where
constitutional rights related to a determination of guilt are implicated, state
procedural and evidentiary rules may not be applied without consideration of the
federal constitutional implications.

255

### E.   The trial court violated Mr. Richardson's constitutional rights by admitting gruesome photographs.

33.   Prior to the testimony of the medical examiner, the trial court held a hearing outside the presence of the jury during which counsel for Mr. Richardson objected to a number of the autopsy photographs. Specifically, trial counsel argued that

> the ones that cause us the greatest concern, Your Honor, are the photographs that are of the skull after the skin and other the hair has been peeled back, so we just have the bare skull with -- and I will --- for the record we'll just make reference to State's Exhibit 237, 238 and 239 which are photographs of the skull—

8/20/09 Tr. at 132. Trial counsel explained that

> Obviously, the State is going to desire to introduce a photograph of every injury or those injuries they choose to offer photographs of that were inflicted to the bodies and to show the number of blows, location of blows and things of that nature.
>
> It's once we start peeling back layers of skin and getting into the internal processes that we really start seeing the gruesome and inflammatory photographs, and those are the type of photographs we're objecting to.
>
> Dr. Simms is very experienced in testifying and can describe a skull fracture without having to show the actual skin peeled back to the bare bones of the skull in order to describe that injury to the jury. We're going to see the injury where it's inflicted on the head, and he's going to describe the fractured bone material under that. I don't think it adds anything.
>
> The probative value of that photograph is outweighed by any prejudice because all it's showing is that yes, indeed, the skull was cracked there which is what a fracture is and which he can describe in words as opposed to having to show these photographs.

256

1   8/20/09 Tr. at 133–34.

2       34.    Trial counsel further objected to State's Exhibits 265 through 276,

3   which depict "various stages of the scalp and hair being peeled back." 8/20/09 Tr. at

4   135.

5               I believe these are on Mr. Feldman (sic) – excuse me, Mr.
            Folker showing the multiple skull fractures to his head

6               including one, specifically 267, which shows gray jello-like
            material oozing out of the hole in the head which I'm sure

7               is a combination of natural processes and decomposition
            processes on this particular injury. And so we would be

8               objecting to any of these internal photographs believing
            that the coroner can describe them without having to show

9               these extremely graphic photographs to a jury.

10  8/20/2009 Tr. at 135. The trial court confirmed State's Exhibit 270 depicted Folker's

11  "brain matter." 8/20/2009 Tr. at 139.

12      35.    The prosecutor argued the photos corroborated Dehnart's testimony

13  regarding the nature of the murder and the use of a hammer as well as the time of

14  death and number of attackers. 8/20/2009 Tr. at 137–38.

15      36.    The trial court overruled the objection, finding "the State has limited

16  the photographs, and this was a brutal homicide. And I think in light of the crime

17  scene and the brutality, I think that they have sufficiently limited it so it's not too

18  prejudicial." 8/20/2009 Tr. at 140.

19      37.    The admission of gruesome photographs may so infect the proceedings

20  with unfairness that there is a denial of the federal constitutional right of due

21  process. *See Spears v. Mullin*, 343 F.3d 1215, 1226 (10th Cir. 2003); *McNeely v.*

22  *Olivarez*, 104 F.3d 365, 368 (9th Cir. 1996).  For purposes of federal habeas corpus,

23  the admission of the gruesome autopsy photos is reviewed to determine whether its

257

admission precluded a fundamentally fair trial guaranteed by due process.  See

*Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  The issue is whether the

admission of evidence was arbitrary or so prejudicial that it rendered the trial

fundamentally unfair.  *See Walter v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).

Under both Nevada and Federal law, evidence must be relevant to be admissible.

See, e.g., Nev. Rev. Stat. § 48.025(1); Fed. R. Evid. 401.  A defendant cannot be

convicted based on evidence irrelevant to any element of the offense.  *See, e.g.,*

*People of the Territory of Guam v. Shymanovitz*, 157 F.3d 1154, 1161 (9th Cir. 1998)

(reversing conviction due to the introduction of irrelevant and highly prejudicial

material).  The autopsy photos were not relevant because they were duplicative of

other less gruesome photos.

38.     Exhibits 148–150 and 245–264 were autopsy photos of Folker, and

151–55, 201–08, 220–36, and 240–44 were autopsy photos of Feldman. Ex. 36 at 7,

10–12. Thus, the prosecution presented a total of 64 autopsy photos to the jury. The

injuries depicted in the gruesome photos were depicted adequately enough in the

other photos to corroborate the issues highlighted by the State. Presentation of

these highly inflammatory photos was more prejudicial than probative, and resulted

in a fundamentally unfair trial.

39.     Two dissenting justices on the Nevada Supreme Court agreed that the

trial court "abused its discretion in admitting certain of the autopsy photographs."

ECF No. 1-9 at 28. The dissenters pointed out that "the gruesomeness of the

photographs, particularly those that displayed the victims' bare skulls after their

scalps were resected during the autopsy, were extremely prejudicial," and that

"several of the photographs merely showed injuries that had been detailed in other photographs from slightly different angles and therefore became less probative." ECF No. 1-9 at 29. "Moreover, as the manner of death was not the subject of great dispute, multiple photographs proving that fact were unnecessary." ECF No. 1-9 at 29; *see also* Ex. 140 at 1-2 ("Several members of the jury and I found the number of crime scene photographs to be grotesque. Looking at so many images of the deceased victims' bloody discolored bodies and skull injuries was traumatizing for some of us, and several images were displayed without an explanation of what was being referenced to or highlighted. It seemed to me that the prosecution was trying to make up for the lack of evidence against Mr. Richardson by playing on our emotions.").

**F.    The district court improperly permitted the jury to receive victim-impact evidence during the culpability phase.**

40.    Throughout the culpability phase of Mr. Richardson's trial, the prosecution was allowed to elicit irrelevant victim impact evidence related to Feldman, in violation of clearly established federal law. *Cf. Gregg v. Georgia*, 428 U.S. 153, 190. ("Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to the determination of that question."). The prosecution's allowance to evoke immaterial victim impact evidence during the culpability phase violated case law settled in *Booth v. Maryland*, 482 U.S. 496 (1987), and Mr. Richardson's due process right under the Fourteenth Amendment set forth in *Payne v. Tennessee*, 501 U.S. 808 (1991).

41.     First, the immaterial evidence used during Mr. Richardson's trial during the culpability phase violated the limitations in *Booth* left untouched by *Payne*. The issue in *Payne* was the admission of penalty phase testimony, not culpability phase testimony. The Court held that victim impact evidence was "simply another form or method [of evidence] . . . informing the sentencing authority about the specific harm caused by the crime in question." *Payne*, 501 U.S. at 825 (emphasis added).

42.     Moreover, although the Court's decision in *Payne* provided prosecutors with a new tool in the sentencing phase, the authority did not imbue an illimitable power to inject victim impact evidence in capital cases. *See Kelly v. California*, 555 U.S. 1020, 1025 (2008) (Stevens, J., advisory opinion) (explaining the rule announced in *Payne* does not provide a boundless ability in the prosecution to admit such powerful and prejudicial evidence). It is clearly established that *Payne* did not overrule the prohibition in *Booth* against the admission of "information concerning a victim's family members characterization of and opinions about the crime, the defendant, and the appropriate sentence." *Payne,* 501 U.S. at 835 (Souter, J., concurring). As such, *Payne* only allows the introduction of victim impact testimony to aid the jury when imposing a sentence upon a defendant convicted of a capital offense. *See, e.g., United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir. 1998).

43.     Second, even if *Payne* overruled *Booth*'s per se ban of victim impact evidence in all stages of a capital trial, the use of capricious evidence during the culpability phase violates the due process clause of the Fourteenth Amendment. The Court in *Payne* left the States and federal courts "unguided" between deciding

what constitutes permissible victim impact evidence and impermissible victim impact evidence that is "unduly prejudicial." *Kelly*, 555 U.S. at 1024 (Stevens, J., advisory opinion).

44.    However, the U.S. Supreme Court provided that "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause provides a mechanism for relief." *Payne*, 501 U.S. at 835 (Souter, J., concurring). The State's use of victim impact evidence violated Mr. Richardson's due process rights because it rendered his trial fundamentally unfair.

45.    Marcia LaFrance provided extensive testimony regarding the type of person her mother, Feldman, was, and the type of physical shape she was in prior to her passing. *See* 8/20/09 Tr. at 51–55 (describing Feldman's daily routine, hobbies, health); *id.* at 59 (Feldman "was an angel. She was the easiest person to get along with. She was always happy. She was always positive. She always had good things to say about everybody. She loved her family. She loved her children"); *id.* at 60 ("She was very social, very outgoing. And when she was younger she was very involved in lots of groups, and activities in the park and stuff like that").

46.    Susan Lovelace also testified about Feldman's personality and hobbies. *Id.* at 109 ("[S]e seemed like she was about four-foot, five, just a firecracker, very alert, very acute to what was going on around her. She drove, had no problems communicating with anyone, and we went out to dinner several times. She gambled [and] played video poker").

47.    There was also testimony regarding Folker's personality and physical health. 8/20/09 Tr. at 60–61 ("Steven was very outgoing. He was very—he was a sweet. He was a very good kid. . . . He had some problems with his back and his legs, because he had been in a very bad fire several years before that and it damaged a lot of things in his back, and his legs. And he was burnt severely, his arms and his legs"). Marcia LaFrance testified that Folker

> would come over and he would fix some things, some pipes, or water pipes, or things like that. He fixed her car, her old car several times.
>
>       He did—you know, he—he wanted to put cable in. We used to fight with her all the time because she said, "No, it's too expensive. It's too expensive." And I said, "You need to have cable, Nan. That way you can see all these other stations."
>
>       So he went down and had the cable installed. And he told the cable people, he said, do not—I do not want any statements going to the house. They are to be sent to me, because she'll have a fit. So he was—he, in fact, paid it for a year in advance, the cable.

8/20/09 Tr. at 62.

48.    Trial counsel objected to the improper admission of victim impact testimony at the culpability phase of trial. 8/20/09 Tr. at 103–04.

49.    Testimony concerning Feldman and Folker's personalities, hobbies, and physical health were irrelevant to the issues at trial. This testimony served nothing more than to inflame the passions and prejudices of the jurors to feel sympathy for the victims—a consideration the jury is not permitted to take into account in the culpability phase of trial. Trial counsel recognized this was nothing more than inadmissible victim impact evidence and the trial court erred in allowing

it. As such, although the testimony given to each juror was emotionally evocative, it had neither relevance nor applicability to the question of guilt.

50.     Additionally, the victim impact evidence presented during the culpability stage of Mr. Richardson's trial injected a "high degree of emotion" in violation of the Fourteenth Amendment's due process clause. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (evaluating a claim that introduction of evidence "so infused the trial with unfairness" as a denial of "due process of law"); *United States v. McVeigh*, 153 F.3d 1166 (1998). The State's testimony produced a verdict based on emotion rather than reason.

51.     The lengthy nature of the victim impact testimony rendered it highly prejudicial. The jury heard a lot of irrelevant testimony about the victim's personalities and hobbies that served only to violate Mr. Richardson's rights to a fair trial and reliable sentence. The testimony added nothing relevant to the jury's deliberation and invited a verdict based on sentiment, rather than reasoned judgment. This testimony had a substantial and injurious effect on the outcome of the proceeding.

52.     To the extent that trial counsel failed to object, and appellate counsel failed to raise this claim—such actions constitute deficient performance. Had trial counsel objected, and/or appellate counsel raised this claim—there exists a reasonable probability of a different outcome.

263

**G.    The trial court erred in failing to preclude the victim impact evidence from Mr. Richardson's prior offenses during the penalty hearing.**

53.    At the penalty phase of Mr. Richardson's trial, the State presented testimony from Staci Sokol regarding a sexual assault Mr. Richardson allegedly perpetrated on her in 1992. In addition to the details of that offense (which were markedly different than details testified to at the original criminal proceeding on the sexual assault charge), Sokol testified regarding the impact of the alleged assault on her son. *See* Claim Four(A)(3), fully incorporated herein. Specifically, Sokol testified that her son was interviewed by the police after the sexual assault:

> So they interviewed my son. And I was against it. I didn't want my kids involved. And the officer was amazing. He was really, really good to my son. And they start[ed] playing -- back then, Teenage Mutant Ninja Turtles were really, really popular. So he would assign different people to play Michelangelo, et cetera.
>
> And then he's like, "Well who's Shredder?" And Craig's like, "Shredder's a bad guy." And he says, "Well, is Uncle Torn Shredder?" And my son would go sit in the corner in the fetal position and cry.
>
> Q.    And that was through this process?
>
> A.    Right. And this was in April. And so he's like, okay. Well, we won't play with Shredder.

8/31/09 Tr. at 56–57.

54.    Trial counsel objected to the "testimony regarding the son." 8/31/09 Tr. at 57. Trial counsel argued the testimony was highly prejudicial and inadmissible "victim impact, or impact of another crime,"

> And as she's talking about the impact on her son, and getting in a fetal position, again, clearly is that type of

264

prejudicial testimony that's not to be admitted during the penalty hearing for the crimes in this case.

8/31/09 Tr. at 62. The State agreed not to ask any further questions regarding the children. Id. On redirect, however, the State asked:

> Q.    Do your children have any memory of this incident?
>
> A.    My son does. They videotaped him in April because with the way that he'd entered the home, and knowing my children as well as he did, it was assumed at that time that my son had let him in. He knew him. He called him Uncle Tom. During the videotaping, I was not allowed to be in the room, so I was sitting outside the room in a chair. And that's what I was explaining. They were playing Teenage Mutant Ninja Turtles, and code playing, and—

8/31/09 Tr. at 75–76.

> Q.    Staci, did your son say anything to you about this incident when he was young?
>
> A.    Yes, ma'am. He did.
>
> Q.    What did he say?
>
> A.    In April he was being videotaped because they had an idea that he was the one that let Tom in the house. And during that videotaping the officer had asked me if they could go take a break and get a soda. And on the way out I had tears. And my son asked me, he says, "Mommy, what's wrong?" And I said, "Mommy doesn't feel good. Mommy has a tummy ache." He says, "No, mamma, it's because Uncle Tom made you bloody in the bedroom."

8/31/09 Tr. at 84.

55.    Victim impact testimony is permitted at the penalty phase of a capital trial on a limited basis, concerning the impact of the charged offense on the testifying witness. Here, Sokol was permitted to testify regarding the impact of a

265

prior offense on her son. Such evidence is inadmissible as it is highly prejudicial and irrelevant. *See Payne v. Tennessee*, 501 U.S. 808 (1991); *Sherman v. State*, 965 P.2d 903, 913–14 (Nev. 1998).

56.     Admission of this testimony violated Mr. Richardson's right to a fair trial and a reliable sentence as it was certain to inflame the passions and prejudices of the jurors, inviting them to sentence Mr. Richardson to death based on the impact to Sokol's son of a prior offense.

57.     This testimony had a substantial and injurious effect on the outcome of the proceeding, as evidenced by the State's heavy reliance on this testimony during closing argument.

> You made a decision of guilt and now you're going to make a decision with regard to consequence, the remedy and penalty in this case. And through this process you have allowed the family to grieve and to get some closure, and have an opportunity to heal. Regardless of what you do today or tomorrow on your decision on this case, you will have afforded them that opportunity. And I think that you've seen that. And other victims as well. Staci that we heard from who came forward years later to tell her story.

9/2/09 Tr. at 15.

> Richardson was convicted of a prior felony involving the use or threat of violence. And we heard from this victim who was willing to come in and relive this event, and put herself out to you, so that you could hear what is really a very important fact to know in this case.
>
> And she bared her soul on it, so she had to go through it again. And it is so appreciated that she did that . . . .

9/2/09 Tr. at 26.

> We don't have one life on the scale, we don't have just two murdered lives on the scale, we don't have two

266

murdered lives and a rape victim on the scale, we have the lives of all of these people that surround them that have been hurt, that have been crippled from the ripple effects of Mr. Tom Richardson.

9/2/09 Tr. at 39.

And she's probably tried to forget this incident a million times. She probably wishes she has never heard the name Tom Richardson. And yet, she's asked to come here 17 years later and relive it. And what a good time she must have had talking to a whole group of strangers about the most private parts of her body being invaded by him, only —only to go through the suspicion and disdain and cross-examination all over again, on a crime that she's already— that he's already been convicted for.

Yeah, that was a really, really great thing for her to do 17 years later. She should be proud of herself for coming here and telling you about Tom Richardson. Because a piece of paper, that Judgment of Conviction, doesn't tell you the whole story. It's just like saying double homicide. It doesn't really tell you the facts of the case.

But when she came here and she spoke to you and she told you what he did to her, you had a very full picture of who Tom Richardson is. And to attack her and dismiss her after she's been vindicated for all these years is offensive.

She wants him dead? Who could blame her? My gosh, he raped her, he orally raped her, he anally raped her. If she didn't want him dead, wouldn't we be wondering, gosh, why, you know, what happened in that incident? She may very well want that, and that would be a completely legitimate feeling given the violence that he inflicted on her. 17 years later she's still feeling that. Why wouldn't she want that?

9/2/09 Tr. at 68–69.

58.   The State literally invited the jury to sentence Mr. Richardson to death based on the impact on the victim of a prior noncapital crime. This Court should be

267

left in grave doubt as to whether Mr. Richardson would have been sentenced to death absent this inflammatory and prejudicial evidence and argument—especially given that a majority of Sokol's penalty phase testimony was not supported by Mr. Richardson's court-martial records. *See* Claim Four(A), (A)(1)–(A)(4), above, fully incorporated herein.

### H. Singly and cumulatively, the trial court errors had a substantial and injurious effect on the outcome of the proceeding.

59.     The trial court errors described above had a substantial and injurious effect on the outcome of Mr. Richardson's trial. As the two dissenting justices on the Nevada Supreme Court pointed out, "the evidence against Richardson was not overwhelming. It consisted chiefly of accomplice testimony that was supplemented by a video from Taco Bell, a $275 deposit, and testimony about a hat that police neglected to recover." ECF No. 1-9 at 24. The weakness of the State's case should leave this court in grave doubt as to whether Mr. Richardson received a fair trial in the face of multiple errors by the trial court, including interference with Mr. Richardson's ability to present a defense, failing to address emotional outbursts by the family, allowing presentation of gruesome photographs, and permitting improper victim impact testimony throughout the trial. The combined impact of these errors deprived Mr. Richardson of his right to a fair trial and a reliable sentence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Claim Ten: Jury Instructions**

Mr. Richardson's convictions and death sentence are invalid under the federal constitutional guarantees of due process, equal protection, effective assistance of counsel, right to a fair trial, and reliable sentence due to trial court error in failing to properly instruct the jury. U.S. Const. amends. V, VI, VIII, XIV.

**Supporting Facts**

**A.    The trial court erred in failing to give an accomplice cautionary instruction.**

1.    The sole piece of evidence actually connecting Mr. Richardson to the murders in this case was the testimony of his co-defendant and alleged accomplice Robert Dehnart. Under Nevada law, a defendant is entitled an accomplice cautionary instruction where the testimony of the accomplice is uncorroborated. *See Howard v. State*, 729 P.2d 1341, 1344 (Nev. 1986); *State v. Streeter*, 22 P. 758, 759 (Nev. 1889) ("statements of an accomplice should be received with great caution"). Here, not only was Dehnart an accomplice, he received an Inducement in exchange for his testimony, making his credibility particularly suspect. *See* Claim Three(B). Trial counsel requested a cautionary instruction, but their request was denied. 08/28/2009 Tr. at 9–10; Ex. 22 at 7.

2.    Mr. Richardson had a constitutionally protected liberty interest in the enforcement of Nevada law requiring a cautionary instruction. The failure to instruct the jury to view the testimony of an uncorroborated accomplice who had also received an inducement with caution was a denial of due process that deprived

269

Mr. Richardson of his right to a fair trial. This error had a substantial and injurious effect on the verdict.

**B.    The district court erred in instructing the jury to do equal and exact justice.**

3.    The equal and exact justice instruction improperly minimized the State's burden of proof. The instruction, which was given at both the culpability and penalty phases of trial, read:

> Now you will listen to the arguments of counsel who will endeavor to aid you to reach a proper verdict by refreshing in your minds the evidence and by showing the application thereof to the law; but, whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given to you in these instructions, with the sole, fixed and steadfast purpose of doing equal and exact justice between the Defendant and the State of Nevada.

Ex. 23 at 52 (Jury Instruction No. 50); Ex. 24 at 22 (Jury Instruction 22).

4.    By informing the jury that it must provide equal and exact justice between Mr. Richardson and the State, this instruction created a reasonable likelihood that the jury would not apply the presumption of innocence, and would thereby convict and sentence based upon a lesser standard of proof than the constitution requires.

5.    The defect in this instruction is in the final clause: jurors are told to deliberate "with the sole, fixed and steadfast purpose of doing equal and exact justice between the defendant and the State of Nevada." This "equal and exact" language improperly quantifies the proportion of "justice" to be allocated between the defendant and the State. The qualitative element of justice injected by the

270

"equal and exact" language creates a reasonable likelihood that a juror will ignore the constitutionally mandated imbalance between the burdens placed upon the parties in a criminal prosecution, which requires the State to bear the burden of proof beyond a reasonable doubt and affords the defendant the presumption of innocence. Instead, the jury is instructed to view the parties on "equal" footing, as if they were in a civil case.

6.    An instruction to do "equal and exact justice" to both parties fundamentally corrupts the sentencing determination and constitutes structural error that is prejudicial per se. In the alternative, this error had a substantial and injurious effect in determining the jury's verdict.

7.    To the extent that trial counsel failed to object, and appellate counsel failed to raise this claim—such actions constitute deficient performance. Had trial counsel objected, and/or appellate counsel raised this claim—there exists a reasonable probability of a different outcome.

**C.    The reasonable doubt instruction was unconstitutional.**

8.    The jury was instructed on the meaning of reasonable doubt pursuant to Nev. Rev. Stat. § 175.211 in both phases of the trial, Ex. 23 at 38 (Instruction No. 36), and the penalty phase, Ex. 24 at 15 (Instruction No. 15):

> A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors after the entire comparison and consideration of all the evidence are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not reasonable doubt. Doubt, to be reasonable, must be actual, not merely possibility or speculation.

9. This instruction inflates the constitutional standard of doubt necessary for acquittal. Giving this instruction created a reasonable likelihood that Mr. Richardson's jury would convict and sentence him based on a lesser standard of proof than the Constitution requires.

10. The second sentence defines reasonable doubt as "not mere possible doubt but is such doubt as would govern or control a person in the more weighty affairs of life." *Id.* This language provided an inappropriate characterization of the degree of certainty required to find proof beyond a reasonable doubt. It explained reasonable doubt itself, not a standard by which reasonable doubt can be determined. As far as can be discerned, no other state currently uses this language in its reasonable doubt instruction, and the few states that previously used it have since disapproved it.

11. The final sentence of the instruction—"[d]oubt to [be] reasonable must be actual, not mere possibility or speculation"—is also constitutionally infirm. *Id.* This language was similar to language condemned by the United States Supreme Court and, when read in conjunction with the "govern or control" language, created a reasonable likelihood that the jury would convict based upon a lesser degree of proof than the Constitution requires. The "actual, not mere possibility or speculation" language elevated the threshold for quantifying reasonable doubt. As a result, the jurors in Mr. Richardson's case received instructions that improperly minimized the State's burden of proof.

12. The characterization of the proof standard as an "abiding conviction of the truth of the charge" does not cure the defects of the trial court's inaccurate

statements about the reasonable doubt standard. That statement cannot be linked to any proper definition of that standard. In conjunction with the language which immediately preceded this statement, it provided the State with an impermissibly low standard of proof.

13.    The reasonable doubt instruction permitted the jury to convict and sentence Mr. Richardson based on a lesser quantum of evidence than the federal and state constitutions require. This structural error is prejudicial *per se*, so no showing of specific prejudice is required. Alternatively, the error had a substantial and injurious effect in determining the jury's verdict.

14.    To the extent that trial counsel failed to object, and appellate counsel failed to raise this claim—such actions constitute deficient performance. Had trial counsel objected, and/or appellate counsel raised this claim—there exists a reasonable probability of a different outcome.

## D.    The malice instructions were unconstitutional.

15.    The jury was instructed in Instruction Nos. 21 and 23 on the element of malice:

> Murder is the unlawful killing of a human being, with malice aforethought, either express or implied.   The unlawful killing may be effected by any of the various means by which death may be occasioned.

Ex. 23 at 23.

> Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

> Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

273

Ex. 23 at 25.

16.     Trial counsel objected to Instruction 23:

> the objection that we make for the record to the definition of "implied malice" containing the language of "abandoned and malignant heart" on the basis that it's unconstitutional and that that language is ambiguous, vague, and really has no practical meaning in the English language, that the term "abandoned and malignant heart" has no legal definition or meaning that can be ascertained, and therefore should not be part of a jury instruction allowing the jury to imply an element of the offense, to wit: Implying malice.

08/28/08 Tr. At 5. The objection was overruled. *Id.* at 6.

17.     These instructions provide for an impermissible and unconstitutional presumption and therefore deprived Mr. Richardson of his right to a fair trial, to equal protection, to due process of law and to be free from cruel and unusual punishment. Moreover, these instructions acted to interfere with the presumption of innocence and relieved the State of its burden to prove guilt of each of the elements of the offense beyond a reasonable doubt. Elimination of the sentence prescribing when malice "shall be implied" was necessary to avoid constitutional problems. This language is reasonably interpreted as imposing an impermissible mandatory presumption.

18.     These instructions also pose substantial problems with respect to the specified "basic facts"—lack of provocation or an "abandoned and malignant heart" —from which malice may be implied. The standard instruction states that malice may be implied "when all the circumstances of the killing show an abandoned and malignant heart." This language is so vague and pejorative that it is meaningless

274

without further definition, and it should have been eliminated in favor of less archaic terms which define the conscious disregard for life from which malice may be implied.  The abandoned and malignant heart with an evil disposition or a despicable character language allows the jury, then, in a close case, to convict because it believes the defendant is a "bad man."  There is also the danger that the language may encourage the jury to apply an objective rather than subjective standard in determining whether the defendant acted with conscious disregard of life, thereby entirely obliterating the line which separates murder from involuntary manslaughter.

19.     The problems arising on this point are complicated by the state of the substantive law of malice, which is both confusing and inconsistent.  The Nevada Supreme Court has held that the statutory provisions significantly narrow the situations in which malice can be negated. These analytical difficulties are the vestiges of the common law rule which presumes malice from the unlawful killing itself, and put the burden of negating malice upon the defendant.  This vestige explicitly appears in the Nevada statute providing that "the killing of the deceased . . . by the defendant being proved, the burden of proving circumstances of mitigation, to justify or excuse the homicide, will devolve on the accused. . . ."  Nev. Rev. Stat. § 200.170.  Under current constitutional standards, however, it is clear that the State cannot enforce such a rule:  as long as malice remains an element of murder, the State must prove it beyond a reasonable doubt; and it cannot lighten its burden by imposing a presumption, mandatory or rebuttable, which requires the defendant to disprove its existence.  The State must prove all elements of the charged crime

beyond a reasonable doubt.  The language of Nev. Rev. Stat. § 200.170 cannot constitutionally be included in a jury instruction.

20.    The substantive problem is that the decisions of the Nevada Supreme Court have defined malice negatively, that is, by reference to the statutory indications of what it is not.  This leads to one of two possible arguable unconstitutional situations: (1) malice is irrebuttably presumed in all cases other than those specified in the statutory definitions of justifiable or excusable homicide; or (2) the State is required to prove malice, but the defendant cannot present evidence showing that the required mental state did not in fact exist, except in support of the statutory exceptions to malice.  Ultimately, the courts will have to decide whether the malice requirement of Nev. Rev. Stat. § 200.020, and the definition of voluntary manslaughter under Nev. Rev. Stat. § 200.040(1)(a), as an unlawful killing without malice, creates a category of residual manslaughter, where malice is not shown, but provocation does not exist either.  This would require a reading of the provocation provisions, Nev. Rev. Stat. § 200.040(2) and § 200.060, as defining one theory by which malice can be negated, but not all possible theories.  Such a reinterpretation of the statutory scheme would require considerable effort.  But the alternative is that the malice element of murder, as construed by the court in the statutory scheme, is either without any constitutionally-adequate definition at all or is the subject of a mandatory presumption.

21.    As such, this jury instruction substantially and injuriously affected the process to such an extent as to render Mr. Richardson's conviction and sentence fundamentally unfair and unconstitutional.

22.    To the extent that appellate counsel failed to raise this claim—such actions constitute deficient performance. Had appellate counsel raised this claim there exists a reasonable probability of a different outcome.

**E.    First and second-degree murder.**

23.    The jury was instructed that

> You are instructed that if you find that the State has established that the defendant has committed first degree murder you shall select first degree murder as your verdict. The crime of first degree murder includes the crime of second degree murder. You may find the defendant guilty of second degree murder if:
>
> 1. You have not found, beyond a reasonable doubt, that the defendant is guilty of murder of the first degree, and
>
> 2. All twelve of you are convinced beyond a reasonable doubt the defendant is guilty of the crime of second degree murder.
>
> If you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict of murder of the second degree.

Ex. 23 at 30 (Instruction No. 28).

24.    Trial counsel argued that defense proposed instruction 31 should be used instead of instruction 28 because:

> [t]he way the State's instruction reads . . . the jury has to believe that they have to agree unanimously that he's not guilty of first degree murder before they can consider second degree murder. And I don't think that's a correct statement or direction to the jury on how to consider the choice between first and second degree murder.

277

08/28/08 Tr. at 7–8. The defense proposed instruction substituted the wording "you have not found, beyond a reasonable doubt, that the defendant is guilty of murder of the first degree" with the wording "one or more of you are not convinced beyond a reasonable doubt that Mr. Richardson is guilty of murder in the first degree." Ex. 22 at 2. The trial court rejected the defense argument. *Id.* at 8.

25.   The instruction, as given, relieved the State of its burden of proving Mr. Richardson guilty of first-degree murder beyond a reasonable doubt. The instruction mistakenly conveyed that the jury had to unanimously agree that Mr. Richardson was *not* guilty of first-degree murder before it could consider whether he was guilty of second-degree murder. In reality, if even one juror did not agree Mr. Richardson was guilty of first-degree murder, he could not be convicted of first-degree murder under Nevada law. The jury was always free to consider second-degree murder as an option, even if some jurors believed he was guilty of first-degree.

26.   This instruction had a substantial and injurious effect on the outcome of the proceeding as it relieved the State of its burden of proof, making the jury more likely to convict of first-degree murder.

27.   To the extent that appellate counsel failed to raise this claim, counsel performed deficiently. Had appellate counsel raised this claim there exists a reasonable probability of a different outcome.

**F.   The anti-sympathy instruction was unconstitutional.**

28.   The jury was instructed that "A penalty verdict may never be influenced by sympathy, passion, prejudice, or public opinion. Your decision should

278

be the product of sincere judgment and sound discretion in accordance with these rules of law." Ex. 24 at 19 (Instruction No. 19).

29.    By forbidding the sentencer from taking sympathy into account, this language precluded the jury from considering evidence concerning Mr. Richardson's character and background, thus effectively negating the constitutional mandate that all mitigating evidence be considered. A reasonable likelihood exists that this instruction denied Mr. Richardson the constitutionally required individualized sentencing determination.

30.    The flaw in this instruction is that it did not limit its prohibition to the jury's consideration of "mere sympathy"— that is, the sort of sympathy that would be totally divorced from the evidence adduced during the sentencing phase—but rather precluded consideration of all sympathy, including any sympathy warranted by the evidence. Because the jury in this case was instructed not to consider any sympathy —rather than "mere" sympathy—the jury likely understood that when making a moral judgment about Mr. Richardson, it was forbidden to consider any evidence which evoked a sympathetic response. Thus the "anti-sympathy" instruction had a substantial and injurious influence on the jury verdict because it substantially rendered the sentence fundamentally unfair.

31.    To the extent that trial counsel failed to object, and appellate counsel failed to raise this claim—such actions constitute deficient performance. Had trial counsel objected, and/or appellate counsel raised this claim—there exists a reasonable probability of a different outcome.

**G.    Singly and cumulatively, the jury instructions prejudiced Mr. Richardson.**

32.    Singly and cumulatively, the instructions given to the jury in Mr. Richardson's case failed to instruct a reasonable juror on the proper application of law. Therefore, the instructions violated his constitutional rights, and the error had a substantial and injurious effect on the outcome of the proceeding. Trial counsels' failure to object and appellate counsel's failure to raise this claim constitutes deficient performance. Had trial counsel objected and appellate counsel raised this claim there exists a reasonable probability of a different result.

**Claim Eleven: Sufficiency of the Evidence**

Mr. Richardson's convictions and death sentence are invalid because his state and federal constitutional right to due process, equal protection, fair trial, and a fair and reliable sentencing hearing were violated when the State engaged in misconduct during the grand jury proceedings and failed to present sufficient evidence to establish probable cause; and failing to present sufficient evidence to convict. U.S. Const. amend. V, VI, VIII, XIV.

**Supporting Facts**

### A. The State engaged in misconduct during the grand jury proceedings and failed to present sufficient evidence to establish probable cause.

1. The State engaged in misconduct during the grand jury proceedings when it presented evidence that it knew to be insufficient. This misconduct permitted the charges to be held over. Mr. Richardson has suffered actual prejudice in that he was indicted, convicted, and then sentenced to death as a result of the State's misconduct during the grand jury proceeding.

2. Clearly established federal law holds that a district court may dismiss an indictment for errors in grand jury proceedings if the errors have prejudiced the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).

3. The evidence presented against Mr. Richardson during the preliminary hearing and then later during grand jury proceedings showed that there was no direct link between Mr. Richardson and the murder victims. In fact, as outlined below, Robert Dehnart was Mr. Richardson's only connection. After the preliminary hearing court found the evidence lacking, the State knew that the same evidence it

1    was presenting to the grand jury was insufficient to tie Mr. Richardson to the

2    murders, yet it presented the evidence anyway.

3           **1.    The State's presentation of evidence at the
             preliminary hearing was insufficient to establish
4           probable cause against Mr. Richardson.**

5           4.    On April 3, 2007, following a preliminary hearing, the court found that

6    the State had failed to establish its burden by "slight or marginal evidence" that Mr.

7    Richardson was involved in these events. 4/3/07 Tr. at 179.

8           5.    This same evidence was then presented to the grand jury. There was

9    insufficient evidence presented to the grand jury to hold the charges against Mr.

10   Richardson. No forensic evidence linked Mr. Richardson to the trailer where the

11   murders occurred. The remaining evidence was based on hearsay.

12          **a)    Although the State attempted to connect Mr.
             Richardson to the scene of the murders by a
13          baseball cap, officers admitted that they did not
             accurately document the scene, including the
14          location of the baseball cap.**

15          6.    There was no evidence to connect Mr. Richardson to the scene of the

16   murders. The State attempted to connect Mr. Richardson with a baseball cap (hat)

17   that had been seen in the trailer, arguing that it belonged to him.

18          7.    During the preliminary hearing, Detective McGrath testified about the

19   condition of the crime scene upon discovery, including the location of the hat that he

20   claimed belonged to Mr. Richardson. During his testimony, Detective McGrath

21   admitted that the photographs of the scene did not accurately portray the location

22   of each item found.

23          Q.    And let me be clear. During the course of the
                  investigation while you're there at the scene, there

1                    would have been a set of photographs taken of the
2                    room before anything was moved, and then as things
                     were being moved, more photographs taken?

3      A.      Yes.

4      Q.      And so in the progression of photographs, we should
                     be able to see that hat somewhere else in the room
5                    at the beginning of the investigation?

6      A.      Well, it's hard to say. If that hat was underneath
                     some clothing that might have been on the floor,
7                    then this particular hat might not be visible in the
8                    initial photographs.

9      Q.      But if it's not visible in the initial photographs and
                     you lift the bed up and find something under the bed,
10                   wouldn't it be normal to take a picture of where it's
                     at when you find it before you move it?

11     A.      Well, you have to understand that all the clothing
                     and the stuff is strewn about the bed, and I can't
12                   recall if this particular hat is on the bed or on the
                     floor or underneath the T-shirt or something like
13                   that.

14     Q.      Well, not only can't you remember, you actually
                     didn't see it at any point until it shows up on the bed
15                   frame, is that a fair statement, or you don't
                     remember seeing it?

16     A:      I don't remember seeing it until I saw this
17                    photograph.

18   *Id.* at 23–24. The detective's lack of complete or accurate documentation for the

19   discovery of the hat left many questions about where the hat was located, whether

20   it had been moved during the investigation, and who the hat belonged to.

21   Accordingly, the hat could not be linked to Mr. Richardson.

22

23

> **b)** **Testimony from lay witnesses did not definitively establish that the hat in the crime scene photographs was the same hat owned by Mr. Richardson.**

8.      The State called Kim Ross to identify this hat as the same hat that Mr. Richardson owned.

9.      However, Ross was not able to definitively identify that hat in the scene photographs presented by the State as the exact same hat owned by Mr. Richardson:

> Q.      Obviously, you can't tell us if the hat in No. 17 is the same hat, can you?
>
> A.      No, I can't.
>
> Q.      It looks just the same?
>
> A.      It appears similar, yes.

*Id.* at 79.

10.     Accordingly, the existence of a hat at the scene of the murders, even if similar to a hat that he owned, did not establish that Mr. Richardson was present for or participated in the murders.

> **c)      Only Dehnart had a connection to Folker.**

11.     Dehnart was a known associate of Folker. Marcia LaFrance, Folker's mother and Feldman's daughter, testified that, not only was she aware that Folker was friends with a young man named "Robert," but that she had met this friend shortly before Folker's death.

> Q.      . . . . Have you ever met a friend of Steven's, Rob or Robert?
>
> A.      Yes.

284

1  Q. When was that?

2  A. I believe it was towards the end of July in 2005.

3  Q. Where did that meeting take place?

4  A. In Lake Arrowhead, which was the last time that I my saw son Steven, and he was in my son's truck.

5

6  Q. Robert was in your son's truck?

7  A. Yes, and he introduced me to him.

*Id.* at 44–45. Ms. LaFrance then identified Dehnart in the courtroom:

8  Q. Did you have occasion—do you see Robert here in court today?

9

10  A. Yes, I believe so.

11  Q. The young man to my right, not the attorney, the other young man?

12  A. Yes.

13

*Id.* at 46. This clearly established that it was Dehnart who had any connection to

14

Folker, rather than Mr. Richardson.

15

**d) The State called Ross to corroborate Mr. Richardson's involvement in the murders with a missing pair of boots; however, the preliminary hearing court excluded this evidence.**

16

17

18  12. The State sought to admit evidence that Mr. Richardson was involved

19 in the murders by having Ross testify about a pair of boots that Mr. Richardson

20 owned. According to the State, Mr. Richardson threw these boots away because the

21 boots were soiled with blood from the murders.

22  13. Ross testified at the preliminary hearing that she had previously

23 purchased boots for Mr. Richardson, but that he had thrown them away. *Id.* at 58.

Ross also testified about her efforts to provide detectives with an identical pair of boots that she had purchased for Mr. Richardson and a copy of her financial documents for that purchase. *Id.* at 58–69. The court excluded much of this testimony as hearsay and irrelevant, as the subsequent pair of boots was purchased after the fact by Ross. *Id.* at 66–70.

> ### e) The forensic evidence recovered from the scene of the murders, specifically bloody fingerprints belonged to Dehnart.

14. The only forensic evidence recovered from the scene of the murders was a direct link to Dehnart. No forensic evidence placed Mr. Richardson inside of the trailer where the murders occurred. This was a significant factor for the preliminary hearing court. Alice Maceo testified that the only fingerprints discovered in the room where Folker's body was found belonged to Dehnart. *Id.* at 118.

15. In determining that there was not enough evidence to bind over Mr. Richardson for trial, the preliminary hearing court was concerned that no forensic evidence connected Mr. Richardson with the interior of the trailer.

| | |
|---|---|
| THE COURT: | There wasn't any—the person who came here—I don't want to argue, but when she talked about prints, she only talked about Mr. [Dehnart's] prints. |
| MR. DASKAS: | Precisely. |
| THE COURT: | She didn't talk about Mr. Richardson's prints. |

*Id.* at 177.

16. The preliminary hearing court also remarked:

> Other than the hat, I really don't know how else you're connecting him to the site of the crime, and that's troublesome because it's not identified on the date of the crime or identified sometime later. And I don't even know if it can be identified as something that he wore exclusively or if he wore it in exchange with Mr. [Dehnart] while he was living with Mr. [Dehnart's] mother.
>
> . . . .
>
> I don't know what Mr. Richardson did. I haven't heard any testimony—I've heard a lot of stuff about Mr. [Dehnart], but I haven't heard anything about what Mr. Richardson did with regard to the relationship with the named victim, having any contact, making any demands, anything that puts him there.

*Id.* at 174–75.

17.     The preliminary hearing court refused to bind the case against Mr. Richardson to the district court because the State's evidence was insufficient to show Mr. Richardson had any connection to the victims or the trailer where the murders occurred.

### 2.     The State improperly submitted Mr. Richardson's case to the grand jury on evidence the State knew to be insufficient.

18.     After failing before the preliminary hearing court, the State sought an indictment against Mr. Richardson before the Grand Jury. And although the State was successful establishing probable cause to bind over Dehnart, the State nevertheless presented Dehnart's case to the same grand jury panel empaneled to hear Mr. Richardson's case.

### a) The State improperly presented Dehnart's case to the same grand jury panel to prejudice the panel against Mr. Richardson.

19.     The grand jury empaneled to hear the case against Mr. Richardson was the same panel that heard the case against Dehnart.

20.     Despite the preliminary hearing court already binding Dehnart over to trial, the State sought an indictment against Dehnart as well—during the same grand jury proceeding as Mr. Richardson's on April 12, 2007. *See* 4/12/07 Tr. at 5 (referencing the defendants together with identical case numbers).

21.     The State improperly sought to influence the outcome of the grand jury proceedings by presenting the case against Dehnart, the stronger case, first. To the extent that the State was going to seek an indictment against Dehnart, the State should have empaneled a separate grand jury for Mr. Richardson—a panel that would not have been unduly influenced by the case against Dehnart.

22.     The State presented largely the same evidence from that preliminary hearing to the grand jury against Mr. Richardson. None of the additional evidence directly linked Mr. Richardson to the murders. The additional evidence presented to the grand jury did not change the tenuous nature of the State's case against Mr. Richardson.

### b) The State presented the same insufficient evidence that was previously rejected by the preliminary hearing court to the grand jury.

23.     The grand jury heard much of the same insufficient evidence that had been previously rejected during the preliminary hearing, including evidence of

Dehnart's fingerprints at the scene and Ross's testimony about the hat that she said belonged to Mr. Richardson.

24.     An accused is entitled to fair consideration at a grand jury hearing. *Franklin v. State*, 513 P.2d 1252, 1257 (Nev. 1973). "At a grand jury proceeding, the state is required to produce evidence establishing 'probable cause' to hold an accused for trial." *State v. Boueri*, 672 P.2d 33, 36 (Nev. 1983). "In presenting a case to a grand jury a prosecutor and his assistants are authorized to recite and explain the law and to present legal evidence (Nev. Rev. Stat. § 172.135(1)) but they must scrupulously refrain from words or conduct that will invade the province of the grand jury or tend to influence the jurors in their judgment." *Franklin*, 513 P.2d at 1255.

### (1)     None of the fingerprints recovered from the scene of the murders matched Mr. Richardson.

25.     For a second time, the State presented forensic evidence from the trailer. Two fingerprints recovered from the trailer belonged to Dehnart. *Id*. at 119. None of the fingerprints recovered from the trailer belonged to Mr. Richardson. *Id*. at 120.  No forensic evidence tied Mr. Richardson to the murders. The State's evidence was insufficient, and the State knew this.

### (2)     Ross again testified about the hat photographed at the crime scene, but this time she identified the hat as belonging to Mr. Richardson.

26.     A hat found at the scene was identified by Ross. *Id*. at 59–63. Ross never saw the hat in person, but claimed to have specific knowledge of its

characteristics, including a unique stain. *Id.* at 63. Ross also testified that the hat worn by Mr. Richardson in the Taco Bell surveillance video was definitively the same hat in the crime scene photograph. *Id.* at 62–63.

27.    The Taco Bell surveillance video was in black and white. Furthermore, it was grainy and of poor quality. *See also* Claim Eleven(C)(1), below, fully incorporated herein.

28.    Despite the poor quality of the video, Ross testified that she was able to identify that specific hat worn by Mr. Richardson. The State was aware that this identification was tenuous, and a departure from her previous testimony at the preliminary hearing, yet determined to put on this evidence anyway.

> **c)     The additional evidence presented to the grand jury did not bolster the insufficient evidence presented at the preliminary hearing.**

29.    In addition to the insufficient evidence presented at the preliminary hearing, the State introduced: (1) a Taco Bell surveillance video; (2) a collection of recorded phone calls from Mr. Richardson while he was incarcerated; (3) the testimony of a forensic pathologist; and (4) the statements of Mr. Richardson's co-defendant.

> **(1)     The State admitted a surveillance video from a Taco Bell location that did not prove Mr. Richardson's presence in the trailer at the time of the murders.**

30.    The State offered a surveillance video from a Taco Bell to establish that Mr. Richardson was in Las Vegas on September 7, 2005, and had been with Folker prior to his death.

31.     During the grand jury proceedings, the State offered witness David Bell, who authenticated a receipt and surveillance video from the Taco Bell location at North Nellis Drive from September 7, 2005. 4/12/07 Tr. at 36–40.

32.     Detective Vaccaro testified that he recovered this video and narrated that Mr. Richardson could be seen on the video. *Id*. at 147–48.

33.     The fact that Mr. Richardson was in the same Taco Bell as Folker prior to Folker's death does not place Mr. Richard in the trailer at the time of Folker's death.

>       **(2)     The State improperly presented recorded phone calls from Mr. Richardson while detained to prejudice the grand jury with Mr. Richardson's pretrial detention.**

34.     The State improperly admitted recorded phone calls from Mr. Richardson while he was in custody. Michael Thompson from the Riverside County Sheriff's Department testified that the recorded phone calls were from Mr. Richardson while incarcerated at the Riverside County Jail. 4/12/07 Tr. at 42–44.

35.     Thompson testified that he recovered the recorded phone calls and provided them to the LVMPD detectives:

> Q.     And back in September of 2005 were you asked by detectives to recover calls from inmates by the name of Robert Dehnart and Thomas Richardson?
>
> A.     Yes.
>
> Q.     And did you actually listen to the calls or did you just save them onto a disk?
>
> A.     No, I didn't listen to them. I just saved them onto a disk.

291

Q. And the calls that you captured, were those provided to local detectives as well as out-of-state detectives to your knowledge?

A. Yes.

*Id*. at 44.

36. These phone calls were not played for the grand jury and had no evidentiary value. The existence of the recorded calls did not serve to establish probable cause that Mr. Richardson was involved in the murders. Rather, the only reason the State sought to admit this evidence was to prejudice the grand jury by impermissibly presenting evidence—designed to destroy Mr. Richardson's presumption of innocence—of Mr. Richardson's pretrial detention.

**(3) The State presented the testimony of a forensic pathologist for the sole purpose of inflaming the grand jury with the gruesome nature of the murders.**

37. The State introduced the testimony of forensic pathologist Dr. Telgenhoff. *Id*. at 66. Dr. Telgenhoff testified in graphic detail about the nature of the injuries that Folker sustained. *Id*. at 72. He also testified about the graphic nature of the decomposed state of Folker's body when it was recovered. *Id*. at 74. Dr. Telgehoff reported similar findings for Feldman. *Id*. at 76. Dr. Telgenhoff also opined that the injuries were caused by a hammer. *Id*. at 71–72.

38. Notably, although Dr. Telgenhoff was the pathologist who testified, the autopsies for both Feldman and Folker were conducted by Dr. Simms. *Id*. at 69.

39. The State's presented Dr. Telgenhoff to inflame the passsions and prejudice of the grand jury with graphic descriptions of the nature of the injuries,

the state of decomposition, and the way in which a hammer could have been used as a weapon.

### (4)   The State improperly presented the statements from Mr. Richardson's co-defendant against him.

40.   The State introduced extensive testimony regarding Dehnart's statements to detectives. *Id.* at 129–42. This was in clear violation of *Bruton v. U.S.*, 391 U.S. 123, 135–36 (1968).

41.   The grand jury was admonished that they could not consider Dehnart's statements against Mr. Richardson. 4/12/2007 Tr. at 157. However, it is clear that the grand jury ignored the admonishment. Dehnart's statement to officers was the only evidence directly linking Mr. Richardson to the trailer. After this evidence was presented, the grand jury returned an indictment. 4/12/2007 Tr. at 158.

42.   Mr. Richardson has suffered actual prejudice by the State's misconduct and this misconduct had a substantial and injurious effect on the proceedings. Mr. Richardson was forced to face capital charges despite the lack of probable cause.

## B.   The State failed to present sufficient evidence to convict.

43.   Mr. Richardson's conviction is based on insufficient evidence. Due process requires that a defendant in a criminal case may not be convicted unless there exists proof beyond a reasonable doubt of every fact necessary to constitute the crime, as defined by the state, with which he is charged. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (citing *In re Winship*, 389 U.S. 358 (1970)). Nevada law requires accomplice testimony to be corroborated by independent evidence that does more than "merely shows the commission of the offense or circumstances thereof."

293

Nev. Rev. Stat. § 175.291.  Instantly, the State did not present any evidence to corroborate the testimony of Robert Dehnart, Mr. Richardson's purported accomplice.  The evidence offered by the State to corroborate Dehnart was not truly corroborative because the evidence did not independently connect Mr. Richardson to the murders. Accordingly, Mr. Richardson's conviction rests on insufficient evidence.

### C.   The only evidence linking Mr. Richardson to the trailer where the murders occurred was the self-serving and inconsistent testimony of Dehnart.

44.   The testimony from Dehnart was the only evidence that connected Mr. Richardson to the scene of the murders. Dehnart entered a plea agreement that required him to testify against Mr. Richardson. *See* Claim Three(B), above. Because the primary evidence against Mr. Richardson was Dehnart's accomplice testimony, the State was required to present corroborating evidence, independent from Dehnart's testimony. Nev. Rev. Stat. § 175.291.

45.   As outlined below, all of the evidence offered by the State carried another explanation that "pointed toward innocent conduct on the part of the defendant." *Heglemeier v. State*, 903 P.2d 799, 803–04 (Nev. 1995) ((citing *State v. Daniels*, 734 P.2d 188, 194 (Mont. 1987) (quoting *State v. Mitchell*, 625 P.2d 1155, 1158 (Mont. 1981)). Accordingly, the evidence was not truly corroborative of Dehnart's narrative.

46.   The State presented six items of evidence to corroborate Dehnart's narrative, yet the evidence pointed to another innocent explanation for each item, an explanation that failed to corroborate Dehnart's narrative: (1) the Taco Bell

surveillance video was captured prior to the murders, (2) the cash that Kimberly

Ross received from Mr. Richardson was not unusual, (3) the unavailability of the

green Taurus was not unusual, (4) Mr. Richardson's act of discarding the boots was

irrelevant, (5) the Home Depot receipt was speculative, and (6) a baseball cap found

in the bedroom where the murders occurred cannot be definitively identified as

belonging to Mr. Richardson because the State allowed it to be destroyed.

Accordingly, the State's corroborating evidence was insufficient to show Mr.

Richardson's actual involvement in the murders.

> **1.   The Taco Bell surveillance video could not corroborate Dehnart's testimony that Mr. Richardson was present during the murders because the video was captured prior to the murders.**

47.    During trial, the State introduced a surveillance video from a Taco Bell

to establish that Mr. Richardson had been in Las Vegas on September 7, 2005, the

day it alleged the murders of Feldman and Folker occurred. 8/24/09 Tr. at 115–77.

The State called David Bell, a manager at the Taco Bell at 401 North Nellis. 8/26/09

Tr. at 155. Bell testified that the store retained video surveillance footage of the

registers and provided detectives with the surveillance video from the transaction

that occurred on September 7, 2005, at 4:09 PM. *See* Ex. 143; 8/24/09 Tr. at 100

(Detective McGrath's testimony about the recovery of the Taco Bell receipt).

48.    Detective McGrath played the Taco Bell surveillance video and

testified that Mr. Richardson was present with Folker and Dehnart. 8/24/09 Tr. at

114–18. The Taco Bell surveillance video, at most, showed that Mr. Richardson

went with Folker and Dehnart to Taco Bell. The fact that Mr. Richardson was

identified as being in Las Vegas, sometime during the afternoon of September 7, 2005, does not place him in the trailer at the time that the murders occurred. Notably, only Dehnart can be definitively placed in the trailer during the murders because his fingerprints were found in blood. 8/24/2009 Tr. at 177. *See also* Claim One(A), fully incorporated herein (explaining that the parties were in possession of evidence that suggests the murders occurred after Mr. Richardson had returned to California on September 8, 2005).

49.     Because the Taco Bell surveillance video does not independently establish Mr. Richardson's presence at the trailer when the murders occurred, it cannot corroborate Dehnart's testimony.

> **2.    Evidence of cash given to Ross by Mr. Richardson is not unique and therefore does not corroborate Dehnart's testimony that Mr. Richardson acquired the cash from Folker's murder.**

50.     The State attempted to corroborate Dehnart's testimony about the money that he took from Folker through Ross by having Ross testify that Mr. Richardson gave her $275.00 in cash the next time that she saw him. 8/25/09 Tr. at 21. Ross had no first-hand knowledge beyond what she was told by Mr. Richardson concerning how he acquired the $275.00 to give to her.

51.     In fact, prior to trial, Ross told officers that it was not unusual for Mr. Richardson or Dehnart to have a lot of cash on hand due to the nature of their jobs. Ex. 68 at 7–8. Ross remembered that this was a cash deposit. *Id*. at 8. She told officers that she could not recall the source of the funds. *Id*. She also recalled that there "have been several times when Tom [Richardson] has brought me home cash."

*Id.* Ross initially told detectives that she and Mr. Richardson would loan money to Dehnart; the times that they would loan him money were the times that they would see him most frequently.

> A:  And borrow money from us all the time. That was usually when we would see Rob. He would come over and borrow twenty, forty, fifty, dollars when we'd get paid. We'd see him again he'd have dinner with us he'd pay us back.

Ex. 64 at 10.

52.     The State introduced a copy of Ross's bank statement from the end of August and through September 2005. Ex. 144. This statement does show a deposit on September 8, 2005, for $275.00. *Id.* at 2. However, the statement shows multiple cash deposits of varying amounts: $225.00 on September 7, $360.00 on September 2, and two deposits for $150.00 on September 11 and 17. *Id.* at 2–3. The State did not present Ross's bank statements for any other month before or after. This snapshot view of a single bank statement does not permit the State to establish anything unusual or unique about the September 8, 2005, deposit. There is nothing unique about Mr. Richardson's giving Ross cash on this occasion. Accordingly, this fact cannot be corroborative of Dehnart's testimony.

**3.      The fact that the green Ford Taurus was not at Ross's home when she had originally expected to be able to use it was not a unique occurrence and therefore cannot be used to corroborate Dehnart's testimony.**

53.     The State attempted to argue that the green car was not available for Ross to use because Mr. Richardson had taken it and was away from home committing the murders. Ross testified that Mr. Richardson was not home with the

car on September 7, 2005, even though she "expected the car to be there." 8/25/09

Tr. at 11–14.

> Q:    Tell us what happened.
>
> A:    I went to leave and the car was not there. And I had
>       to reschedule the dental appointment.
>
> Q:    When you say the car wasn't there, what happened?
>
> A:    Tom had the car.
>
> Q:    And were you expecting the car to be there when you
>       went to find it?
>
> A:    Yes.
>
> Q:    And Tom had the car. What had gone wrong here
>       with your scheduling?
>
> A:    I don't know.
>
> Q:    You expected the car to be there?
>
> A:    Yeah, I assumed that he had been called into a job.

*Id*. at 14.

54.    When asked whether Mr. Richardson had called Ross to say that he

would not be home, Ross testified that she was not able to remember. *Id*. at 15.

However, Ross previously told police that Mr. Richardson had called her to say that

he would not be back in time for her appointment that morning. Ex. 68 at 5.

Similarly, Ross previously told detectives that she believed that Mr. Richardson had

been called on a hauling job, which was not unusual. *Id*. In her initial meeting with

detectives, Ross reported that sometimes Mr. Richardson would not get back until

2:00 or 3:00 in the morning. Ex. 64 at 10. Ross also told detectives that Dehnart had

access and would use the green car on occasion. Ex. 64 at 5.

55.    Ross did not have any first-hand knowledge concerning the

whereabouts of Mr. Richardson or the car. All Ross could definitively say was that

the car was not in her driveway. Accordingly, the fact that Mr. Richardson was not

home with the car on September 7, 2005, cannot stand as corroboration of Dehnart's

testimony.

> **4.    The fact that Mr. Richardson had discarded a pair of
> faulty boots cannot corroborate Dehnart's testimony
> when the State did not introduce any evidence at trial
> that boot prints had been found at the scene of the
> murders.**

56.    The State argued that evidence that Mr. Richardson had thrown away

a pair of broken boots corroborated Dehnart's testimony. During trial, though, the

State never introduced evidence of any shoe prints at the scene of the murders.

57.    Ross testified that she had purchased a pair of boots for Mr.

Richardson and that he told her that he had to throw them away because they were

broken. 8/25/09 Tr. at 22–26. Significantly, Ross did not herself witness him

throwing away the boots.

58.    The "corroboration" offered by Ross's testimony about the boots that

Mr. Richardson discarded was sourced by Dehnart for the purpose of minimizing his

own involvement. Neither Ross nor the detectives gave much thought to what shoes

Mr. Richardson wore that day until Ross sent an email to Detective Vaccaro and left

a voice-message stating that she had "re-purchased" the pair of boots. *See* Exs. 66,

67. In these messages to Detective Vaccaro, Ross revealed that Dehnart was the

source of this concern about the boots: "According to my son [Dehnart], shoeprints like these should be present." Ex. 67.

59.     As no evidence of any shoe prints at the scene were presented during trial, the fact that Mr. Richardson once owned a pair of boots that he discarded cannot corroborate any part of Dehnart's testimony. Furthermore, it is telling that none of the investigation focused on shoe prints until after Dehnart presented the idea to Ross. Accordingly, this corroboration evidence cannot be credible or relevant.

>    **5.     The Home Depot receipt introduced at trial could not corroborate Dehnart's purchase of the murder weapon.**

60.     The State introduced a hammer and Home Depot receipt during the trial that it argued was corroborative of Dehnart's testimony. However, the acquisition of the receipt was based on conjecture and therefore cannot be corroborative.

61.     The State called an employee from the Home Depot store where Dehnart told officers he had purchased the hammer. 8/26/09 Tr. at 173–89. The Home Depot employee testified that he assisted officers with retrieving the receipt. *Id.* at 174–75; Ex. 61. The State argued that this transaction corroborated Dehnart's testimony that he had purchased the hammer. This argument is speculative at best.

62.     Although detectives were able to retrieve surveillance video from the Taco Bell that showed Mr. Richardson, Dehnart, and Folker purchasing food, no such similar effort was made here to establish that the individual who made the September 7, 2005, cash purchase of a single hammer was Dehnart. Additionally, detectives neglected to attempt to obtain any surveillance video from the Home

Depot location, including any video that might show Mr. Richardson, Folker, and

Dehnart as customers in the store.

63.     Furthermore, Dehnart's initial statements to detectives made no

mention of going to purchase a hammer. *See* Exs. 27, 145. On September 27, 2005,

Dehnart first spoke with detectives and told them that he had no idea where the

hammer came from and blamed Mr. Richardson for bringing the hammer into the

trailer.

> Q:    Where did the hammer come from?
>
> A:    I don't know. I guess he had it in some clothes he
>       brought.

Ex. 145 at 47.

64.     The purchase of the hammer and the trip to the Home Depot was

presented for the first time in the written proffer of Dehnart's plea— just weeks

before Mr. Richardson's trial was scheduled to begin. Ex. 60. This document still did

not specify the location of the purchase of the hammer. During trial, it was revealed

that it was only upon the suggestion of Detective Vaccaro that the hammer had

been purchased at a Home Depot store:

> Q:    Detective Vaccaro was with you when you were—
>       when you were doing your proffer?
>
> A:    Yes, he was in the room.
>
> Q:    Okay. And he's the one that suggested the only store
>       in the area was a Home Depot?
>
> A:    That's correct.
>
> Q:    And so he's the one that came up with the name of
>       the store that you possibly purchased the hammer
>       at?

301

A:    Prior to that I knew it was either a Home Depot or a Lowe's. I wasn't sure. But I knew those were the only two possibilities.

8/26/09 Tr. at 130–31.

65.    The Home Depot receipt cannot corroborate Dehnart's testimony because it is based on Dehnart's own effort to shift the blame away from himself, as demonstrated by his conflicting stories to detectives. The State failed to introduce any evidence that Dehnart was actually at the Home Depot store with Mr. Richardson and Folker, or that the actual weapon used in the murders was purchased by Dehnart at that particular Home Depot location.

### 6.    Evidence of a baseball cap found in the trailer where the murders occurred cannot corroborate Dehnart's testimony that Mr. Richardson was a participant in the murders.

66.    The State offered evidence that a baseball cap found in the trailer where the murders occurred corroborated Dehnart's testimony that Mr. Richardson was present in the bedroom of the trailer when the murders occurred. Detective McGrath made a point to show that Mr. Richardson was seen on the video wearing a baseball hat. 8/24/09 Tr. at 114. Importantly, the video was black and white and in grayscale; no color was visible. *Id*. at 118–20.

67.    Detective McGrath later testified that he and Detective Vaccaro were speaking with Ross when Detective Vaccaro saw a picture of Mr. Richardson in a white and red "Auto 500" hat. *Id*. at 159–162; Ex. 147. This picture made Detective Vaccaro recall a baseball cap that he and other detectives saw at the scene, and subsequently left. *Id*. at 163–167.

68.     Despite the fact that the Taco Bell surveillance video was not in color, the detectives concluded that Mr. Richardson was wearing this exact baseball cap. *Id*. at 70. Ross also testified that Mr. Richardson owned a baseball cap like this and that she had washed it from time to time. 8/25/09 Tr. at 18. Ross testified that the baseball cap in the photos from the crime scene was the same baseball cap that Mr. Richardson owned—distinguished by a particular fade pattern from the times she washed it. *Id*. at 19; *see* Ex. 25, Ex. 26.

69.     Evidence of the existence of a hat does not corroborate any aspect of Dehnart's testimony. First, the baseball cap worn by Mr. Richardson on the Taco Bell surveillance video could not be identified. There was nothing distinct and no evidence of any particular color scheme. Second, no conclusions could be reasonably drawn from crime scene photographs because these photographs do not show a discernable logo and certainly do not show any particular or unique staining pattern. Accordingly, there is no evidence to support the State's conclusion that this particular baseball cap at the scene was either owned or worn by Mr. Richardson, and thus it cannot be used as corroboration of Dehnart's testimony.



Exs. 25, 168.

70.     To the extent that trial counsel failed to move for dismissal based on the State's failure to corroborate Dehnart's testimony, such a failure amounted to ineffective assistance of counsel. There is a reasonable probability that the outcome of this trial would have been different, specifically that Mr. Richardson would not have been convicted based on the testimony of an uncorroborated codefendant who pled guilty.

**Claim Twelve: Judicial Bias**

Mr. Richardson's convictions and death sentence are invalid under the federal constitution due to bias on the part of the trial court in not disclosing a benefit anticipated and received by Dehnart in exchange for his testimony. U.S. Const. amends. V, VI, VIII, & XIV. The court also suffered from bias during the state postconviction proceeding due to the existence of animosity between the court and postconviction counsel in connection with a judicial misconduct proceeding that was pending at the time of the state postconviction proceeding, and deference is accordingly unwarranted for contested findings made by the court. 28 U.S.C. § 2254(b)(b)(B)(ii) & 2254(d).

**Supporting Facts**

1.     Mr. Richardson was denied his constitutional right to due process because (a) the trial court (the Honorable Michelle Leavitt) did not disclose the existence of a benefit anticipated and received by Dehnart regarding concurrent sentencing with a California conviction; and (b) significant animosity existed between Judge Leavitt and Mr. Richardson's postconviction attorney, Dayvid Figler as the result of Attorney Figler's representation of Eugene Ross, a case before Judge Leavitt, that was pending at the time of Mr. Richardson's state postconviction proceedings. As a result, deference under the AEDPA is unwarranted as to the contested factual findings made by Judge Leavitt.

**A. The trial court demonstrated bias by failing to disclose its assurances to Dehnart that he would receive concurrent sentencing with his California conviction if he complied with the terms of his guilty plea agreement.**

2. On August 26, 2009, Mr. Richardson's co-defendant, Robert Dehnart, testified on behalf of the State as part of a plea agreement. *See* Claim Three(B), fully incorporated herein. Prior to his testimony, Dehnart pleaded guilty before Judge Leavitt. 7/28/09 Tr. at 1. Neither Mr. Richardson nor his trial counsel were present. *Id.*

3. During Dehnart's change of plea hearing, Judge Leavitt reviewed the conditions of the guilty plea agreement (GPA), which included a guilty plea to one count of first-degree murder and one count of robbery with a deadly weapon. Sentences were to be 20 to 50 years for the murder, a minimum 2 years on the robbery, and a minimum 2 years for the deadly weapon if Dehnart testified truthfully against Mr. Richardson, in accordance with the written plea agreement. *See* Ex. 91. Prior to Judge Leavitt conducting Dehnart's colloquy to determine if he was entering into the agreement knowingly, voluntarily, and intelligently, the following took place:

> MR. O'BRIEN:  Judge, Mr. [Dehnart] did ask me about what would be the posture—this case with the time he's doing in California, right now? I informed Mr. [Dehnart] that I believed that he would get concurrent time if he testified in a manner that he got the benefit of the deal—the benefit of the bargain detailed in the Guilty Plea Agreement.

| | | |
|---|---|---|
| THE COURT: | | Right. And *the attorneys did speak to me about that and I gave an indication—the State indicated that they would not propose any objection to that—* |
| MR. O'BRIEN: | | Okay. |
| THE COURT: | | *—and if you testify consistent with the agreement to testify and you testified truthfully I would see no reason why I would not grant you concurrent time.* |
| MR. O'BRIEN: | | Okay. |
| THE COURT: | | Does that answer your question |
| THE DEFENDANT: | | Yes it does. |

7/28/09 Tr. at 3–4 (emphasis added).

4.      The imposition of concurrent sentences was a significant benefit to Dehnart because he was sentenced to a total of twelve years in prison for the offense(s) in California (K-Mart robbery). *See* Ex. 189.  However, Mr. Richardson's trial counsel were unaware of this, as it was not contained in the GPA, nor were they present at Dehnart's change of plea hearing. At Mr. Richardson's trial, only the State and Judge Leavitt were aware that this new benefit was promised during Dehnart's change of plea hearing.

5.      During Dehnart's testimony as a State witness, Dehnart did not disclose this significant benefit:

| | | |
|---|---|---|
| Q: | | Sometime in the in the course of this case, the Las Vegas case, you obviously made a deal with the State of Nevada, the prosecutors? |
| A: | | Yes. |

307

| | | |
|---|---|---|
| Q: | And as you–as you sit here today can you explain what what the deal is. I mean, you're testifying on behalf or as a State's witness. |
| A: | Yes. |
| Q: | And what are you getting in exchange for that? |
| A: | I was to plead guilty to one count of first degree murder, and I was also to testify against Thomas Richardson and that I would receive a sentence between 24 and 80 years in prison. |
| Q: | Okay. And you don't have to give me the exact date, but when was that deal made? |
| A: | I think at the end of July. |
| Q: | Of this year? |
| A: | Of this year. |

8/26/09 Tr. at 70–71. Dehnart then proceeded to answer questions about the investigation surrounding the hammer. *Id.* Neither Judge Leavitt nor the State corrected Dehnart's failure to disclose the full extent of the benefits he received, or informed defense counsel that Dehnart had omitted a significant benefit.

6.      This prejudiced Mr. Richardson as a violation of *Napue v. Illinois*, 360 U.S. 264 (1959), as discussed in Claim Three(B). However, while *Napue* concerns the State's obligations, Judge Leavitt was also aware of the additional benefit, as she had agreed to bestow it upon Dehnart after his testimony. 7/28/09 Tr. at 6.

7.      At any point during Dehnart's testimony, Judge Leavitt could have ensured that Mr. Richardson's trial counsel and the jury were aware of the added benefit not contained in the written GPA. Yet, she failed to do so.

8.    Judge Leavitt's failure to disclose material impeachment evidence to Mr. Richardson demonstrates that she was unable to act as a fair and impartial arbiter at Mr. Richardson's trial

9.    The existence of judicial bias constitutes structural error that is prejudicial per se.

**B.    Animosity existed between Judge Leavitt and Mr. Richardson's state postconviction Attorney Dayvid Figler, as a result of Attorney Figler's representation of Eugene Ross; such animosity carried over from Ross's case to prejudice Mr. Richardson.**

**1.    Judge Leavitt failed to follow constitutional safeguards during Eugene Ross's trial despite Attorney Figler's objections.**

10.    Attorney Figler represented Mr. Richardson in state postconviction proceedings, as well as Eugene Ross at trial and on direct appeal.[11] *See Ross v. State*, 113 Nev. 1341, 2015 WL 5664891 (Sept. 23, 2015) (unpublished disposition). During Eugene's 2012 murder trial, Judge Leavitt had an emotional reaction to a defense witness speaking to a juror and attempted to hold her in contempt.  During the incident Judge Leavitt failed to follow constitutional safeguards and later received a public reprimand for her conduct from the Commission on Judicial Discipline. Ex. 136 at 29. *See generally,* Ex. 51 at 4 (citing *State v. Ross,* Eighth Jud. Dist. Ct. case number C221000-1).

---

[11] In order to avoid confusion between Eugene Ross and Kimberly Ross, who is Robet Dehnart's mother and Mr. Richardson's ex-girlfriend, Mr. Richardson will refer to Eugene Ross as Eugene and Kimberly Ross as Ross.

### a)   Gina Dotson, a defense witness, contacted a jury member.

11.   During Eugene's trial, Attorney Figler planned to call Eugene's mother, Gina Dotson, as a defense mitigation witness. Because Dotson's daughter, Toni Reed, who was also a defense witness, had not arrived at the courthouse; Dotson approached juror #1, Thomas Gyllenhammer, and asked to use his cell phone. Ex. 136 at 1. Gyllenhammer allowed Dotson to use his phone to call Reed. *Id.* at 29. Dotson then told Reed to come to court because the defense attorney needed her there. *Id.* at 29–33. Gyllenhammer was seated next to Dotson while Dotson was speaking with Reed. *Id.* at 29. The conversation took place within earshot of the rest of the jury. *Id.* at 28. Gyllenhammer, when questioned by Judge Leavitt, told the court that he heard the whole conversation between Dotson and Reed, including what Reed said through the telephone, and could identify Reed by her name *Id.* at 30. When Dotson then returned the phone to Gyllenhammer, Gyllenhammer asked her for a cigarette in exchange for using his phone. *Id.* at 25. Dotson responded that he "[could] have half" and broke a cigarette in two before handing him one half. *Id.*

12.   Cynthia Dustin, defense attorney for KC Coulter, Eugene's co-defendant, witnessed the interaction between Dotson and Gyllenhammer and reported it to Officer Trammell, Judge Leavitt's bailiff. Ex. 136 at 17. Officer Trammell, outside the presence of the jury, arrested Dotson. *Id.* at 5–6. Officer Trammell also confiscated Gyllenhammer's cell phone and gave it to Judge Leavitt.

### b)   Judge Leavitt's mishandling of Dotson's contempt hearing prejudiced the defendant and Attorney Figler.

13.    When Officer Trammell reported the incident to Judge Leavitt she became very agitated stating: "I'm—I'm beyond outraged. Beyond." Ex. 136 at 13. Judge Leavitt thereafter undertook a highly irregular "indirect contempt hearing" in the middle of Eugene's trial. *Id*. at 20. While Judge Leavitt may summarily punish contempt which she witnessed in court, contempt committed out of the court's view must be charged by affidavit. *See* Nev. Rev. Stat §§ 22.010; 22.030. Judge Leavitt did not request an affidavit describing the event from either Dustin or Officer Trammel and instead assumed the role of inquisitor. Judge Leavitt accused Dotson of indirect contempt and jury tampering. Ex. 136 at 13. Judge Leavitt's impromptu investigation swept in members of the defense team as witnesses against Dotson, whom they had planned to use in Eugene's defense.

14.    During the contempt hearing Daniel Bunin, Eugene's other defense attorney, told Judge Leavitt that he had contact with Dotson earlier that morning. Ex. 136 at 8. Dotson had asked to borrow his cellphone to call Reed. *Id*. Because Reed did not answer, Bunin told Dotson that he would take Reed's call if she called back. *Id*. at 9. Upon learning that Bunin had Reed's phone number stored in his cell phone, Judge Leavitt asked Bunin to approach the bench so that she could compare the number Dotson dialed on Bunin's phone to the one she dialed on Gyllenhammer's phone. *Id*. at 9–10, 14. Attorney Figler objected and asked for new co-counsel because Bunin had now become a witness. *Id*. at 10. Judge Leavitt did not rule on the objection. *Id*.

15.    Shortly thereafter, Gyllenhammer's phone, which Judge Leavitt was holding, began to ring and displayed Reed's phone number on the caller ID. *Id*. at 12. Judge Leavitt answered the phone and identified herself and asked who the caller was. *Id*. at 13. The caller hung up. Irritated, Judge Leavitt found what was happening "so outrageous I don't even know what to say." *Id*. at 14. After reviewing the events leading up to Dotson's arrest, Judge Leavitt admitted Dotson into the courtroom for questioning. *Id*. at 19.

16.    Attorney Figler objected to Judge Leavitt questioning Dotson and requested that she be appointed an attorney. Judge Leavitt refused:

| | |
|---|---|
| Attorney Figler: | ". . .I don't feel comfortable with you asking her any questions[,]" |

. . . .

| | |
|---|---|
| Attorney Figler: | ". . .doesn't she have the right to an attorney if she chooses?" |

. . . .

| | |
|---|---|
| Attorney Figler: | "I think before she answers any questions she should be appointed an attorney." |

. . . .

| | |
|---|---|
| Judge Leavitt: | "Okay. I'm not appointing." |

Ex. 136 at 20.

17.    The State echoed Attorney Figler's request that Judge Leavitt appoint an attorney because "she's probably going in."[12] *Id*. at 20. Judge Leavitt again

---

[12] It is important to note the State's comments "expecting" Dotson to be held in custody were improper, as Dotson was scheduled to testify for the defense. It was in the State's interest to capitalize on Judge Leavitt's anger with a defense witness.

1   refused to appoint counsel, stating she did not want to delay Eugene's trial by

2   having to wait for a public defender to appear for Dotson.

3      18.   Judge Leavitt also misconstrued the statute under which Dotson was

4   to be charged with contempt by altering the interpretation of "immediate view":

> Judge Leavitt:   Well, it says, [u]nless contempt is
>                  committed in the immediate view and
>                  presence of the [c]ourt, meaning ocular
>                  view of the [c]ourt. . .the charge must
>                  be made by affidavit and the
>                  contemptor given the right to show
>                  cause why he should not be
>                  punished. . .
>
> Attorney Figler:   That's the gray area.
>
>                    . . . .
>
> Judge Leavitt:   Well, yeah, that's what I'm saying, or
>                  which I have direct knowledge. Clearly
>                  I have direct knowledge because
>                  [Officer Trammell]'s an extension of
>                  the [c]ourt. I mean he's supposed to be
>                  my person.
>
> Attorney Figler:   That's not ocular.

*Id* at 22; *see also* Nev. Rev. Stat. § 22.030; *see also* Nev. Rev. Stat § 22.010(6).

17      19.   Eventually, Judge Leavitt acquiesced and appointed counsel when

18   Attorney Figler stated that she had also raised the possibility of a jury tampering

19   charge, which could be brought by the district attorney's office. *Id*. at 21–22, 24.

20   Judge Leavitt scheduled a hearing on Ms. Dotson's contempt charges the following

21   morning at 10:00AM and remanded Doston pending that hearing. There is no

22   record that Dotson had the opportunity to argue for release or bond. *Id*.

23

20.     The record does not indicate that Dotson appeared before Judge Leavitt as scheduled and instead made her first appearance ten days later, on February 2, 2012. *See* Ex. 137 at 1 (reproduced in *Ross v. State*, NSC #62444, XIX AA 4481). On that date, Dotson appeared in court represented by Alzora Jackson from the office of the Special Public Defender. *Id.*

21.     Attorney Jackson challenged Judge Leavitt's handling of the contempt hearing, noting the judge had not complied with Nev. Rev. Stat. § 22.030 because the incident was not in immediate view of the court. *Id.* at 12. Judge Leavitt responded that the interpretation of "immediate view" was an open question. *Id.* Ultimately, Jackson secured Dotson's release. *Id.* at 11.

### c)   Judge Leavitt's mishandling of Dotson's contempt proceeding led to a public reprimand by the Nevada Judicial Discipline Commission.

22.     Following Eugene's trial, Dotson filed a complaint against Judge Leavitt with the Commission for Judicial Discipline.[13] The complaint alleged violations of Judicial Canon Rule 1.1 (failure to comply with the law, including the Code), Judicial Canon Rule 2.2 (failure to uphold and apply the law), Rule, 2.5(A) (failure to perform judicial duties competently and diligently), Rule 2.12(A) (failure to require judicial staff to act in a manner consistent with the judge's obligation under the Code), and 2.16(A) (failure to be candid and honest with disciplinary agency). Ex. 52 at 2.

---

[13] Complaints and investigative materials held by the Commission are confidential. *See* Nev. Rev. Stat. 1.4683 *et seq.* Undersigned counsel relies on the published findings of the Commission. As such, it is unclear whether Dotson was assisted by counsel in filing the complaint with the Commission.

23.    Of particular importance to the strained and acrimonious relationship between Attorney Figler and Judge Leavitt was the Commission's finding that Judge Leavitt had not been honest in responding to the Commission's inquiries:

> While providing answers or responses to the Commission as a Respondent in these proceedings:
>
> (a) failing to be honest with the Commission by stating words to the effect, or which led the Commission to believe, that on January 24, 2012 in case# 06-C221000, *State v. Eugene Ross et al.*, over which the Respondent was presiding, there was sworn testimony to the facts of Complainant Gina M. Dotson's interaction with jurors outside the courtroom;
>
> (b) failing to be honest with the Commission by stating words to the effect, or which led the Commission to believe, the Respondent fully advised Complainant Dotson of the underlying factual basis leading to her incarceration on a contempt charge;
>
> (c) failing to be honest with the Commission by stating words to the effect, or which led the Commission to believe, that counsel from the Public Defender's Office was immediately appointed and advised of Complainant Dotson's status as an incarcerated person and the reasons for the incarceration and
>
> (d) failing to be honest with the Commission by stating words to the effect, or which led the Commission to believe, a complaint was filed forthwith against Complainant Dotson pursuant to NRS 22.030.

Ex. 52 at 3.

24.    Judge Leavitt ultimately admitted to each of these allegations. *Id.* The Commission found that Judge Leavitt failed to provide Dotson with the appropriate procedural safeguards, such as allowing Dotson time to respond to the contempt allegations or to seek release on bail. *Id.* at 2–3.

25.    Judge Leavitt's conduct with respect to Dotson and misreading of the statute prejudiced Attorney Figler's defense of Eugene, as Dotson was a planned defense witness. By the end of Eugene's trial Attorney Figler and Judge Leavitt had a contentious and fraught relationship. The tension created by Judge Leavitt's handling of Dotson followed Attorney Figler as he proceeded through Eugene's appeal and began Mr. Richardson's postconviction proceeding.

### 2.    Attorney Figler's Argumentative Briefing in connection with Eugene's case and in his recusal motion filed in this case created a risk of bias that prejudiced Mr. Richardson.

26.    At the time of the Commission's order and public reprimand, Eugene's case was pending on appeal before the NSC. *See Ross v. State*, 113 Nev. 1341, 2015 WL 5664891 (Sept. 23, 2015) (unpublished disposition). The NSC ordered supplemental briefing on the issue of Judge Leavitt's public reprimand as it pertained to Eugene's case. Ex. 53; 8/27/15 Tr. at 5.

27.    Pursuant to the NSC's order, Attorney Figler filed a supplemental brief. *See* Ex. 54. In his supplemental brief, Attorney Figler presented arguments against Judge Leavitt, including accusations that were not part of the Commission's findings. Attorney Figler lead the brief with the implication that Judge Leavitt was not being honest about her impartiality.

28.    Attorney Figler accused Judge Leavitt of making "gratuitous proclamations". Ex. 54 at 5–6. In addition, he repeatedly called into question her honesty and impartiality:

> . . .Judge Leavitt failed to be honest about ANY determination of contemptible conduct attributable to Ms. Dotson.

*Id.* at 8 (capitalization in original);

> ". . .it is clear in light of the Public Reprimand that Judge Leavitt was never going to even *consider it* given Judge Leavitt's willingness to even make false representations *about it* to the Judicial Discipline Committee."

*Id.* at 10 (emphasis and capitalization in original).

29.    Following supplemental briefing in Eugene's appeal, Attorney Figler moved Judge Leavitt to recuse herself from Mr. Richardson's case under Nev. Rev. Stat. § 1.230. Ex. 51. Attorney Figler argued that because of his involvement in challenging Judge Leavitt during Dotson's contempt hearing and his characterization of her conduct in his supplemental briefing, Judge Leavitt may hold animus towards him, and by extension Mr. Richardson. 8/27/15 Tr. at 5; Ex. 51 at 4–5. Attorney Figler also noted that because Judge Leavitt's honesty was called into question by her conduct before the Commission, she might harbor animus towards him and by extension Mr. Richardson. Attorney Figler continued his arguments against Judge Leavitt in his motion for recusal:

> ". . .Judge Leavitt has not been required to explain undisputed lapses of honesty in [Eugene Ross's] case. . .[p]etitioner believes there is at least an implied bias/appearance of impropriety for this sanctioned judge to continue to hear his death penalty matter"

Ex. 51 at 6.

30.    A reasonable observer would conclude that Judge Leavitt and Attorney Figler had a fraught and contentious relationship during Mr. Richardson's postconviction proceedings. Judge Leavitt was agitated during Dotson's contempt

hearing on January 24, 2012, and an observer could reasonably attribute her agitation in part to Attorney Figler's conduct in court.

31.     The subsequent public reprimand from the Commission contain findings that would cause the average jurist in Judge Leavitt's position to harbor bias against Figler, given his arguments in the supplemental briefs filed in Eugene's appeal before the NSC, and in Mr. Richardson's case, where he alleged Judge Leavitt's "dishonesty" before the Commission. This difficult relationship created a bias or a risk of bias against Attorney Figler and Mr. Richardson. *See Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971) ("insulting attack upon the integrity of the judge [carried] such potential for bias as to require disqualification") (cleaned up).

32.     Deference under the AEDPA is not warranted as to contested findings made by the court during the state postconviction proceeding. The existence of bias/partiality by the postconviction court is a circumstance that renders the state corrective process ineffective to protect Mr. Richardson's constitutional rights. 28 U.S.C. § 2254(b)(1)(B)(ii). Deference to the factual findings of the court is also unwarranted under 28 U.S.C. § 2254(d).

**Claim Thirteen: Death Penalty**

Mr. Richardson's convictions and death sentence are invalid under state and federal constitutional guarantees of due process, equal protection, a fair trial, and a reliable sentence because Nevada's capital sentencing scheme and the death penalty are unconstitutional. U.S. Const. amends. V, VI, VIII, XIV; Nev. Const. Art. 1 §§ 3, 5, 6, 8, 9, 10, 15, 18; Nev. Const. Art. 4, § 21.

**Supporting Facts**

### A.   Nevada's capital sentencing scheme is unconstitutionally vague.

1.   The Nevada Supreme Court announced in *Castillo v. State*, 442 P.3d 558 (Nev. 2019), that the weighing of aggravators against mitigation is not part of the death-eligibility determination under Nevada law. The Court's unforeseeable and retroactive judicial expansion of narrow and precise statutory language defining death-eligibility violates the fair-notice requirements of the Due Process Clause. In the alternative, the Court's holding in *Castillo* reveals an inherent vagueness in the statute that also violates federal due process principles and the Eighth Amendment. The Court's new interpretation of the capital sentencing scheme independently violates Mr. Richardson's right to a jury trial by holding that the outweighing finding walks him back to death eligibility, rather than advances him away from it.

319

1

2

### 1. The Nevada Supreme Court's recent decisions represent a sharp divergence from Nevada Statutes and its own precedent.

3

4          2.          The proper interpretation of Nevada's death-penalty scheme over the

5     last four decades has been the subject of sharp disagreement by the members of the

6     Nevada Supreme Court. *See Canape v. State*, 888, 859 P.2d 1023, 1038 (Nev. 1993)

7     (Springer, J., dissenting) ("I have become convinced that no one, including the

8     members of this court, presently understands precisely what juries are required to

9     do in Nevada when they are asked to decide between the death penalty and life

10    imprisonment"). But capital defendants could at least rely on the Nevada Supreme

11    Court's consistent enforcement of one aspect of the scheme—the requirement that

12    juries consider death as an option only *after* concluding that mitigating evidence

13    does not outweigh any statutory aggravating factors. Thus, as the Nevada Supreme

14    Court has held repeatedly over three decades—a capital defendant is not "death

15    eligible" unless the outweighing determination favored the State. Starting in 2015,

16    however, and without explicitly acknowledging the departure, the Nevada Supreme

17    Court began to sharply diverge from the statutes and its prior precedents. In

18    addition to disregarding *stare decisis* without "compelling reasons for so doing," the

19    Court usurped the power of the Nevada legislature by rewriting the plain language

20    of the capital sentencing scheme. *Miller v. Burk*, 188 P.3d 1112, 1124 (Nev. 2008);

21    *see also State v. Harte*, 194 P.3d 1263, 1268 (Nev. 2008) (Hardesty, J., concurring).

22

23

1

2

         **a)**      **For more than three decades, the Nevada Supreme Court's opinions were aligned with the plain language of the capital-sentencing scheme.**

3         3.     Nevada statutes establish a capital-sentencing scheme with two

4  preliminary steps, which are required before the jury can consider whether to

5  impose the death penalty. The jury must (1) find at least one statutory aggravating

6  factor, and (2) determine that no mitigating circumstances outweigh that

7  aggravating factor or factors. *See* Nev. Rev. Stat. §§ 175.554, 200.030(4)(a). Only

8  after the jurors complete these two preliminary steps can they move to the third

9  step, where they for the first time consider non-statutory aggravation and other-

10  matter evidence relating to the individual characteristics of the defendant. *See* Nev.

11  Rev. Stat. § 175.552(3); *Burnside v. State*, 352 P.3d 627, 646 (Nev. 2015); *Butler v.*

12  *State*, 102 P.3d 71, 82–83 (Nev. 2004). These statutes work together because it

13  makes little sense to include a third step that merely duplicates the considerations,

14  arguments, and evidence from the second step.

15         4.     For thirty-five years, opinions from the Nevada Supreme Court

16  followed the plain language of these statutes, consistently holding that the finding

17  of an aggravating factor and the outweighing determination are *both* prerequisites

18  to death eligibility. In 1984, the Court explained that "the death penalty may be

19  imposed" only if mitigating factors do not outweigh aggravating factors. *Ybarra v.*

20  *State*, 679 P.2d 797, 802 (Nev. 1984); *see also Gallego v. State*, 711 P.2d 856, 862

21  (Nev. 1985). And in two cases the following decade, the Court held that the death

22  penalty "is only a sentencing option" if aggravating factors outweigh mitigating

23

1    circumstances. *Bennett v. State*, 901 P.2d 676, 683 (Nev. 1995); *see Williams v.*

2    *State*, 945 P.2d 438, 447 n.8 (Nev. 1997).

3         5.    Over the following twenty years, the Nevada Supreme Court continued

4    to characterize the outweighing determination as an "eligibility" finding that was

5    required before consideration of the death penalty. *See McConnell v. State*, 107 P.3d

6    1287, 1292 (Nev. 2005); *see also Johnson v. State*, 59 P.3d 450, 460 (Nev. 2002),

7    *overruled on other grounds by Nunnery v. State*, 263 P.3d 235 (Nev. 2011); *Servin v.*

8    *State*, 32 P.3d 1277, 1285 (Nev. 2001); *Hollaway v. State*, 6 P.3d 987, 996 (Nev.

9    2000); *Middleton v. State*, 968 P.2d 296, 314–15 (Nev. 1998).

### b)    In 2015, the Nevada Supreme Court began departing from its precedents and the statutory sentencing scheme.

12         6.    In a series of three opinions over four years, *Lisle*, *Jeremias*, and

13    *Castillo*, the Nevada Supreme Court abandoned its precedents *sub silentio* and

14    departed from the plain language of the statutes, purportedly removing

15    outweighing from the eligibility determination.

16         7.    The Nevada Supreme Court began its departure from the statutes in

17    *Lisle v. State*, 351 P.3d 725 (Nev. 2015). For the first time, the Court characterized

18    the outweighing determination in Nevada as one of selection rather than eligibility,

19    holding that outweighing is "part of the individualized consideration that is the

20    hallmark of what the Supreme Court has referred to as the selection phase of the

21    capital sentencing process." *Id.* at 732. But the Court further explained, in saying

22    that Nevada's outweighing process was part of the "selection phase," it was

23    referring to the definition given that phrase by the Supreme Court in *Sawyer v.*

*Whitley*, 505 U.S. 333, 343 (1992), which was a case interpreting Louisiana's capital

sentencing scheme, not the scheme enacted by the Nevada Legislature. *Lisle*, 351

P.3d at 732–33.[14] And the Nevada Supreme Court continued to recognize, as it had

for the previous thirty years, that "death-eligibility" in Nevada refers to *both*

preliminary determinations—which, the Court explained, "stems from a relatively

unique aspect of Nevada law that precludes the jury from imposing a death

sentence if it determines that the mitigating circumstances are sufficient to

outweigh the aggravating circumstance or circumstances." *Id.* at 732; *see also*

*Burnside*, 352 P.3d at 646 (in a decision issued same day as *Lisle*, the court

continued to recognize three-step sentencing scheme in Nevada). Nevertheless, this

holding provoked a strong dissent from two Justices, accusing the majority of

engaging in "semantic gymnastics in order to conclude that Nevada's death penalty

scheme is something other than what the statutes plainly make it." *Lisle*, 351 P.3d

at 735 (Cherry & Saitta, JJ., dissenting). The dissenting opinions recognized the

key difference between Nevada's statutory sentencing scheme and the scheme at

issue in *Sawyer*—that the plain language of Nevada's scheme requires outweighing

as a precondition to reaching the ultimate sentencing decision. *See id.* Ignoring this

difference, the dissent concludes, transforms Nevada's scheme into something

different than the statutes require. *Id.*

      8.     In *Jeremias*, the Nevada Supreme Court doubled down on its

statement from *Lisle*, purportedly removing outweighing completely from the

---

[14] In *Sawyer v. Whitley*, as in *Lisle*, the United States Supreme Court addressed actual innocence of the death penalty. Neither case addressed the Sixth Amendment.

eligibility determination. *See Jeremias v. State,* 412 P.3d 43 (Nev. 2018). "[A] defendant is death-eligible," the Court newly held, "so long as the jury finds the elements of first-degree murder and the existence of one or more aggravating circumstances." *Id.* at 54. But the Court still qualified its holding, adding that its use of "death-eligibility" came from Eighth Amendment narrowing case law, not Sixth Amendment case law. *See id.* (explaining that the use of "death-eligible" is "as the term is used for the purposes of the narrowing requirement amenable to the beyond-a-reasonable-doubt standard").

9.      Finally, in *Castillo*, the Nevada Supreme Court completed what it started in *Lisle* and *Jeremias*, reading the outweighing step out of existence. The Court insisted that "the weighing of aggravating and mitigating circumstances is not part of death-eligibility under [Nevada's] statutory scheme." *Castillo*, 442 P.3d at 561. In support, the Court cited only to *Jeremias* and *Lisle*—ignoring its previous cases holding the exact opposite. *See id.* And, unlike *Jeremias* and *Lisle*, the Court did not qualify its use of the term "death-eligible" to refer to the definition of the term from Eighth Amendment cases.

10.     Thus, in the past seven years, the Nevada Supreme Court has disrupted decades of precedent in a way that fundamentally misinterprets what Nevada juries are supposed to do when undertaking one of the most crucial and grave determinations any jury could make. This disruption was completely unnecessary, done not to rectify confusion in the statutes, but to reject constitutional claims that could have been resolved without fundamentally changing the statutory scheme. *See Lisle*, 351 P.3d at 735 (Cherry & Saitta, JJ.,

dissenting); *see also Castillo*, 442 P.3d at 561 n.1 (noting "apparent confusion" caused by recent changes in the NSC's precedent).[15]

### 2. The Nevada Supreme Court's unforeseeable expansion of narrow and precise statutory language defining death eligibility cannot be applied retroactively to cases on collateral review.

11.     Prior to the Nevada Supreme Court's decision in *Lisle*, 351 P.3d 725, there was no question that the weighing of aggravators against mitigation was part of the death-eligibility determination under Nevada law. The plain language of the statute said that it was. *See* Nev. Rev. Stat. §§ 175.554, 200.030(4)(a). And the Nevada Supreme Court said that it was. *See Ybarra,* 679 P.2d at 802. Repeatedly. *See McConnell,* 107 P.3d at 1292; *Servin*, 32 P.3d at 1285; *Hollaway*, 6 P.3d at 996; *Middleton*, 968 P.2d at 314–15; *Williams*, 945 P.2d at 447 n.8; *Bennett*, 901 P.2d at 683.

12.     Most unequivocally, the Nevada Supreme Court held in 2002 that

> Nevada statutory law requires two distinct findings to render a defendant death-eligible: "The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." This second finding regarding mitigating circumstances is necessary to authorize the death penalty

---

[15] The Nevada Supreme Court rejected "Castillo's argument that he should be permitted to take advantage of the apparent confusion caused by our lack of precision when using the term 'eligibility.'" *Castillo*, 442 P.3d at 561 n.1. But this just shows why the NSC should not be reinterpreting the capital sentencing scheme when this case concerns the application of the Sixth Amendment. Further, in *Lisle*, the parties did not have an opportunity to brief the issues above. And interpretation of the capital sentencing scheme was not necessary there—or in *Jeremias* or *Castillo*.

in Nevada, and we conclude that it is in part a factual
determination, not merely discretionary weighing.

*Johnson*, 59 P.3d at 460 (quoting Nev. Rev. Stat. § 175.554(3)).

13.    The holdings in *Lisle*, *Jeremias*, and *Castillo* were unexpected and indefensible in light of prior precedent, and the holdings violate state and federal due process principles. As the dissent in *Lisle* pointed out, the Nevada Supreme Court had "for decades unequivocally and consistently followed this straightforward interpretation of Nevada's death penalty scheme." *Lisle*, 351 P.3d at 731 (Cherry & Saitta, JJ., dissenting). There can be no question that when the Court affirmed Mr. Richardson's conviction in 2012, its precedents unequivocally held that the weighing process was part of the eligibility determination in Nevada.

14.    Holding this judicial change in the law against Mr. Richardson—despite the state of the law at the time of his conviction and direct appeal—would overlook or misapply controlling United States Supreme Court precedent. The High Court in *Bouie v. City of Columbia* held that "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." 378 U.S. 347, 354 (1964). This is so because "[w]hen [an] unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." *Id*. The Court reiterated in *Rogers v. Tennessee* that "[d]ue process prohibits the retroactive application of judicial interpretations of criminal statutes that are

1    'unexpected and indefensible by reference to the law which had been expressed

2    prior to the conduct in issue.'" 532 U.S. 451, 461 (2001).

3        15.    The Nevada Supreme Court's newly minted interpretation of Nevada

4    law in *Lisle* satisfies this standard, as it "was clearly at odds with the statute's plain

5    language and had no support in prior [Nevada] decisions." *Id.* at 458.  As the dissent

6    acknowledged in *Lisle*, the Court "engage[d] in semantic gymnastics in order to

7    conclude that Nevada's death penalty scheme is something other than what the

8    statutes plainly make it." *Lisle,* 351 P.3d at 735. The error committed by the Court

9    here falls under *Bouie* rather than *Rogers* because the rule derives from a statute

10   passed by the Legislature rather than a common law doctrine that can be refined by

11   judicial interpretation. *Cf. Metrich v. Lancaster*, 569 U.S. 351, 365 (2013) (state

12   supreme court "did not violate due process" when it interpreted "an unambiguous

13   statute" "for the first time" (quotations omitted)).

14       16.    Just as the change in law announced by the South Carolina Supreme

15   Court in *Bouie* could not be applied retroactively, neither can the Nevada Supreme

16   Court's change in the law announced in *Lisle* be applied retroactively to cases that

17   became final prior to 2015. Petitioners like Mr. Richardson did not have fair notice

18   at the time of their convictions that the finding of an aggravator alone was

19   sufficient to make them eligible for the death penalty. *See, e.g., United States v.

20   Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel

21   construction of a criminal statute to conduct that neither the statute nor any prior

22   judicial decision has fairly disclosed to be within its scope." (internal citations

23   omitted)); *Marks v. United States*, 430 U.S. 188, 191–92 (1977) (explaining due

327

process protects against judicial infringement of the "right to fair warning" that certain conduct will give rise to criminal penalties); *Douglas v. Buder*, 412 U.S. 430, 432 (1973) (per curiam) (holding trial court's construction of the term "arrest" as including a traffic citation, and application of that construction to defendant to revoke his probation, was unforeseeable and thus violated due process); *Rabe v. Washington*, 405 U.S. 313, 316 (1972) (per curiam) (reversing conviction under state obscenity law because it did "not giv[e] fair notice" that the location of the allegedly obscene exhibition was a vital element of the offense).

17.     The Eleventh Circuit in *Magwood v. Warden, Alabama Dept. of Corrections* held that an unforeseeable and retroactive judicial expansion of precise statutory language in Alabama's death-penalty statutes which altered the standards for death eligibility violated federal due process under *Bouie* and *Rogers*. 664 F.3d 1340, 1348–49 (11th Cir. 2011). Similarly, the Nevada Supreme Court's expansion in *Lisle* of the definition of precise statutory language defining death eligibility violates the fair-warning requirement of the Due Process Clause. Accordingly, the Nevada Supreme Court cannot apply its reinterpretation of death eligibility under Nevada law to defendants like Mr. Richardson whose convictions became final prior to 2015.

18.     Instead, the Nevada Supreme Court and this Court must apply the law as it existed at the time Mr. Richardson's conviction became final. Clearly, in 2012 when his conviction became final, the weighing process was part of the death eligibility determination. And applying the decision in *Hurst* to Nevada law as it existed in 2012, Mr. Richardson is entitled to relief.

19.     The Supreme Court in *Hurst v. Florida* for the first time applied the Sixth Amendment to a capital sentencing system in a "weighing state," like Nevada, where the jury must find that mitigation evidence does not outweigh aggravating factors in order to find the defendant eligible for death. 577 U.S. 92 (2016). And in *Hurst* the Court recognized for the first time that this "outweighing" requirement is an "element" of a capital sentence that must be submitted to the jury and proven beyond a reasonable doubt. *Id.* at 97–98 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000)); *see Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) ("[T]he jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt"). With that recognition, the Court imported into weighing states fundamental constitutional guarantees at the penalty phases of capital murder trials. Among those fundamental protections is the constitutional imperative that the State prove every statutory element of death eligibility beyond a reasonable doubt.

20.     In light of *Hurst*, which applies retroactively, the trial court was required to give Mr. Richardson's jury a clear instruction that, in order to find him eligible for the death penalty, the prosecutor must prove that there are insufficient mitigating circumstances to outweigh the aggravating circumstances *beyond a reasonable doubt*.

21.     During the eligibility stage of the penalty phase, the trial court instructed the jurors to weigh mitigating evidence against any aggravating factors.[16] But the court failed to instruct the jury that it could only find Mr.

---

[16] Ex. 24 at 7.

329

Richardson eligible for the death penalty if the mitigating evidence did not outweigh the aggravating evidence beyond a reasonable doubt.[17]

22.    An error with respect to the constitutional standard of proof beyond a reasonable doubt is structural error and prejudicial per se. In the alternative, the absence of the required instruction was an error that was not harmless beyond a reasonable doubt.

### 3.    The Nevada Supreme Court's unforeseeable expansion of the narrow and precise statutory language defining death eligibility has rendered the statute unconstitutionally vague.

23.    As discussed above, until recently, the law governing the weighing of aggravating and mitigating circumstances has been clear, at least with respect to the role of the outweighing finding in the capital sentencing scheme. The Nevada Supreme Court's departure from that law has created two vagueness problems that render the statute unconstitutional.

24.    First, the Eighth Amendment prohibits the use of "vague propositional factor[s]" in the sentencing decision. *See Tuilaepa v. California*, 512 U.S. 967 (1994). The reason is that the Supreme Court's entire death penalty jurisprudence is aimed at ending "arbitrary and capricious sentencing." *See id.* A vagueness challenge under the Eighth Amendment asserts that "the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leave them and appellate courts with the kind of open-ended discretion

---

[17] *See generally id.*

which was held invalid in *Furman v. Georgia*." *Maynard v. Cartwright*, 486 U.S. 356, 361–62 (1988).

25.     Nevada law is without ambiguity: "The jury may impose a sentence of death *only* if it finds at least one aggravating circumstance and *further finds* that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." Nev. Rev. Stat. § 175.554 (emphasis added). Thus, the statutory language requires two findings. *Johnson*, 59 P.3d at 460, is also without ambiguity:  "This second finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and *we conclude that it is in part a factual determination, not merely discretionary weighing*." *Id.* (emphasis added). This language also makes clear two findings are required.

26.     Against this is the Nevada Supreme Court's recent decision in *Castillo*, which held that "the weighing of aggravating and mitigating circumstances is not part of death-eligibility under our statutory scheme." 442 P.3d at 561. This directly contradicts the statute and the Nevada Supreme Court's prior case law.

27.     Taking *Castillo* as law, the statutory scheme must be vague because the Nevada Supreme Court has taken two opposite positions on its meaning. And these two opposite readings of death eligibility must also mean that the jury in Mr. Richardson's case were not adequately informed on what they needed to find in order to impose the death penalty. The Court's rulings show that some jurors likely interpreted weighing as an eligibility finding, while others may have interpreted it as a selection finding. If the Nevada Supreme Court can interpret the statutory

331

scheme one way for thirty years, then interpret it entirely differently, it must follow that lay jurors would experience the same problem.

28.     This distinction matters. Under *Holloway*, 6 P.3d 987, the Nevada Supreme Court held that "other matter" evidence could be considered as part of sentence selection, but not for eligibility. *Id.* at 997; *see also* Nev. Rev. Stat. § 175.552(3). However, the language in *Castillo* now calls the jury instructions the Nevada Supreme Court has carefully crafted over the years into doubt: "Although the relevant statutes provide that a jury cannot impose a death sentence if it concludes the mitigating circumstances outweigh the aggravating circumstances, that provision guides jurors in exercising their discretion to impose a sentence to which the defendant is already exposed . . . ." *Castillo*, 442 P.3d at 561 (internal citations omitted). If, as the *Castillo* opinion indicates, weighing is no longer part of the eligibility determination, weighing is also no longer part of the narrowing function. *See Holloway*, 6 P.3d at 996. This, in turn, calls into question the Nevada Supreme Court's conclusion that "other matter" evidence may not be considered as part of the weighing process. *Id.* ("Under Nevada's statutory sentencing scheme, the State can offer this evidence for only one purpose: for jurors to consider in deciding on an appropriate sentence after they have determined whether the defendant is or is not eligible for death").

29.     The conflict between *Holloway* and *Castillo* shows the vagueness now present in Nevada's death penalty scheme. This lack of clarity invites jurors to do what *Furman*—and the Nevada Legislature—sought to prevent: impose death arbitrarily. *See Holloway*, 6 P.3d at 996 (describing how "Nevada Legislature passed

and the Governor approved Senate Bill No. 220" to "implement [the] narrowing function" required by Constitution). Because the NSC's reading of Nev. Rev. Stat. § 175.554 does not channel the arbitrary and capricious imposition of death, the statute is unconstitutionally vague under the Eighth Amendment.

30.     Second, the Fourteenth Amendment forbids statutes that fail to convey what they prohibit. "As generally stated, the void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The requirement for clarity is enhanced in criminal statutes. *See United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009). Though the language of Nev. Rev. Stat. § 175.554, and the Nevada Supreme Court's prior precedent, has been clear, the Nevada Supreme Court's deviation from that language has created irreconcilable vagueness. Indeed, the Court's apparent propensity to disagree with itself about this language can only reflect a vagueness in the statute. For, if the Nevada Supreme Court cannot agree with its prior interpretation, an ordinary person cannot be expected to know how a capital defendant becomes death eligible. Because the statute is now vague under the Fourteenth Amendment's due process clause, Mr. Richardson's death sentence is unconstitutional.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

> **4.     The Nevada Supreme Court's reinterpretation of the capital sentencing scheme violates Mr. Richardson's right to a jury trial as jurors make findings; they do not "walk back" findings.**

31.     In an attempt to avoid the above conflict with the *Apprendi* line of cases, the Nevada Supreme Court reformulated Nevada's capital-sentencing scheme by reversing the legal effect of the outweighing finding. This new formulation requires the jury, instead of determining whether mitigating evidence outweighs aggravating factors as a prerequisite to considering death, to use the outweighing determination to "walk-back" a death-eligibility finding to a life sentence. *See Castillo*, 442 P.3d at 561. This reformulation conflicts with a second line of United States Supreme Court precedent applying the Sixth Amendment and demands Mr. Richardson receive relief.

32.     The United States Supreme Court first considered in *Andres v. United States* the interpretation of a statute that required jurors to "walk back" a sentence of death to a sentence of life. 333 U.S. 740 (1948). The federal death-penalty statute at the time, 18 U.S.C. § 567, allowed jurors to "qualify" a guilty verdict by adding "without capital punishment." *Id.* at 742 n.1 (quoting 18 U.S.C. § 567). If the jury did not qualify the guilty verdict, the death penalty was automatic. *Id.* The Court rejected a construction of the statute "whereby a unanimous jury must first find guilt and then a unanimous jury alleviate its rigor." *Id.* at 748–48. Instead, the Court explained, the jury must decide unanimously on guilt and then decide unanimously between life imprisonment and death. *Id.*

33.     Next, in *Mullaney v. Wilbur*, the United States Supreme Court considered a Maryland statute that required a defendant prove he acted "'in the heat of passion on sudden provocation' in order to reduce . . . homicide to manslaughter," *i.e.*, to "walk back" a homicide to manslaughter by proving an affirmative defense. 421 U.S. 684, 684–85 (1975). The Court addressed two aspects of the Maryland statute: (1) the defendant had the burden of proving heat of passion, and (2) the statute did not require proof beyond a reasonable doubt. *Id.* at 696–701. Because the absence of heat of passion significantly increased the defendant's potential sentence the Court concluded that both aspects of the Maryland statute violated due process. *Id.* "This is an intolerable result," the Court explained, "in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter." *Id.* at 703–04.

34.     The Court also rejected an argument that the burden should remain with the defendant "because of the difficulties in negating an argument that the homicide was committed in the heat of passion." *Id.* at 701. "No doubt this is often a heavy burden," the Court acknowledged, but "[t]he same may be said of the requirement of proof beyond a reasonable doubt of many controverted facts in a criminal trial." *Id.* The Constitution requires the State prove the absence of heat of passion beyond a reasonable doubt, as "this is the traditional burden which our system of criminal justice deems essential." *Id.*

35.     In combination, *Andres* and *Mullaney* show that the construction of Nevada's death-penalty statutes given by the Nevada Supreme Court violates Mr.

Richardson's constitutional right to a jury verdict. The outweighing determination is a prerequisite to the jury considering a death sentence. *See Lisle*, 131 Nev. at 366, 351 P.3d at 732. And it violates the Due Process Clause and the Eighth Amendment to make this requirement an afterthought for the jury, used only to lessen a death sentence to life imprisonment. *See Mullaney*, 421 U.S. at 703–04.[18]

36.     This error was structural, and thus not harmless. In the alternative, this error had a substantial and injurious effect on the outcome of the proceeding.

### B.     Nevada's lethal-injection protocol is unconstitutional.

37.     Nevada law requires that the State execute condemned inmates by injecting a lethal drug. *See* Nev. Rev. Stat. § 176.355(1).

#### 1.     Lethal injection is unconstitutional in all circumstances.

38.     "[E]volving standards of decency that mark the progress of a maturing society," along with an ever-expanding list of botched executions, compel the conclusion that lethal injection as a means of execution can never satisfy the demands of the Eighth Amendment. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958). Although there is Supreme Court authority to the contrary, *see, e.g., Glossip v. Gross,* 576 U.S. 863 (2015); *Baze v. Rees*, 553 U.S. 35 (2008), these cases resulted in sharply divided opinions. In addition, the Supreme Court decided the cases without the benefit of factual development by the district court regarding the numerous

---

[18] Allowing the jurors, as an act of mercy, to walk back a death sentence to life imprisonment also lessens their sense of personal responsibility, in violation of the Eighth Amendment. *See Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985).

executions in recent years, using various drug combinations, that resulted in prolonged pain and suffering.

39.     Those instances of botched lethal injections include the following:

● Charles Brooks, Jr. (December 7, 1982, Texas): The executioner had a difficult time finding a suitable vein. The injection took seven minutes to kill. Witnesses stated that Brooks "had not died easily." *See* Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us*, 63 Ohio St. L.J. 63, 139 (2002) [hereinafter "Denno I"]; Deborah W. Denno, *Getting to Death: Are Executions Unconstitutional?* 82 Iowa L. Rev. 319, 428–29 (1997) [hereinafter "Denno II"].

● James Autry (March 14, 1984, Texas): Autry took ten minutes to die, complaining of pain throughout. Officials suggested that faulty equipment or inexperienced personnel were to blame. *See* Denno II, *supra*, at 429; Denno I, *supra*, at 139.

● Thomas Barefoot (October 30, 1984, Texas): A witness stated that after emitting a "terrible gasp," and after the prison medical examiner declared him dead, Barefoot's heart was still beating. *See* Denno II, *supra*, at 430; Denno I, *supra*, at 139.

● Stephen Morin (March 13, 1985, Texas): It took almost 45 minutes for technicians to find a suitable vein, while they punctured him repeatedly, and it took another eleven minutes for Morin to die. *See* Denno II, *supra*, at 430; Denno I, *supra*, at 139; Michael L. Radelet, *Post-Furman Botched Executions*, Death Penalty Information Center, available at http://www.deathpenaltyinfo.org [hereinafter "Radelet"].

● Randy Wools (August 20, 1986, Texas): Wools had to assist execution technicians in finding an adequate vein for insertion. He died seventeen minutes after technicians inserted the needle. *See* Denno II, *supra*, at 431; Denno I, *supra*, at 139; Radelet, supra; *Killer Lends a Hand to Find a Vein for Execution*, L.A. Times (Aug. 20, 1986), http://tinyurl.com/z7nylnm.

● Elliot Johnson (June 24, 1987, Texas): Johnson's execution was plagued by repetitive needle punctures; it took executioners thirty-five minutes to find a vein. *See* Denno II, *supra*, at 431; Denno I, *supra*, at 139; Radelet, supra; *Addict Is Executed in Texas for Slaying of 2 in Robbery*, N.Y. Times (June 25, 1987), https://www.nytimes.com/1987/06/25/us/addict-is-executed-in-texas-for-slayng-of-2-in-robbery.html.

● Raymond Landry (December 13, 1988, Texas): Executioners for forty minutes "repeatedly probed" Landry's veins with syringes. Then, two minutes after the injection process began, the syringe came out of Landry's vein, "spewing deadly chemicals toward startled witnesses." A plastic curtain was pulled so that witnesses could not see the execution team reinsert the catheter into Landry's vein. "After 14 minutes, and after witnesses heard the sound of doors opening and closing, murmurs and at least one groan, the curtain was opened and Landry appeared motionless and unconscious." Landry was pronounced dead twenty-four minutes after the drugs were initially injected. *See* Denno II, *supra*, at 431–32; Denno I, *supra*, at 139; Radelet, *supra*.

● Stephen McCoy (May 24, 1989, Texas): In a violent reaction to the drugs, McCoy "choked and heaved" during his execution. A reporter witnessing the scene fainted. *See* Denno II, *supra*, at 432; Denno I, *supra*, at 139; Radelet, *supra*.

● George Mercer (January 6, 1990, Missouri): A medical doctor was required to perform a surgical "cut down" procedure on Mercer's groin. *See* Denno II, *supra*, at 432; Denno I, *supra*, at 139.

● George Gilmore (August 31, 1990, Missouri): Officials used force to stick the needle into Gilmore's arm. *See* Denno II, *supra*, at 433; Denno I, *supra*, at 139.

● Charles Coleman (September 10, 1990, Oklahoma): Technicians had difficulty finding a vein, delaying the execution for ten minutes. *See* Denno II, *supra*, at 433; Denno I, *supra*, at 139.

● Charles Walker (September 12, 1990, Illinois): There was a kink in the IV line, and the needle was inserted

improperly so that the chemicals flowed toward Walker's fingertips instead of his heart. As a result, Walker's execution took eleven minutes rather than the three or four minutes contemplated by the state's protocols, and the sedative chemical may have worn off too quickly, causing excruciating pain. When these problems arose, prison officials closed the blinds so that witnesses could not observe the process. *See* Denno II, *supra*, at 431; Denno I, *supra*, at 139; Radelet, *supra*; Niles Group Questions Execution Procedure, United Press International (1992).

● Maurice Byrd (August 23, 1991, Missouri): The machine used to inject the lethal dosage malfunctioned. *See* Denno II, *supra*, at 434; Denno I, *supra*, at 140.

● Ricky Rector (January 24, 1992, Arkansas): It took almost an hour for a team of eight to find a suitable vein. A curtain separated witnesses from the injection team, but they could hear repeated, loud moans from Rector. *See* Denno II, *supra*, at 434–35; Denno I, *supra*, at 140; Joe Farmer, *Rector's Time Came, Painfully Late*, Ark. Democrat-Gazette, Jan. 26, 1992, at 1B; Marshall Fray, *Death in Arkansas*, The New Yorker, Feb. 22, 1993, at 105.

● Robyn Parks (March 10, 1992, Oklahoma): Parks violently gagged, jerked, spasmed and bucked in his chair after officials administered the drugs. A witness reported that Parks's death looked "painful and inhumane." *See* Denno II, *supra*, at 435; Denno I, *supra*, at 140; Radelet, *supra*.

● Billy White (April 23, 1992, Texas): Because White was a longtime heroin user, executioners had difficulty finding a vein that was not severely damaged. It took 47 minutes for White to die. *See* Denno II, *supra*, at 435–36; Denno I, *supra*, at 140; Radelet, *supra*.

● Justin May (May 7, 1992, Texas): May groaned, gasped and reared against his restraints during his nine-minute death. *See* Denno II, *supra*, at 436; Denno I, *supra*, at 140; Radelet, supra; Robert Wernsman, *Convicted Killer May Dies*, The Huntsville Item, May 7, 1992, at 1; Michael Graczyk, *Convicted Killer Gets Lethal Injection*, Denison Herald, May 8, 1992.

● John Gacy (May 10, 1994, Illinois): The lethal injection chemicals solidified, blocking the IV tube. Officials closed the blinds for ten minutes, preventing witnesses from watching the execution team replace the tubing. *See* Denno II, *supra*, at 435; Denno I, *supra*, at 140; Radelet, *supra*; Scott Fornek & Alex Rodriguez, *Gacy Lawyers Blast Method: Lethal Injections Under Fire After Equipment Malfunction*, Chi. Sun-Times, May 11, 1994, at 5; Lou Ortiz & Scott Fornek, *Witnesses Describe Killer's 'Macabre' Final Few Minutes*, Chi. Sun-Times, May 11,1994, at 5; Rob Karwath & Susan Kuczka, *Gacy Execution Delay Blamed on Clogged IV Tube*, Chi. Trib., May 11, 1994, at 1.

● Emmitt Foster (May 3, 1995, Missouri): Seven minutes after the lethal chemicals began to flow into Foster's arm, officials halted the execution because the chemicals stopped circulating. With Foster gasping and convulsing, blinds were drawn so witnesses could not view the scene. Officials pronounced death thirty minutes after the execution began, but they did not open the blinds until three minutes later. According to the coroner, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney. Foster did not die until several minutes after a prison worker finally loosened the straps. *See* Denno II, *supra*, at 437; Denno I, *supra*, at 140; Radelet, supra; Editorial, *Witnesses to a Botched Execution*, St. Louis Post-Dispatch, May 8, 1995, at 6B; Tim O'Neil, *Too-Tight Strap Hampered Execution*, St. Louis Post-Dispatch, May 5, 1995, at 1B; Jim Salter, *Execution Procedure Questioned*, Kansas City (Mo.) Star, May 4, 1995, at C8.

● Ronald Allridge (June 8, 1995, Texas): Executioners conducted Allridge's execution with only one needle, rather than the two required by the protocol, because they could not find a suitable vein in his left arm. *See* Denno II, *supra*, at 437; Denno I, *supra*, at 140.

● Richard Townes (January 23, 1996, Virginia): It took 22 minutes for medical personnel to find a vein. After repeated unsuccessful attempts to insert the needle through the arms, they finally inserted the needle through the top of Townes's right foot. *See* Denno II, *supra*, at 437; Denno I, *supra*, at 140; Radelet, *supra*.

340

● Tommie Smith (July 18, 1996, Indiana): From the time that the execution team began sticking needles into Smith's body, it took one hour and nine minutes for him to die. For 16 minutes, the team failed to find adequate veins, and then a physician was called. The execution team gave Smith a local anesthetic, and the physician twice attempted to insert the tube in Smith's neck. When that failed, the team inserted an angiocatheter into Smith's foot. Only then did officials allow witnesses to view the process. The executioners finally injected the lethal drugs 49 minutes after the first attempt, and it took another 20 minutes before officials pronounced Smith's death. *See* Denno II, *supra*, at 437; Denno I, *supra*, at 140; Radelet, *supra*.

● Luis Mata (August 22, 1996, Arizona): Mata remained strapped to a gurney with the needle in his arm for one hour and ten minutes while his attorneys argued his case. When finally injected, his head jerked, his face contorted, and his chest and stomach sharply heaved. *See* Denno II, *supra*, at 438; Denno I, *supra*, at 140.

● Scott Carpenter (May 8, 1997, Oklahoma): Carpenter gasped, made guttural sounds, and shook for three minutes following the injection. Officials pronounced his death eight minutes later. *See* Denno I, *supra*, at 140; Radelet, *supra*; Michael Overall & Michael Smith, *22-Year-Old Killer Gets Early Execution*, Tulsa World, May 8, 1997, at A1.

● Michael Elkins (June 13, 1997, South Carolina): Liver and spleen problems caused Elkins' body to swell, requiring executioners to search almost an hour—and seek assistance from Elkins—to find a suitable vein. *See* Denno I, *supra*, at 140; Radelet, *supra*; *Killer Helps Officials Find a Vein at His Execution*, Chattanooga Free Press, June 13, 1997, at A7.

● Joseph Cannon (April 23, 1998, Texas): It took two attempts to complete the execution. Cannon's vein collapsed and the needle popped out after the first injection. He then made a second final statement and was injected a second time behind a closed curtain. *See* Denno I, *supra*, at 141; Radelet, *supra*; *1st Try Fails to Execute Texas Death Row Inmate*, Orlando Sent., Apr. 23, 1998, at A16; Michael Graczyk, *Texas Executes Man Who Killed San*

341

*Antonio Attorney at Age 17*, Austin Am.-Statesman, Apr. 23, 1998, at B5.

● Genaro Camacho (August 26, 1998, Texas): Camacho's execution was delayed approximately two hours because executioners could not find suitable veins in his arms. *See* Denno I, *supra*, at 141; Radelet, *supra*.

● Roderick Abeyta (October 5, 1998, Nevada): The execution team took twenty-five minutes to find a vein suitable for the lethal injection. *See* Denno I, *supra*, at 141; Radelet, *supra*; Sean Whaley, *Nevada Executes Killer*, L.V. Rev-J., Oct. 5, 1998, at 1A.

● Christina Riggs (May 3, 2000, Arkansas): The execution was delayed for eighteen minutes when prison staff could not find a vein. *See* Radelet, *supra*.

● Bennie Demps (June 8, 2000, Florida): It took the execution team 33 minutes to find suitable veins for the execution. "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no problems finding one vein, but because the Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures. *See* Denno I, *supra*, at 141; Radelet, *supra*; Rick Bragg, *Florida Inmate Claimed Abuse in Execution*, N.Y. Times (June 9, 2000), http://tinyurl.com/z9k66yn; Phil Long & Steve Brousquet, *Execution of Slayer Goes Wrong: Delay, Bitter Tirade Precede His Death*, Miami Herald, June 8, 2000.

● Bert Hunter (June 28, 2000, Missouri): In a violent reaction to the drugs, Hunter's body convulsed against his restraints during what one witness called "a violent and agonizing death." *See* Denno I, *supra*, at 141; Radelet, *supra*; David Scott, *Missouri Executes Convicted Killer*, Associated Press, June 28, 2000.

● Claude Jones (December 7, 2000, Texas): Jones's execution was delayed 30 minutes while the execution team struggled to insert an IV. One member of the execution team commented, "They had to stick him about

five times. They finally put it in his leg." *See* Radelet, *supra.*

● Joseph High (November 7, 2001, Georgia): For 20 minutes, technicians tried unsuccessfully to locate a vein in High's arms. Eventually, they inserted one needle in his chest, after a doctor cut an incision there, and inserted the other needle in one of his hands. Officials pronounced High dead one hour and nine minutes after the procedure began. *See* Denno I, *supra*, at 141; Radelet, *supra.*

● Joseph L. Clark (May 2, 2006, Ohio): It initially took executioners 22 minutes to find a suitable vein in Clark's left arm to insert the catheter. As the injection began, the vein collapsed. After an additional 30 minutes, the execution team succeeded in placing a catheter in Clark's right arm. However, the team again tried to inject the drugs into the left arm, where the vein had already collapsed. These difficulties prompted Clark to sit up, tell the executioners "It don't work," and ask, "Can you just give me something by mouth to end this?" Officials pronounced Clark dead 90 minutes after the execution began. *See* Radelet, *supra*; Andrew Welsh-Huggins, *Botched Execution Leads to Ohio Review*, Associated Press (May 12, 2006).

● Angel Diaz (December 13, 2006, Florida): After the initial injection, Diaz grimaced, contorted his face, and gasped for air for at least ten to twelve minutes. Prison officials administered a second injection, and 34 minutes passed before they declared Diaz dead. Shortly thereafter, Governor Jeb Bush halted all executions and selected a committee "to consider the humanity and constitutionality of lethal injections." *See* Radelet, *supra*; Terry Aguayo, *Florida Death Row Inmate Dies Only After Second Chemical Dose*, N.Y. Times, Dec. 15, 2006; Adam Liptak & Terry Aguayo, *After Problem Execution, Governor Bush Suspends the Death Penalty in Florida*, N.Y. Times, Dec. 16, 2006; Ellen Kreitzberg & David Richter, *But Can it be Fixed? A Look at Constitutional Challenges to Lethal Injection Executions*, 47 Santa Clara L. Rev. 445, 445–46 (2007).

● Christopher Newton (May 24, 2007, Ohio): Executioners stuck Newton at least ten times before getting the shunts in place and injecting the needles. It then took over two

343

hours for Newton to die. Officials blamed the delay on Newton's weight—265 pounds. *See* Radelet, *supra*; *Ohio Lethal Injection Takes 2 Hours, 10 Tries*, Associated Press, May 24, 2007.

● John Hightower (June 26, 2007, Georgia): It took prison officials almost an hour to complete Hightower's execution, 40 minutes of which they spent trying to locate a usable vein. *See* Radelet, *supra*; Lateef Mungin, *Triple Murderer Executed After 40-Minute Search for Vein*, Atlanta J. Const., June 27, 2007.

● Curtis Osborne (June 4, 2008, Georgia): Executioners spent 35 minutes trying to find a suitable vein. After they administered the drugs, it took an additional 14 minutes before the in-chamber doctors pronounced Osborne's death. *See* Radelet, *supra*; Rhonda Cook, *Executioners Had Trouble Putting Murderer to Death: For 35 Minutes, They Couldn't Find Good Vein for Lethal Injection*, Atlanta J. Const., June 27, 2007.

● Rommell Broom (Sept. 15, 2009, Ohio): After two hours, executioners terminated their efforts to find a suitable vein in Broom's arms and legs. They failed despite Broom's assistance. "Broom said he was stuck with needles at least [18] times, the pain so intense he cried and screamed out." Upon ordering the execution to stop, Governor Ted Strickland announced that he would seek physicians' advice on "how the man could be killed more efficiently." Executioners blamed Broom's extensive use of intravenous drugs for their difficulties. *See* Radelet, *supra*.

● Brandon Joseph Rhode (Sept. 27, 2010, Georgia): After the Supreme Court rejected Rhode's appeals, "[m]edics . . . tried for about 30 minutes to find a vein to inject the three-drug concoction." It then took 14 minutes for the lethal drugs to kill him. Greg Bluestein, *Georgia Executes Inmate Who Had Attempted Suicide*, Atlanta J. Constitution, Sept. 27, 2010.

● Dennis McGuire (January 16, 2014, Ohio): Ohio used a "new, untested cocktail of drugs," midazolam and hydromorphone, in this execution. "A reporter for the Columbus Dispatch, one of the witnesses at the execution, described Mr. McGuire as struggling, gasping loudly, snorting and making choking noises for nearly 10 minutes

before falling silent and being declared dead a few minutes later." Rick Lyman, *Ohio Execution Using Untested Drug Cocktail Renews the Debate Over Lethal Injections*, N.Y. Times, January 16, 2014.

● Jose Villegas (April 16, 2014, Texas): After courts denied Villegas a stay of his execution based on mental retardation; officials executed him using compounded phenobarbital. Villegas reportedly stated, "It does kind of burn. Goodbye." Linda Greenhouse, *Still Tinkering*, N.Y. Times, May 14, 2014.

● Clayton Lockett (April 30, 2014, Oklahoma): After a doctor in attendance pronounced Lockett unconscious, "things went visibly wrong." Lockett twitched, mumbled, attempted to lift his head and shoulders, and appeared to be in pain. The warden announced a "vein failure" and ordered the execution aborted. Approximately 43 minutes after the execution began, "Lockett died of a 'massive heart attack.'" Radelet, *supra*; Erik Eckholm & John Schwartz, *Oklahoma Vows Review of Botched Execution*, N.Y. Times, April 30, 2014. Following Lockett's execution, state officials convened a grand jury to study executions in Oklahoma, resulting in a May 2016 report that sharply criticized the state's oversight and implementation of its protocol. *See Interim Report 14, In the Matter of Multicounty Grand Jury*, Case No. SCAD-2012-61 (Okla. May 19, 2016), https://deathpenaltyinfo.org/files/pdf/MCGJ-Interim-Report-5-19-16.pdf.

● Joseph Wood (July 23, 2014, Arizona): After the execution team injected the chemicals, Wood repeatedly gasped for one hour and forty minutes before he died. Radelet, supra. Senator John McCain of Arizona described Wood's execution as tantamount to "torture." Ben Brumfield & Mariano Castillo, McCain: *Prolonged Execution Was Torture* (Sept. 8, 2014), http://www.cnn.com/2014/07/25/justice/arizona-execution-controversy/.

● Brian Terrell (Dec. 9, 2015. Georgia): "[I]t took an hour for the nurse assigned to the execution to get IVs inserted into both of the condemned man's arms. She eventually had to put one into Terrell's right hand. Terrell winced several times, apparently in pain." *See* Radelet, *supra*.

● Brandon Jones (Feb. 3, 2016, Georgia): Executioners spent 24 minutes trying to insert an IV into Jones' left arm, another eight minutes into his right, and tried again, unsuccessfully, to insert it into his left arm. A physician was called to assist, in violation of several codes of medical ethics, and he or she spent another 13 minutes inserting and stitching the IV near Jones's groin. Six minutes later, Jones's eyes popped open. *See* Radelet, *supra*.

● Ronald Bert Smith, Jr. (December 8, 2016, Alabama): During the early part of his execution, Smith clenched his fists and raised his head. Smith then heaved, gasped, and coughed while struggling for breath. That lasted for thirteen minutes after the executioners administered the lethal drugs. Officials did not pronounce Smith's death until 34 minutes after the execution began. https://www.al.com/news/birmingham/2016/12/alabama_d eath_row_inmate_is_se.html

● Alva Campbell (November 15, 2017, Ohio): The execution team spent 30 minutes trying to find a suitable vein on Campbell's arms before moving to his right leg. About 80 minutes after the execution was scheduled to begin, it appeared that the execution team had successfully inserted the syringe. But two minutes later, officials told media witnesses to leave and called off the execution. See Radelet, supra; Andrew Welsh-Huggins, *Ohio calls off execution after failing to find inmate's vein*, AP News (November 16, 2017), https://www.apnews.com/ac66f9c4dfd646ffbe6425981c3e2 dd5.

● Doyle Lee Hamm (February 22, 2018, Alabama): The executioners tried for two and a half hours to find a suitable vein to inject the execution drugs into Hamm, who suffered from advanced lymphatic cancer and carcinoma. Hamm was left with ten to twelve puncture marks, including six in his groin and others that punctured his bladder and femoral artery. Officials eventually called off the execution. *See* Radelet, *supra*; Tracy Connor, *Lawyer described aborted execution attempt for Doyle Lee Hamm as 'torture,'* NBC News (Feb. 24, 2018), https://www.nbcnews.com/storyline/lethal-injection/lawyer-calls-aborted-execution-attempt-doyle-lee-hamm-torture-n851006.

● John Marion Grant (October 28, 2021): Grant died after experiencing two dozen full body convulsions and vomiting all over himself following a lethal injection. Grant continued to breathe for several minutes before executioners wiped his face; Grant then had more involuntary convulsions and continued vomiting. He was declared unconscious shortly thereafter and at that point was administered a second lethal injection dose. *See* Patrick Reilly, *Death row inmate convulses, vomits in 3rd consecutively botched Oklahoma execution*, NY Post (October 28, 2021), https://nypost.com/2021/10/28/oklahoma-botches-third-consecutive-execution-attempt

40.     In short, far from providing "a safe, reliable, effective and humane" method of execution consistent with the Eighth Amendment, lethal injection has been shown to be far less reliable than methods preceding it. *See* Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (2014); *cf.* *Wood v. Ryan*, 759 F.3d 1076, 1102–03 (9th Cir. 2014) (Kozinski, J., dissenting from the denial of rehearing en banc) (suggesting that, "[i]f a state wishes to continue carrying out executions," it should return to earlier "more . . . foolproof" methods).

## 2.     Lethal injection in Nevada is unconstitutional.

### a)     Nevada's September 5, 2017, execution protocol.

41.     In July 2017, the Eighth Judicial District Court of Nevada issued a warrant scheduling the execution of inmate Scott Dozier. At that time, Nevada's execution protocol was unknown. Counsel from the District Attorney's Office were unable to provide the court with any information about how, and with what drugs, NDOC intended to carry out Dozier's execution. Instead, counsel simply pointed to a radio program, where an NDOC official said that, if an execution warrant was signed they would be able to obtain the needed drugs.

347

42.    More than a month later, pursuant to litigation in Dozier's state postconviction case regarding the constitutionality of his planned execution, the State produced a new execution protocol, dated September 5, 2017. The new protocol provided for a novel three-drug lethal injection procedure utilizing the drugs diazepam (a benzodiazepine), fentanyl (an opioid), and cisatracurium (a paralytic).[19]

43.    Counsel on behalf of Dozier thereafter retained and consulted with an expert in anesthesiology, Dr. David Waisel, regarding Nevada's new protocol.[20] Dr. Waisel was highly critical of the State's protocol.[21] He opined that the protocol constituted a "sea change" from every other protocol of which he was aware, because the paralytic drug was designed to be the agent of death.[22] Specifically, the third drug, the paralytic cisatracurium, kills by preventing an inmate's ability to breathe, not through drugs that anesthetize (thereby ensuring an unconscious person during the process), but through drugs that paralyze muscles.

---

[19] The three-drug protocol, the nation's first using fentanyl and a paralytic agent as the final killing drug was devised by Nevada's former Chief Medical Officer, John DiMuro, D.O. DiMuro interviewed with the Washington Post after resigning from his position, telling the paper that he settled on the protocol in a matter of minutes. The December 11, 2017, article quoted him saying, "I honestly could have done it in one minute. It was a very simple, straightforward process." Ex. 120.

[20] Dr. Waisel is a certified anesthesiologist with the American Board of Anesthesiology. Formerly at Boston's Children's Hospital and an Associate Professor of Anesthesia at Harvard Medical School; Dr. Waisel is currently the Director of Pediatric Anesthesiology at Yale New Haven Hospital. Dr. Waisel has practiced anesthesiology for nearly thirty years, consulted on lethal injection protocols, testified approximately ten times in court, and authored almost fifty peer reviewed publication on anesthesiology. *See* Ex. 121 (October 4, 2017, Declaration of Dr. David B. Waisel).

[21] *Id.*

[22] *Id.* at 4.

44.     Premised upon the expert's opinions, counsel for Dozier argued that the protocol and drugs chosen created a substantial risk of causing cruel pain and suffering because its use creates a substantial risk of the condemned inmate being paralyzed and awake while dying of suffocation.[23] "The horror of being awake and unable to move is beyond description," Dr. Waisel observed, citing a known example of a patient undergoing surgery who was aware and paralyzed, who reported she "desperately wanted to scream or even move a finger to signal to the doctors that she was awake." Ex. 121 at 5. Nevada's 2017 execution protocol, in Dr. Waisel's opinion, was "practically designed to ensure substantial harm of 1) air hunger following the injections of diazepam and fentanyl and 2) awareness while being paralyzed after the cisatracurium injection." *Id.*

45.     Dr. Waisel's opinions also included a concern that the dosage amounts provided for the first two drugs (diazepam and fentanyl) were markedly low. *Id.* at 17.

### b)     Nevada's November 9, 2017, execution protocol.

46.     After receiving the opinions from Dozier's expert anesthesiologist, the State amended its execution protocol. In October 2017, NDOC informed the state district court it was making changes, including: (1) increasing the loading (starting) dosages for the drugs and clarifying that those loading amounts were never meant to be a cap; (2) instructing that the drugs be "titrated to effect"; (3) conducting "consciousness assessments" to determine how the condemned inmate is responding

---

[23] *See* Ex. 122 at 27 (*State v. Dozier*, District Court of Clark County, Nevada, Case No. C215039, Recorder's Transcript of Evidentiary Hearing of Chief Medical, Nov. 3, 2017).

to the drugs, and if he is still conscious, then gradually increasing the dosages, and repeating the process, until the inmate no longer provides responses to stimuli; and (4) following the administration of fentanyl with a tactile stimulus, described as "some sort of pinch," before the execution team would move on to the paralytic drug. *Id*. at 6. A revised protocol with these changes was adopted and made effective November 9, 2017.

47. Although the State decided that these changes were appropriate, the State was unwilling to agree to other changes recommended by Dozier's expert and continued to insist on using a three-drug protocol that employed a paralytic agent as the third and final (lethal) drug. *See generally id*.

48. The state district court held an evidentiary hearing concerning the revised protocol on November 3, 2017, where Dr. Waisel testified. The State presented no expert testimony in opposition to Dr. Waisel's testimony.

49. Dr. Waisel testified that the proper administration of 100 mg of diazepam followed by 7,500 mcg of fentanyl would be sufficient, with a high degree of certainty, to kill the condemned inmate by stopping his breathing. Ex. 122 at 22. He estimated that the time from administration of the drugs to death would be approximately ten minutes. *Id*. at 23.

50. Dr. Waisel further testified that the paralytic drug contained in the protocol was unnecessary to effectuate death because, if the dosages of the first two drugs at the levels stated above were properly administered, the inmate would have already stopped breathing by the time the third drug was administered. *Id*. On the other hand, if the first two drugs were not properly administered, there is a

350

substantial risk that the use of the paralytic drug will cause cruel pain and suffering, as the condemned inmate would still be sentient when the paralytic was administered. *Id.*

51.    Following the evidentiary hearing, the state district court granted an injunction and ordered a stay of the impending execution.[24] The court found that the State's proposed use of a paralytic drug in the execution presented an unconstitutional substantial risk of harm and an objectively intolerable risk of harm in violation of the Eighth Amendment.[25]

52.    The State challenged the district court's ruling by petitioning for a writ of mandamus in the Nevada Supreme Court. The Nevada Supreme Court reversed the district court but only on procedural grounds, holding that the lower court abused its discretion in considering the matter because there is no mechanism in postconviction proceedings for bringing a lethal injection challenge. *Nevada Department of Corrections v. Eighth Judicial Dist. Court*, Nos. 74679, 74722, 2018 WL 2272873, \*2 (Nev. May 10, 2018) (unpublished order).

### c)    Nevada's June 11, 2018, execution protocol.

53.    In 2018, while the State's petition for writ of mandamus was pending, NDOC altered its November 9, 2017, execution protocol. Because it had run out of its supply of diazepam, the State substituted the drug midazolam (which like diazepam is a benzodiazepine) as the first drug in the protocol. The protocol continued to utilize fentanyl as the second drug, and cisatracurium as the third and

---

[24] Ex. 123. NDOC sought a stay of execution from the district court to appeal the injunction order preventing it from using a paralytic agent.
[25] *Id.*

final killing drug. The former Director of NDOC officially signed and adopted this execution protocol on June 11, 2018. Ex. 124.

54.     Nevada's June 11, 2018, execution protocol presented essentially the same problems presented by the preceding protocol, and like that protocol, was ultimately never used. In September 2018 the State was enjoined from carrying out an execution under the protocol as a result of litigation brought on behalf of manufacturers of the designated drugs.

### d)     Nevada's 2021 execution protocol.

55.     In late March 2021, the Clark County District Attorney announced he would be pursuing an execution warrant against Zane Floyd. The execution warrant was sought even though the State lacked the capability of carrying out an execution pursuant to the 2018 lethal injection execution protocol and had yet to finalize a new protocol.[26] Floyd thereafter filed his Complaint for Injunctive and Declaratory Relief on April 16, 2021, seeking to enjoin Defendants from executing him under the 2018 protocol. *See* Ex. 125.

56.     Following a number of hearings in federal district court, NDOC adopted a new execution protocol dated June 10, 2021. Ex. 126. Nevada law contemplates that the lethal injection protocol be devised pursuant to direction or guidance from the State's Chief Medical Officer (currently Defendant Dr. Ihsan Azzam), as the NDOC Director is required by statute to consult with the Chief

---

[26] David Ferrara, DA to proceed with death penalty against gunman in 1999 store killings, Las Vegas Review Journal, https://www.reviewjournal.com/crime/courts/da-to-proceed-with-death-penalty-against-gunman-in-1999-store-killings-2315637/.

Medical Officer in selecting the drug or combination of drugs to be used in a lethal injection execution. Nev. Rev. Stat. § 176.355(2)(b). Consistent with this requirement, it was the previous Chief Medical Officer of Nevada, Dr. John DiMuro, who had developed the lethal injection protocols in September and November of 2017 that were the subject of the Scott Dozier state court lethal injection litigation. Ex. 126 at 23. Daniels apparently consulted with Azzam on two occasions regarding the drugs in the execution protocol. However, the dosage amounts provided for in NDOC's new protocol was not provided pursuant to the guidance of Dr. Azzam. Rather, it appears from the June 28, 2021, testimony of NDOC Director Daniels regarding his consultation with NDOC's retained expert Daniel Buffington regarding the dosage amounts of the selected drugs, that Nevada's new lethal injection protocol was designed between Director Daniels and Buffington. Ex. 127 at 39. The new protocol authorizes either a three-drug or a four-drug lethal injection procedure, and provides six different possible drugs from which the procedure is to be comprised, with eight possible combinations. Specifically, the protocol sets forth the following combinations of drugs and alternates: (1) fentanyl or alfentanil, (2) ketamine, (3) cisatracurium, and (4) potassium chloride or potassium acetate. Ex. 126 at 23. An alternative three-drug protocol repeats the drugs in steps one, two, and four, but omits the paralytic agent cisatracurium. *Id.* The protocol additionally specifies dosages, concentrations, and preparation instructions, among other subjects. *Id.* at 24.

353

### (1) The unconstitutional risk created by the six drugs in Nevada's execution protocol.

57. Each of the six drugs in Nevada's 2021 execution protocol carry a demonstrated risk of causing unnecessary pain and suffering.

### (a) Risks created by Nevada's intended use of either fentanyl or alfentanil.

58. Fentanyl is a powerful synthetic opioid. As an opioid, fentanyl has analgesic properties. Ex. 128 at 27. Fentanyl, however, cannot be relied on to induce unawareness. Fentanyl is not a general anesthetic. Thus, the inclusion of fentanyl in Nevada's novel drug protocol does not alleviate the substantial and unjustified risk that Mr. Richardson will be aware while he is being killed, or that he will agonizingly suffocate to death. Neither fentanyl nor alfentanil can reliably obtain a sufficient state where Mr. Richardson is unaware of what is happening to him.

59. It is well established that even high doses of fentanyl cannot reliably block awareness. This recognition in the field of anesthesiology dates back thirty-five to forty years, when practitioners utilizing high doses of fentanyl by itself, or with a limited additional agent such as a benzodiazepine, in performing open heart surgeries discovered instances of patient awareness during the operation.[27] As a result, doctors stopped the practice of using high-dose fentanyl to achieve anesthetic depth, and other formulas, including fentanyl (in lower dosages) but used in combination with myriad other chemical agents, became the standardized practice.

---

[27] *See, e.g.,* Jonathan B. Mark & Leslie M. Greenberg, *Intraoperative Awareness and Hypertensive Crisis during High-Dose Fentanyl-Diazepam-Oxygen Anesthesia*, 62 Anesth Analg. 698–700 (1983); Nagaprasadarao Mummanemi, M.D., *Awareness and Recall with High-Dose Fentanyl-Oxygen Anesthesia*, 59 Anesth Analg, 948–49 (1980).

354

60.    Fentanyl is also known to cause chest wall rigidity, particularly when delivered in bolus doses as under Nevada's protocol. This will likely cause Mr. Richardson to experience the distress and anguish of feeling like he is unable to breath.

61.    Alfentanil presents the same problems as fentanyl. The principle difference between the drugs is that alfentanil is recognized as being shorter acting, with its desired effect diminishing more rapidly. *See* Ex. 129 at 5. As a consequence, its use in the context of an execution would, compared to fentanyl, present an even greater risk of harm to Mr. Richardson. *See also* Ex. 130 at 7–10; Ex. 129 at 4–5.

> **(b)    Risks created by Nevada's intended use of ketamine.**

62.    The intended purpose of ketamine is to, along with the first drug fentanyl, anesthetize the prisoner, rendering him unconscious and insensate to pain and suffering throughout the execution procedure. *See* Ex. 129 at 5–7.

63.    Ketamine is a last resort anesthetic inappropriate for use in an execution. Under traditional three-drug execution protocols, the initial drug delivered is a barbiturate, such as sodium thiopental or pentobarbital, for the purpose of inducing general anesthesia and rendering the subject unconscious and insensate to pain. Unlike sodium thiopental and pentobarbital, however, ketamine is not a barbiturate. Rather, ketamine is categorized as a dissociative anesthetic.

64.    Ketamine is not a typical anesthetic and is not commonly used in clinical practice as a standalone anesthetic. As a dissociative drug similar to phencyclidine (PCP), it causes a person to experience hallucinations and often a

state of dysphoria. In addition, an individual can still consciously experience one's surroundings and feel severe pain and horrific stimuli, such as that associated with the third or fourth drugs, cisatracurium or potassium chloride (or alternatively potassium acetate), while under sedation using fentanyl plus ketamine. Expert opinion establishes that the administration of fentanyl (or alfentanil) plus ketamine will not produce a flat-line EEG, i.e., will not result in a state of unconsciousness. In short, administration of the first two drugs under Nevada's execution protocol will cause Mr. Richardson to be dissociative and incompetent. The State's use of ketamine thus creates a substantial risk that Mr. Richardson will suffer harm in violation of his Eighth Amendment rights.

65.     Ketamine is also likely to cause excessive oral secretions (salivating), which can lead to choking or result in laryngospasm. Laryngospasm occurs when the vocal cords suddenly close up when taking in a breath, blocking the flow of air into the lungs, and it is known to be a frightening experience. Furthermore, ketamine, especially in high doses, causes nausea and vomiting. *See* Ex. 130 at 10–12.

**(c)     Risks created by Nevada's intended use of cisatracurium.**

66.     Nevada's intended use of the third drug, cisatracurium, creates an unnecessary risk of harm to Mr. Richardson. Its use presents a substantial and unjustified risk of causing pain and suffering. *See, e.g.*, *id.* at 5, 13. As Chief Justice Roberts noted in *Baze*, "failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk

of suffocation from the administration of pancuronium bromide [a paralytic] . . . ." *Baze v. Rees*, 553 U.S. 35, 53 (2008). So too here: should the first two drugs fail to achieve the desired state of unconsciousness, "there is a substantial, constitutionally unacceptable risk of suffocation from the administration of" cisatracurium. *Id.* Under such circumstances, the cisatracurium would cause a freezing of Mr. Richardson's muscles, including his diaphragm, causing him to suffer from air hunger and the feeling of suffocation.

67.     The Eighth Judicial District Court in Clark County, Nevada, considered the constitutionality of the paralytic agent, cisatracurium, in the context of the Scott Dozier litigation. That court recognized the substantial risk of harm created by use of cisatracurium as the third drug in Nevada's November 2017 protocol. Expert witness Dr. David Waisel, an anesthesiologist from Boston Children's Hospital in Boston, Massachusetts, presented testimony concerning Nevada's execution protocol and opined that the intended use of cisatracurium was unjustifiable. The paralytic third drug, he explained, was unnecessary under the former protocol because, if the dosages of the first two drugs at the levels stated were properly administered, the inmate would have stopped breathing by the time the paralytic was administered. Ex. 122 at 26. It was therefore unnecessary to use cisatracurium. *Id.* at 27–28. On the other hand, the expert explained, if the first two drugs were not properly administered, there was a substantial risk that the paralytic drug would cause cruel pain and suffering, as the inmate would be aware and sensate as he was slowly suffocated to death. *Id.*; *see also* Ex. 130 at 5.

357

68.    The expert thus concluded that the paralytic drug provided no benefit while at the same time creating a substantial risk of pain and suffering. Ex. 122 at 108–09. In a medical setting, such a risk would never be taken: "In medicine, every risk we take we want a benefit for. We never take a risk that does not give a benefit." *Id.* at 109.

69.    The state court found Waisel's testimony credible and persuasive. Following the evidentiary hearing, the court enjoined NDOC from conducting an execution utilizing its three-drug protocol, specifically finding the State's use of a paralytic drug presented an unconstitutional risk of injury and an objectively intolerable risk of harm, in violation of the Eighth Amendment and the corresponding provision of the Nevada Constitution. Ex. 123 at 16.

70.    Moreover, cisatracurium's superfluousness is reinforced by NDOC's decision to make the drug optional in the final protocol. *See* Ex. 126 at 23–28 (EM 103.03). "[T]he purposeless and needless imposition of pain and suffering" is by definition "unconstitutional punishment." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (quoting *Enmund v. Florida,* 458 U.S. 782, 798 (1982)); *see Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (pronouncing that a "sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *La ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence").

**(d)** **Risks presented by Nevada's intended use of potassium chloride or potassium acetate.**

71.     Nevada's protocol calls for potassium chloride (or potassium acetate) to be administered as the last drug in either its three-drug or four-drug method. Both drugs interfere with the electrical signals that stimulate the contractions of the heart and will induce cardiac arrest. It is well recognized, however, that if the personnel carrying out the execution fail to ensure Mr. Richardson has first achieved the requisite depth of anesthesia, Mr. Richardson will suffer excruciating pain from administration of the potassium chloride. *See* Ex. 130 at 13–14; Ex. 129 at 7; *see also Baze*, 553 U.S. at 53 (finding it "uncontested" that, failing a proper dose of the anesthetic, "there is a substantial, constitutionally unacceptable risk of . . . pain from the injection of potassium chloride").

72.     The inclusion of potassium acetate as a possible alternative to potassium chloride exacerbates the risks presented to Mr. Richardson. Potassium acetate's efficacy for use as part of a lethal injection procedure is virtually unknown. Its use would make Nevada's already experimental protocol even more experimental.

**(2)** **The protocol contains no assurances that state officials will properly store, transport, and administer the execution drugs to decrease the risk of unconstitutional pain and suffering.**

73.     There is a lack of assurance in Nevada's execution protocol and otherwise no evidence that NDOC will properly transport the lethal injection drugs and store and maintain the drugs safely and at the correct temperature. Indeed,

NDOC was found to have mishandled the transportation and storage of the drug cisatracurium, causing the drug to be "compromised," in the *Alvogen* litigation.[28] In addition, there is a lack of assurance that the State will use unexpired drugs. Frequently, drugs do not have a long shelf life following the date of manufacture. Ketamine, for instance, typically has a shelf life of two years.

74.    The risk of expiration of some or all of the drugs is not merely speculative. In the *Alvogen* litigation, for example, the drug cisatracurium, which was required to be refrigerated and kept stored between 36 and 46 degrees Fahrenheit, froze, and, according to the manufacturer, had to be used within 21 days or discarded.[29]

### (3)    Risks presented by inadequate provisions for staff training.

75.    Nevada's execution protocol fails to provide for proper training of execution team members and to ensure minimum qualifications of medical personnel participating in executions, exacerbating the risks presented by Nevada's experimental lethal injection procedure.

76.    The lack of adequate provision for training was also the subject of expert testimony in the state court litigation concerning the potential execution of

---

[28] Ex. 132—*Alvogen v. Nevada Dept of Corrections, et al.*, No. A-18-777312-B (Dist. Ct., Clark County Nev.), Sept. 28, 2018, Findings of Fact and Conclusions of Law at 33.

[29] Ex. 131—*Alvogen v. Nevada Dept of Corrections, et al.,* No. A-18-777312-B (Dist. Ct., Clark County Nev.), 9/13/18 Tr. at 130-35 (Testimony of Anthony Wallace).

Scott Dozier.[30] The expert anesthesiologist for Dozier, Dr. Waisel, opined that

Nevada's protocol failed to adequately set forth the execution staff qualifications

and training needed for conducting an execution. *See also* Ex. 130 at 6–7.

77.    As Dr. Waisel testified in state court proceedings on Nevada's

execution protocol, ensuring proper training and qualification is crucial:

The protocol is predicated on an assessment of anesthetic depth. That is whether

[the inmate] can respond. That is a skill that comes from training and experience.

Without knowing that, it is impossible to assess the risk of an error in this rather—

in this assessment, which is actually an art. It's not a black-and-white matter. It's

an ability to assess for subtle signs that may indicate that there's a potential for

response. Ex. 122 at 33.

78.    In other words, executions require a trained, qualified, properly

credentialed medical professional to assess the condemned inmate's level of

anesthetic depth. Under Nevada's current protocol, assessment of the anesthetic

depth of the inmate prior to administering ketamine, cisatracurium, and the final,

killing drug, is achieved by the "attending physician or other medical personnel,"

who must attempt to elicit a response to tactile stimuli—in the form of a "medical

grade pinch." Ex. 133 at 5–7. Just because an individual does not respond to tactile

stimuli, however, does not necessarily mean the person is unaware. Ex 122 at 34.

Indeed, the expert noted that even a licensed surgeon would not necessarily know

when a person was sufficiently unaware to accurately administer the cisatracurium:

---

[30] Provision for training in Nevada's 2021 protocol is the same as that provided in the November 2017 protocol about which Dr. Waisel provided testimony.

"this assessment is not something that is part of surgical training, nor is it part of something that they practice on a daily basis or a frequent basis." *Id.* And Dr. Waisel further testified to being unaware of the term "medical grade pinch" used by Nevada's protocol and being unaware of any objectively ascertainable definition of the term. *Id.* at 35. The ambiguity of this term is exacerbated by the nature of fentanyl (or alftentanil) and ketamine, which interfere with reliable assessments of unawareness.

79.     Dr. Waisel ultimately opined that if execution staff's ability to assess anesthesia is limited by inadequate training or lack of experience, an error is more likely to occur. "If they are wrong, in other words, if he's not sufficiently anesthetized and he receives cisatracurium, he is at risk for being aware and paralyzed, which is quite harmful to [the condemned inmate]." *Id.* at 36. In addition, as Dr. Waisel explained, a prison setting is a dramatically unfamiliar situation and location for execution team personnel, which increases the risk of errors. Ex. 135 at 2–3 Risks are further increased if staff is inexperienced, and thus high quality practice is "of critical importance." *Id.* at 3, 5. Practice means having a sufficient number of rehearsals prior to the execution to ensure the execution team is prepared and ready. However, having reviewed Nevada's updated execution protocol, Dr. Waisel noted that it failed to provide any assurances regarding the training, practice, and experience of its personnel involved in the execution. *Id.* at 3, 6. He specifically noted the protocol failed to state the amount of experience minimally required for the EMTs responsible for placing the IV lines, and it failed to require the attending physician to have specialized training and sufficient

362

experience assessing and monitoring anesthetic depth. *Id.* at 6. Dr. Waisel opined

that the combination of factors presented by the shortcomings in Nevada's

execution protocol created a substantial risk of harm:

> In short, having inexpert executioners in an unfamiliar and suboptimal location performing an event they have not done before and have not had sufficient high-quality practice performing, using a novel unproven technique, creates a substantial risk for an error that causes substantial harm.

*Id.* at 3.

80.    Dr. David Greenblatt, who reviewed Nevada's June 2018 Protocol,

shares the same opinion as Dr. Waisel regarding the need for an appropriately

trained and qualified medical professional to assess the inmate's level of anesthetic

depth:

> [I]t is absolutely necessary that a current, active licensed physician, experienced with anesthesia or emergency medicine, be present during the procedure to, at minimum, direct and oversee the actions or performance of the other execution team members involved in carrying out the execution.

Ex. 128 at 28–29.

81.    Thus, Nevada's execution protocol is insufficient in that it does not

provide any assurance that the individual, even if he or she is a physician, is

adequately trained and professionally qualified to assess the condemned inmate's

anesthetic depth. This flaw in the protocol is exacerbated by the ambiguity

regarding the presence of an attending physician—as opposed to some undefined

"other medical personnel"—to monitor the anesthetic depth and to perform the

verbal and physical stimuli checks.

82.    In addition, the current protocol assigns to "Drug Administrators" the responsibility of injecting the drugs. Ex. 124 at 48. The protocol fails to set forth any minimal qualifications and experience required of the drug administrators, who are two members selected from the Execution "Security Team." *See* Ex. 126 at 23 (EM 103.03.A).

83.    Nevada's June 2021 protocol appears to provide for no more execution team training than that provided in the November 2017 and June 2018 protocols, with one exception. Both the June 2018 and June 2021 protocols contain a provision, in EM 110.02.B., stating that prior to the execution the Warden is to receive "practical training" in measuring and reporting the condemned inmate's level of consciousness and monitoring the IV sites for signs of compromise. Ex. 124 at 48; Ex. 133 at 4. Even with practical training, however, the Warden is not qualified to perform these tasks. Having unqualified personnel carrying out a lethal injection creates undue risk of harm and a botched execution.

### (4)    Risks presented by the execution chamber.

84.    The execution chamber at Ely State Prison has never been used before.[31] And its design was based on the execution chamber at San Quentin State Prison in California—also never used before and designed almost fifteen years ago. The maintenance and final design of Nevada's chamber is thus untested.

85.    In addition, the equipment to be used for the execution, if improperly selected, set up, or maintained, can contribute to unconstitutional pain and suffering. NDOC has not made public this information.

---

[31] Previous executions have occurred at Nevada State Prison in Carson City.

**(5)   Failure to provide right of access to
counsel and to the courts.**

86.    Nevada's 2021 execution protocol spells out various procedures and a
timeline for the day of the inmate's scheduled execution. Because the protocol only
allows for a visit by counsel after the inmate's last meal, after he has been provided
with a sedative drug, presumably chlorpromazine, and for an unknown duration of
time that may be terminated at the whim of NDOC staff (the "designated warden"),
Ex. 126 at 55 (EM 109.05.K), the protocol fails to ensure the condemned inmate
adequate access to counsel and to the courts on the day of the scheduled execution.
This includes a failure to clearly provide such access during the final hour or
minutes leading up to, and at the time of, Mr. Richardson's execution. And there is
no provision dealing with counsel's ability to contact the courts if necessary, before
or during the execution.

87.    Mr. Richardson's execution under Nevada's 2021 protocol, as explained
above, and as it continues to change at the whim of NDOC violates Mr. Richardson's
right to be free from cruel and unusual punishment and his rights under the federal
constitution. As Dr. Zivot opined:

> [w]he the NDOC execution plan is considered in total, the
> cause of death will very likely [be] by asphyxiation as a
> consequence of paralysis in a person in a state of agitated
> delirium, psychosis, and terror . . . .

Ex. 129 at 7.

### 3. Mr. Richardson's challenge to Nevada's lethal-injection scheme is cognizable.

88.    Mr. Richardson acknowledges this Court may also need to decide whether, and to what extent, a petitioner like him may raise constitutional challenges to a State's proposed lethal injection in a federal habeas proceeding, as opposed to an action arising under 42 U.S.C. § 1983. *See Payton*, 658 F.3d at 893 n.2. Though three recent challenges to lethal injection heard by the Supreme Court have arisen in the context of a Section 1983 action, *see Nelson v. Campbell*, 541 U.S. 637, 639 (2004); *Hill v. McDonough*, 547 U.S. 573, 576 (2006); *Glossip*, 576 U.S. at 867–68, those cases are not dispositive.

89.    In the earliest decided case, *Nelson*, the Supreme Court acknowledged, but did not resolve, "the difficult question of how to categorize method-of-execution claims generally," while noting circumstances where such challenges might fall within the purview of habeas corpus. *See Nelson*, 541 U.S. at 644–45. Two years later, the Court in *Hill* held that the petitioner could proceed in a Section 1983 action, where his complaint alleged theories that "would not necessarily prevent the State from executing him by lethal injection" and were therefore more akin to a "challenge to the circumstances of his confinement." *See Hill*, 547 U.S. at 579–80.

90.    The Ninth Circuit has provided no additional guidance on this issue. Habeas petitioners have twice claimed that California's lethal injection protocol is unconstitutional; both times the court dismissed the claim as unripe because California did not have a protocol in place. *See Andrews v. Davis*, 798 F.3d 759, 785 (9th Cir. 2015), opinion withdrawn and superseded on different grounds, 866 F.3d

994 (9th Cir. 2017); *Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011). The court in

*Payton* expressly reserved ruling whether any renewed challenge "should be by way

of habeas relief or through an action under 42 U.S.C. § 1983." *Payton*, 658 F.3d at

893 n.2. In addition, at least one sitting judge in this district, the Honorable Robert

C. Jones, has issued a Certificate of Appealability over the extent to which

challenges to lethal injection are recognizable in habeas proceedings. *Riley v.*

*McDaniel*, No. 3:01-CV-0096-RCJ-VPC, 2010 WL 3786070, at *60–61 (D. Nev. Sept.

20, 2010), *rev'd and remanded on other grounds*, 786 F.3d 719 (9th Cir. 2015).

91.    Finally, in *Adams v. Bradshaw*, 644 F.3d 481 (6th Cir. 2011) (per

curiam), the Sixth Circuit concluded that some challenges to lethal-injection

protocols could be raised in habeas petitions, based on then-existing Supreme Court

authority:

> [n]owhere in *Hill* or *Nelson* does the Supreme Court state
> that a method-of-execution challenge is not cognizable in
> habeas or that a federal court "lacks jurisdiction" to
> adjudicate such a claim in a habeas action. Whereas it is
> true that certain claims that can be raised in a federal
> habeas petition cannot be raised in a § 1983 action, it does
> not necessarily follow that any claim that can be raised in
> a § 1983 action cannot be raised in a habeas petition.
> Moreover, *Hill* can be distinguished from this case on the
> basis that Adams has not conceded the existence of an
> acceptable alternative procedure. *See* 547 U.S. at 580.
> Thus, Adams's lethal-injection claim, if successful, could
> render his death sentence effectively invalid. Further,
> Nelson's Statement that "method-of-execution challenges[]
> fall at the margins of habeas," 541 U.S. at 646, strongly
> suggests that claims such as Adams's can be brought in
> habeas.

*Adams*, 644 F.3d at 483 (internal citations omitted; alteration in original). On this basis, the court denied the state's motion to dismiss the petitioner's habeas claim and remanded for factual development of his lethal-injection claim. *Id.*

92.   After *Adams*, the Supreme Court decided *Glossip*, in which a bare majority of the Court upheld the district court's denial of a preliminary injunction enjoining the use of Oklahoma's then-existing lethal injection protocol in an action brought under Section 1983. *Glossip*, 576 U.S. at 878–93. Along the way, the *Glossip* majority interpreted *Hill* as holding "that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Glossip*, 576 U.S. at 879–80 (citing *Hill*, 547 U.S. at 579–80). But this statement is not dispositive on whether and under what circumstances a petitioner may bring a lethal-injection challenge in habeas. Addressing the effect of *Glossip* on its prior decision in *Adams*, the Sixth Circuit adhered to its prior holding that some claims challenging lethal injection are cognizable in habeas:

> [n]otwithstanding the warden's assertion that a method-of-execution challenge can only be brought in a § 1983 action under *Hill* . . . , Adams can bring this claim in a § 2254 proceeding. As the warden submits, *Glossip* stated that *Hill* "held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Glossip*, 135 S. Ct. at 2738. As we observed in [*Adams I*], however, Adams's case is distinguishable from that presented in *Hill* because at least some of Adams's claims, if successful, would bar his execution, and Adams does not concede that lethal injection can be administered in a constitutional manner. *Cf. Hill*, 547 U.S. at 580.

*Adams v. Bradshaw*, 817 F.3d 284 (6th Cir. 2016).

368

93. The Nevada Supreme Court recently reiterated that lethal injection challenges are not cognizable in state habeas actions in *Nevada Department of Corrections v. Eighth Judicial Dist. Court*, Nos. 74679, 74722, 2018 WL 2272873, *2 (Nev. May 10, 2018) (unpublished order) (hereafter NDOC). In that case, petitioner Scott Dozier brought a lethal injection challenge in connection with a postconviction petition for writ of habeas corpus. And although the state district court granted an injunction and ordered a stay of the execution, the Nevada Supreme Court reversed the district court on procedural grounds holding that the lower court abused its discretion in considering the challenge. The Nevada Supreme Court explained that "this court has clearly stated that an inmate may not litigate a challenge to the lethal injection protocol in a postconviction petition because it falls outside the relatively narrow statutory framework of NRS Chapter 34." *Id.* at *2.

94. As the Nevada Supreme Court has made clear, there is no mechanism in postconviction habeas for bringing a lethal injection challenge. Thus, such a claim cannot be procedurally defaulted, and this Court may address the merits of this claim.

## C.   The Death Penalty is Cruel and Unusual.

95. The death penalty is cruel and unusual under the Eighth Amendment to the United States Constitution because its application is rife with defects. See *Gregg v. Georgia*, 428 U.S. 153, 227 (1976) (Brennan, J., dissenting); *id.* at 231 (Marshall, J., dissenting); *Kennedy v. Louisiana*, 554 U.S. 407, 441 (2008) ("[C]apital punishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty:

369

retribution and deterrence of capital crimes”); *see also Glossip v. Gross*, 576 U.S. 863, 908–946 (2015) (Breyer, J., dissenting) (outlining lack of penological purpose, arbitrariness, and unreliable application of the death penalty).

96.     Evolving standards of decency mark the progress of a maturing society and have led to the recognition that killing as a means of punishment is always cruel. *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *see also Furman v. Georgia*, 408 U.S. 238, 312 (White, J., concurring).

97.     Popular sentiment has pushed the death penalty out of favor in the United States. As a result, the majority of U.S. states now prohibit the death penalty as punishment for any crime. *See* Death Penalty Information Center (DPIC), States With and Without the Death Penalty, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state (noting twenty-three states have abolished the death penalty, and three currently have a moratorium in place). The majority of the executions in the United States are carried out by merely five states. *See* DPIC, Executions by State and Region Since 1976, https://deathpenaltyinfo.org/executions/executions-overview/number-of-executions-by-state-and-region-since-1976. The annual number of executions has dropped from 85 per year in 2000 to only 11 in 2021. *Id*. The declining use of capital punishment signals that it is both cruel and unusual and fails to serve any legitimate penological purpose.

98.     Because the death-penalty scheme in Nevada is unconstitutional, Mr. Richardson’s death sentences must be vacated because such sentences are

1   prejudicial per se. To the extent that Mr. Richardson must show prejudice, the

2   scheme had a substantial and injurious effect on his penalty verdict.

3         **D.**    **Nevada's capital punishment scheme fails to adequately**
            **narrow the class of defendants eligible for the death**

4               **penalty.**

5       99.   A capital sentencing scheme must "genuinely narrow the class of

6   persons eligible for the death penalty and must reasonably justify the imposition of

7   a more severe sentence on the defendant compared to others found guilty of

8   murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988); *see also Zant v. Stephens*,

9   462 U.S. 862, 877 (1983). The Supreme Court requires that the death penalty be

10  reserved for only the most heinous of offenses and, to ensure that goal, has insisted

11  that states employ procedures that narrow its application. *See Kennedy v.*

12  *Louisiana*, 554 U.S. 407 (2008):

13            For these reasons, we have explained that capital
          punishment must be limited to those offenders who commit

14            'a narrow category of the most serious crimes' and whose
          extreme culpability makes them 'the most deserving of

15            execution.' *Roper* [*v. Simmons*, 543 U.S. 551] at 568 [2005]
          (quoting *Atkins* [*v. Virginia*] 536 U.S. 304] at 319 [2002]

16            Though the death penalty is not invariably
          unconstitutional, (citation omitted), the Court insists upon

17            confining the instances in which the punishment can be
          imposed.

18  554 U.S. at 420; *see also Glossip v. Gross*, 576 U.S. 863, 916 (2015) (J. Breyer,

19  dissenting) (observing that since reinstatement of the death penalty in 1976, the

20  Supreme Court has sought to make imposition of capital punishment less arbitrary

21  by restricting its use to the "worst of the worst").

22

23

100.   A state legislature may sufficiently narrow the class of defendants eligible for the death penalty by setting forth clear, narrowly defined capital offenses, or by using aggravating factors applied at the sentencing phase to narrow broad definitions of capital offenses. *Id*. at 246. Once eligibility for the death sentence is established by one of these two mechanisms, the sentencing jury may decide whether to actually impose a sentence of death. *California v. Ramos*, 463 U.S. 992, 1008 (1983) ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment").

101.   Nevada's capital sentencing scheme fails to meet the constitutional requirement of sufficiently narrowing the class of defendants eligible for the death penalty because Nevada defines capital offenses broadly and then attempts to narrow the class of murders eligible for death by the use of statutory aggravators. Nev. Rev. Stat. §200.033. Unfortunately the aggravating factors set forth by the legislature are effectively a dragnet for all first-degree murders. In Nevada, first-degree murder is defined by nineteen acts, including felony murder based on eleven predicate felonies and their attempt. Nev. Rev. Stat. § 200.030(1)(a)–(e). A defendant convicted of first-degree murder is eligible for the death penalty if at least one aggravating factor is found. Nev. Rev. Stat. § 220.030(4)(a). The statutory language describing permissible aggravators is vast. *See* Nev. Rev. Stat. § 200.033 *et. seq.* Given the large number of statutory aggravating circumstances, it is highly

probable that an aggravator may be charged in addition to the predicate murder or predicate felony murder. *See McConnell v. State*, 102 P.3d 606, 624 (Nev. 2004).

102. The statutory death penalty scheme in Nevada is unconstitutional because it does not *genuinely* narrow the class of death eligible defendants and allows capital sentencing that is arbitrary and capricious. *Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Jurek v. Texas*, 428 U.S. 262, 271 (1976); *Hidalgo v. Arizona*, 138 S. Ct. 1054, 1057 (2018) (Breyer, J., statement respecting denial of certiorari). The result of which is that Nevada has one of the highest populations of death-row inmates per capita in the nation. *See Death Sentencing Rates*, Death Penalty Information Center, http://deathpenaltyinfo.org/death-sentences-capita-state (last visited September 21, 2022).

103. Because the death-penalty scheme in Nevada does not properly narrow the class of those who are eligible it is unconstitutional and any sentence that is a result of such an unconstitutional scheme is prejudicial *per se*. To the extent that Mr. Richardson must show prejudice, the scheme had a substantial and injurious effect on the verdict.

**E. Executive clemency is effectively unavailable in Nevada.**

104. Mr. Richardson's sentence of death is invalid because Nevada fails to provide a meaningful mechanism by which capital defendants may seek clemency.

105. Executive clemency is an essential safeguard in a capital punishment scheme, and each state which utilizes capital punishment includes a provision for executive clemency. *Ohio Adult Parole Authority v. Woodward*, 523 U.S. 272, 282 (1998). States which include executive clemency as part of their capital punishment

scheme must ensure that clemency procedures comport with due process. *Evitts v. Lucey*, 469 U.S. 387, 401 (1985). Nevada's clemency statute, Nev. Rev. Stat. §§ 213.005–213.100, do not ensure that capital defendants receive due process. *See Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

106.    Nevada has only granted clemency to death sentenced prisoner on only one occasion, Thomas Nevius, in 2002. *See* American Bar Association Capital Clemency Resource Initiative, Nevada Capital Clemency Memorandum, May 17, 2017, https://www.capitalclemency.org/state-clemency-information/nevada/. Nevada's executive clemency board (Board), who ultimately grant or deny clemency, is composed of the governor, the justices of the Nevada Supreme Court, and the Nevada attorney general. Nev. Rev. Stat § 213.010. The justices of the Nevada Supreme Court have routinely ruled against Mr. Richardson, and the Nevada Attorney General has opposed all postconviction petitions Mr. Richardson has filed. It is clear that the clemency procedure in Nevada cannot comport with due process because the vast majority of the Board cannot be impartial arbiters. The Supreme Court has restated the importance of impartial proceedings following *Matthews*:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done. . .

374

*Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (internal citations and quotations omitted); *See also Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (". . .unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case.") Finally, the Board has failed to promulgate clear criteria by which to adjudicate clemency decisions. *See* Ex. 134. While the Board offers a broad outline of the clemency criteria, it fails to define the criteria or standards by which it conducts its review, fails to notice the parties as to which cases or types of cases the Board may consider in its review, and fails to establish procedures as to how such criteria may be evaluated. *See generally Harris By and Through Ramseyer v. Blodgett¸* 853 F.Supp. 1239, 1286–1290 (W.D. Wash. 1994). Because of glaring deficiencies in Nevada's clemency mechanism, no meaningful path to clemency exists for capital defendants.

107.   The failure to have a functioning clemency procedure makes Nevada's death penalty scheme unconstitutional, requiring the vacation of Mr. Richardson's sentence.

## F.   Nevada's death penalty scheme operates in an unconstitutionally arbitrary and capricious manner.

108.   The Nevada capital sentencing process permits juries to impose the death penalty for any first-degree murder accompanied by an aggravating circumstance. *See* Nev. Rev. Stat. § 200.303(4)(a). The statutory aggravating circumstances are so numerous and vague that they arguably exist in every first-degree murder case. *See* Nev. Rev. Stat. § 200.033. In addition, as a result of plea-

bargaining practices and the jury system in Nevada, defendants with offenses more aggravated than Mr. Richardson's have received sentences less than death.

109.    Because of this arbitrary and capricious application of the death penalty, it is unconstitutional under the Eighth Amendment.

**G.    The death penalty is excessive in Mr. Richardson's case.**

110.    Mr. Richardson's sentence of death is excessive given the facts in his case. The Nevada Supreme Court's vague and arbitrary review of Mr. Richardson's sentence of death violates both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The Nevada Supreme Court failed to apply the constitutional standards of the Due Process Clause.

111.    In *Gregg*, the Supreme Court held that to satisfy the strictures of the Eighth Amendment a sentence of death may not be disproportionate to the facts of the offense. *See Gregg v. Georgia,* 428 U.S. 153, 173 (1976). The Court in *Gregg* made clear that because of the unique, severe, and irrevocable nature of the death penalty, sentencing procedures which carried a "substantial risk" of arbitrariness were impermissible *Id.* at 188. To that end, the court-imposed limits on discretionary sentencing: "[w]here discretion is afforded to a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitable directed and limited…" *Id.* at 189. In *Zant*, the Supreme Court recognized mandatory appellate review as an important safeguard that worked hand in hand with statutory aggravating factors to limit the class of defendants eligible for the death penalty and ensure an individualized determination in each case. *Zant v. Stephens*, 462 U.S. 862, 875–876, 878–879

(1983). Death penalty schemes that incorporate mandatory appellate review must

conduct that review fairly and meaningfully in accordance with the Due Process

Clause. *Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("In short, when a state opts to act

in a field where its action has significant discretionary elements, it must

nonetheless act in accord with the dictates of the Constitution and, in particular, in

accordance with the Due Process Clause"); *accord Harris By and Through Ramseyer

v. Blodgett,* 853 F.Supp. 1239, 1286–1290 (W.D. Wash. 1994) (giving discussion of

constitutional requirements for mandatory appellate review).

112.    Mr. Richardson was convicted and sentenced to death on the thinnest

of evidence. In addition, the statutory aggravators upon which the State relied were

constitutionally infirm. *See* Claims Four(A), Fourteen, Fifteen, fully incorporated

herein.  Furthermore, Mr. Richardson's co-defendant, who admitted to the murders,

was given a lesser sentence. The Nevada Supreme Court failed to properly review

the record because of a lack of procedural safeguards, and allowed a grossly

excessive sentence to stand.

## H.    Elected Judges.

113.    Judges and justices in Nevada's court system are popularly elected and

thereby face the possibility of removal if they make a controversial or unpopular

decision. *See* Nev. Const. art. 6, §§ 3, 5. This method of selecting judges renders the

Nevada judiciary insufficiently impartial to preside over a capital case under the

Due Process Clause.

114.    In the common law tradition, English judges qualified to preside in

capital cases had tenure during good behavior. Almost a hundred years prior to the

377

adoption of the Constitution, in 1700, a provision requiring that "Judges' Commissions be made "*quamdiu se bene gesserint*"[32] was considered sufficiently important to be included in the Act of Settlement. *See* W. Stubbs, *Select Charters*, 531 (5th ed. 1884). The Framers of the Constitution saw fit to include the protection of tenure during good behavior of federal judges under Article III. *See Medina v. California*, 505 U.S. 437, 445-56 (1992) (understanding at the time of the adoption of the Constitution is the benchmark for the protection afforded by the Due Process Clause).

115.    Nevada law does not include any mechanism for insulating state judges and justices from majoritarian pressures which would affect the impartiality of a judge in a capital case. *Beets v. State*, 821 P.2d 1044, 1056–58 (Nev. 1991) (Young, J., dissenting) ("Nevada has a system of elected judges. If recent campaigns are an indication, any laxity toward a defendant in a homicide case would be serious, if not fatal, campaign liability"). The absence of such protections results in a denial of due process in capitals cases because elected judges face removal or the possibility of financially draining campaigns in the event of an unpopular ruling. *See* Legislative Comm'n Subcomm. to Study the Death Penalty and Related DNA Testing Tr., Feb. 21, 2002 (former Justice Rose noting that the lesson of election campaigns, involving allegation that justices of Supreme Court "wanted to give relief to a murderer and rapist," was "not lost on the judges in the State of  Nevada, and I have often heard it said by judges, 'a judge never lost his job by being tough on

---

[32] "As long as he shall behave himself well."

1   crime'"). The impartiality of judges implicates the fundamental fairness of the

2   proceeding as well as aspects of mandatory review under the Due Process clause.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Claim Fourteen: Actually Innocent of the Death Penalty**

Mr. Richardson's death sentence is invalid under the federal constitutional guarantees of due process, equal protection, a reliable sentence, and freedom from cruel and unusual punishments because the statutory aggravating circumstances found by the jury are constitutionally infirm. U.S. Const. V, VIII, XIV.

**Supporting Facts**

1.    At sentencing, the jury found two statutory aggravators, which made Mr. Richardson eligible for the death penalty. First, the robbery of a K-Mart store in Riverside California, following a guilty plea. Ex. 160, *see generally*, Cal Pen. Code § 211. Second, a prior conviction for rape and attempted sodomy following a military court-martial. Ex. 153; *see generally*, 10 U.S.C. §§ 920; 880. Each of these convictions are constitutionally infirm and may not be used as aggravators to enhance Mr. Richardson's conviction for first degree murder. Nev. Rev. Stat. § 200.033.

A.    **The California robbery conviction is constitutionally infirm and may not be used to enhance Mr. Richardson's conviction.**

1.    **The Due Process Clause prevents the State from using constitutionally infirm prior convictions as aggravators.**

2.    The Due Process Clause of the Fourteenth Amendment protects a defendant against arbitrary deprivation of his liberty by a state and entitles a defendant to procedural protections afforded by state law. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). The Nevada Supreme Court has held that a constitutionally infirm prior conviction may not be used to enhance a sentence. *Dressler v. State*, 819

P.2d 1288, 1295–96 (Nev. 1991) ("If a defendant can establish, by a preponderance of the evidence, that the prior conviction is constitutionally infirm, then that conviction may not be used to enhance the defendant's sentence"). The Unite States Supreme Court has held that counsel is ineffective for failing to competently advise a defendant about collateral matters, especially those matters which are "severe" and intimately tied to the criminal case at hand. *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (reversing denial of state postconviction relief for failure to advise defendant about deportation consequences of guilty plea). The State is therefore prohibited from using a prior conviction in which counsel was ineffective for failing to advise on collateral consequences of a plea as a statutory aggravator.

> **2.      Mr. Richardson's California robbery conviction is constitutionally infirm because counsel was ineffective for failing to advise him of collateral consequences.**

3.      On September 25, 2005, Mr. Richardson and Dehnart were arrested for robbing a K-Mart store in Riverside, California. At his arraignment on September 27, 2005, Public Defender Melainee Collins was appointed to represent Mr. Richardson. Ex. 154; Ex. 56 at 12. At the time of his arrest in Riverside, the Las Vegas Metropolitan Police (LVMPD) were actively investigating the murders of Feldman and Folker.

4.      Having found Dehnart's fingerprint at Feldman's residence during their investigation, LVMPD detectives traveled to Riverside, California, and interviewed both Mr. Richardson and Dehnart at the Riverside County Jail on September 27 and 28, 2005. 8/24/09 Tr. at 130–31. Based on conversations with the

detectives, there can be little doubt that Mr. Richardson knew he was under investigation for the murders of Feldman and Folker. By extension, because Public Defender Collins had been appointed by the court before the detectives interviewed Mr. Richardson, she should have been notified that law enforcement intended to speak with her client.

5.     During the pendency of Mr. Richardson's California robbery case, he attempted to bring the Las Vegas investigation to Collins's attention. *See, e.g.,* Claim Two(G), above, fully incorporated herein; Ex. 141 at 1 (where Mr. Richardson attempts to use the Las Vegas investigation to obtain a shorter sentence in California, Collins would have ultimately been involved). Collins told Mr. Richardson that he would have to address that case when he was ultimately returned to Nevada. Collins did not attempt to call the court, public defender, or special public defender in Clark County to ascertain the status of the investigation, or to ascertain the collateral consequences Mr. Richardson might face.

6.     There is no indication that Mr. Richardson was advised as to the severe collateral consequences he would face by pleading guilty to the robbery in California.[33] Ex. 56 at 5–7 (minutes of Mr. Richardson's plea do not indicate he was advised about collateral consequences); Ex. 160 at 1 (Mr. Richardson's plea form indicates he was only advised as to immigration consequences). As such, Collins

---

[33] As of the instant filing the undersigned are attempting to procure a copy of Mr. Richardson's file from the Riverside, California, Public Defender because current counsel believes the file contains evidence supporting this claim. However, the custodian of records at the Riverside County Public Defender Office has indicated that the file has been misplaced.

was ineffective under *Padilla*, and the State of Nevada may not rely on his robbery conviction to enhance his sentence because it is constitutionally infirm.

7.  To the extent that trial, appellate, or postconviction counsel should have raised this claim they were ineffective for their failure to prevent the State from using this conviction as a statutory aggravating circumstance.

**B.  Mr. Richardson's conviction in a military court-martial may not serve as a statutory aggravator.**

### 1.  The use of military court-martial verdicts as aggravators violates equal protection.

8.  The Sixth Amendment requires a unanimous verdict in all criminal convictions tried before a jury. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020). Nevada requires a unanimous jury verdict. Nev. Rev. Stat § 175.481. That requirement is congruous with Nevada's long-standing requirement that prior convictions used to enhance a sentence may not be constitutionally infirm. *Dressler v. State*, 819 P.2d 1288, 1295–96 (Nev. 1991).

9.  Military courts-martials do not require a unanimous verdict. *Ex Parte Quirin*, 317 U.S. 1, 40–41 (1942) (holding that exceptions concerning "land or naval forces" to Fifth Amendment are implied to the Sixth Amendment). The Uniform Code of Military Justice (UCMJ) does not require a unanimous jury verdict in non-capital courts-martial. 10 U.S.C. § 852(a)(3) (requiring a majority of three-fourths of the jury members present). In addition, court-martials are construed to be outside the scope of Article III adjudication and exempt from many protections generally afforded in civilian cases. *See Ex Parte Quirin*, 317 U.S. at 39 (noting that vicinage

requirements were incompatible with the realities of military service and military

tribunals were an institution historically separate from Article III courts).

10.     In addition, the makeup of a jury in a military court-martial

disadvantages enlisted soldiers, such as Mr. Richardson. The UCMJ states that no

member of the armed forces may be tried by another member junior in rank. 10

U.S.C. § 825(e)(1). This limitation on the jury pool follows from the requirement

that when an enlisted member is tried by court-martial, the membership of the jury

must be entirely officers, or upon request of the defendant, one third enlisted

members. 10 U.S.C. § 825(a)(2).

11.     The United States Manual for Court Martials (MCM) states that the

jury foreperson (referred to as the president of the court-martial) shall be the

"detailed member senior in rank." Manual for Courts-Martial § II-50–51 (U.S. Joint

Serv. Comm. on Mil. Just. 2019) (available at https://jsc.defense.gov/Portals/99/

Documents/2019%20MCM%20(Final)%20(20190108).pdf?ver=2019-01-11-115724-

610).

12.     This inherently skews the jury because any enlisted member of the

jury may defer to, or be reluctant to contradict, the decisions of a senior officer who

is the jury foreperson, or group of officers who make up the majority of the jury.

Rather than voting independently, the findings of the jury may be unduly

influenced by the rank of the officers present. Similarly, this arrangement affects

the decision of a defendant to be tried by a jury or by a military judge.

13.     The distinction between convictions in civilian courts and those in

courts-martial is stark: only in civilian courts are a defendant's rights under the

Fifth and Sixth Amendment fully protected. The result is that if the State of Nevada allows the use of convictions from both civilian courts and military court-martials under Nev. Rev. Stat. § 200.033 the statute violates equal protection. The statute creates two classes of first-degree murder defendants. First, those whose prior convictions were the result of a constitutionally sound process. Second, those whose prior conviction was not. This creates two groups of similarly situated defendants, one of which is not guaranteed the full protection of the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886); *Furman v. Georgia*, 408 U.S. 238, 249 (1972) (Douglas, J. concurring).

14.    Because a court-martial offers significantly fewer constitutional protections then that afforded by Nevada and the federal constitution—any resulting conviction cannot be used to enhance Mr. Richardson's first-degree murder conviction into a capital offense given that Mr. Richardson had no real choice—jury made up of mostly officers, which only requires a ¾ majority, or trial by judge.

15.    The invalidity of the statutory aggravating circumstances against Mr. Richardson demonstrates that he is actually innocent of the death penalty as he can show by clear and convincing evidence that no reasonable fact finder could have found him eligible for the death penalty consistent with state law. In the alternative, the invalidity of one or mor statutory aggravating circumstances had a substantial and injurious effect on the penalty verdicts.

16.     To the extent that trial, appellate, or postconviction counsel should have raised this claim they were ineffective for their failure to prevent the State from using this conviction as a statutory aggravating circumstance.

**Claim Fifteen: Preindictment Delay**

Mr. Richardson's convictions and death sentences are invalid under the federal constitutional guarantees of the right to speedy trial, due process, confrontation, effective assistance of counsel, equal protection, a fair trial, freedom from cruel and unusual punishment, and a reliable sentence because—during the time the State delayed in seeking an information/indictment—key evidence was destroyed and Mr. Richardson was convicted of a felony offense that was then used as an additional statutory aggravator. U.S. Const. amend. V, VI, VIII, and XIV.

**Supporting Facts**

1.     The lengthy delay between the filing of the initial complaint and bringing Mr. Richardson to Clark County, Nevada to face charges violated Mr. Richardson's constitutional right to a speedy trial and his Sixth Amendment right to counsel. *Doggett v. United States*, 505 U.S. 647, 649 (1992); *United States v. Gouveia*, 479 U.S. 180, 189 (1984).

2.     The Clark County District Attorney filed an initial complaint accusing Mr. Richardson and Robert Dehnart of first-degree murder on October 21, 2005. A warrant for the arrest of Dehnart and Mr. Richardson issued the same day. They were not brought before the Las Vegas Justice Court to be arraigned until February 28, 2007, despite the fact that law enforcement knew Dehnart and Mr. Richardson were being held in California.

**A.** **The preindictment delay violated Mr. Richardson's constitutional speedy trial rights.**

    **1.** **The length of the delay and the reason for the delay are attributable to the State.**

        **a)** **The State had all the necessary evidence to prosecute Mr. Richardson in 2005.**

3.     By the time the State filed the initial complaint on October 21, 2005, Las Vegas Metropolitan Police Department (LVMPD) detectives had already collected all of the relevant evidence necessary to prosecute Mr. Richardson. The LVMPD began their investigation into the murders of Folker and Feldman on September 10, 2005. 8/21/09 Tr. at 105. Detective McGrath discovered a receipt from Taco Bell in Feldman's home. 8/24/09 Tr. at 100. The receipt led detectives to a local Taco Bell, where they viewed and obtained a surveillance video. 8/24/09 Tr. at 113. The surveillance video showed Mr. Richardson, Dehnart, and Folker talking and purchasing items; and placed Mr. Richardson in Las Vegas on September 7, 2005, the day the State alleged the murders of Feldman and Folker occurred. 8/24/09 Tr. at 114, 117.

4.     In 2005, LVMPD detectives collected Folker's cell phone records, and discovered calls from a home in Riverside, California. 8/24/09 Tr. at 126. Detectives subsequently learned that Mr. Richardson and Kim Ross, Dehnart's mother, lived at that residence. 8/24/09 Tr. at 127.

5.     On September 18, 2005, Alice Maceo, a fingerprint analyst for the LVMPD, matched bloody fingerprints found at Feldman's trailer to Dehnhart. Ex. 156 at 2. Dehnart's fingerprints were contained in the California Department of

Justice database. Ex. 156; 8/26/09 Tr. at 228; 8/24/09 Tr. at 127. LVMPD detectives had little trouble locating Dehnart, and through him Mr. Richardson, because both men had been arrested for the robbery of a K-Mart store in Riverside, California on September 25, 2005, and were being held in pretrial detention at the Riverside County Jail. Ex. 154; Ex. 56 at 12.

6.     LVMPD Detectives Vaccaro and McGrath travelled to California and interviewed both Mr. Richardson and Dehnart at the Riverside County Jail on September 27 and 28, 2005. 8/24/2009 Tr. at 130–31. Dehnart gave statements to the detectives on both September 27 and 28, 2005. Exs. 27–28. In his statements to detectives, Dehnart exculpated himself and inculpated Mr. Richardson for the murders. Ex. 145 at 129–30. This statement became the basis for Dehnart's proffer and testimony against Mr. Richardson. Exs. 27–28.

7.     While in Riverside in September of 2005, LVMPD detectives executed a search warrant on Ross's home. 8/24/09 Tr. at 129. During the search, Detective Vaccaro found a photograph of Mr. Richardson wearing an Auto Club 500 hat, which he stated he saw at the crime scene. 8/24/09 Tr. at 159.

8.     On October 21, 2005, the Clark County District Attorney appeared *ex parte* in the Las Vegas Justice Court (Justice Court) before the Honorable Kathy Hardcastle. On that date, the State filed a complaint alleging Mr. Richardson's involvement in the murder of Folker and Feldman. Ex. 20. The State also requested an arrest warrant for Mr. Richardson and Dehnart, which the Justice Court issued. Ex. 157. Detective McGrath, whose declaration supported the warrant, did not include any evidence gathered after his September 28, 2005, interview with

Dehnart. *Id.* at 20–30. Likewise, Detective Vaccaro's affidavit, sworn to on April 5, 2007, to support the case's presentment to a grand jury does not allege any facts or evidence obtained after 2005. *See* Ex. 156.

**b)**      **Despite knowing his whereabouts, the State**
**failed to extradite Mr. Richardson.**

9.      The Justice Court docket indicates that neither Mr. Richardson nor Dehnart were in the custody of Clark County or the State of Nevada at the time the complaint was filed and the arrest warrant issued. Ex. 155 at 1–2; 3; 6–7. This is unsurprising because LVMPD detectives had interviewed them in Riverside, California, a few weeks earlier and knew they were being held for felony offense(s). Ex. 56 at 3; Ex. 160; 8/24/2009 Tr. at 130–31. With this knowledge, the State had the ability to check the status of Mr. Richardson's California case, and if he were still being detained it could learn where he was being detained. Ex. 56 at 12.

10.      While the Nevada warrant was active, Mr. Richardson's case in Riverside was continued twelve times at the request of Mr. Richardson's public defender, Melainee Collins, with no action on the part of the State to bring Mr. Richardson to Nevada. Ex. 56 at 7–12. On May 22, 2006, Mr. Richardson pleaded guilty to two counts of robbery with a deadly weapon enhancement. Ex. 56 at 7. Mr. Richardson was sentenced to five years incarceration on each robbery charge to run concurrently. Mr. Richardson was also sentenced to a term of one year for a single weapon enhancement, which was to run consecutively, for a total of six years. Ex. 160 at 2. Mr. Richardson was also given 243 days of jailtime credit. *See* Cal. Penal Code § 4019; Ex. 56 at 6. Mr. Richardson was then sent to North Kern State Prison

on June 6, 2006, and then to the California Correctional Center on August 9, 2006. Ex. 158 at 7, 11. Nevada took no action and did not seek to extradite Mr. Richardson until January 25, 2007. Ex. 160 at 23–29.

11.     Other than the detectives' visit to interview Mr. Richardson on September 28, 2005, Mr. Richardson never received any notice that the complaint against him had been filed. He was never served a copy of the warrant while he was incarcerated by the state of California, nor were extradition hearings held. Mr. Richardson did not know of the charges against him in Nevada until he was arraigned in the Las Vegas Justice Court in February 2007.

12.     Dehnart was brought before Las Vegas Justice Court on January 23, 2007. Ex. 155 at 7. However, Mr. Richardson was brought before Las Vegas Justice Court until February 27, 2007. Ex. 155 at 1. This hearing was continued until February 28, 2007, when the court appointed the Clark County Special Public Defender (SPD). *Id.*

### 2.     Key evidence bearing on Mr. Richardson's guilt was destroyed because of the delay.

13.     Mr. Richardson suffered severe prejudice because the destruction of evidence impaired his ability to mount a defense. Evidence in the form of photographs taken by the crime scene cleaners was destroyed before he was ever arraigned or appointed an attorney. *United States v. Agurs*, 427 U.S. 97, 109–10 *California v. Trombetta*, 467, U.S. 479, 488–89 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Because the State relied heavily on their own photographs of the same evidence, the defense was unable to contradict the State's theory.

### a) The State relied on their own crime scene photographs to place Mr. Richardson at the scene.

14.     The State relied on their own crime scene photographs of the Auto Club 500 hat to place Mr. Richardson at the crime scene. Detectives Vaccaro and McGrath testified that they observed the hat in a photograph at Ross's house, and that it was the same hat they observed in Feldman's home. Exs. 25–26; Ex. 147; 8/24/09 Tr. at 160. To positively place Mr. Richardson at the scene, the State had to demonstrate that the hat in the crime scene photograph was indeed Mr. Richardson's. Detectives McGrath and Vaccaro originally disagreed as to whether the crime scene photographs matched the photo taken from Ross's house. Detective McGrath testified:

> A.   As soon as Detective Vaccaro [sic] saw the photograph, he picked it up, and he showed it to me, and he said, this in the hat.
>
>                 . . . .
>
> Q.   What happened next?
>
> A.   I–I didn't make–I didn't know whether to believe him or not believe him that that was the hat.

8/24/09 Tr. at 160. Detective Vaccaro relied heavily on the crime scene photographs to identify the Auto Club 500 hat and put in extensive effort to convince Detective McGrath it was the same hat. 8/24/09 Tr. at 160.

15.     The photographs the LVMPD relied on at trial do not clearly show the brim or logo on the hat, and detective McGrath bolstered the credibility of the photo through his testimony. 8/24/09 Tr. at 163–66. The only piece of evidence which

392

might have disproved the authenticity of the hat were the photographs taken by the crime scene cleaning crew.

### b) The delay resulted in the destruction of additional, potentially exculpatory, photographs.

16. On September 16, 2005, shortly after the LVMPD had finished their investigation of Feldman's trailer, Nevada Crime Scene Cleaners, a local disposal and sanitation company, was hired to remove the furnishings, carpet, and effects from the affected areas of Feldman's home, and to disinfect the trailer. 8/21/09 Tr. at 220–24; Ex. 188. Bryant Gareth, the owner of Nevada Crime Scene Cleaners testified that he had cleaned Feldman's home and that all the materials removed were either taken to a landfill, or in the case of biologically contaminated items, incinerated on or about September 23, 2005. 8/21/09 Tr. at 219, 225–28.

17. There is little doubt that Nevada Crime Scene Cleaners produced a second full set of photographs of the crime scene before the contents of Feldman's trailer were destroyed. Gareth testified that his company's policy required the cleaning crew to digitally photograph every room before and after clean-up in case "the insurance company or anybody had any questions about it." 8/21/09 Tr. at 230.

18. The photographs taken by Nevada Crime Scene Cleaners would have included the Auto Club 500 hat detectives stated was in the room where Folker's body was found. *See* Exs. 25–26. The Auto Club 500 hat was key to the State's case because it was the only evidence linking Mr. Richardson to the crime scene. *See generally* Claim One.

19.    LVMPD did not collect the hat itself during the crime scene investigation and left it hanging on a bed frame in the trailer, to be destroyed by the crime scene cleaners. *See* Claim Seven. Unfortunately, the additional photographs taken by the cleaners, and which may have shed light on the authenticity of the hat, were never recovered by the defense because the company's policy dictated that the digital photographs be deleted after one year—a date that expired while Mr. Richardson was unrepresented and unaware of the charges against him. 8/21/09 Tr. at 230. If Mr. Richardson had access to cleaner's additional photographs, he would have been able to challenge the State's use of the crime scene photographs.

## B.    The preindictment delay violated Mr. Richardson's Sixth Amendment right to counsel.

### 1.    Mr. Richardson's Sixth Amendment right to counsel was violated because counsel was not appointed at the time the complaint was filed.

20.    Mr. Richardson's Sixth Amendment right to counsel attached when the State filed the complaint in the Las Vegas Justice Court on October 21, 2005. *United States v. Gouveia*, 479 U.S. 180, 189 (1984) ("the right to counsel attaches at the initiation of adversary proceedings . . . [because] the government has committed itself to prosecute"). The purpose of the Sixth Amendment right to counsel is to protect the defendant at critical stages of the case, including pretrial proceedings. *Id.* at 189. Capital cases are especially sensitive and require additional procedural safeguards. *See e.g., Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973) (strict procedural rules must give way when fundamental fairness requires).

21.     Mr. Richardson was not appointed counsel until February 28, 2007, more than 16 months after the State filed formal charges against him and solidified their intention to prosecute him. Ex. 155. In this capital case, the period following the conclusion of the State's investigation was critical. The State was well aware that Mr. Richardson was incarcerated in California facing additional charges and knew that any evidence left at the crime scene, after they released it to the family, would be destroyed. 8/24/09 Tr. at 163 (Detective McGrath recommended that Feldman's family use Nevada Crime Scene Cleaners to clean Feldman's home). Had Mr. Richardson been appointed counsel at the time the complaint was filed, his attorney could have intervened in both of these issues.

## 2.     Failure to appoint counsel prejudiced Mr. Richardson by creating an additional statutory aggravator.

22.     The delay was highly prejudicial because Mr. Richardson pleaded guilty to armed robbery in California while the State waited to extradite Mr. Richardson to Nevada. *See* Ex. 160. The State then used this California conviction as a statutory aggravator to make Mr. Richardson eligible for the death penalty in Nevada. *See Furman v. Georgia*, 408 U.S. 238, 249 (1972) (Douglas, J., concurring); Nev. Rev. Stat. § 200.033.

23.     At the time the complaint was filed in the Las Vegas Justice Court on October 21, 2005, Mr. Richardson had only proceeded through arraignment in California, and only had one conviction that the State could potentially use as a statutory aggravator. Ex. 153. However, by the time Mr. Richardson was brought to

Nevada to face his charges in February 2007, he had been adjudicated guilty in his California case and now presented with two statutory aggravators. Ex. 160.

24.     Because of the State's delay, and the failure to appoint counsel in a timely fashion, Nevada defense counsel could not contact Mr. Richardson's California attorney to ask California counsel to hold the California case in abeyance until Mr. Richardson was tried for his capital case in Nevada. As Mr. Richardson's Nevada attorneys stated—this is standard practice to avoid another statutory aggravator attaching to the capital case. Ex. 37 at 4; Ex. 38 at 3–4.

25.     To the extent that trial, appellate, or state postconviction counsel should have objected or raised this claim, they performed deficiently. Mr. Richardson was prejudiced by their failures and inactions as their failure resulted in a second crime of violence aggravator being added to the jury's consideration on whether they would impose a death sentence. But for their deficient performance, there is a reasonable probability of a more favorable result.

### 3.     Failure to appoint counsel prejudiced Mr. Richardson because key evidence was destroyed.

26.     Had Mr. Richardson been appointed counsel at the time the complaint was filed, his attorney could have begun an investigation and prevented the destruction of the additional, possibly exculpatory, crime scene photos taken by Nevada Crime Scene Cleaners.

27.     These errors were structural in nature. In the alternative these errors had a substantial and injurious effect on the verdict.

**Claim Sixteen: Appellate Counsel was Ineffective for Failing to Raise Meritorious Constitutional Claims.**

Richardson's convictions and death sentences are invalid under the federal constitutional guarantee of the right to due process, equal protection, a fair trial, freedom from cruel and unusual punishment, and the effective assistance of counsel, because appellate counsel was ineffective for failing to raise meritorious constitutional claims on direct appeal. U.S. Const. amends. V, VI, VIII, and XIV.

**Supporting Facts**

1. Mr. Richardson was denied his right to the effective assistance of appellate counsel due to appellate counsel's failure to raise substantial and cognizable federal constitutional issues, and appellate counsel's failure to raise all available grounds for relief on appeal. These substantial and cognizable constitutional issues are raised as claims in this petition, and Mr. Richardson incorporates by reference the factual allegations, allegations of prejudice, and arguments as if set forth here in full.

2. Specifically, direct appeal counsel was ineffective for failing to raise the following claims in whole or in part: Claim One(C); Claim Two(A)–(E), (F)(2), (G); Claim Five(A)(1)(b), (A)(5)(b); Claim Nine(F); Claim Ten(B)–(G); Claim Fourteen; and Claim Fifteen(B)(2).

3. There was no strategic reason designed to effectuate Mr. Richardson's best interest that would justify appellate counsel's failure to thoroughly review the record, and to fully assert and litigate these clearly meritorious claims on Mr. Richardson's behalf. Had appellate counsel raised these claims, there is a

397

reasonable probability that the Nevada Supreme Court would have reversed Mr. Richardson's convictions and death sentences, and/or ordered a new trial or, at a minimum, refined his sentence to something less than death.

**Claim Seventeen: The Cumulative Effect of the Errors Demonstrated in this Petition Deprived Mr. Richardson of a Fundamentally Fair Proceeding and Resulted in a Constitutionally Unreliable Guilt Determination**

Mr. Richardson's convictions and sentences of death are invalid under the federal constitutional guarantees of due process, equal protection, a fair trial, freedom from cruel and unusual punishment, and the effective assistance of counsel, because of cumulative error that distorted the factfinding process and rendered the guilt and penalty proceedings fundamentally unfair. U.S. Const. amends. V, VI, VIII, and XIV.

**Supporting Facts**

1. Each of the claims raised herein requires Mr. Richardson's convictions and sentences be vacated. Mr. Richardson incorporates each and every factual allegation contained in this petition as if fully set forth herein.

2. The cumulative effect of the errors demonstrated in this petition deprived Mr. Richardson of fundamentally fair proceedings and resulted in a constitutionally unreliable guilt and sentencing determination. Whether or not any individual error requires the vacation of his convictions and sentences, the totality of these errors and omissions resulted in substantial prejudice to Mr. Richardson.

3. Individually and cumulatively, these constitutional violations were prejudicial and substantially and injuriously affected the fairness of the guilt and penalty proceedings.

### PRAYER FOR RELIEF

For the reasons stated above, this Court should issue a writ of habeas corpus and vacate Thomas Richardson's conviction and death sentence.

Dated this 7th day of October, 2022.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ T. Kenneth Lee*
T. Kenneth Lee
Assistant Federal Public Defender

*/s/ Heather Fraley*
Heather Fraley
Assistant Federal Public Defender

*/s/ Lisa C. Brunner*
Lisa C. Brunner
Assistant Federal Public Defender

*/s/ Benjamin A. Gerson*
Benjamin A. Gerson
Assistant Federal Public Defender

400

1

## VERIFICATION

2      I declare under penalty of perjury under the laws of the United States of

3 America and the State of Nevada that the facts alleged in this petition are true and

4 correct to the best of counsel's knowledge, information, and belief.

5      Dated this 7th day of October, 2022.

6                                              _/s/ T. Kenneth Lee_____
                                              T. Kenneth Lee
7                                              Assistant Federal Public Defender

8                                              _/s/ Heather Fraley_____
                                              Heather Fraley
9                                              Assistant Federal Public Defender

10                                             _/s/ Lisa C. Brunner_____
                                              Lisa C. Brunner
11                                             Assistant Federal Public Defender

12                                             _/s/ Benjamin A. Gerson_____
                                              Benjamin A. Gerson
13                                             Assistant Federal Public Defender

14

15

16

17

18

19

20

21

22

23